1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

JOHNNY B. DELASHAW, JR.,

10                    Plaintiff,

11          v.

12

SEATTLE TIMES COMPANY, and
13   CHARLES COBBS,

14                    Defendants.

Case No.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE
WITH BUSINESS RELATIONSHIP AND/OR
EXPECTANCY, UNFAIR BUSINESS
PRACTICES IN VIOLATION OF RCW 19.86
ET SEQ. AND CIVIL CONSPIRACY

15

16                        **I.    INTRODUCTION**

17          1.      In early 2017, the Seattle Times (Times) published a series of sensational articles

18   attacking the quality of patient care at the Swedish Neurosurgical Institute (SNI), a practice group

19   within Swedish Health Services d/b/a Swedish Medical Group (Swedish), and accusing Dr. Johnny

20   Delashaw and other SNI surgeons of endangering patients by racing through surgeries in order to

make more money.
21

22          2.      These claims were false.  The main factual assertions in these articles, and the overall

23   thesis and message conveyed by the articles, were false, defamatory and caused serious damage to

24   the reputation and career of Dr. Johnny Delashaw, injured patients who needed his care, and

25   damaged the quality of health care in the Pacific Northwest.  The Times was in possession of highly

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 1

1  credible information demonstrating the falsity of its statements but chose to omit even a hint of the

2  compelling, documented facts showing that its claims about SNI and Dr. Delashaw were false.

3       3.     In its articles, the Times claimed that at the time of the articles and for many months

4  before them, Dr. Delashaw was paid based on the volume of surgeries he performed and that, for

5  this reason, Dr. Delashaw had neglected his patients by performing "concurrent surgeries."  The

6  term "concurrent surgeries" refers to a single lead surgeon running two surgeries at the same time,

7  leaving one operating room in mid-operation to go to another.  The article claimed that the result of

8  this practice was that the lead surgeon was absent from at least one if not both surgeries during

9  critical times, endangering patients.  The Times asserted that Dr. Delashaw was engaging in these

10  dangerous practices at the time of publication and for many months before and was placing patients

11  at risk.  The Times claimed that Dr. Delashaw's "concurrent surgery" practice included leaving the

12  operating room as soon as the patient was under anesthesia and then moving to the next operation,

13  resulting in increased complications and a general decline in the actual outcomes for patients treated

14  by Dr. Delashaw and other surgeons at SNI.

15      4.     Each of these claims is false.  The Times' claimed "motive" for the concurrent

16  surgeries alleged to be taking place during the period before the articles were published was that Dr.

17  Delashaw was paid based on volume.  But for nearly two years before the Times went to print, Dr.

18  Delashaw was on salary.  He had no financial incentive to increase his surgical volume.

19      5.     The claim that, because Dr. Delashaw was paid based on volume, "concurrent

20  surgeries" were taking place at SNI is also false.  There were no concurrent surgeries.  An extensive

21  Washington State Department of Health investigation that included scores of interviews of

22  knowledgeable witnesses found that the Times' claim that SNI was engaging in "concurrent

23  surgeries" was not true.

24      6.     The Times claimed that its "findings" were the product of an "investigation," but in

25

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 2

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

fact the Times' claims would not have survived an actual "investigation."[1]

7.     The Times had in its possession highly credible information from an eyewitness to hundreds of Dr. Delashaw's surgeries clearly showing that its claims were false, but the Times chose not even to acknowledge the existence of this information.  The Times' approach to its "investigation" was to omit any information that did not fit the accusations it was determined to make.

8.     The Times tried to bolster its basic thesis that Dr. Delashaw raced through concurrent surgeries, endangering patients, by also claiming that SNI had been experiencing poor patient outcomes when matched against comparable neurosurgical institutions.  But objective data show that, during the period covered by the Times articles, SNI maintained its standing as a high quality neurosurgical institution with outcomes and quality of care as good as, or better than, comparable institutions.  SNI achieved this high quality of care while expanding its volume of surgeries, which, in the case of Dr. Delashaw, involved many surgeries at the highest level of difficulty and risk.  The Times turned the truth—a major local neurosurgical achievement—into a malicious fiction.

9.     The Times committed the very sins it purported to uncover: in an effort to generate readers via sensational press, the Times sacrificed truth for accuracy, leveling catastrophic blows on Dr. Delashaw, his reputation, his finances, and his patients.  Dr. Delashaw, the medical community in Seattle, and patients here and across the country who needed (and still need) Dr. Delashaw's attention continue to suffer the consequences of the Times' knowingly false reporting.

## II.     PARTIES

10.     Plaintiff Dr. Johnny B. Delashaw, Jr., is a citizen of the state of Arizona, residing in

---

[1] Attached as Appendix A is a collection of eyewitness statements from the MQAC proceeding.  These include statements from 45 individuals based on their personal interactions with Dr. Delashaw.  These are representative of Dr. Delashaw's character and approach to patient care and also consistent with information that was provided to, but disregarded by, the Times' reporter before the Times' series went to print.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 3

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Sedona, Arizona.  Dr. Delashaw was employed at SNI from fall 2013 through March 1, 2017.

11.    Defendant Seattle Times Company is a privately owned business incorporated in Delaware with its primary place of business at 1000 Denny Way, Seattle, Washington, 98109.

12.    Defendant Dr. Charles Cobbs is a citizen of the state of Washington, residing in Mercer Island, Washington.  He is currently employed at SNI.

### III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs.

14.    This Court has personal jurisdiction over Defendants because each Defendant is licensed to and regularly does conduct business in Washington and the unlawful conduct alleged in this Complaint occurred in Washington.

15.    Venue is proper in the United State District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391(a) and (c).  Each Defendant has continuous and systematic contacts with this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS

A.    **Dr. Delashaw's Medical Credentials**

16.    Dr. Delashaw was raised in Longview, Washington.  He earned his Bachelor of Science degree in Biology with honors and distinction from Stanford University, and earned a medical degree from the University of Washington School of Medicine.  He completed his residency at the University of Virginia under Dr. John Jane, who was a world-renowned neurosurgeon, a President of the Society of Neurological Surgeons, and a close mentor of Dr. Delashaw until Dr. Jane's death in 2015.

17.    Immediately before going to SNI, Dr. Delashaw was the chief of neurological surgery

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 4

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

1   for University of California, Irvine Health, where he played an important role in building a facility

2   widely recognized for excellence in treating spine problems. He pioneered a national surgical

3   referral network for cranial disease. He served as Chairman of the Department of Neurological

4   Surgery at UC Irvine's School of Medicine.

5       18.     Before going to UC Irvine, Dr. Delashaw spent twenty years at Oregon Health &

6   Science University (OHSU), where he held the positions of chief of Neuro-Oncology and Skull Base

7   Surgery and professor of Neurological Surgery, Otolaryngology and Neurology. During his decades

8   at OHSU, Dr. Delashaw traveled once a week to see patients in his hometown of Longview,

9   Washington, where friends and neighbors still lived and in the town where his father had been a

10  doctor. He resumed this practice after joining SNI—weekly he and his staff drove five hours round

11  trip from Seattle to Longview, arriving in Longview at 8 a.m., where he saw patients all day before

12  driving back to Seattle and then, where necessary, arranged for treatment for his patients at SNI. Dr.

13  Delashaw also saw a need for improved neurosurgical treatment in remote areas of Alaska, opened

14  a clinic there, and while at SNI traveled there to see patients, and then arranged for patients in need

15  of surgery to be treated at SNI.

16      19.     At the beginning of his career, Dr. Delashaw served as the chief of Neurosurgery at

17  Gainesville Veteran's Administration Hospital, and later became an assistant professor of

18  Neurological Surgery at the University of Florida.

19      20.     In the spring of 2013, SNI set out to recruit Dr. Delashaw, who was then at UC Irvine,

20  because of his exceptional surgical skills, his recognition in the profession for those skills, and his

21  record of developing new highly effective surgical techniques. SNI was also very interested in the

22  wide referral base Dr. Delashaw enjoyed as a result of professional recognition of his skills and

23  methods.

24      21.     Dr. Delashaw initially declined SNI's offer but a few months later was persuaded to

25  accept, in part because of the unique opportunity SNI presented for new ways to achieve cures—

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

combining advanced surgical skills and surgical improvements with previously untapped technological advances. Seattle and SNI represented the potential to blend surgical innovation with technological innovation to cure the previously incurable.

22. SNI had begun in 2004 with the goal of developing into a cutting edge neurosurgical institution in the Pacific Northwest. Eight years later, in 2012, SNI and Swedish became part of Providence St. Joseph Health (Providence), a non-profit health care provider consisting of about 50 hospitals and hundreds of clinics in Washington, Alaska, California, Oregon, Montana, New Mexico, and Texas. In April 2013, Dr. Rod Hochman, the former CEO of Swedish, became President and CEO of Providence.

23. Providence's acquisition of Swedish immediately expanded SNI's referral network and potential patient base.

24. Providence and Swedish recruited Dr. Delashaw with the expectation that his considerable skills and the high regard in which he was held among other neurosurgeons would help to transform SNI into a mecca for advanced neurosurgery. Dr. Marc Mayberg, then the Co-Director of SNI, advocated recruiting Dr. Delashaw and helped to persuade him to come to Seattle.

25. Dr. Delashaw joined SNI in October 2013, and performed as expected. He was a major force in transforming SNI from a good community hospital into a nationally recognized center of neurosurgical excellence. Dr. Delashaw's reputation coupled with his referral base helped SNI to attract other top-flight surgeons. The resulting team increased SNI's capabilities and recognition, leading to increases in surgical patient volume and a high quality of care.

26. When SNI first offered Dr. Delashaw a position in about March 2013, he declined. Then, in May 2013, Dr. Mayberg renewed the effort. Dr. Mayberg told Dr. Delashaw that if he joined SNI, he would have a leadership role. Dr. Mayberg had just been diagnosed with cancer, believed he would probably need to step down as Co-Executive Director of SNI, and was interested in finding a highly qualified neurosurgeon capable of leading SNI.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 6

27.     Dr. Delashaw joined SNI in October 2013.

28.     After Dr. Delashaw's arrival, SNI expanded both its volume of work and its capabilities in large part as a result of Dr. Delashaw's reputation and hard work.  Dr. Delashaw attracted other highly qualified neurosurgeons to join SNI, expanding SNI's capabilities, which in turn led to increased referrals and increasing recognition of SNI as a center capable of handling the most difficult cases.

**B.      Dr. Delashaw Joined SNI at a Time of Significant Internal Change**

29.      The changes that accompanied, and in part resulted from, Dr. Delashaw's joining SNI created some turmoil among certain doctors, nurses, and staff who resented the loss of the more relaxed atmosphere they had previously enjoyed at a community hospital.  The affiliation with the health care giant Providence also created friction.  The increased pace and intensity of work that resulted from SNI's increased capabilities bothered some.  Dr. Delashaw gradually became aware of these personnel problems.

30.     Dr. Mayberg continued to be active and was recovering from his cancer. Dr. Mayberg's compensation at the time Dr. Delashaw joined SNI was based in part on a pooling system for Relative Value Units (RVUs)—meaning that revenue generated by other surgeons' work was allocated in part to Dr. Mayberg.  When Dr. Delashaw was made a Providence employee, it was unclear whether his RVUs would be added to the pool.  Dr. Mayberg wanted Dr. Delashaw's RVUs added to the pool, which would have redounded to Dr. Mayberg's financial benefit—i.e., he would receive financial credit for work done by Dr. Delashaw.

31.     Dr. Delashaw had a work ethic that was uncommon at SNI in the past though he was soon joined by others with a similar approach.  Dr. Delashaw had high energy, and worked intensely at his surgical practice, at pursuing his goals for SNI, at implementing new techniques, and at bringing in new, very capable surgeons.  Dr. Delashaw worked longer days and scheduled earlier surgeries than had previously been standard practice.  In the meantime, Dr. Mayberg was recovering

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

1  and had determined that he could maintain his leadership role, and took over sole leadership of SNI.

2  Dr. Mayberg's administrative salary combined with his surgery income (including his participation

3  in a compensation pool at SNI) yielded him a $1.16 million income even though he performed fewer

4  surgical procedures than many. The compensation pool allowed surgeons who were not actually

5  performing surgical work on a patient to be paid a portion of the fees generated by those who did

6  perform the surgeries.

7         32.     Dr. Mayberg had expected that Dr. Delashaw would bring SNI many additional

8  patients, but Dr. Mayberg did not take steps to prepare the hospital or its staff for increased volume.

9  This failure led to some staff resenting the changes in ways that might have been avoided with better

10 planning by Dr. Mayberg. This leadership failure aggravated the resentment some SNI personnel

11 felt over the increased pace of work.

12        33.     At the time of Dr. Delashaw's arrival at SNI in 2013, about five hospitals and seven

13 emergency rooms in greater Seattle were sending cases to SNI. During 2014, SNI was starting to

14 attract increasing numbers of patients from the Pacific Northwest, the greater West and to some

15 extent from across the United States. This trend continued into 2015 and 2016. Between 2010 and

16 2015, patient volume grew 66%.

17        34.     By 2016, SNI was the referral center for approximately forty hospitals across five

18 states in the Northwest region and, especially for very difficult cases, for hospitals in other regions.

19 This change was driven mainly by the high quality of SNI's work.

20        35.     SNI's patient volume increase was also driven by a sharp increase in the number of

21 other hospitals referring difficult cases to SNI—which was also in part the result of the exceptional

22 capabilities of SNI's surgeons. This growth was augmented by SNI's affiliation with Providence

23 and by the Affordable Care Act's extension of insurance coverage to a large new segment of sick

24 patients.

25        36.     By 2016, the vision that had led SNI to recruit Dr. Delashaw, and that had led Dr.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 8

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Delashaw to come to SNI, was being realized. The SNI achievement was part of a broader accomplishment brought about by some of Seattle's leading citizens and physicians to improve neuroscience techniques, to combine them with technological advances, and to communicate the results around the world. That commitment centered on SNI and also on the non-profit Seattle Science Foundation (SSF). In 2007, a handful of people who saw the potential to blend technology with neurosurgery formed SSF to advance collaboration between patient care providers and technologists. By 2016, SSF had grown to worldwide recognition both for its scientific/medical research and development work and for its extraordinary achievement in communicating new surgical techniques to skilled surgeons around the world. SSF had developed systems for transmitting real time demonstrations of surgical techniques to scores of surgeons in remote locations. Instead of a highly skilled (and needed) surgeon spending five days traveling round trip to (for example) Tokyo to demonstrate a new technique to half a dozen surgeons, the same person could spend a few hours performing the technique in Seattle while high-quality real-time video and audio were transmitted to Tokyo and other places around the world, observed by dozens of surgeons. It was this kind of opportunity to blend neurosurgical advances with technology that had persuaded Dr. Delashaw to leave Southern California and come to Seattle.

37. While Dr. Delashaw and others were working to modernize and expand SNI to become a nationally recognized center of neurosurgical excellence, some incumbent surgeons and staff, including Drs. Cobbs and Mayberg, felt marginalized because of their diminished roles.

38. During 2014, Swedish management had decided to end the pooling system for compensation and to adopt a compensation system based on a surgeon's own RVUs without any compensation pooling—meaning that Dr. Mayberg (and others) would no longer be paid for surgical care they did not deliver. Ending pooling had a number of benefits, including ensuring that physicians' compensation did not depend on a patient's ability pay, and also ensuring that surgeons received pay for what they did without having it siphoned off by surgeons who were not performing

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

the work. The change in compensation method was adopted and implemented by Swedish management, not by Dr. Delashaw, though he also believed it was best to align financial reward with high quality surgical work.

39. The end of pooling produced unfavorable financial results for Dr. Mayberg. He was no longer being paid for surgeries he did not perform. A parallel development also affected his compensation—a change in leadership.

40. In early 2014 at a meeting of surgeons at the Washington Athletic Club, it was reported that Swedish management was planning to change or end the existing medical directorships. The following month at a faculty meeting, Dr. Mayberg was questioned about how much he was drawing as an administrative salary. In mid-2014 Swedish management removed Dr. Mayberg as the medical director of SNI.

41. Between losing his position as medical director of SNI and the elimination of the pooling compensation system, Dr. Mayberg's annual compensation dropped from $1.16 million to about $360,000 (subject to his ability to increase it by doing more work). Dr. Mayberg associated both decisions with Dr. Delashaw even though both decisions were made by Swedish management.

42. Around this time, Dr. Mayberg and his longtime colleague, nurse Mary Fearon, former Director of Perioperative Services, began encouraging SNI nurses to file anonymous complaints against Dr. Delashaw, taking advantage of the resentment a few of the SNI staff, including nurses, felt as a result of the many changes in pace and intensity that accompanied SNI's transformation from a community hospital to a neurosurgical powerhouse.

43. In November 2014, Dr. Delashaw presented his strategic vision for SNI at a faculty meeting. Around a month later, in December and during a meeting at the Seattle Science Foundation, Providence / Swedish leadership informed SNI that Dr. Delashaw would assume the leadership role of Chairman of SNI, which he did on or about April of 2015. From that date forward—over 22 months before the Times articles—Dr. Delashaw was paid based on his SNI salary and did not

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 10

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

benefit financially from performing a large volume of surgeries.[2]  Although Dr. Mayberg remained at SNI, Mary Fearon left in May 2015 after being advised by Swedish management that she was being uncooperative in scheduling Dr. Delashaw's operating room time and that complaints she had recently had submitted about SNI were not credible.

44.	After he became Chairman, Dr. Delashaw took several actions to improve quality of care, transparency, and accountability.  Dr. Delashaw implemented more robust quality review processes designed to find and correct quality problems.  Dr. Delashaw routinely attended and presented at the specialty conferences at SNI, including the Tumor Board, Cerebrovascular Conference, Mortality and Morbidity Conference, and Grand Rounds.  Dr. Delashaw also established a formal Patient Outcome and Quality Review Committee in September 2015 to formalize the collection of detailed data on morbidity and mortality at SNI—i.e., to get objective data that would enable SNI to improve performance and results (which were already high).

45.	Dr. Delashaw also implemented a method of choosing the best aneurysm treatment for each patient—a method that was designed to be objective and to avoid any individual bias for "clipping" vs. "coiling," which could otherwise be influenced by the expertise a particular surgeon had for one method.  Instead, this plan called for each patient's case to be reviewed either by one surgeon who specialized in coiling and one who specialized in clipping, or by at least two surgeons, one of whom was proficient in both methods.

46.	With Dr. Delashaw's encouragement, SNI also hired Dr. Cameron McDougall, one of the country's leading authorities in aneurysm treatments.  Dr. Delashaw was not an advocate for a particular method of aneurysm treatment; he was an advocate of choosing the right aneurysm

_____

[2] Dr. Delashaw had been traveling regularly to Alaska to care for patients there and had been compensated on a per diem basis for doing so.  After he became Chairman in April 2015, he arranged for SNI to hire two surgeons to take his place.  Dr. Delashaw may have been paid a small sum after April 2015 for his Alaska work.

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

treatment.

47.    Dr. Delashaw also revamped the referral process so that general referrals—meaning referrals to SNI vs. referrals to individual surgeons—were allocated to the right surgeons equitably and openly.  The first step was to require that all general referrals—sometimes called "indirect" referrals—came to him as the leader, for distribution to the appropriate surgeon.  To assure complete objectivity, in July 2016, he assigned Dr. McDougall to preside over the allocation process, with the results published so that all of the neurosurgeons were aware of them.  This transparent practice is used at hospitals across the country, but, like some of the other reforms at SNI, it replaced an existing practice that allowed certain doctors to "cherry pick" referrals for their own benefit.  One of these doctors was Dr. Cobbs.

48.    When Dr. Cobbs joined SNI in August 2013 as the Director of SNI's Ivy Center for Advanced Brain Tumor Treatment, he thought that he should receive all brain tumor surgery referrals to SNI.  After the reform of the allocation process, Dr. Cobbs was not receiving all brain tumor referrals, and he grew unhappy about his compensation.  Even though Dr. Cobbs negotiated a $300,000 research incentive bonus with Dr. Delashaw, he objected to his compensation level and complained that the objective and transparent new referral system constituted "poaching patients."

49.    Dr. Cobbs associated Dr. Delashaw with his resentment over his compensation.  The new systems were in fact aligned with similar practices at other large hospitals, were designed to improve patient outcomes, and were based on objective, transparent criteria.  Like Dr. Mayberg, Dr. Cobbs had benefited financially from an inferior system and he resented the doctor who had properly used his authority to implement the improvements.

C.    **Dr. Mayberg and Dr. Cobbs Plot Their Attack on Dr. Delashaw**

50.    Drs. Mayberg and Cobbs made an agreement to implement a plan to destroy Dr. Delashaw's reputation in order to secure his termination, or at least his removal from his leadership role at SNI.  They did so because they resented their loss of income and authority—losses that

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 12

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

resulted from changes highly beneficial to patients. So they made a deal—a conspiracy—and set out to accuse Dr. Delashaw of endangering patients. This conspiracy is in writing, as are the plans for launching a series of attacks on Dr. Delashaw which included falsifying complaints, following a lawyer's advice on how best to induce SNI management to get rid of Dr. Delashaw, and, ultimately, led to lying under oath to conceal their activities.

51.    One of the Cobbs/Mayberg tactics was to abuse the SNI anonymous complaint system, which had been created to enable those with legitimate concerns to express them without fear of retaliation. In January 2016, Dr. Mayberg filled out an anonymous facilities complaint against SNI and sent it to the Department of Health from the Park Postal store in the Madison Park neighborhood of Seattle. The complaint asserted that numerous other complaints had been made anonymously about "inappropriate surgeries, increase in complications and infection rates, unsupervised surgery and critical care by neurosurgical fellows" and that "attempts to mitigate or resolve these issues have been unsuccessful" leading to "widespread resignations." These claims were fabricated by Dr. Mayberg. His anonymous complaint was investigated and evaluated by the Department of Health in July 2016. In its summary of findings and conclusions, the investigator found with respect to every allegation: "not substantiated due to lack of evidence."

52.    Much later, Dr. Mayberg sought to conceal that he was the author of the anonymous complaint. In May 2017, the Washington State Medical Quality Assurance Commission (MCAQ) suspended Dr. Delashaw's license to practice medicine. Dr. Mayberg had been highly instrumental in bringing about this suspension. In the MCAQ proceeding, Dr. Mayberg's deposition was taken by Dr. Delashaw's lawyer, who asked him about the anonymous complaint. Dr. Mayberg lied at his deposition of December 18, 2017. When he was directly asked, "Did you send that complaint in January 2016?" he stated, "I did not." After Dr. Mayberg was visited by the FBI and retained a lawyer with expertise in criminal matters, he, in a later deposition, testified that he had lied under oath on December 18, 2017, and admitted that he was the author of the complaint. Dr. Mayberg was

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 13

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

so committed to the course of action that he and Dr. Cobbs had adopted to destroy Dr. Delashaw that he committed perjury in order to sustain it and conceal his part in it.

53.     The abuse of complaints was not limited to Dr. Mayberg's anonymous January 2016 complaint.  In March 2016, in an anonymous complaint to the Medical Commission, a complainant said that on December 21, 2015, "Dr. Delashaw threw a phone at a nurse in the OR.  The phone was shattered.  The nurse involved was Trish Flett.  She was very upset at the incident.  Dr. Delashaw then went to the OR control desk and screamed at Deborah DesJardin-Rowland the charge nurse and threatened her job."   The Medical Commission began an investigation of this phone/yelling complaint, assigning it a low priority (Priority B).  This incident also was a fabrication:  the head of Human Resources at SNI and two doctors who had worked with Dr. Delashaw on the day in question signed sworn declarations that they had not witnessed Dr. Delashaw throw anything in the OR or yell at any of the staff, and were not aware of any reports of Dr. Delashaw throwing anything in the OR or yelling at any of the staff.

54.     Like Dr. Mayberg, Dr. Cobbs harbored resentment over compensation issues that underlay his actions against Dr. Delashaw.  In the fall of 2016, after learning that other surgeons did not have production caps in their contracts as he did, Dr. Cobbs attempted to renegotiate his compensation structure with the Swedish administration to enable him to make more money, but he failed.  Dr. Cobbs was still offended by the improved system for cranial referrals that led to a decline in his referrals.  In his own words, he decided to go "nuclear and kick the hornets nest," believing, as he stated, that Dr. Delashaw was responsible for the decline in his referral practice, and thus his income.

55.     Unaware of the plot swirling around him, Dr. Delashaw continued to work to improve and expand SNI.  On October 22, 2016, Swedish held its gala, raising over $6 million in fundraising for its various initiatives, many of which were driven by Dr. Delashaw and his cadre of surgeons. The event was a watershed moment for Dr. Delashaw and those working together to promote SNI to

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 14

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

the forefront of neurosurgery. While speaking at the event, Dr. Delashaw reminded SNI's supporters that its goal was nothing less than to cure paralysis. The evening reflected the significant achievements of SNI in the few years since Dr. Delashaw's arrival.

56.     As Dr. Delashaw solidified his leadership position, Drs. Cobbs and Mayberg and a few other disgruntled surgeons continued to conspire to bring him down and escalated their campaign against him. They lobbied other SNI surgeons to sign a letter of complaint against Dr. Delashaw. As part of the Mayberg/Cobbs conspiracy, Cobbs sought outside advice on the types of claims to make that would be best calculated to undermine the confidence of Swedish management in Dr. Delashaw. In an email dated November 1, 2016, Dr. Cobbs explained:

> I just spoke to a very experienced hospital administrator . . . . We need to change the tone of our letter. We need to minimize the focus on Johnny stealing cases and other gripes. . . . It will be critical to include (Providence CEO) Rod Hockman [sic] and Mike Butler in the letter. And, to [knock it] out of the park we need to send it to the Board of Providence

57.     In fact, Dr. Cobbs has stated that he never witnessed disruptive behavior by Dr. Delashaw in the operating room and had never reported him for safety concerns to the Department of Health. Dr. Cobbs' actual reasons for resenting Dr. Delashaw had to do with Dr. Cobbs' decreased income (for which Dr. Delashaw had no responsibility). But Dr. Cobbs heeded the advice of the hospital administrator to stop talking about what was really motivating him—money—and start inventing stories that would be troubling to SNI management.

58.     As part of his and Dr. Mayberg's refocused effort, Dr. Cobbs consulted a lawyer, who advised that the way to inflict maximum damage on Dr. Delashaw's standing at SNI and potentially have him removed was to generate the kinds of complaints that would worry Swedish management. On November 1, 2016, Dr. Cobbs wrote an email to Dr. Ryder Gwinn, Dr. Rod Oskouian, and Dr. Jens Chapman. In the email, Dr. Cobbs did not suggest that the problems identified actually existed, only that they were the types of complaints that would undermine Dr. Delashaw with SNI management:

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Hey guys I have an amazing attorney who's gonna look over the document. He's my best friend from college and was number one at Harvard Law school and he's also a really good friend of Ed Laws.[3] First of all he wants to make sure that that message I sent out from Ed Laws goes nowhere and I told him I would say that. Secondly I need someone to send me right now the latest version of the cover letter and the other stuff. He knows exactly what we are dealing with and **he said the critical issue is not necessarily what we believe is our complaints but what Will make the corporate people squirm. These types of things include evidence of workplace violation of intimidation, female stress, etc.** and even worse cover-up of any quality metrics etc. We need to get our act together make sure we have access to documentation of these types of issues. Please send me the latest version now and I will send it to him ASAP.

59.     In another e-mail sent a few hours later, Dr. Cobbs reiterated the plan of, first, identifying the kinds of issues that would worry management, and then cooking up allegations of such incidents:

The off the cuff response of my lawyer friend is we can cry all we want, but the administration may feel culpability and thus maintain a defensive posture. He said it's extremely important that we list things that are concrete violations of law such as work place discrimination, discrimination based on sex, suppression of quality control efforts, etc. He hasn't evaluated our letter yet but I'm hoping he can find concrete terms that we can list (1, 2, 3, etc) that are considered nuclear bombs to the administration [and] which will make them think carefully about pushing back.

60.     In short, Dr. Cobbs, with the help of a non-Swedish hospital administrator and a lawyer, started by identifying the kinds of complaints that would worry SNI management and then set about inventing them. Dr. Cobbs was hoping the lawyer could "find concrete terms that we can list" that are considered "nuclear bombs." The documents that Drs. Cobbs and Mayberg later generated were the product of this plan: find the accusations that will worry management and make those accusations—without regard to whether there was any truth to them.

61.     Over the coming weeks, Dr. Cobbs put the attorney's plan into action by repeatedly disparaging Dr. Delashaw in letters designed to make the Swedish "corporate people squirm." In these letters, he falsely stated that he was expressing the "unanimous" views of SNI's faculty and

---

[3] Ed Laws is the Director of the Pituitary and Neuroendocrine Center at Brigham and Women's Hospital.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 16

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

falsely accused Dr. Delashaw of endangering patient safety and harming SNI's financial condition. In a later deposition, when asked what he thought 'unanimous" meant Dr. Cobbs initially said it was more than fifty percent and then testified that "I don't know exactly what 'unanimous' means . . . ." In fact, Dr. Cobbs' fellow surgeons refused to sign the letter of so-called unanimous complaints and an SNI administrator has testified that the Cobbs' materials purporting to summarize the events at the meeting of surgeons are not accurate. But Dr. Cobbs persisted in widely distributing these false materials.

62.     Drs. Cobbs and Mayberg also continued to lobby their fellow neurosurgeons against Dr. Delashaw. Using their wives' e-mail accounts, they exchanged drafts of a "Game Plan" to achieve their goal of "accomplish[ing the] resignation of JD [Johnny Delashaw]." Their plan was not driven by concerns for patient safety but was designed to destroy Dr. Delashaw's reputation and his standing at SNI. Following the attorney's advice to try to develop claims that would make Swedish management "squirm," Drs. Cobbs and Mayberg urged their colleagues to join them in refusing to negotiate with Providence or with the other surgeons, in blocking discussion on issues that would not support their goal of removing Dr. Delashaw, and in taking whatever action would ensure that Dr. Delashaw would immediately lose all authority at SNI.

63.     These plans authored by Drs. Cobbs and Mayberg would also—once Dr. Delashaw was out of the way—have allowed them to advance their compensation and professional stature at SNI—the financial and professional ambitions that had motivated them to seek advice on how best to attack Dr. Delashaw.

64.     Drs. Cobbs and Mayberg saw the wisdom of concealing their actual (financial) motives for seeking Dr. Delashaw's removal. As Dr. Cobbs put it: "**if we look like we are doing this for greed it will make our case weaker.**" So Dr. Cobbs recommended instead laying out "**a clear case that we are doing this for the benefit of the common good and the Institute.**"

65.     On November 17, 2016, Dr. Cobbs broadcast his criticisms of Dr. Delashaw to

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Swedish executives and falsely stated that "[a]lmost all" of SNI neurosurgeons supported his views. This was false. Dr. Cobbs claimed that other surgeons had declined to sign his letter for fear of retaliation, but in fact they did not support it. Within a week, Dr. Cobbs' false report of a consensus on the (false) claims about Dr. Delashaw was sent to dozens of Swedish employees through an anonymous email sent from a Gmail account using the pseudonym jbartsolo@gmail.com. The email was calculated to make the corporate types squirm: its subject line was "Cherry Hill is not safe for patient care with Dr. Delashaw in a leadership role" and it demanded Dr. Delashaw's resignation while asserting that he had "all the hallmarks" of being a "high-functioning psychopath[]."

66. The Times reported these internal SNI communications that were obviously, and improperly, provided to the Times, and formed a cornerstone of its "investigation" of SNI.

**D. The Times Claimed that in an "Investigation" It Found that Dr. Delashaw and Others Were Engaging in "Concurrent Surgeries" and that Dr. Delashaw Was Neglecting and Endangering Patients because He Was Paid Based on Volume.**

67. Beginning on February 10, 2017, the Times published a series of articles accusing SNI in general, and Dr. Delashaw in particular, of endangering neurosurgical patients.

68. One such practice, according to the Times, was "concurrent surgeries." Concurrent surgeries are surgeries in which the critical portions of each operation occur simultaneously despite being led by the same doctor. The Times claimed that Dr. Delashaw was motivated to perform "concurrent surgeries" because he was paid on a piecework basis—the more surgeries he could perform in a day, the more money he made. The Times claimed that Dr. Delashaw's greedy pursuit of volume placed patient care in jeopardy.

69. Specifically, the Times published the following false and/or misleading statements in "The O.R. Factory," written by Mike Baker and Justin Mayo and published on February 10, 2017 (all emphasis added):

  a)  "The doctors in the neuroscience unit are incentivized to pursue a high-volume approach with contracts that **compensate them for large patient numbers** and complicated surgical techniques."

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

b) "In the past, the SNI surgeons pooled a portion of their pay and redistributed it among each other. It was a system designed to encourage doctors to pass along patients to their peers when they thought a co-worker might be a better specialist to handle the patient's procedure. In some surgical settings, all income is pooled this way."

c) ". . . Providence and Swedish had overhauled the way Cherry Hill's neuroscience program approaches the business of medicine, **enriching** the nonprofit institution **and its star surgeons**."

d) "The revised contracts at Cherry Hill's SNI program ended the pooling system, according to records and interviews. **Surgeons would be paid almost entirely on their production**, as measured by Relative Value Units, or RVUs."

e) **"The top two doctors—[including] Delashaw—each exceeded $75 million in billed charges**, almost $25 million more than the state's nearest brain and spine surgeon outside of the SNI group."

f) **"**But the **aggressive pursuit of more patients, more surgeries and more dollars** has undermined Providence's values—rooted in the non-profit's founding as a humble home where nuns served the poor—and **placed patient care in jeopardy, a Seattle Times investigation has found."**

g) "The hospital touts its star surgeons to draw patients from hundreds of miles away, but **six current and former staffers said** those doctors will sometimes **do little in the operating room once the patient is under anesthesia**. Instead, the surgeons will **leave less-experienced doctors** receiving specialized training to handle parts of a surgery. That allows the **primary surgeons to be in another operating room—a practice known as 'concurrent surgery'**—to maintain high volumes. It is not prohibited but can test the limits of Medicare rules."

70. In summary, the Times reported that its "investigation" had revealed that Dr. Delashaw and other "star surgeons" "**are incentivized**" to maximize volume because they are "paid almost entirely on their production" and that, for this reason, Dr. Delashaw and other surgeons were engaging in "**concurrent surgeries**" to increase volume and make more money. The Times reported that, in order to increase volume and thus income, Dr. Delashaw was leaving important surgical tasks to less experienced doctors—i.e., he and others "**do little in the operating room once the patient is under anesthesia**," leaving less experienced doctors to "handle parts of the surgery." The Times said that these alleged ongoing practices "placed patient care in jeopardy."

71. Each of these claims is false.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

72.     **Dr. Delashaw was on salary** during the majority of his time at SNI, including the approximately two-year period of rapidly increasing surgical volume ending when he resigned in early 2017.  The fundamental predicate for the Times' attack—volume-based compensation of Dr. Delashaw that was motivating him to race through surgeries endangering patients—was false.

73.     The Times published a chart in an effort to show that Dr. Delashaw's surgical volume rose as a result of the "aggressive pursuit of more patients, more surgeries and more dollars."  The chart shows that for the calendar year 2015 Dr. Delashaw had over $76 million in "billed charges," placing him among the "state's top six brain and spine surgeons" and meaning he brought in $25 million more than "the state's nearest brain and spine surgeon outside of the SNI group."  The chart was intended to establish high surgical volume resulting from being "paid almost entirely on [his] production," but it demonstrates the opposite.  Effective April 2015, Dr. Delashaw was placed on a fixed salary and assumed his duties as Chair of SNI's Neurosurgical Division.  For seventy-five percent of 2015 he had no financial incentive to work as hard as he did.  He remained on a fixed salary through 2016 and until his departure in 2017.  The chart shows that Dr. Delashaw worked very hard even though doing so did not increase his income.

74.     **There were no "concurrent surgeries."**  The Times knew that Dr. Delashaw did not engage in this practice.  Dr. Delashaw's colleague told the Times, and confirmed in writing, that he was a meticulous surgeon who performed every critical part of every operation himself—based on participating with him in hundreds of operations—but the Times disregarded this compelling information.

75.     The Washington State Department of Health later confirmed what Dr. Delashaw's colleague had told the Times:  concurrent surgeries did not happen.  The DOH investigated the Times' claims, interviewing 127 witnesses and publishing a 135-page report. The DOH found:

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

"In the concurrent surgeries, it was alleged the attending surgeon was not available or present during critical portions of the surgery. Concurrent surgeries by attending surgeons were not substantiated."[4]

76.     Finally, the claim that these non-existent practices placed patient care in jeopardy is false. SNI's surgical outcomes did not decline during Dr. Delashaw's tenure, even though its surgeons were performing the most difficult operations, as explained further in the next Section.

**E.     The Times Misrepresented Patient Outcomes as Poor When Objective Data the Times Had in Its Possession Showed that They Were Excellent**.

77.     The Times' repeatedly claimed that Dr. Delashaw's and other SNI top surgeons' use of "concurrent surgeries" (false) and premature departures from the operating room (false) in pursuit of more money (false) resulted in "endangering patients." Dr. Delashaw and other SNI surgeons took good care of their patients, and the results prove it.

78.     Instead of using the available relevant, reliable data, the Times published non-indicative data and twisted it to support its story. The Times claimed in "The OR Factory":

"Among 10 patient safety indicators published by the federal government, *Cherry Hill* ranked below national levels in three areas in the data through the middle of 2015: blood clots after surgery, collapsed lungs and serious complications."

"In benchmarks tracked by the federal government, *Cherry Hill* was flagged for having high rates of blood clots, collapsed lungs and serious surgical complications." (Emphasis added.)

79.     "Cherry Hill" refers to the location of several Swedish Hospital facilities and is often contrasted with "First Hill." The statistics the Times reported regarding "blood clots after surgery" and "serious complications" covered many Swedish facilities located on "Cherry Hill," including Medicine, the Intensive Care Unit, and the cardiovascular center. The Times cited these statistics as supporting its claim that Dr. Delashaw and other SNI surgeons were "endangering" patients at SNI, using data that did not reflect SNI's outcomes.

---

[4] 2017 Investigative Report, On-Site State and Federal Hospital Investigation, Swedish Medical Center-Cherry Hill, ("Investigative Report") at 10 (Aug. 7, 2017).

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

80.     According to data relating to SNI's performance generated by a national firm on which hospitals across the country rely—Premier Quality Advisor (Premier)—SNI's outcomes were better than institutions of comparable size across the United States. Premier analyzes and benchmarks patient outcomes using information from 3,750 major hospitals and closely monitors, records and compares mortality and other factors. SNI's numbers during the relevant period, as calculated by Premier, show consistently excellent patient outcomes compared to its peer institutions.

81.     For example, Premier uses its extensive database to set an expected mortality rate— that is, the mortality rate one can anticipate from "normal" competent care. This expected mortality rate is then compared to the actual rate at a particular facility such as SNI. The comparison is called an "Observed/Expected" (O/E) ratio, which describes how the actual (observed) rate compares to the norm (expected). An O/E mortality rate of one means the actual mortality rate was the same as the expected mortality rate. Less than one means the performance was better than expected.

82.     Specific to SNI, the objective data covering more than 2,800 cases confirms that their patient outcomes were *better* than expected using the national benchmark data. For example, for SNI cranial and spinal cases generally, as well as for Dr. Delashaw specifically, the Observed/Expected mortality rate was below one—meaning mortality was at a lower rate than expected for the procedures in question.

83.     The DOH also investigated the Times' claims that patients were endangered in connection with SNI's expansion and found no basis for them. The DOH carefully assessed outcomes during the period of expansion and determined that patient outcomes remained excellent (all emphasis added):

"A review of the quality data for the Swedish Neurosciences Institute from 2012 – 2017 **did not reveal an increase in surgical complications and infections**. The

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 22

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

quality data was obtained from the electronic medical record and **benchmarked externally**."[5]

 "A review of medical records of hospital deaths for patients undergoing spine and/or cranial surgery in 2014 and 2015 was undertaken. **This did not reveal any patterns or trends regarding quality of care**."[6]

84.     According to the DOH findings, SNI maintained a high quality of patient care while undergoing a major increase in patient referrals from other hospitals and other increases in the number and complexity of neurosurgical procedures.  The objective facts are the opposite of the Times' claims.

**F.     The Seattle Times Misrepresented the Reasons for and Results of SNI's Expansion**.

85.     The Times' claims that Dr. Delashaw was paid based on volume and as a result had delivered shoddy patient care were false.  But the Times did not simply misrepresent what occurred; it misrepresented the motivation for and the results of the SNI expansion—and in the process it also completely missed the real SNI story while inflicting massive damage to the results that had been achieved and the people who achieved them.

86.     As set forth above, SNI recruited Dr. Delashaw in an effort to realize the full potential of SNI—which was to become a mecca for outstanding neurosurgery.  One goal was to join forces with SSF and take advantage of its depth in technological expertise.

87.     Dr. Delashaw's part of this effort included bringing his own exceptional skills to bear while also helping to recruit the very best surgeons from all over the United States to Seattle and to SNI.  Part of the lure—the same lure that brought Dr. Delashaw to SNI in 2013—was the opportunity to participate in revolutionizing neurosurgical care by working with outstanding surgeons and with

[5] Investigative Report, at 4.

[6] Investigative Report, at 4.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 23

Seattle's tech community on cures that surgery alone cannot achieve, and having the opportunity to communicate new techniques around the world using the facilities of SSF.

88.     The volume of surgical work at SNI rose steeply in 2014 through 2016. This increase did not cause any decline in excellent care; it occurred largely *because* of excellent care combined with technological advances, expansion of operating spaces, and a resulting increase in referrals. By 2016, SNI was attracting referrals from ten times the number of hospitals that were referring tough cases to SNI before Dr. Delashaw arrived. Dr. Delashaw and his colleagues were in the midst of achieving the goal that had attracted him to Seattle and, at the gala in October 2016, raised over $6 million to continue SNI's growth and depth.

89.     A key part of the expansion was to attract very capable surgeons. For example, before 2013, SNI had one open aneurysm surgeon and two interventional practitioners. By the summer of 2016, SNI had on staff two open aneurysm surgeons, two interventional practitioners, and two neurosurgeons versed in both techniques. This increase in numbers was also an increase in depth: there were more surgeons who were skilled in each of the two major techniques, making it easier to match a patient's condition with the right surgeon.

90.     Other reasons for the increase in SNI's surgical volume included Providence Health & Services' acquisition of Swedish Medical Center in 2011, which broadened SNI's referral base significantly. By 2016, SNI was the referral center for hospitals across five states in the Northwest. A third factor leading to volume increase was the Affordable Care Act, which brought patients to SNI who had previously been untreated, leading to an influx of cases made more challenging by prior neglect.

91.     The truth about SNI expansion is the opposite of the Times' reporting: the real SNI story is one of remarkable achievement. Its increased volume of difficult neurosurgical cases resulted mainly from high—not low—quality. The Times' claims of greed-driven volumes resulting in patient neglect are not simply false; the truth is precisely the opposite. But the Times' false

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

reporting has severely undermined an achievement in high-quality neurosurgical care that was of great value to the Puget Sound region and the western United States.

**G.  The Times Falsely Claimed that the Pursuit of "More Dollars" "Placed Patient Care in Jeopardy" because of "Massive Caseloads" and Excess Burdens on Staff, Including "20-Hour Days."**

92.     The Times reported:

"[T]he **aggressive pursuit of more patients, more surgeries and more dollars" resulted in "massive caseloads" for "medical staffers from the operating room to the intensive-care unit [which has] forced some nurses at Cherry Hill to be on duty for 20 hours in a day**. . . . It's not uncommon to see some nurses who support Cherry Hill's operating-room work 20 hours in a 24-hour period, said Knapp, **despite research showing that long shifts can lead to more mistakes."**

93.     These Times' claims were false.  The Department of Health investigated them, interviewing 127 witnesses, and found **"<u>no evidence</u> that staff worked beyond their scheduled hours or that staffing levels were below recommended staffing guidelines."**[7]

**H.      The Times Falsely Claimed that Dr. Delashaw Engaged in Unnecessary Surgical Procedures and did so to Increase his Income.**

94.     The Times cited data from Dr. Delashaw's time at UC Irvine and SNI as evidence that he performed the clipping procedure to generate profit.

95.     The Times reported:

a)      "When Delashaw moved to the Cherry Hill hospital in Seattle, that campus jumped from 36 percent of cases getting a clip in 2012 to 57 percent in 2014. The statewide average remained under 40 percent during that same time."

b)      "A Seattle Times analysis of patient data shows dramatic shifts in aneurysm treatment as Delashaw moved between jobs. Before his 2012 arrival at UC Irvine, the university's medical center performed clipping surgery in only about 13 percent of cases.  After Delashaw's arrival, 62 percent of aneurysm patients undergoing treatment at Irvine received a clip — the highest rate among California hospitals who had at least 20 aneurysm cases, according to state data analyzed by The Times."

---

[7] Investigative Report, at 6 (emphasis added).

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

96.     When Dr. Delashaw arrived at UC Irvine, a number of aneurysm referrals followed him and he performed approximately 60 clipping procedures in his first few months, which were completed with a mortality rate of 0%. The Times omitted this information, which demonstrates the complete falsity of the claim that, under Dr. Delashaw, the choice of aneurysm treatments was driven by profit rather than by patient care.

97.     The Times extensively described the clipping procedure for aneurysms and repeatedly stated or implied that the clipping procedure was unnecessarily invasive and/or was performed because it was more costly and would line the pockets of the surgeons. The Times made no effort to find out or report to its readers on the reasons that clipping is often the best treatment for particular patients, and avoided any mention of the objective system SNI had instituted to make sure that the right procedure was chosen for each patient.

98.     One important factor in choosing clipping is that it is less likely than coiling to require further treatment at a later time. SNI's patient base was geographically widespread and included remote areas of Alaska. After arriving at SNI, Dr. Delashaw contracted with the Alaska Native Tribal Health Consortium, traveled to and worked in Alaska, and developed a strong referral base in Alaska. For a patient with an aneurysm that requires follow-up, as coiling often does, avoiding multiple arduous trips from Alaska to Seattle can be a life-saving factor in itself. For these far-flung patients, the clipping procedure was often the right choice for that reason alone.

99.     Dr. Delashaw also established a procedure at SNI that was designed to ensure that the choice of treatment for every aneurysm was reviewed by at least two doctors, including one surgeon capable of clipping and another capable of coiling—in short, the purpose of the system was to ensure that two surgeons with combined expertise in each method made the initial decision regarding which treatment was more appropriate for each patient. In addition, all non-emergent aneurysms (e.g. non-ruptured) were reviewed at a weekly stroke conference attended by SNI faculty (including fellows) which determined the best course of care. In addition, under Dr. Delashaw's

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

leadership, SNI hired Dr. Cameron McDougall, an acknowledged expert in aneurysm treatment who specialized in coiling.

100. Instead of reporting the truth, which was that Dr. Delashaw led a concerted effort to assure rigorous and objective treatment choices for aneurysms, the Times printed a falsehood:

> "[Interventional neuro-radiologist Dr. Joe] Eskridge said he and Newell [a surgeon who handled many aneurysm clippings] often discussed aneurysms to assess whether the patient would have better results with a clip or coil procedure. . . . 'Delashaw never did that,' said Eskridge . . . ."

Dr. Delashaw went beyond "discussing" the treatment choice; he implemented a rigorous system for making the best choice in each case.

## I. The Main Claims the Times Made in Its Articles Were False and the Conclusions the Times Presented Were Based on Claims the Times Knew Were False.

101. A fundamental falsehood in the Times articles about Swedish hospital was the claim that its reporting resulted from an "investigation." It did not. No investigation would have failed to uncover that in the period on which the articles focused Dr. Delashaw was not pursuing "more surgeries, more dollars" because he was paid based on volume; he was not. A request for his contract—or a simple question—would have shown that during the nearly two years preceding publication of the Times' articles, Dr. Delashaw was on salary. The Times also deliberately ignored and withheld from its articles highly reliable information showing that no "concurrent surgeries" were taking place at SNI—as the DOH later determined—but instead falsely reported that Dr. Delashaw (and others) were making brief appearances in the OR and then leaving for another 'concurrent" surgery once the patient was under anesthesia.

102. This claim was refuted by Dr. Prashant Kelkar. Before publishing the first article, the Times interviewed Dr. Kelkar, a neurosurgeon and fellow at SNI who had worked with Dr. Delashaw in the operating room at SNI hundreds of times. After the interview, Dr. Kelkar followed up by sending an e-mail to Mr. Baker of the Times recapping elements of the interview to make sure that

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 27

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Mr. Baker understood the information Dr. Kelkar had given to him. Dr. Kelkar wrote to Mr. Baker on February 6, 2017, as follows:

> I never had an experience over hundreds of surgeries I performed with him [Dr. Delashaw] that he was anything but respectful, courteous and cognizant of his actions and comments in the OR with nurses/surgical techs/anesthesiologists/residents/fellows. He is a well-liked surgeon from every interaction I was a part of.
>
> Dr. Delashaw is a caring, compassionate physician who enjoys practicing neurosurgery and takes pride in being "the best" and having good outcomes.
>
> In my experience over hundreds of surgeries with Dr. Delashaw, he was scrubbed and actively engaged in the critical part of every surgery without fail.
>
> There was never an instance where he was unavailable or immediately not present for any surgery.
>
> We clarified that the main surgeons including myself operating with Dr. Delashaw were highly trained Board Eligible Neurosurgeons at the time. This is a fact that you were not aware of till today.
>
> I believe Dr. Delashaw came to SNI well intentioned to grow and develop a Neurosciences program beyond the ability of the faculty that was there at the time. His success certainly leads to scrutiny by others around him, whether that be due to jealousy, anger, greed, change, or other. Each instance in medicine where I see someone of power get scrutinized there is always two sides to the story and my ask of you is that you not ruin a good man's career to write a "sexier" story. Please feel free to call me at any time for any further follow up.

103. There is no mention of either the interview or the letter in the Times' article; instead, the Times wrote only: "Another former fellow, Dr. Prashant Kelkar, said Delashaw always came in a timely fashion." Dr. Kelkar and other neurosurgeons provided Mr. Baker with first-hand accounts of personal observations of Dr. Delashaw that uniformly and directly contradicted the main assertions in the Times' articles. Before the Times went to press, it had been advised by the doctors who actually operated with Dr. Delashaw that he was always present for the critical portions of surgeries, that he was invariably responsible in his patient care, and that there was no factual support for the claims of problematic behavior. After speaking with these doctors, the Times' reporters

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 28

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

knew, or should have known, that they had been provided "misinformation and bad data" by their sources.

104.    In the wake of these attacks, Dr. Delashaw was unable to focus on patient care, so he resigned from Swedish at the end of February 2017.

105.    The false accusations filed against Dr. Delashaw had led to a "Priority B" (low priority) MQAC investigation starting in March 2016.  Over six months later, on October 7, 2016, a panel of the Medical Commission had authorized only a summary "restriction" of Dr. Delashaw's license.  As part of the MQAC investigation, SNI had provided statements from surgical fellows and the head of human resources that showed that the phone-throwing claim was false.  As soon as the Times articles came out on February 10, 2017, MQAC did an about face on its low-priority, careful approach to the unsupported claims against Dr. Delashaw.  In response to the Times article, State Senator Karen Keiser pressured the MQAC to take swift action.  The MQAC's investigator Stephen Correa had interviewed the surgeons identified in the newspaper article.  Those surgeons admitted that they had never seen any disruptive behavior by Dr. Delashaw.  But under pressure from Senator Keiser and in the politically charged environment the Times articles had created, MQAC proceeded to suspend Dr. Delashaw's medical license on the basis that he posed an "immediate risk to the public health and safety" despite the fact that he was no longer practicing.  In short, based on the very same evidence that had led to months of inaction followed by a mere restriction of Dr. Delashaw's license, suddenly, in direct response to the Times' articles and with no further investigation, Dr. Delashaw was deprived of his license to practice medicine.

106.    Discovery in the MQAC proceeding has revealed that Dr. Cobbs and Dr. Mayberg conspired to damage Dr. Delashaw's reputation and standing in order to effect his removal from his position at SNI; that they intentionally violated their obligations to Swedish in this effort to displace Dr. Delashaw so that they could improve their own professional and financial opportunities; that they did so using their wives' personal email accounts to avoid detection of their conspiracy; and

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 29

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

that they lied in order to cover up their actions and committed other abuses of their discovery obligations in the MQAC proceeding in furtherance of their conspiracy, including making knowingly false statements under oath, and withholding hundreds of pages of documents that evidenced a concerted effort to destroy Dr. Delashaw.

107.    The Times' false claims and the Cobbs/Mayberg conspiracy have destroyed Dr. Delashaw's career and have led directly to an unjustified suspension of his license, which has led to serious "collateral damage." Dr. Delashaw has a unique skill level in certain kinds of neurosurgical procedures and patients with conditions few can treat who need continuing care. He has patients in Longview, Washington, who need his help, for which there is no substitute.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION: DEFAMATION – LIBEL
### (AGAINST THE TIMES)

108.    Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

109.    On February 10, 2017, and in subsequent articles, the Times published multiple false statements defaming the character, motivations, and quality of medical care provided by Dr. Johnny Delashaw.

110.    Those statements were unprivileged.

111.    The Times actually knew or, in the exercise of reasonable care, should have known, that its statements were false or would create a false impression in a material respect.

112.    Dr. Delashaw is not a public figure. The controversy and his role in it were manufactured by the Times in an attempt to increase its readership and advertising revenue; to the extent that Dr. Delashaw subsequently participated in the controversy, he was forced to do so by the Times' defamatory statements and the public firestorm they were calculated to create. The Times also acted with malice; the Times knew the defamatory statements were false, or acted with reckless

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

disregard for their falsity, when it published them. The Times has continued to publish the false statements on its website despite its knowledge that the Department of Health investigation reached conclusions that flatly contradict the Times' reports about Dr. Delashaw.

113.    The Times' false statements impugned Dr. Delashaw's professional reputation and caused him significant professional injury.

114.    The Times' abuse of its role as the community's newspaper of record has proximately caused and continues to cause massive damage to Dr. Delashaw, including but not limited to extreme reputational harm and loss of employment opportunities.

**SECOND CAUSE OF ACTION: DEFAMATION BY IMPLICATION
(AGAINST THE TIMES)**

115.    Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

116.    The Times' "watch dog" series about SNI, beginning with the article, "The O.R. Factory," taken as a whole, created the false impression that Dr. Delashaw was driven by greed to maximize his income by performing unnecessary surgeries; that he abandoned patients during surgery in violation of his professional obligations; and that he presided over an "O.R. Factory" that harmed patients. The Times created this false impression by publishing multiple false statements about Dr. Delashaw and in part by omitting material facts that were contrary to the Times' desired story line.

117.    The Times' articles, read holistically, created the blatantly false implication that Dr. Delashaw posed a threat to the very patients he sought to help and the equally false implication that he should be removed from his leadership position at SNI.

118.    The Times' articles, read holistically, created the demonstrably false implication that patient-care outcomes declined during Dr. Delashaw's tenure at SNI. The Times omitted material facts that were contrary to its objective of demonizing Dr. Delashaw, including but not

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

limited to the fact that health outcomes during Dr. Delashaw's tenure at SNI did not decline; that Dr. Delashaw's income was not tied to his surgery volume during the two-year period on which the Times articles focus; that he never engaged in "concurrent surgeries"; and that he implemented a process to assure that treatments for patients, including aneurysm treatments, were chosen objectively in the best interests of the patient.

119.    The Times' false statements were unprivileged.

120.    The Times knew or, in the exercise of reasonable care, should have known that its statements were false or would create a false impression in a material respect.

121.    Dr. Delashaw is not a public figure. The controversy and his role in it were manufactured by The Times; Dr. Delashaw's subsequent participation in the controversy was the result of a controversy created by the Times' proliferation of its defamatory statements.

122.    The Times acted with malice in its false statements and in its omission of material facts because the Times knew the statements it made were false or incomplete, or it exercised so little care in ascertaining the facts that its conduct was reckless and without regard for the truth.

123.    The Times' conduct has proximately caused and continues to cause massive damage to Dr. Delashaw, including but not limited to extreme reputational harm and loss of employment opportunities.

### THIRD CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP AND/OR EXPECTANCY
### (AGAINST THE TIMES)

124.    Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

125.    At the time of the conduct at issue, Dr. Delashaw had a business relationship with Swedish Health Services d/b/a Swedish Medical Group and had a business expectancy arising from his vast referral base, which extended to the entire United States and to other countries. The referral

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 32

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

base consisted of scores if not hundreds of physicians, clinics and hospitals who knew of and respected Dr. Delashaw's exceptional capabilities, devotion to patients, and work ethic, and who referred neurosurgical patients to him, including those with the most challenging neurosurgical problems. But for Defendants' conduct, Dr. Delashaw's business relationship with Swedish Health Services would have continued, and his referral base would have continued to operate as it had for decades, resulting in a steady and very substantial source of patients requiring Dr. Delashaw's skills.

126.  The Times knew of Dr. Delashaw's relationship with Swedish Health Services and of the value, reliability, and importance of his referral base.

127.  The Times intentionally induced or caused the termination of these business relationships and expectancies through its repeated publication of false and defamatory statements about Dr. Delashaw.

128.  The Times' interference was for an improper purpose—to generate a public scandal in order to promote readership of the Times' "watch dog" series—and was accomplished through improper means, including publication of knowingly false and defamatory statements about Dr. Delashaw.

129.  The Times' conduct was a proximate cause of damages to Dr. Delashaw.

**FOURTH CAUSE OF ACTION: UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW 19.86 ET SEQ.
(AGAINST THE TIMES)**

130.  Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

131.  In its quest to generate a controversy, the Times deceived its readers and the general public. The Times touted its "watch dog" series as the product of a thorough independent investigation when, in fact, it was not the result of an investigation but was designed to create a scandal about a local hospital. The Times deceived its readers by failing to disclose the actual facts regarding the subject matter of its report, including the fact (known by the Times) that a primary

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 33

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

source, Dr. Mayberg, acted with a fundamental conflict of interest throughout all of his interactions with the Times. The Times published deceptive statements regarding Dr. Delashaw and promoted its false reports through its website, newspaper, and social media as part of a multimedia marketing strategy in order to maximize the controversy to attract readers to its website to increase its revenue, and the Times' false reports remain available today on internet sites across the world.

132. The Times' deceptive acts occurred in trade or commerce. The Times' disparagement of Dr. Delashaw was a key component of its multi-media marketing strategy to increase the Times' revenue and notoriety.

133. The Times' publication of the false articles is a betrayal of its readers' trust and profoundly affected the public interest by damaging health care in Seattle. The Times' false reporting has the capacity to deceive (and did deceive) a substantial portion of the public. The Times' deceptive acts have resulted in damage to Dr. Delashaw's reputation, including the unprecedented summary suspension of his medical license in the wake of the Times' articles. The Times' false reporting has prevented sick individuals from receiving medical care from Dr. Delashaw and has damaged the quality of health care available in the Seattle area.

**FIFTH CAUSE OF ACTION: DEFAMATION – LIBEL**
**(AGAINST COBBS)**

134. Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

135. Throughout 2016, Dr. Cobbs made multiple false statements, both directly and by implication, defaming the character, motivations, and quality of medical care provided by Dr. Johnny Delashaw.

136. Those statements were unprivileged.

137. Dr. Cobbs actually knew or, in the exercise of reasonable care, should have known that his statements were false or would create a false impression in a material respect.

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 34

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

138.     Dr. Delashaw is not a public figure. The controversy and his role in it were manufactured by Defendants' conduct; Dr. Delashaw's subsequent participation and role in the controversy were a forced response to the Times' defamatory statements and the publication of Dr. Cobbs' defamatory statements.  Dr. Cobbs also acted with malice; he knew that his statements about Dr. Delashaw were false, or acted with reckless disregard for their falsity, when he made them.

139.     Dr. Cobbs' false statements impugned Dr. Delashaw's professional reputation and caused him significant professional injury.

140.     Dr. Cobbs' conduct has proximately caused and continues to cause damage to Dr. Delashaw, including but not limited to extreme reputational harm and loss of employment opportunities.

### SIXTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP AND/OR EXPECTANCY (AGAINST COBBS)

141.     Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

142.     At the time of the conduct at issue, Dr. Delashaw had a business relationship with Swedish Health Services d/b/a Swedish Medical Group and had a business expectancy arising from his vast referral base, which extended to the entire United States and to other countries.  The referral base consisted of scores if not hundreds of physicians, clinics and hospitals who knew of and respected Dr. Delashaw's exceptional capabilities, devotion to patients, and work ethic, and who referred neurosurgical patients to him, including those with the most challenging neurosurgical problems.  But for Defendants' conduct, Dr. Delashaw's business relationship with Swedish Health Services would have continued, and his referral base would have continued to operate as it had for decades, resulting in a steady and very substantial source of patients requiring Dr. Delashaw's skills.

143.     Dr. Cobbs knew of Dr. Delashaw's relationship with Swedish Health Services and his referral base.

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

144.     Dr. Cobbs intentionally induced or caused the termination of these business relationships and expectancies through his campaign to undermine Dr. Delashaw's reputation.

145.     Dr. Cobbs' interference was for an improper purpose—specifically to promote the ouster of and otherwise inflict harm on Dr. Delashaw—and was accomplished through improper means, including defamation and Dr. Cobbs' violation of his obligations to Swedish.

146.     Dr. Cobbs' conduct was a proximate cause of damages to Dr. Delashaw.

### SEVENTH CAUSE OF ACTION: CIVIL CONSPIRACY
### (AGAINST COBBS)

147.     Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1–107 as if stated herein.

148.     As alleged in detail above, Dr. Cobbs and Dr. Mayberg acted in concert to destroy Dr. Delashaw's reputation and career at SNI by defaming him; tortiously interfering with Dr. Delashaw's business relationship with Swedish Health Services, and his business expectancy from referrals; and through other unlawful means.

149.     Dr. Cobbs and Dr. Mayberg entered into an agreement to accomplish the conspiracy to destroy Dr. Delashaw's reputation and career and worked in concert to do so.

150.     Dr. Cobbs and Dr. Mayberg acted on each other's behalf in furtherance of the conspiracy.

151.     Dr. Cobbs' and Dr. Mayberg's conspiracy was the proximate cause of harm to Dr. Delashaw, including the destruction of his professional reputation and other damages.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

# VI. PRAYER FOR RELIEF

In light of the foregoing, Dr. Delashaw prays for the following:

1.     An order enjoining the Times from publishing false statements about Dr. Delashaw and requiring that it remove the false statements about Dr. Delashaw from its website and publish a retraction;

2.     An order enjoining Dr. Cobbs from making false statements about Dr. Delashaw;

3.     Monetary damages in an amount to be proven at trial, including an award of prejudgment interest in an amount to be proven at trial;

4.     Reasonable costs, disbursements, attorney's fees, and prejudgment interest on all liquidated costs and expenses of litigation and additional taxes resulting from the payment to Plaintiff of all of the foregoing; and

5.     Any such further relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED this 11th day of April, 2018.

HARRIGAN LEYH FARMER & THOMSEN LLP

By: _s/ Arthur W. Harrigan, Jr._
    Arthur W. Harrigan, Jr., WSBA #1751

By: _s/ Tyler L. Farmer_
    Tyler L. Farmer, WSBA #39912

    Arthur W. Harrigan, Jr., WSBA #1751
    Tyler L. Farmer, WSBA #39912
    999 Third Avenue, Suite 4400
    Seattle, WA 98104
    Tel:   (206) 623-1700
    Fax:   (206) 623-8717
    Email: arthurh@harriganleyh.com
    Email: tylerf@harriganleyh.com

***Attorneys for Johnny B. Delashaw, Jr.***

COMPLAINT FOR LIBEL, DEFAMATION BY
IMPLICATION, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIP AND/OR EXPECTANCY,
UNFAIR BUSINESS PRACTICES IN VIOLATION OF RCW
19.86 ET SEQ. AND CIVIL CONSPIRACY - 37

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700 FAX (206) 623-8717

Appendix A

| | | | |
|---|---|---|---|
| 1. | Attachment | 1 | Declaration of June Altaras |
| 2. | Attachment | 2 | Letter of Cary & Andrea Balogh |
| 3. | Attachment | 3 | Letter of Shelby Balogh |
| 4. | Attachment | 4 | Declaration of Scott Baumer |
| 5. | Attachment | 5 | Letter of Lenora Bjorkquist |
| 6. | Attachment | 6 | Letter of Matthew Lorne Brown |
| 7. | Attachment | 7 | Letter of Lisa Byram |
| 8. | Attachment | 8 | Letter of Jonathan Carlson, MD |
| 9. | Attachment | 9 | Letter of Parthasarathi Chamiraju |
| 10. | Attachment | 10 | Declaration of Justin Cetas, MD |
| 11. | Attachment | 11 | Letter of Vince Chan, MD |
| 12. | Attachment | 12 | Letter of Aurora S. Cruz, MD |
| 13. | Attachment | 13 | Declaration of Johnny Delashaw, MD |
| 14. | Attachment | 14 | Letter from Aclan Dogan, MD |
| 15. | Attachment | 15 | Declaration of Laureen Driscoll |
| 16. | Attachment | 16 | Email of Laura Floodeen, RN, BSN, OCN |
| 17. | Attachment | 17 | Declaration of Seymur Gahramanov, MD |
| 18. | Attachment | 18 | Declaration of Sandra Gilcher-Kimmel |
| 19. | Attachment | 19 | Email of Stephen G. Giles, MSPAC, PhD |
| 20. | Attachment | 20 | Email of Robert Hart, MD |
| 21. | Attachment | 21 | Email of Frank Hsu |
| 22. | Attachment | 22 | Email of Christopher Hubbard |
| 23. | Attachment | 23 | Declaration of Patricia Hudson (previously submitted) |
| 24. | Attachment | 24 | Supplemental Declaration of Patricia Hudson |
| 25. | Attachment | 25 | Letter of Matt Hunt and associate fellows |
| 26. | Attachment | 26 | Declaration of Joseph Keen, MD |
| 27. | Attachment | 27 | Letter of Prashant Kelkar, D.O. |
| 28. | Attachment | 28 | Email of Leah Kilmer |
| 29. | Attachment | 29 | Declaration of Richard A. Kirkpatrick, MD |
| 30. | Attachment | 30 | Declaration of Daniel Klinger (previously submitted) |
| 31. | Attachment | 31 | Email of KJ Larsen |
| 32. | Attachment | 32 | Declaration of Zachary Litvack, MD |
| 33. | Attachment | 33 | Letter of Amitoz S. Manhas |
| 34. | Attachment | 34 | Letter of Sean O. McMenomey, MD |
| 35. | Attachment | 35 | Declaration of Marc Moisi, MD |
| 36. | Attachment | 36 | Declaration of Adrienne Oden |
| 37. | Attachment | 37 | Letter of Rod J. Oskouian, Jr, MD |
| 38. | Attachment | 38 | Declaration of Akshal Patel, MD |
| 39. | Attachment | 39 | Declaration of Kevin Reinard, MD (previously submitted) |
| 40. | Attachment | 40 | Email from Julie Rissberger |
| 41. | Attachment | 41 | Letter from Craig Roosendaal |
| 42. | Attachment | 42 | Declaration of Jayson Sack, MD |
| 43. | Attachment | 43 | Email of Courtney Spackman |
| 44. | Attachment | 44 | Letter of Jeffrey M. Stubblefield |
| 45. | Attachment | 45 | Letter of Wayne Summers |
| 46. | Attachment | 46 | Letter of Todd Welch, MD |

\* Personal Information has been redacted

ATTACHMENT 1

STATE OF WASHINGTON
DEPARTMENT OF HEALTH
MEDICAL QUALITY ASSURANCE COMMISSION

|  |  |
|---|---|
| In the Matter of: | Master Case No. M2016-1094 |
| Johnny B. Delashaw, M.D. | DECLARATION OF JUNE ALTARAS |
| Respondent. | |

I, June Altaras, declare as follows:

1.    I am over the age of 18 years, I am competent to testify, and have personal knowledge of the matters set forth herein.

2.    I obtained my bachelor's degree of science in nursing and my master's degree in nursing from the University of Washington, and I am currently on the faculty at University of Washington School of Nursing.   I have worked in healthcare for 31 years, both as a clinical nurse, and in nursing and hospital administration.   I have over three decades of experience in nursing leadership.

3.    I joined Swedish in 1986. I became the Chief Nursing Officer at Swedish Health Services in 2012, a role which I held until 2015. In addition to the Chief Nursing Officer role, in 2013 I was appointed Chief Operating Officer for Swedish Seattle, from 2013 to 2015.   In January 2015, I became the Swedish Seattle Chief Executive, the title of which position changed in 2017 to Swedish Health Services Chief Operating Officer/Chief Administrative Officer.

4.    As a nursing leader, I work to empower nurses on my teams to take ownership and leadership in their work, to improve patient outcomes, and to improve their work environments.  In 2015, UW Bothell named me as the 2015 Distinguished Alumnus of the Year. In 2016, Seattle Magazine named me as their Outstanding Health Care Executive for the Puget Sound Region.  As stated by Seattle Magazine, this award honors champions for change who are compassionate visionaries who believe in better patient care.

5.     Beginning in 2014-15, the leadership and health care providers at Swedish Neuroscience Institute (SNI) started to transition SNI from a community-based hospital service line, to a world renowned 24 hours a day, 7 days a week neuroscience institute.

6.     As SNI grew, the neurosurgeons and staff were able to take on more patients, and there was an increased workload for the nursing staff at SNI. There was also a change in leadership. Dr. Marc Mayberg and Dr. David Newell stepped down as Co-Directors of SNI, and Dr. Johnny Delashaw became the Chair in early 2015. Following Dr. Delashaw's arrival and the recruitment of new surgeons, patient and surgical volumes at SNI increased and several nurses became unhappy with the changing work environment, which they communicated to me.

7.     In September 2015, four nurses came to me to talk about the work environment at SNI. At the same time, some of the neurosurgeons were unhappy with the practice of the nurses utilizing the electronic Quality Variance Report (e-QVR) system at Swedish. As a result, I felt that there were issues that needed to be addressed on both sides, and started working to address these issues.

8.     I asked Swedish Human Resources (HR) to conduct a large-scale assessment of the culture at SNI, and they interviewed approximately ten neurosurgeons and ten nurses. After they completed their assessment, HR reported to me that there were problems with shared vision of what was taking place at SNI. HR recommended that we embark on regular teamwork sessions with the staff and neurosurgeons.

9.     When I met with Dr. Delashaw in the fall of 2015, he was committed to maintaining a positive environment at SNI, he wanted the nurses to be able to talk frankly with the physicians, and told me he was very committed to this process.

10.    As part of HR's efforts, several neurosurgeons and nurses formed a steering committee to work on the changes occurring at SNI. I was not part of that steering committee, but as executive sponsor of the initiative, I received regular reports. Dr. Delashaw served on the steering committee. The meetings began in January 2016, and took place several times a month.

DECLARATION OF JUNE ALTARAS, M.N.
MQAC File No. 2016-3527 MD
Page 2

11.     It is my understanding that Dr. Delashaw attended the majority of these meetings over the course of the year, and that Dr. Delashaw made himself available and open during this process.

12.     In addition to these weekly meetings, to further the work of this team, the neurosurgeons and staff held an offsite retreat in June 2016. At the retreat, which Dr. Delashaw attended, the neurosurgeons and staff developed an action plan for mitigating problems the team perceived, and they discussed how they would resolve these issues. The group agreed to put that plan into place.

13.     In order to make further improvements at SNI, Swedish arranged for executive coaching for Dr. Delashaw. It was my understanding that Dr. Delashaw cooperated with this process, and I witnessed improvement in his communications.

14.     Two of the original four nurses who met with me in September 2015 requested to meet with me again in August of 2016. When I met with these two nurses, they reported to me that there were still some concerns with SNI management but that the teamwork between the nurses and neurosurgeons had improved based on the work of Organizational Development and the team.

15.     Despite the efforts to improve the relationship, the original group of nurses who approached me with concerns left SNI. Although the departure of a group of nurses is unfortunate at any institution, SNI had hired many new, experienced nurses during its time of growth.

16.     In my role as an executive, I encouraged real time resolution of issues between caregivers, including nurses, and neurosurgeons. My belief was that if the nurses reported these issues at the time they occurred, then we could have a conversation with the neurosurgeons at the same time the issues were happening. I never intended to discourage the nurses from using the e-QVR system.

17.     To the remaining issue raised in the Statement of Charges and the Ex Parte Motion that led to the MQAC summary action—that Dr. Delashaw yelled, swore, pointed his

finger at others or made threatening movements toward staff—I never personally witnessed this behavior.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on June  2  , 2017.

_____
June Altaras

ATTACHMENT 2

June 1, 2017


Bennett Bigelow & Leedom, P.S.
601 Union Street Suite 1500
Seattle, WA 98101-1363


Attention: Amy Magnano

We have recently become aware of Dr. Johnny Delashaw's license being suspended. I would like to share my personal and family's experience with you in regards to the care that he provided.

A few years ago I went to see my PCP due to some chronic neck pain with the expectation of being referred on to physical therapy. He sent me to have an MRI that same day and was contacted before I got back home. The test revealed that my spinal cord was being compressed and possibly damaged. They suggested I seek a Neurosurgeon as soon as possible. That afternoon we called Dr. Delashaw's office in Seattle (we lived in Gresham OR at that time) and I was scheduled for a consultation the next week.

I was greeted in the Exam Room by Dr. Delashaw who was professional and pleasant. He examined me and reviewed my scans. His recommendation was to have surgery to repair the damaged discs in my neck. He reviewed my medical history at length and fully explained what procedures would be done, the risks and expected recovery. I felt very confident, informed, safe, respected, and cared for. I had the surgery and can say that I was in the best of care.

A short time later our 1 year old granddaughter was diagnosed with Hydrocephalus. Our son and daughter-in law lived in Grand Forks, ND at the time and medical care was not available to her there. Without hesitation we reached out to Dr. Delashaw and he immediately responded. My personal experience has been that Dr. Delashaw truly cares about his patients and presents himself extremely professional, honest, caring, trustworthy, and dedicated to provide the best possible care and treatment to his patients.

We appreciate the time you have taken to listen to our heartfelt appreciation and sincere thankfulness that Dr. Johnny Delashaw has given to our family.

If you have any questions please do not hesitate to contact me.



Best Regards,



Cary & Andrea Balogh

ATTACHMENT 3

Shelby D. Balogh



JUNE 1, 2017

To whom it may concern;

My name is Shelby D. Balogh, I am a husband, father of 4 children, and am primarily employed as a data analyst. I am writing to provide an account of my experience with Dr. Delashaw and to express my sincere respect and gratitude for his contributions to my daughter Elizabeth A. Balogh's health and treatment.

On April 29th of 2015 my wife and I contacted Dr. Delashaw after receiving the results of an MRI taken of our 1 year old daughter. At the time we lived in a rural part of the upper Midwest without access to a pediatric neurosurgeon. Upon speaking with my father, he recommended that I contact Dr. Delashaw to see if he could provide any advice or recommendations. Dr. Delashaw returned our calls and emails immediately and requested a copy of Elizabeth's medical records. In less than 24 hours Dr. Delashaw had recommended to us a pediatric neurosurgeon at the University of Minnesota. Dr. Delashaw took the time and made a special effort to make a personal referral which resulted in an immediate booking of an appointment for our daughter.

Dr. Delashaw acted with great professionalism and with sincere care for my daughter's condition. Dr. Delashaw's willingness to help, without doubt, contributed to my daughter's receipt of prompt medical care by a team of professionals that were able to successfully treat her condition. To this day, Elizabeth enjoys the normal life that any three year old would, and we are reminded at each milestone that she hits of the role that Dr. Delashaw played in her treatment. If there are any questions regarding our experience with Dr. Delashaw, I would encourage you to contact me directly via the contact information provided. I would appreciate the time to discuss our gratitude to him.

Warm regards,

ATTACHMENT 4

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of: | No. M2016-1084 |
| | DECLARATION OF SCOTT BAUMER |
| JOHNNY B. DELASHAW, JR., MD License No. MD00023061 | |
| Respondent. | |

I, Scott Baumer, declare as follows:

1.    I am competent to testify, and have personal knowledge of the matters set forth herein.

2.    I am a sales representative for Synaptive Medical in the Pacific NW, which provides, among other tools, high-resolution imaging technology systems that allow neurosurgeons to visualize the brain's topography with three-dimensional mapping, and robotically position surgical optics to allow more precise surgical intervention.

3.    I have known Dr. Delashaw since 1995 when he was practicing at OHSU. I first met him because of my professional work, and over the years have had the privilege to come to know him well also as a close personal friend. Over those years, as part of my work, I have been present at over 100 surgeries that Dr. Delashaw has performed. About a dozen or so of those have been at SNI. The last of those surgeries at which I was present was very recent, sometime in January or February 2017 at SNI. During these years, I have also become acquainted with many of Dr. Delashaw's colleagues and co-workers.

4.    Because I have seen Dr. Delashaw both at work and in social settings, including many fly fishing trips together, I have come to know him and his personality well. He is an extraordinary professional, both in his professional skills and his professional demeanor. I have seen him at work and at leisure, in times of relaxation and in times of stress.

5.	In every setting in which I have seen and known him, I have never once seen him lose his temper. He is an effective communicator, and works very well with his professional colleagues and staff.

6.	I recall one occasion at OHSU when I was present at an aneurysm clipping, and a nurse's error caused a major complication during the surgery that compromised the patient's life. Dr. Delashaw resolved the issue successfully. Even in that very stressful situation, it was Dr. Delashaw himself who kept the whole room calm, and carefully and appropriately applied his professional skills to communicate with the entire surgical team. This is just one of many examples I could offer about the consistent high quality of Dr. Delashaw's professional skills and demeanor.

7.	In my 20+ years of attending and supporting neurosurgical procedures both here in the NW region and nationally with dozens of neurosurgeons I consider Dr. Delashaw to be one of the most surgically skilled and mindful surgeons I have had the pleasure of working with. I strongly support Dr. Delashaw's continuing practice of medicine. I urge the Commission to make every effort to return him to practice as soon as possible as losing a surgeon of his skill set is a severe loss to our community for both patients and the advanced training of neurosurgeons.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Portland, Oregon on June 2, 2017.

SCOTT BAUMER

ATTACHMENT 5

June 2, 2017

To Whom It May Concern:

I would like to express my appreciation for the thoughtful and caring treatment I received from Dr. Johnny Delashaw before, during and after my back surgery some years ago at OHSU. Prior to the surgery I was apprehensive, but Dr. Delashaw was reassuring and as a result I felt confident about his diagnosis and my need for surgery. He explained the procedure thoroughly and answered any questions completely.

Following the surgery he kept contact with me to closely follow my recovery. The surgery was successful and I have no recurring problems.

I am very thankful to Dr. Delashaw for his care and success of the surgery and that I no longer have chronic back pain.

Sincerely,

Lenora Bjorkquist

ATTACHMENT 6

May 12, 2017

Matthew Lorne Brown



Since August of 2015, I, Matthew Brown, have been a Clinical Application Specialist with Synaptive Medical. Synaptive is a medical device company that provides surgical navigation for neuro procedures and surgical optics for both neuro and spine procedures. This technology is owned and utilized in the operating rooms at Swedish Medical Center (Cherry Hill Campus) by both spine and neuro surgeons.

On May 9, 2017, I read *The Seattle Times* article pertaining to Dr. Johnny Delashaw and the suspension of his medical license by the State of Washington. This article suggests that the Medical Quality Assurance Commission *"said Delashaw had intimidated subordinates by yelling, swearing and making threatening movements toward staff members. That had a chilling effect on staff members, according to the commission, and some became afraid to ask Delashaw questions that were needed to properly care for patients."*

Since 2015, I've been in the operating room for 75 of Dr. Johnny Delashaw's procedures at Swedish Cherry Hill. During these procedures, I never once witnessed Dr. Delashaw "yelling, swearing or making threatening movements toward staff members". At no time, did I ever personally feel intimidated by Dr Delashaw nor did I ever witness a single circumstance of intimidation against others.

In fact, the totality of my experience in Dr. Delashaw's operating rooms runs in absolute direct contrast to the Commission's allegations. In my experience, I would describe Dr. Delashaw's demeanor and behavior as consistently calm; almost serene. On no occasion inside or outside the operating room, did I ever hear Dr. Delashaw even raise his voice. He managed his operating rooms in a very calm and extremely competent manner. Questions were asked freely and answers given without attitude or hesitation. Ultimately, Dr. Delashaw created a calm atmosphere that allowed me and, from what I observed, others to perform their jobs to the best of their abilities with patient care as the highest priority.

In conclusion, I find the Commission's allegations deeply chilling and disturbing as they are so far removed from what I witnessed and know to be the truth.

Sincerely,

Matthew Lorne Brown

ATTACHMENT 7

6/2/17

To whom it may concern:


I have worked with Johnny Delashaw, MD for over 15 years at OHSU. He is one of the most technically gifted surgeons that I have worked with. I in fact recommended several friends to see him for cranial & spine surgery and they had a great experience and great surgical outcomes.
He was always in a great mood and professional when I was in the OR suites with him.

Dr. Delashaw was also one that worked with different companies to bring in new products and innovation that helped push the Neurosurgical field forward which resulted in better patient care and outcomes.

I would personally say that he is one of the top Neurosurgeons in the country and is highly thought of in the medical community. He has also spent a lot of time in helping teach and lecture to other surgeons internationally to help improve the quality of care in foreign countries.

Sincerely,
Lisa Byram
Medical Sales Consultant

ATTACHMENT 8



INLAND
NEUROSURGERY
AND SPINE

Sacred Heart Doctor's Building

105 W 8ᵗʰ Avenue, Suite 200  Spokane, Washington 99204  Phone  509.624.9112  Fax: 509.624.1087  Web: www.neuroandspine.com

June 2, 2017

To:  Washington State Medical Board

Re: Johhny Delashaw MD

I am a board certified Neurosurgeon, practicing in Spokane, Washington.

I am writing this letter to the Washington State Medical board in support of Dr. Delashaw.

I have known Dr. Delashaw for over 16 years in several capacities.  I was his resident for 7 years at Oregon Health and Science University, department of neurological surgery from 2001 to 2008. Subsequently, we have collaborated and shared complex neurosurgical patients between Spokane and Seattle over the last 4 years.

I have found him to be a very hard working and extremely skilled neurosurgeon.  This profession of neurosurgery comes with many challenges both from a medical and system of care perspective. When interpersonal difficulties arise I have always found Dr. Delashaw to behave appropriately. I have never felt that Dr. Delashaw was angry, or abusive to patients, residents, physicians, or staff as the newspaper reports describe.  During residency I always found him supportive, never mean, belittling, or angry.

There is no doubt that his surgical and clinical skills are outstanding.  He is a leader in neurosurgical education and training.  He is widely published in peer reviewed journals. He is always willing to accept in transfer and take on the most difficult and dangerous neurosurgical problems, that few other neurosurgeons in the state are willing to care for.   I have personally operated with him as his resident for 7 years, and can testify to his skill.

I am not informed about the details of allegations involving Swedish Medical Center, nor his medical licensure issues.  However, what I have read in the newspaper is not consistent with the person I know very well, both at an interpersonal level and professionally.

Sincerely,

Jonathan Carlson, MD

ATTACHMENT 9

To whom so ever it may concern

I was a Cerebrovascular and Skull-base Neurosurgery Fellow at Swedish Neuroscience Institute (SNI) from 2013-2014. I worked with Johnny Delashaw, M.D. from October 2013-June 2014. I assisted approximately 100 surgeries with Dr. Delashaw in my time at SNI. During that time, I was able to witness his demeanor both in and outside of the operating room (OR).

Every fellow at SNI was excited when we heard about Dr. Delashaw's arrival at SNI. He had and has a first rate reputation as a surgeon. I had a great experience working with him. He is a hardworking and highly organized person. Dr. Delashaw's confidence and elegant techniques allowed him to complete surgeries in a safe and efficient way for his patients.

After Dr. Delashaw's arrival, it appeared that more patients with aneurysms and skull-based tumors were referred to SNI than before his arrival. As he is a world-renowned Skull-base surgeon, patients also use to come from different neighboring states for treatment with Dr. Delashaw. Dr Delashaw has a great passion for teaching, and he started the skull-base conferences at SNI, where he was teaching skull-base anatomy and approaches. He was instrumental in engaging all fellows to be part of their own education by conducting frequent meetings and allowing everyone to voice their opinion. His involvement in the SNI fellows' education was phenomenal.

In my interaction with Dr. Delashaw both in and outside of the OR, I did not witness any of the disruptive behavior that is alleged here: that Dr. Delashaw screamed or pointed his finger at staff, or threw instruments. That was simply not my experience of Dr. Delashaw's demeanor. I also did not witness any efforts by Dr. Delashaw to discourage the staff from communicating with him, or reporting any issues that they had with him, or anyone else.

Rather, Dr Delashaw was available all the time on phone and he was easy to reach. As an on call fellow, I was able to reach Dr. Delashaw in the middle of the night to obtain a clear plan for his patients, was very helpful to the patients and families he helped. I still remember communicating with Dr. Delashaw about his patients' treatments even when he was on vacation. His patients respected and loved him very much. In fact, I remember

a patient who came from Oregon who had a skull-base tumor, and that patient told me that Dr. Delashaw was a god to him and his family, because he had been alive for almost two decades due to the care and treatment Dr. Delashaw provided.

I want to share my personal story with Dr Delashaw. My wife had high prolactin levels and was on Bromocriptine medication prescribed by an endocrinologist. We were given different opinions about MRI results and for many years, we did not have a clear picture of what was happening. The treatment was interfering with our lives, as my wife was not able to tolerate the medication. We approached Dr Delashaw, who in my opinion was the best pituitary surgeon I have ever known. He met with my wife and me, and showed us a microadenoma on the MRI scan, which no one had told us about before that meeting. Dr. Delashaw recommended that my wife change her medication, and to watch for any side effects. Dr. Delashaw also gave us a hope that if my wife could not tolerate the medication, a surgeon could go in and resect microadenoma to get her off medication permanently. Dr. Delashaw never pressured my wife to undergo surgery, and we were fortunate to have him in our lives. Even today, my wife gets a MRI approximately every 2 years and updates him regularly. If he stops operating, my family will be gravely affected if my wife cannot obtain surgical treatment with him. Likewise, I feel there are hundreds of families dependent on him for his services.

I urge the Commission to reconsider their summary suspension and restore Dr. Delashaw's license, in order that he can continue to improve the lives of his patients.

Parthasarathi Chamiraju
Email: █████████████
Ph: █████████

ATTACHMENT 10

STATE OF WASHINGTON
MEDICAL QUALITY ASSURANCE COMMISSION

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of: | No. M2016-1084 |
| | DECLARATION OF JUSTIN CETAS, M.D. |
| JOHNNY B. DELASHAW, JR., MD License No. MD00023061 | |
| Respondent. | |

I, Justin Cetas, M.D., declare as follows:

1.      I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I am an Associate Professor of Neurological Surgery at Oregon Health & Service University.  I am also the Chief of Neurosurgery at the Portland VA Health Care System, in Portland, Oregon.

3.      I have known Dr. Johnny Delashaw for the last fifteen years, first as a resident, and later as a colleague and friend.  During those fifteen years, I worked very closely with Dr. Delashaw, and I have seen firsthand how he interacts with nurses, surgical techs, anesthesiologists and others in the operating room, clinics and elsewhere. Dr. Delashaw is often gregarious and boisterous, at times terse during critical portions of complicated cases, but never abusive or threatening.

4.      Dr. Delashaw has always been a consummate professional with patient safety at the forefront of his mind.  I have learned a tremendous amount from Dr. Delashaw over the years.  He is an excellent technical surgeon who is not afraid to tackle the most challenging cases.  He is hard-working, with an impressive amount of energy and endurance.   He can demand those around him to be equally hard-working and focused on the case at hand.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Portland, Oregon, on June 2, 2017.

JUSTIN CETAS, M.D.

ATTACHMENT 11

To Whom It May Concern,

My name is Vince Chan and I am an otolaryngologist/rhinologist employed by the Swedish Physician Group and have a focused interest in diseases of the anterior skullbase. I am writing this letter in support of my colleague Dr. Johnny Delashaw. I have been privileged with the opportunity to work with him regularly over the past few years since he arrived at Swedish Cherry Hill. I have worked directly with him in the operating room watching him supervising fellows, and interacting with colleagues and OR staff. He is one of the best neurosurgeons I have ever operated with. He is attentive to patients and I have seen him first had at the patient's bedside in the middle of the night. I have been fortunate to sit down to dinner with his close family on more than one occasion. Also at the table were his residents and fellows who he mentors and supports and who then go on to become compassionate providers as well. The OR staff interactions I have witnessed have been positive and respectful. I hope my experience can lend perspective to the multitude of conflicting voices and I would be happy to answer any questions you may have.


Vince Chan MD
Otolaryngology/Rhinology
Swedish Medical Group

ATTACHMENT 12

Aurora S. Cruz, MD, MBA
Resident Physician
Department of Neurosurgery
University of Louisville
220 Abraham Flexner Way
Suite 1531
Louisville, KY 40202

To Whom It May Concern:

    This letter is in support of Dr. Johnny B. Delashaw. I first met Dr. Delashaw as a third year medical student at University of California, Irvine in 2013. From the time of our first meeting, Dr. Delashaw has always treated me with a great deal of respect and kindness. In August and September 2015, I spent a month with Dr. Delashaw and his colleagues at the Swedish Neuroscience Institute as a rotating medical student. Prior to my rotation, Dr. Delashaw offered his time as a mentor and guide as I was preparing my application for Neurosurgical residency training. During my time at Swedish, Dr. Delashaw spent time coaching me, both surgically and professionally, and clearly took a great deal of pride in training his medical students, rotating residents, and neurosurgical fellows. He has acted as a mentor and went to lengths to assist me and recommend my application to residency. I spent a great deal of time in the operating room and clinic with Dr. Delashaw and his fellows, and I never saw them placed in an unsafe or unattended positions. As is common in academic training, Dr. Delashaw reviewed the goals and risks of the surgical approach with the fellows and they were allowed appropriate autonomy with direction and oversight by Dr. Delashaw. I never witnessed any unusual or unsafe practices with Dr. Delashaw or his trainees.

    In the operating room, Dr. Delashaw is polite with staff, focused on patient care, and a highly skilled surgeon and teacher. I never witnessed any abusive behavior, and Dr. Delashaw was friendly with many of the OR staff at Swedish. He often booked intricate and high acuity cases, which required a great deal of coordination, specialized equipment, and focus during the case. I am married to a Neurosurgery Surgical Technologist and, from the perspective of O.R. staff, these kinds of high acuity neurosurgery cases are stressful by nature. I never witnessed any harsh or disrespectful treatment of any of the staff members or other physicians, despite the high acuity of the cases. Dr. Delashaw treated the entire OR staff with respect during my entire experience at SNI.

    As part of my rotation, I rounded with the fellows and Dr. Delashaw in the hospital on his patients. Dr. Delashaw was always kind with patients and nursing staff during rounds. He took time to sit and discuss operative planning and risks and benefits with the patients and their families and was upfront and honest about potential surgical complications. Dr. Delashaw's patients trust him and traveled

from far distances to consult with him. He often attracted high acuity and rare cases because of his extensive experience and training. His patients were kept in the ICU for an appropriate amount of time before moving to a surgical step-down unit and discharged to home or rehab in coordination with case management and social work. Dr. Delashaw rounded on his patients daily and took the time to speak to each of them regarding their care. Having spent time at multiple institutions with many different neurosurgeons, I felt that Dr. Delashaw provided excellent care to his patients that met or exceeded the standard of care. If I personally needed complex neurosurgical management, I would certainly call Dr. Delashaw for his expertise.

In all of my experiences with Dr. Delashaw over the past four years, I have been impressed with his love of teaching, his dedication to doing what is best for his patients, and his excellence in neurosurgery. I am proud to know and have worked with Dr. Delashaw and I hope that I have the opportunity to do so again soon.

If you have any questions regarding this letter or any of my experiences with Dr. Delashaw, please do not hesitate to contact me.

Warmly,

Aurora S. Cruz, MD MBA

ATTACHMENT 13

|  |  |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of: | No. M2016-1084 |
|  | DECLARATION OF JOHNNY DELASHAW, M.D. |
| JOHNNY B. DELASHAW, JR., MD License No. MD00023061 |  |
| Respondent. |  |

I, Johnny Delashaw, M.D., declare as follows:

1.     I am competent to testify, and have personal knowledge of the matters set forth herein.

2.     I have been a licensed practicing physician and surgeon in five states including Virginia (1984-present, but now inactive status), Florida (1990-1995), Oregon (1992-2012), Alaska (2016-present), and Washington State (1984-2017), without incident or suspension of my license until now.  In fact, to my knowledge, I have never had a complaint made to the Washington State Medical Quality Assurance Commission (MQAC) in 25 years of neurosurgery practice in this state until 2016.

3.     I achieved my medical degree at the University of Washington in 1983. I then completed a general surgery internship and went on to graduate from the Neurosurgery Residency program at the University of Virginia in 1990.  I next spent two years at the University of Florida as an Assistant Professor of Neurological Surgery from 1990-1992.  From there, I accepted a faculty position at Oregon Health & Science University where, over the next twenty years, I became a Professor and ultimately served as the Chief of Neuro-Oncology and Skull Base Surgery, as well as Vice-Chairman of the Neurosurgery Department..

4.     In 2012, I accepted the opportunity to be the Chairman of the Department of Neurological Surgery at the University of California, Irvine (UCI).  My work achievements there included improving the education aspect of the neurosurgery residency program and the quality of care delivered to our patients at UCI.

5.     While I was at UCI, I was approached by individuals at Swedish Neuroscience Institute (SNI) to join their practice in Seattle. The recruiters from SNI emphasized that my presence would boost the SNI program in knowledge, skills, and achievements. However, in large part due to my success at UCI, I initially declined the offer to move to SNI.

6.     Even though I initially declined the SNI position, multiple individuals from Swedish and Providence returned to convince me to join SNI. One of these individuals included Dr. Marc Mayberg, who was the Chairman of SNI at the time. After several months of SNI's efforts to recruit me, I finally decided to accept the position after Dr. Mayberg appealed to me personally to take over his position. Dr. Mayberg explained to me that he would be stepping down from his leadership position due to health issues. He informed me that he felt I could lead SNI into the future and make it a nationally known Neuroscience Institute.

7.     I arrived at SNI in September 2013. Upon arrival, I discovered that Dr. Mayberg had changed his mind about stepping down as Chairman and decided to stay at SNI. Dr. Mayberg's change of heart caused division within the department and resulted in unnecessary tension. This was exacerbated by Nurse Mary Fearon, who was very loyal to Dr. Mayberg, and who supported his leadership and opposed any transition of that leadership. Regardless, in April 2015, less than two years after I started at SNI, Swedish leadership selected me to be the chair of SNI.

8.     Clinically, although I developed a robust practice at SNI, my surgical volume at SNI still did not equal the volume that I had had at OHSU. Further, in addition to my work at SNI, I also established a satellite practice in Longview, Washington, to see patients in my former hometown.

9.     As the department Chairman at SNI, I oversaw the growth, development, and expansion of the staff, patient quality and delivery of care, and scientific advancement of neurosurgical studies. Contrary to the recent reporting by the Seattle Times, I was on a salary and not incentivized to perform surgery. Improvement in patient quality and outcomes was a passion of mine. I set up a formal Patient Outcome and Quality Review Committee in

September 2015 and began collecting detailed data on morbidity and mortality, as it is difficult to know how to improve until one is absolutely sure what the quality and outcomes are.

10.     I also personally recruited nationally known physicians, surgeons, and researchers. The reputations of these professionals resulted in an increase in the number of patients from around the world to seek care at SNI. Under my direction, we improved the quality of our specialty conferences, which included the Tumor Board; Cerebrovascular Conference; Mortality and Morbidity Conference; and Grand Rounds.

11.     Additionally, while I was chair, SNI published 135 peer reviewed scientific papers per year contributing to advancements in the field of Neuroscience. This yearly volume of neurosurgical publications may be the largest number of any neurosurgical training center in North America. Prior to 2015, SNI averaged about 10 peer-reviewed publications per year.

12.     As a consequence of the above efforts, SNI gained significant national attention for high-quality patient care and developments in neurological research. In fact, SNI was even under consideration for a residency program until my departure.

13.     Throughout my career, and while I was at SNI, I have always taken the concerns of staff seriously, including those of nurses, mid-levels (PAs, NPs), office staff, and other physicians. I have an open-door policy and have always encouraged honest and constructive communications as part of my medical practice. I emphasized the importance of teamwork and always held patient care as my number one priority. I have never discouraged staff from reporting issues with me, with other staff members, or with any medical institution, including Swedish.

14.     The Swedish nursing administration approached me in fall 2015 to help resolve concerns raised by some medical staff regarding the everyday running of the OR and the increasing workload. Directly in response to those concerns, we arranged for and conducted weekly meetings with nursing administration, key OR nursing staff, several surgeons, a human resources representative, a psychologist, and myself for nearly six months.

15.     Our work culminated in an off-site retreat where all the members openly acknowledged that real progress had been made, and the group expressed excitement for the future. Unfortunately, the OR nurses attending these weekly meetings left SNI shortly after that offsite retreat. They left abruptly and all at once. In order to address any potential staffing issues, I convened a meeting of the neurosurgeons for the next morning, at 7 a.m., to roll back the surgical schedules. I cut my own cases first. I worked with the rest of the neurosurgeons, and Dr. Ian Wright, an anesthesiologist, to close operating rooms and rearrange schedules, until more nurses could be hired.

16.     I received my first MQAC investigation letter related to one complaint in June 2016. The letter asked about a fictitious incident where an anonymous complainant alleged I threw a cell phone at an OR nurse on December 21, 2015.

17.     I sent my response to the investigation letter in August 2016 to the Medical Commission. I have subsequently learned that there were additional complaints made by SNI nurses in May 2016 to MQAC, but I was never informed of their existence until after my summary suspension, on May 9, 2017. Nevertheless, because they now form the basis of the summary suspension of my license, they are addressed below.

    a..     Ms. Rowland's complaint that I "screamed at [her] and threatened her job" is not accurate. At the time this event occurred, there had been additional surgeries on the schedule for that afternoon. Despite the fact that the patients were present at the hospital prepped and waiting for surgery, the surgeons were ready and waiting, and their surgeries had been on the schedule, Ms. Rowland as charge nurse had made the unilateral decision to allow the nurses for that OR to go home and had closed the OR, single-handedly preventing the surgeries from going forward. I was upset that she had made that decision, but I did not behave in the manner she described.

    b.     Ms. Hendershott has alleged that I barged into a meeting, and yelled, screamed and pointed my finger at her. This is not an accurate recounting of this meeting. In the first instance, I requested that the meeting take place, because multiple

surgeons had reported to me that Ms. Hendershott was having problems with insubordination in the operation rooms. I arrived at the meeting, because I had called it, and discussed the issue with Ms. Fearon and Ms. Hendershott. That Ms. Hendershott had a negative, subjective experience in this meeting is unfortunate, because that was not my intent; rather, we needed to address her insubordination in the OR, so that there were no further future issues when patients were on the table.

c.      I have never been accused of touching or physically intimidating a staff member in my three decades of practice.

d.      On the allegation related to the use of fluoroscopy, I remember the episode well. We were in a procedure, and a group of nurses came in and stood and chatted among themselves. I found their presence in the OR unusual, and internally questioned why they had chosen to enter during an ongoing surgery, but I did not direct them to leave. I yelled "fluoro" so that the nurses could put on lead, as was hospital policy, at least half a dozen times. The nurses chose not to put on lead. I then took a one second shot of the patient, as was required by the procedure. At that point, Ms. Haskins yelled at me that I had not given proper warning of the use of radiation because one of the visiting nurses had just informed her colleagues that she was eight weeks pregnant. Until that moment, I had not been aware of that information. After the procedure was completed, I found the pregnant nurse and apologized to her for the use of fluoro in the room where she was present. Neither Ms. Haskins, nor the pregnant nurse, nor any of the other visiting nurses, had any role in the OR while that procedure was ongoing. The Chief of Staff reviewed the incident. The end result of the review was that I agreed to take a radiation class to resolve the matter, which I did immediately.

e.      I have never had a complication with a retained object for one of my patients.

f.      On the issue of communication about specimens, I recall one occasion during surgery when a nurse who, in labeling a tissue sample, asked me, while I was still

engaged in a surgical procedure, how to spell words that a neurosurgical OR nurse should known how to spell. She asked me to spell for her the word "malignant" or "meningioma." I no doubt reflected surprise at her request, given that I was still in the middle of the procedure, concentrating on the task at hand.

18. On February 10, 2017, the Seattle Times published a grossly misleading, unfair, and inaccurate article about my work at SNI, among other issues. Many of the materials used by the Seattle Times to support its claims are erroneous, if not grossly misleading to the public. Although I learned that the Times received many letters, phone calls, and messages in support of me and my work, they chose not to make these public.

19. I voluntarily resigned from Swedish on March 3, 2017. **I was never asked to resign**. Instead, I left after the Seattle Times published a malicious character assassination in February 2017. The article created an environment in Seattle that became distracting and made it too difficult for me to fully concentrate on my patients.

20. Throughout my career and during this investigation, my primary and most heart-felt concern has been for my patients -- even at the expense of spending time with my loving and understanding family. My passion and focus will always will be to provide the best patient care, and in doing so, improving quality of life. These are the values instilled in me by my father, who was a family doctor in Longview, WA. He practiced there from 1963 until his death from cancer in 1997.

21. I offer the attached exhibits, which are true and correct copies of:

**Exhibit 1**      Cherry Hill's Case Mix Index and Cranial and Spine Totals – Cherry Hill;

**Exhibit 2:**      Cherry Hill's Mortality Data from 2012-16;

**Exhibit 3:**      Cherry Hill's Readmission Data from 2012-16;

**Exhibit 4:**      My surgical mortality and readmission rates from 2013-16.

Specific to my data, these nationally recorded statistics are in stark contrast to the allegations that I pose an imminent risk of harm to patient safety. Instead, they show my surgical

mortality and readmission rates are lower than the expected rates for similar work based on national averages.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on June 5, 2017.

JOHNNY DELASHAW, M.D.

EXHIBIT 1

# Case Mix Index – Cherry Hill

| | Cherry Hill Case Mix Index | | | | | | |
|---|---|---|---|---|---|---|---|
| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | % Change |
| 2.16 | 2.25 | 2.37 | 2.46 | 2.69 | 2.75 | 2.86 | 32.4% |

Provided by Swedish Clinical Transformation

# Cranial and Spine Case Totals – Cherry Hill

| | Cherry Hill Cranial and Spine Case totals | | | | |
|---|---|---|---|---|---|
| 2012 | 2013 | 2014 | 2015 | 2016 | % Change |
| 2247 | 2419 | 3506 | 3956 | 4547 | 202.40% |

Premier Care Science

 SWEDISH

EXHIBIT 2

# Crani and Spine Mortality Rate – Cherry Hill
## Observed and Expected



All Cranial and Spine Case Mortality Rate - Cherry Hill
Q1 2012 - Q4 2016
O/E 0.60  SS 99%

Premier Care Science

SWEDISH

EXHIBIT 3

# Crani and Spine Readmission Rate - Cherry Hill
## Observed and Expected



All Cranial and Spine Case Readmission Rate - Cherry Hill
Q4 2012 - Q4 2016
O/E 0.82 SS 99%

| | 2012 Q1 | 2012 Q2 | 2012 Q3 | 2012 Q4 | 2013 Q1 | 2013 Q2 | 2013 Q3 | 2013 Q4 | 2014 Q1 | 2014 Q2 | 2014 Q3 | 2014 Q4 | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Outcome Cases | 529 | 637 | 579 | 700 | 686 | 764 | 635 | 743 | 779 | 871 | 884 | 972 | 922 | 1,057 | 1,045 | 1,107 | 1,074 | 1,123 | 1,057 | 1,129 |

Cases Without Readmission
Readmission Rate
Cases With 30 Day Readmission
Expected Readmission Rate

Premier Care Science

 SWEDISH

EXHIBIT 4

## MORTALITY

| Outcome Cases | Total Deaths for Outcome Cases | Observed | Expected | Variation | O/E |
|---|---|---|---|---|---|
| 1493 | 27 | 1.81% | 2.17% | -0.36% | 0.83 |

## 30-DAY READMISSIONS

| Outcome Cases | Total Readmissions for Outcome Cases | Observed | Expected | Variation | O/E |
|---|---|---|---|---|---|
| 1460 | 93 | 6.37% | 6.27% | 0.10% | 1.02 |

ATTACHMENT 14

Washington State Medical Quality Assurance Commission
111 Israel Road SE, Tumwater, WA 98501

To the Medical Commission:

I am writing this letter to support Dr. Johnny B. Delashaw, who was a mentor, teacher and a colleague to me for a long time.

I have been working as an attending in the Department of Neurological Surgery at Oregon Health and Science University since July 2016. I have known Dr. Johnny Delashaw since July 2001 when I started to work with him as his skull base fellow. I continued to my training with him as a resident in the department of neurological surgery from July 2002 to July 2006. I then worked with him as a partner attending until he left OHSU.

During this time period, I learned from him the most delicate and safest microneurosurgery techniques, and the best decision making strategy for patients with skull base and cerebrovascular diseases. I scrubbed approximately 250 surgical cases annually with him during my training years. After I started to work as an attending, he was always available for help in the operating room for complex surgical cases whenever I needed him.

He is one of the few extremely skillful, gifted neurosurgeons in the world and I consider myself very lucky since I had an opportunity to be trained by him.

Aclan Dogan MD

Associate Professor
Director, Cerebrovascular and Skull Base Surgery
Department of Neurological Surgery and Interventional Neuroradiology
Oregon Health & Science Center
3181 Sam Jackson Park Rd.
Portland OR 97035

ATTACHMENT 15

# STATE OF WASHINGTON
## MEDICAL QUALITY ASSURANCE COMMISSION

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>JOHNNY B. DELASHAW, JR., MD<br>License No. MD00023061<br><br>Respondent. | No. M2016-1084<br><br>DECLARATION OF LAUREEN DRISCOLL |

I, Laureen Driscoll, declare as follows:

1.     I am competent to testify herein, and have personal knowledge of the matters set forth herein.

2.     By way of background, I have a master's degree in Nursing Administration from Northeast University, as well as my MBA in Business Administration from University of Washington, Foster School of Business. I also have my nursing degree, but I have not practiced clinically since 1998. From February 2015 until December 2016, I was the Chief Operating Officer at Swedish Cherry Hill. From May 2013 until February 2015, I was the Nurse Executive at Swedish Cherry Hill.

3.     In August 2015, when approximately five perioperative nurses came to the Cherry Hill Administration suite looking for June Altaras, I ended up meeting with them because June was on vacation at the time. In the letter that the nurses had prepared, the nurses raised concerns about their work environment at the Swedish Neuro Perioperative Services.

4.     After meeting with the nurses, I met with Meredith Gould the Nurse Executive at Cherry Hill and Chuck Lee the Interim Perioperative Director at Cherry Hill to discuss their concerns in particular about work load and create a plan to improve staffing. I also immediately informed June Altaras while she was on vacation and scheduled for her to meet with the nurses the day she returned as the nurses requested.

5.     Johnny Delashaw, M.D. was the Chief of Neurosurgery at Cherry Hill, so after June and I met with the nurses, we met with him that same night to review the nurses' concerns. My

perception of his response was that he took our meeting and their concerns seriously, as he then arranged a mandatory meeting of all of the neurosurgeons at 7:00 a.m. the next morning.

6.     At the meeting with the neurosurgeons, at which I was also present, Dr. Delashaw raised the issue with the group that the nurses felt overworked.   Dr. Delashaw then worked with the other neurosurgeons at that meeting and afterward to address and alleviate the nurses' concerns. I was aware that Dr. Delashaw worked with the neurosurgeons to arrange vacations and take time off so that the nurses would get some relief in their schedules.   Over the next month, he also arranged to send the nurses food during their busy times, as well as other support in order to improve their working experience.

7.     A week after the initial meeting, June Altaras and I met with the group of nurses again to review their complaints with them. At some point after that, June Altaras formed a steering committee to address the work environment at SNI.  The weekly committee meetings included the perioperative nurses who initially raised the concerns, neurosurgeons, and members of the SNI leadership including Dr. Delashaw.

8.     Based on my experience in interacting with the SNI nurses at Cherry Hill, their primary complaint about Dr. Delashaw was that he was scheduling surgery to take place at 5:00 a.m. on Thursdays, and they did not like that because the call team would need to start the surgery.

9.     I never witnessed any of the behavior that the Department of Health has alleged. I never witnessed Dr. Delashaw yell at nurses, throw a cellphone, or swear at the nurses.

10.    The Department of Health interviewed me the week of May 8, 2017, and asked me whether I witnessed Dr. Delashaw yelling at nurses, or throwing things, or swearing at the nurses. I reported to the investigator that I did not witness any of that behavior.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at _Tacoma_ . _Washington_ on May _3_, 2017.

_____
Laureen Driscoll

DECLARATION OF LAUREEN DRISCOLL
File No. M2016-1084
Page 2

ATTACHMENT 16

From: ERIC LAURA FLOODEEN ████████████████
Sent: Friday, June 2, 2017 4:17 PM
To: Amy M. Magnano <AMagnano@bbllaw.com>
Subject: Dr Johnny Delash

To whom it may concern:

I am a patient of Dr Johnny Delashaw's, writing on his behalf following the Seattle Times expose articles, and the suspension of his medical license. I had brain surgery for a cavernous malformation in February, after having had a seizure the previous month. When I met with Dr Delashaw prior to surgery, he very clearly explained what would be done during the surgery, and he stated that he preferred not to open or close, and gave his rationale, which was that the use of the saw used to cut through the skull could cause lasting vibrations in the hand of the surgeon, at the very time he wants to be most steady, and that there are others who are better at suturing for a nicer looking scar. I am completely fine with having another surgeon doing the non-critical portions of the surgery, especially if it leads to better outcomes.

I saw the Seattle Times expose article late Friday afternoon February 10th, and was scheduled as the first case of the day on Monday the 13th. I called the on-call physician on Saturday, and requested a call from Dr Delashaw. Dr Delashaw returned my phone call, and I was able to ask some questions raised in the very concerning article. My questions were answered, and I felt comfortable in proceeding. The surgery and the recovery period all went well.

I have since had an MRI, which looked good, have stopped my anti-seizure medicine, and have had no further seizures.

I chose Dr Delashaw because of his excellent reputation, because I know people who have had him do successful surgery on a family member, or consult in a difficult case, and because he was a high school classmate. I do not regret my choice.

As a medical professional, I take health care seriously, and I am concerned that the Times articles were biased, inadequately researched, and perhaps an unfair influence in the suspension of Dr Delashaw's license, as well as causing unwarranted patient fears, especially in regard to overlapping surgical suites, which is standard practice.

Sincerely,
Laura Floodeen, RN, BSN, OCN


Sent from my Verizon Wireless 4G LTE smartphone

ATTACHMENT 17

STATE OF WASHINGTON
DEPARTMENT OF HEALTH
MEDICAL QUALITY ASSURANCE COMMISSION

|  |  |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>Johnny B. Delashaw, Jr., MD<br>**License No. MD00023061**<br><br>Respondent. | No. M2016-1084<br><br>DECLARATION OF SEYMUR GAHRAMANOV, M.D. |

I, Seymur Gahramanov, M.D., declare as follows:

1.      I am a neurosurgery resident at University of New Mexico. I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I was a neurosurgery fellow at Swedish Neuroscience Institute (SNI) from 2013-2014. During my fellowship year at SNI, I participated in approximately 400 surgeries with Dr. Delashaw. I was able to witness Dr. Delashaw's demeanor inside the operating room (OR), as well as outside, and at the bedside for his patients.

3.      I felt quite fortunate to have Dr. Delashaw train me during my fellowship year at SNI. He was one of the best, busiest, and well-known neurosurgeons in the country. Dr. Delashaw's surgical techniques and efficiency were very impressive. In the OR, he created a great team-oriented atmosphere, always communicating with the surgical and anesthesia staff with friendly manners. In fact, I have not experienced any stress in assisting Dr. Delashaw in the OR. He stayed focused and calm even in critical surgical situations.

4.      Working with Dr. Delashaw was a great learning opportunity for me. Dr. Delashaw always discussed each case prior to surgery and went through positioning the patients on the surgical table, surgical approaches, possible difficulties and ways to avoid complications, and instruments and equipment necessary for each specific case. Dr. Delashaw was open to discussions of alternative options. I was very excited to assist him in surgeries since he liked to explain and demonstrate his way of operating.

5.      Dr. Delashaw's communicating skills were outstanding. Patients loved talking to him. Dr. Delashaw paid attention and listened to his patients. He had an individual approach and discussed the diagnosis, treatments and prognosis in the way his patients would understand without causing the tension or stress.

6.      Dr. Delashaw worked very hard, and expected the same from his fellows. Simply put, Dr. Delashaw is one of those surgeons who puts the benefit of the patient above his personal time.

7.      After Dr. Delashaw's arrival at SNI, the number of cases rose, as well as the number of educational events, research, and publications. Experts in various fields of neurosurgery came to lecture at Grand Rounds and courses, and their lectures are available free for everyone to watch online.

8.      It was my experience that SNI made great strides in education, patient care, and research under the leadership of Dr. Delashaw. Also, in addition to his work at SNI, Dr. Delashaw had a clinic in Longview, Washington, and would drive four hours round trip to see patients in Longview every Friday. He was extremely dedicated to his patients.

9.      Accordingly, I was very surprised to learn that some of the SNI nurses had made allegations in this proceeding about Dr. Delashaw yelling, being rude, or throwing instruments. I have never even seen him raise his voice to anyone on the staff. Dr. Delashaw was always approachable, and his patients loved him. Dr. Delashaw was a very good communicator, and I found him to be very kind.

10.     In fact, as a senior resident in the Department of Neurosurgery at the University of New Mexico, I use Dr. Delashaw as an example on how to communicate with nurses and residents. When Dr. Delashaw first came to SNI, he was explaining something in a room to a patient, and one of the nurses reminded him to use sanitizer. Dr. Delashaw did apply sanitizer, thanked the nurse for reminding him, and told everyone in the room how important the use of sanitizer was. I thought Dr. Delashaw's response was very nice, and I use it as a teaching example with my residents.

11.    I strongly support Dr. Delashaw's continuing practice of medicine, and the restoration of his medical license.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Department of Neurosurgery, UNM on May 31, 2017.

_____
SEYMUR GAHRAMANOV, M.D.

ATTACHMENT 18

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>JOHNNY B. DELASHAW, JR., MD<br>License No. MD00023061<br><br>Respondent. | No. M2016-1084<br><br>DECLARATION OF SANDRA GILCHER-KIMMEL |

I, Sandra Gilcher-Kimmel, declare as follows:

1.      I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      To give you a brief background, my dad, Robert "Bob" Gilcher underwent surgery on April 19, 2016, to have a pineal region brain tumor removed. He was a 78-year old man, in otherwise good health and full mental capacity. He was referred to Dr. Delashaw by his long-time family doctor, in Hermiston, Oregon. Dr. Delashaw had very frank and definitive conversations with my dad and mom about the risks involved and the complexity of the surgery, and also the prognosis of the tumor taking its own course over the next few months without surgery. My dad understood and readily acknowledged and accepted the risks of the surgery.

3.      Sadly, there were unforeseen complexities regarding the tumor and complications during the surgery. My dad came out of it in a coma, which he remained in for nine days until the family agreed, knowing there was little to no hope of a meaningful recovery, to remove life support. There were five surgeons involved in my dad's surgery, but Dr. Delashaw is the one who came to us afterwards (and it was after 11:00 p.m.) to let us know how it all had gone. He took his time and he spoke with us candidly about the complications with the surgery. He did not have to share all the details that he did, we would never been the wiser. Over the course of the next nine days, Dr. Delashaw was not only forthcoming and compassionate with us, he made himself available to us 24/7. On day three following the surgery (it was a Friday), he shared with

us that he had to make a trip to Hawaii for the weekend for a wedding. It was not just any wedding, he had an important commitment to go. But, he gave us his personal cell number and told us we could call with any questions or concerns at any time. He certainly did not have to do that! We would never have even known he was gone, if that had been his desire. And he came and spoke with us on the day he returned. Doesn't sound much like a surgeon who is more focused on high volume numbers of surgeries and money rather than patients, does it?

4. From the night my dad came out of the surgery, there was a family member (and more often than not, several family members) at his bedside round the clock, literally, for nine days. The ICU nurses and staff at Swedish Cherry Hill Neuroscience Institute were so kind to us. They not only took good care of their primary patient, my dad, they also engaged with and took good care of their secondary patient, his family. Over the course of nine days and nights, we were never asked to leave the room. We were given the option whenever they were bathing or changing bedding, and we left momentarily out of respect for my dad.

5. There are many things, every single one of which is positive, I could share about our experience in ICU at Swedish and with Dr. Delashaw. I kept daily detailed notes so I could journal my dad's last nine days and since these allegations came out about Dr. Delashaw and Swedish Cherry Hill Neuroscience Institute ICU, I've gone over and over those notes, my journal and in my mind about those nine days and I can't find one red flag, nor can I remember a single instance where any of my family had reason to question Dr. Delashaw or the quality of care my dad was receiving in ICU. All were above reproach.

6. I'm so disappointed and saddened to have not seen an "other side of the story" describing all of Dr. Delashaw's thousands of successes or his skill and contributions to the successes and improvement of intricate, complicated brain surgery. I've had people comment to me about my dad's "bad outcome" but it's become a positive sharing opportunity. It was anything BUT a "bad outcome." My dad had the best team of surgeons we could have hoped for. He had the best ICU care we could have hoped for. He did not suffer. It was simply his time to be called home. I wonder how people think doctors and surgeons learn and improve

things, if they never have complications during surgeries? We have never once regretted my dad having the surgery. We have never once questioned anything about Dr. Delashaw. We know that Dr. Delashaw made every effort for my dad's surgery to be successful.

7.    I'm angry with the Seattle Times for capitalizing on publishing one sad, unfortunate outcome for one patient, but not sharing any others. I feel incredibly sad for all the people who may not be able to have the skill and expertise of Dr. Delashaw available to them when they need it most. To think that all he knows may be lost to the medical world because of these allegations, is unfathomable.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Portland, Oregon on June 2, 2017.

SANDRA GILCHER-KIMMEL

ATTACHMENT 19

From: Steve Giles ████████████████████████
Sent: Friday, June 2, 2017 3:10 PM
To: Amy M. Magnano <AMagnano@bbllaw.com>
Subject: Delashaw, Johnny

To Whom It May Concern,

I worked closely with Dr Johnny B. Delashaw as a physician assistant in the OHSU Department of Neurological Surgery through 2010. I had the opportunity to see him care for a wide variety of neurosurgical patients. He did so with great professionalism, skill, passion and empathy. He ran a very busy practice utilizing resident physicians, fellows and physician assistants.

Within scope of practice parameters, each of us performed direct patient care under his guidance and supervision.

Dr Delashaw demonstrated responsible and appropriate patient care. He followed both inpatients and outpatients and arranged for appropriate coverage when off site.

I feel that his utilization of fellows was within the standards of similar practices across neurological surgery and other specialities where these doctors are considered to be junior attending physicians.

I believe that he has served as a stellar member of the neurological surgery establishment and that he has trained and mentored numerous skilled neurosurgeons who are in practice across the United States today providing care to the citizens of this country.

He is an asset to the medical community and preventing his continued practice of neurological surgery in the State of Washington will be to the detriment of those in need of his skills.

I have the utmost respect Dr Delashaw.

Regards,

Stephen G. Giles, MSPAC, PHD

ATTACHMENT 20

**From:** Robert Hart ▓▓▓▓▓▓▓▓▓▓▓▓
**Date:** June 2, 2017 at 9:29:52 PM PDT
**To:** Todd Welch ▓▓▓▓▓▓▓▓▓▓▓
**Cc:** "Amy M. Magnano" <amagnano@bbllaw.com>
**Subject: Re: Dr. Delashaw**

Ms Magnano:

Sorry that I did not have more availability to talk yesterday (Friday). I will add briefly to Mr.
Welches comments here.

Johnny Delashaw is simply put, a surgeon's surgeon. What I mean by that is that his technical
skill, experience, and calm demeanor all should serve as examples to be modeled by surgeons
desiring to up their game. There is not a surgeon or a man of Dr. Delashaw's ability or character
behind every corner. He is uniquely skilled across the many domains that determine the ability
of a surgeon and physician. I feel it is a travesty that he is being called out in the press in a
manner that I would call at best unsubstantiated, and at worst orchestrated by lesser talents that
are threatened by and jealous of his skills. I hope and believe that you will prevail in restoring
his name and reputation to his rightful position in the medical community.

With regards

Robert Hart, MD

ATTACHMENT 21

**From:** FRANK HSU ██████████████████
**Sent:** Friday, June 2, 2017 3:27 PM
**To:** Amy M. Magnano <AMagnano@bbllaw.com>
**Subject:** Letter for Johnny Delashaw

June 2, 2017

To whom it may concern,

I am writing a letter of support for Dr. Johnny Delashaw, Jr. I have known Dr. Delashaw for 21 years. I have gotten to know him very well. He is a man with the highest integrity. He has been a great mentor to me. I first met him when I was a resident for neurosurgery training at Oregon Health Sciences University. I was under his tutelage for 7 years. After a few years he then recruited me to join him in an academic practice when he was the Chair of the Department of Neurosurgery at the University of California, Irvine. I have gotten to know him as a mentor and boss professionally.

I admire Dr. Delashaw as a teacher. He is a compassionate physician. He is a master surgeon. He is tireless in teaching future generation of neurosurgeons. All his trainees share this admirations for him. We all learned a great amount from him. There are countless of patients and families helped by him directly and indirectly by numerous trainees he educated. His work ethic is second to none. He is the most industrious physician I have ever met. He is eager to help people and sometimes at the expense of self sacrifice.

Dr. Delashaw is a kind and generous person. His demeanor is friendly and caring. His patients love him and trust him. He is very approachable. His positive attitude definitely is infectious and he certainly has great influence on his peers and friends. He treats people with respect and is well liked by most colleagues.

I unconditionally support Dr. Delashaw's character. My personally experiences training under him and working for him affirmed my believe that he is a great physician and educator. If you have any further question please don't hesitate to contact me.

Sincerely yours,

Frank P. K. Hsu, MD, PhD
Chair of Department of Neurological Surgery and Physical Medicine and Rehabilitation
University of California, Irvine

ATTACHMENT 22

Amy,

Thank you for giving me the opportunity to write this letter on behalf of Dr. Johnny Delashaw. I am aware of the allegations against your client, and I find them deeply troubling and disturbing for a variety of reasons that I will address in depth. I volunteer this information freely, willingly, and without obligation. It is my sincere hope that my input will help to dispel any and all allegations against your client.

My name is Christopher L. Hubbard. I am forty years old, and have lived in Seattle, Washington since July of 2012. Prior to my career in the medical device industry, I was a senior officer and combat pilot in the United States Navy. I retired from naval service as a highly decorated F/A-18 Super Hornet pilot. I have served in Operation Enduring Freedom and Operation Iraqi Freedom. I have over 3000+ flight hours and 1000+ combat hours. I have over 400+ carrier arrestments and night landings aboard the USS KITTYHAWK and USS STENIS. I was a Division Lead, Lieutenant Commander, and leader of men for many years. My honor, courage, and integrity as a senior officer and warfighter were the foundations of my success and reputation amongst my peers. One does not attain such credentials in Naval Combat Aviation without consistently demonstrating the integrity and commitment to earn the trust and respect of his fellow war fighters. We were the top 1% in all of US combat aviation. It is therefore extremely important that this fact is highlighted so as to add credibility and worth to my statements about Dr. Johnny Delashaw, as I do not make them lightly. What I will state to you is 100% factual to the best of my knowledge and I will testify to the following statements if I am required to do so.

Currently, I am a Spine Territory Manager for Globus Medical. I have worked in the medical device industry since 2010. I first met Dr. Delashaw in November of 2015 at Swedish Cherry Hill. I approached him at the Swedish Science Foundation during a cadaveric lab and training session. As a STM, I was trying to introduce myself to him as a means of establishing a professional relationship. The goal was to introduce him to my company in the hopes of showing him the value that our products could bring to his patient base and spinal practice.

From the very first introduction, Dr. Delashaw treated me with the utmost professional respect and courtesy. This is not the norm among surgeons and especially amongst neurosurgeons. In fact, one of the most difficult aspects of my transition from military service and into the medical device field as a consultant was how poorly the surgeons at times would treat us. I was used to receiving the utmost respect and courtesy as a naval aviator and it was a harsh awakening moving to the medical field in a support role. Surgeons are mostly condescending, arrogant, disrespectful, and rude. Dr. Delashaw is the exact opposite. In my experience he has always been respectful, courteous, professional, and kind. I have yet to recall a time in the hospital or outside the OR that I haven't seen him in a light-hearted and magnanimous mood. My experience with him in the Operating Room has been overwhelmingly impressive and positive. In fact, when I was appraised of the allegations against your client in this environment I was appalled.

The OR and cockpit environments are eerily similar. One does not enter either without a meticulously detailed plan, an absolute knowledge of the expected procedural undertaking, and the ability to adapt to and overcome the many obstacles and surprises that are not part of that plan. One has to be calm, cool, and collected at all times and especially when under extreme duress. I have flown with the very best pilots in the world, and the one trait that they all shared

1

was simple: the ability to circumvent and solve any unexpected problem with a certain ease and confidence as if they knew what was coming. Dr. Delashaw is no different. In fact he is the same.

The OR is no different than a fighter jet cockpit, however what I have witnessed in surgeon behavior in my career as a consultant is frightening compared to what I was used to as a pilot. I have witnessed the exact opposite of what I knew as a pilot. I have witnessed surgeons panicking, not knowing their procedural steps, yelling and screaming at their staff, not being able to overcome procedural difficulties, rudeness, extreme fatigue, unpreparedness, arrogance, overconfidence, and the like.

What is so impressive to me in the OR about Dr. Delashaw was his professional demeanor. His OR presence was always calm, cool, and collected. Add to that the extreme stress he would endure in training his fellows, in an environment that can not afford error, just adds to his overall stellar professional character. I forgot to mention that I was an F/A-18 Flight Instructor for the final three years of my naval career, so I am well versed in the stresses of trying to pilot an aircraft while keeping watch over student pilots, or worse yet being in the same cockpit (like the OR) and trying to complete the mission successfully with a person who was actually trying to crash the plane.

As a mentor and teacher, Dr. Delashaw was always prepared, never fatigued, and consistently entered the OR with a humorous and charismatic personality that was infectious. The staff loved him and he was well respected and admired by his fellows. I deeply respect and admire him. He is a requisite expert in his field. In fact, it was because of this one personality characteristic that I looked forward to working with him on every case. I always knew what I was getting with Dr. Delashaw. I always knew I would be working with a surgeon who was kind, funny, professional, respectful, and ALWAYS in a good mood. I can not remember a time that he wasn't smiling, cracking a funny joke, and generally ensuring that the mood in the OR was light-hearted and fun. He is one of the most gifted surgeons that I have ever seen. His knowledge of anatomy and procedural applications is exemplary.

I therefore am appalled and offended to hear of the allegations against him, suggesting anything other than the aforementioned facts is absurd. Dr. Delashaw is the last person who would ever conduct himself in such ways as finger-pointing or throwing things in the OR. That would never happen and is in complete contradiction to his character, personal demeanor, and professional acumen. Dr. Delashaw, in the 40+ times that I have worked with him, has conducted himself at ALL times with honor and aplomb.

On the contrary, it was the OR and nursing staff that was consistently unprepared, unprofessional, moody, arrogant, and unable to perform their professional duties at a minimum requisite level on a consistent basis. It would be so bad at times that I was amazed at that one fact: Regardless of what was happening or transpiring around him, Dr. Delashaw at ALL times, remained calm, cool, and collected. Always professional. Always courteous. He was a true pleasure to work for and with.

Any allegation to the contrary is a 100% fabrication and a lie. I am disgusted to see such allegations having any weight what-so-ever. I am inclined to believe that these allegations were made against him by an individual or individuals who had malicious intents to harm your clients career.

If there is any additional information that I can provide, please do not hesitate to ask. I would trust Dr. Delashaw with my life in the OR, and it is for the exact aforementioned reasons that I would do so.

Thank you,
Christopher L. Hubbard.

ATTACHMENT 23

## STATE OF WASHINGTON
## DEPARTMENT OF HEALTH
## MEDICAL QUALITY ASSURANCE COMMISSION

In the Matter of:

Johnny B. Delashaw, M.D.

                Respondent.

MQAC File No. 2016-3527 MD

DECLARATION OF PATRICIA HUDSON

I, Patricia Hudson, declare as follows:

1.     I am the Director of Human Resources at Swedish Health Services, in Seattle, Washington. I am over the age of 18 years, am competent to testify, and have personal knowledge of the matters set forth herein.

2.     I obtained my bachelor's degree in Psychology from the University of Washington in 1991. I then obtained my Master's in Management Degree from University of Phoenix. I have been working in Human Resources since 1987. Prior to my work at Swedish, from 2002-2015, I was the division HR Manager for the Seattle division of Safeway, in which I managed 14 people and was responsible for approximately 27,000 employees in a five state area. I left Safeway to join Swedish in March 2015.

3.     In my role as Director of Human Resources, I manage the campuses at Swedish First Hill and Swedish Cherry Hill. When I began at Swedish in March 2015, there was a change occurring at Swedish Neuroscience Institute (SNI). Before I joined Swedish, SNI had a more standard operating day. However, when I arrived the schedule was changing to a setting more geared toward round the clock surgical care.

4.     Due to the changing schedule, a number of nurses were having and reporting issues with the change in workload. Accordingly, I interviewed approximately 10-12 nurses of the thirty-four in total, and ten physicians at SNI, including Dr. Delashaw, to see what they were looking for at SNI.

5.      This project became a year-long endeavor, in which we formed a steering committee to foster communication between the physicians and nursing staff. On the committee, there were five physicians and four nurses, and over the course of the year, I believe the committee was doing very good work together. However, over the course of the year, we did have some of the nurses leave, due to the fact that the workload had increased.

6.      Dr. Delashaw served on the steering committee. Dr. Delashaw attended the majority of these meetings over the course of the year. He made himself available and open during this process. While I had some nurses report that they perceived Dr. Delashaw was intimidating to them, I had no reports that amounted, in any way, that Dr. Delashaw yelled at any of the nurses, or ever threw anything at anyone.

7.      In fact, when I met with Dr. Delashaw, he was very engaged in maintaining a positive environment at SNI, he wanted the nurses to be able to talk frankly with the physicians, and he was very committed to this process on his end.

8.      I have received no reports to Human Resources, between March 2015 and present date, that Dr. Delashaw yelled at a nurse, or threw anything in the OR.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on August 4, 2016.

Patricia Hudson

ATTACHMENT 24

In the Matter of the License to Practice as a
Physician and Surgeon of:

Johnny B. Delashaw, Jr., MD
**License No. MD00023061**

                Respondent.

No. M2016-1084

**SUPPLEMENTAL DECLARATION
OF PATRICIA HUDSON**

I, Patricia Hudson, declare as follows:

1.     I am the Director of Human Resources at Swedish Health Services, in Seattle, Washington. I am competent to testify, and have personal knowledge of the matters set forth herein. This declaration supplements the declaration I signed on August 4, 2016.

2.     In my work on the steering committee that I testified about in my August 4, 2016 declaration, I attended one meeting where three of the charge nurses at SNI, Caroline Dufault, Niki Ellington, and Bernadette Haskins, advised the group that they were leaving Swedish Neurosciences Institute (SNI) to go to Swedish Orthopedic Institute. I was surprised at their news and thought it was unfortunate, because of how much work the steering committee had put in over the year: meeting once a week on Thursdays, and occasionally, for hours at a time. All three were members of the steering committee. Although I cannot recall the specific language they used, all three advised generally that they were leaving because they had been at SNI for some time and were ready for a change. The nurses did not say they were leaving because of Dr. Johnny Delashaw.

3.     I have been advised that there are allegations before the Medical Commission that Dr. Delashaw yelled, intimidated, swore or threw things at the staff at SNI. I did not witness this behavior by Dr. Delashaw, and I did not receive any reports from nurses that he had engaged in this behavior.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on June 2, 2017.

Patricia Hudson

ATTACHMENT 25

June 1, 2017

Dear Johnny,

We, your former residents, fellows, and colleagues are writing this letter to express our gratitude for everything that you have given to us over the years. All of us have benefitted from your generosity, time, and expertise as a teacher, neurosurgeon, and friend.

We know that the last several months have been a challenging time and we wanted to show you our support and appreciation for you as a mentor and friend. For several decades, you have touched and impacted many lives of patients, students, and trainees. Because of your contributions, we have become better doctors and better surgeons. As such, we are honored and privileged to part of your legacy in neurosurgery.

Sincerely,


Matt Hunt
Frank Hsu
Zachary Litvack
Justin Cetas
Ahmed Raslan
Kenny Liu
Jason Weinstein
Jonathan Carlson
Jeff Raskin
Aclan Dogan
Jordi Kellogg
James K. Liu
Michael Horgan
Todd Kuether
Hai Sun
Ray Tien
Mark Piedra
Farhad Limonadi
Eric Thompson
Samuel Hughes
Emun Abdu
Daniel Guillaume
Kapil Moza
Kiarash Golshani

ATTACHMENT 26

STATE OF WASHINGTON
MEDICAL QUALITY ASSURANCE COMMISSION

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>JOHNNY B. DELASHAW, JR., MD<br>License No. MD00023061<br><br>Respondent. | No. M2016-1084<br><br>**DECLARATION OF**<br>**JOSEPH KEEN, M.D.** |

I, Joseph Keen, M.D., declare as follows:

1.    I am one of Dr. Delashaw's former fellows. I am over the age of 18 years, am competent to testify, and have personal knowledge of the matters set forth herein.

2.    I am currently a neurosurgical oncology fellow at Emory University. In 2014-2015, I worked with Dr. Delashaw as a visiting 5th year resident from the Loma Linda University Neurosurgery Residency Program. During my year at Swedish, I was in approximately 400-500 surgeries with Dr. Delashaw, and as such, I had close observation of both his surgical and professional demeanor.

3.    In my experience of several hundred surgeries with Dr. Delashaw, aside from being one of the most skilled and competent surgeons I have ever worked with, I also found Dr. Delashaw to be one of the most pleasurable neurosurgeons to work with and interact with in the operating room. Despite the fact that he was regularly performing some of the most complicated and difficult surgeries in neurosurgery, he was always approachable, professional, and maintained great composure, even in the most challenging surgeries.

4.    In the 400-500 surgeries I had with Dr. Delashaw in the operating room, I never witnessed any disruptive behavior. I have never seen him raise his voice to any staff member, let alone throw an instrument. In my experience, Dr. Delashaw was a very good surgeon to work with in the OR. While there were moments that were very serious given the complex nature of the surgery, I never witnessed him yell at anyone or exhibit any negative behavior during those

times. I also never witnessed any comments or movements by Dr. Delashaw that I perceived to be intimidating to any of the staff.

5.    In the vast number of surgeries I had with Dr. Delashaw, and in my experience with him outside of the operating room, I never saw or was aware of him discouraging staff members from reporting any issues they had in the operating room. Additionally, I never saw him discouraging any of the staff from communicating with him during or after surgery. In fact, my experience was the opposite: that he encouraged open communication with and from the staff at Swedish.

6.    Dr. Delashaw was also an extremely skilled educator. Dr. Delashaw had a unique ability to simplify many matters of neurosurgery and neurosurgical education that otherwise seem relatively convoluted. Dr. Delashaw's efficiency and high level of skill routinely made challenging surgeries appear straightforward.

7.    Regarding bedside patient care, Dr. Delashaw was one of the few attending neurosurgeons in all of my training that rounded on his patients daily (routinely in the morning and evening). Without question, he was always professional and had a unique skill of helping patients feel more comfortable despite the graveness of their disease. Dr. Delashaw always exuded confidence, which I believe translated into patient and family comfort and confidence. Even for difficult or adversarial patients, he maintained his professionalism and composure. Dr. Delashaw loves his job and loves working extremely hard for his patients; and this resulted in very positive interactions with patients and their families.

8.    In summary, I believe Dr. Delashaw is a great neurosurgeon and educator. He is the surgeon I would want for my family or myself, if the situation arose.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at _Atlanta_ , _GA_____ on May _30_, 2017.

_____
Joseph Keen, M.D.

ATTACHMENT 27



**MICHIGAN SPINE & BRAIN SURGEONS PLLC**

TECK M. SOO, MD FRCS(ED) FRCSC FACS
PETER L. BONO, DO
RODERICK CLAYBROOKS, MD
RYAN J. BARRETT, DO FACOS
BOYD F. RICHARDS, DO
CLIFFORD M. HOUSEMAN, DO
PRASHANT S. KELKAR, DO

May, 27 2017

To Whom it May Concern:

I am a neurosurgeon practicing in Detroit, MI, and a former fellow of Dr. Johnny Delashaw from 2014 – 2015 at Swedish Neuroscience Institute. Recently there has been a flurry of bad publicity against Dr. Delashaw that ultimately led to his voluntary resignation from his position at SNI.

My unbiased opinion from hundreds of miles away is that a small group of neurosurgeons and their allies ganged up and gave a one sided story to the Seattle Times to further their agenda. The sad aftermath is that they willingly devastated, in my opinion and others', the career of one of the best neurosurgeons in the country.

Dr. Delashaw is nationally and internationally known to be a surgeon's surgeon. He has trained hundreds of residents/fellows/and colleagues to become better neurosurgeons and advance their careers and give their patients better outcomes.

He is well liked by his patients and staff that he closely worked with. In my year at SNI I never once witnessed him being verbally or psychologically abusive, I never saw him lose his temper or control of a situation. He was a fair and honest surgeon who gained the respect of those around him because of his lovable personality, his excellent skill set as a surgeon, and his obvious caring nature he had for his patients/fellows/residents/nurses/scrub techs/colleagues.

He rounded at least once every day on his patients, he was present for every single operation, I have no recollection of any negligence or behavior that put a patient in harm's way. He is a high energy, and high efficiency/low drag surgeon who expects those around him to excel and achieve to the same standards he sets.

Seattle Times did what they do best, wrote a good story. But there is no process in place to prevent them from steamrolling an individual's career if they can't get the story to fit the audience. Bottom line is that the fictional and dramatized nature of the articles published filled with half-truths serves only their purpose.

I ask that you look at Johnny Delashaw's career, outcomes and interactions from a clearer lens. With due diligence you will find the big picture shows that Johnny has had a positive impact upon neurosurgery locally in Washington/Oregon. Also, he has trained competent and safe neurosurgeons to extend that impact into the community nationwide. He is honest, professional, caring, hard working and talented. If further information is wanted I can be reached 24/7 by cell phone, 2488213132.

Regards,
Prashant Kelkar, D.O.
Neurosurgeon

PROVIDENCE MEDICAL BUILDING
22250 PROVIDENCE DRIVE
SUITE 601
SOUTHFIELD, MI 48075

PROVIDENCE PARK
26850 PROVIDENCE PARKWAY
SUITE 215
NOVI, MI 48374

OAKWOOD MEDICAL BUILDING
18181 OAKWOOD BOULEVARD
SUITE 202
DEARBORN, MI 48123

ST. JOHN MACOMB
11800 EAST 12 MILE ROAD
SUITE 208
WARREN, MI 48093

ATTACHMENT 28

From: Leah Kilmer███████████████████
Sent: Friday, June 2, 2017 11:37 AM
To: Amy M. Magnano <AMagnano@bbllaw.com>
Subject: Johnny Delashaw

Hello Amy-

My name is Leah Kilmer. I am a surg tech who went to school in Portland from 2000-2002 and did part of my clinical rotations at OHSU. Students were not really allowed in Delashaw's room because it took a higher level of scrub skill and wasn't usually a good teaching time for us. I was extremely interested and always watched from the window during my lunch breaks. I was diagnosed with Hodgkin lymphoma on spring break of 2002. I was only 18 and terrified. I had surgery and then was having chemo every other Friday and became so sick that I was allowed to do my clinical rotations whenever I could instead of the standard days and hours. Dr. Delashaw somehow heard of my story and interest in neuro and informed my clinical supervisor I could come into his rooms whenever I wanted. He took time to teach me things and made me feel so excited and in awe of neurosurgery. When I had to leave to break scrub to throw up, or even if I just looked like I was having a hard time, he was understanding, accepting and extremely supportive. It was because of him that I went into neurosurgery for the next 15 years after graduating. What I noticed, and what stuck with me about him, was that as long as you cared and genuinely tried then he was okay. He didn't tolerate laziness or incompetence, it instilled a foundation for me early in my career to really do my best everyday and to make my patients and surgeons proud.

My aunt needed surgery on her neck and I didn't hesitate to recommend him. She had an ACDF by him at OHSU and then years later a posterior fusion at Swedish by him. She travelled from Long Beach, WA to have him to her posterior fusion here in Seattle. We were all extremely happy with her care and her outcomes. She is devastated to learn what is happening. All she said was "who will help me now if I need further surgery later on." My mother's friend also needed surgery and I recommended him as well. She also had an excellent outcome at Swedish.

I trust him with my family members and am beyond grateful for what he did for me all those years ago. I can't speak to how he was at Swedish because I wasn't there, but can say that I feel like he has realistic expectations of his staff. I never saw him bully anyone. He set a high threshold for all the people helping him do his job, it wasn't however one that was difficult to meet. You just had to care about your job and your patient. Something that should be expected out of anyone, in any field of service.

Thank you for letting me share my experiences with Dr. Delashaw. I wish him all the best and hope the outcome of this can be a positive one for him.

Leah Kilmer

Sent from my iPhone

1

ATTACHMENT 29

STATE OF WASHINGTON
DEPARTMENT OF HEALTH
MEDICAL QUALITY ASSURANCE COMMISSION

No. M2016-1084

In the Matter of the License to Practice as a
Physician and Surgeon of:

DECLARATION OF RICHARD A.
KIRKPATRICK, MD

JOHNNY B. DELASHAW, JR., MD
License No. MD00023061

            Respondent.

I, Richard A. Kirkpatrick, MD, declare as follows:

1.      I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I am a physician licensed to practice in Washington State since 1976. My medical degree is from the University of Washington School of Medicine. I completed my residency and fellowship at the Mayo Clinic. Since 1976, I have practiced as an internist in Longview, Washington at Kirkpatrick Family Care, a practice founded by my father and uncle. Our clinic has three physicians, four PA-Cs, and four ARNPs.

3.      I have known Dr. Johnny Delashaw, Jr. since he was a kid. He and my wife were high school classmates. I know him as "Johnny Bill," and am happy to consider him a personal friend. I also knew his father, Dr. (Johnny) "Bill" Delashaw, Sr., who practiced medicine in Longview. I have the utmost respect for Johnny Bill, including the quality of his medical skills, the results he achieves for patients, his communications with patients, and his personal and professional demeanor. He is in every way an excellent physician.

4.      Our practitioners and I have referred almost 400 patients to Johnny in recent years while he has been at Swedish Neuroscience Institute. Many others from Longview received care from him when he was at Oregon Health Sciences University in Portland. He is very accessible, and is always willing to add another patient to his clinic schedule and to answer questions day or

night, weekdays and weekends, even when he is out of town or out of the country.. The outcomes he has achieved for them are excellent. Based on my experience and personal knowledge of these patients, Johnny's complication rate is extremely low. ~~Nearly all~~ Most of the patients I have referred to Johnny for neurosurgical care have told me that they owe him their happiness, if not their lives.

5.      I am familiar with the allegations that the Commission has received against Johnny. The allegations of disruptive or unprofessional conduct are ~~simply not true. That is~~ contrary to my decades of personal experience with him, as well as the reports I receive from patients and students, residents, and fellows who have been with him in the operating room.

6.      I completely support the medical practice of Johnny B. Delashaw, Jr. I urge the Medical Commission to restore his license so that he can return to providing life-saving medical care for the residents of my community and around the state.


I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Longview, Washington on June 5 , 2017.

_Richard Allen_
_____
RICHARD A. KIRKPATRICK, MD

ATTACHMENT 30

STATE OF WASHINGTON
DEPARTMENT OF HEALTH
MEDICAL QUALITY ASSURANCE COMMISSION

In the Matter of:

Johnny B. Delashaw, M.D.

Respondent.

MQAC File No. 2016-3527 MD

DECLARATION OF DANIEL
KLINGER, M.D.

I, Daniel Klinger, declare as follows:

1.    I am a neurosurgeon practicing in San Antonio, Texas.  I am over the age of 18 years, am competent to testify, and have personal knowledge of the matters set forth herein.

2.    I obtained my medical degree from University of Texas Southwestern in 2008.  I then completed a neurosurgery residency between the years of 2008-2015.  I came to Swedish Health Services in June 2015 to complete a post-graduate skull-based neurosurgery fellowship with Dr. Johnny Delashaw.  I completed that fellowship in June 2016.

3.    During my fellowship, I worked with Dr. Delashaw on an almost daily basis.  In my experience with Dr. Delashaw over the course of a year, he was very laidback, very upbeat, and very professional with the staff.  During the year that I spent at Swedish Neurosciences Institute (SNI), I never witnessed Dr. Delashaw raise his voice with any of the operating room staff, or engage in any type of violence.

3.    I was at the hospital on December 21, 2015.  I was in operating room (OR) 5 at SNI on that date, and saw Dr. Delashaw at multiple points during that day.  At no time during that day did I witness Dr. Delashaw throw anything in the OR or raise his voice to anyone on the staff.  I also did not hear any reports regarding this type of behavior.

4.    In fact, during my time at Swedish, I never heard any of the staff or physicians mention anything that relates to the allegation presented in this initial complaint, that Dr. Delashaw threw a cell phone at a member of the nursing staff, or that he yelled at one of the nurses.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at San Antonio, Texas on July 28, 2016.

Daniel Klinger, M.D.

ATTACHMENT 31

To whom it may concern:

Last June, following Father's Day weekend, I started to have some noticeable neck pain. After a few weeks, I went to see my local physician and he assured me that it was nothing major and nothing some ibuprofen couldn't fix. I began taking ibuprofen daily and failed to see any improvement in my pain. Hoping the pain would go away, I waited a few months. A few months had passed and the pain had gotten much worse. I decided I would give physical therapy a try. I did physical therapy for a month, three times a week and nothing had changed. I became frustrated and came to the realization that I needed a real diagnosis so I spent my money on a MRI. The MRI revealed that I had a severe herniated disc at the C6-C7 level. After consulting a spine "expert", she advised that a steroid injection would fix the issue. I then paid for a steroid injection in which I was assured that this would all but eliminate the pain in my neck, if not help tremendously. It didn't. My pain had gotten worse.

Following the steroid injection, I could barely cope with the pain. I left work one day in the afternoon due to the pain and couldn't return until the issue was resolved. I reached out to a local surgeon, who I will not name, and he agreed to see me the following week. I explained that my pain tolerance was a 10 on a scale from 1-10 and his secretary confirmed the earliest he could see me was 9 days later. Once I met the surgeon, he told me what I already knew: I needed surgery. He suggested getting 2-level surgery, instead of 1-level surgery, even though my herniated disc was only 1-level. I then had to go back and forth with my insurance company to try and get the 2-level surgery approved as it is extremely expensive. After writing an appeal and many not-so-pleasant arguments back and forth with their representatives, they stood firm and only approved 1-level surgery. My mother suggested getting another opinion, which I laughed at the idea as I figured whoever I meet with next will tell me the same thing. Getting a second opinion was one of the best decisions I had ever made – the second opinion was from Dr. Johnny Delashaw.

Dr. Delashaw didn't make me wait 9 days to see him, in fact, he saw me the following afternoon. He also informed me that 2-level surgery was absolutely not necessary and 1-level surgery was ideal, (something I wish I knew and hadn't wasted a week and a half on with the insurance company in severe pain.) He wasn't trying to sell me on using him as my surgeon – he genuinely cared about my wellbeing. He understood my sense of urgency. On the car ride home, I thought to myself, "this guy met me within 24 hours, compared to 9 days, recommended the necessary surgery instead of an unnecessary approach, and can help me sooner than later." It was an easy decision and more importantly the right decision.

He performed the surgery and hours following the surgery he came up to my room and checked on me. His bedside manner meant a lot to me because I knew how busy he was and he still took the time to make sure I was healing properly. Furthermore, sometime after the surgery, I had some concerns. I didn't want to bother him, but I reached out to him via email. Within the day, he didn't reply to my email, instead, he gave me a phone call. He assured me that my symptoms were normal and gave me peace of mind that I would be alright. I am now close to pain-free and I have Dr. Delashaw to thank for my health. I couldn't imagine where I'd be today without his prompt assistance to my excruciating pain. I didn't know he was a world-renowned surgeon before I had met him, however, following the surgery, I would be shocked if he wasn't. If I were to ever need surgery again, God forbid, I wouldn't trust anyone more than Dr. Johnny Delashaw.

Best regards,

KJ Larsen
Relocation Consultant
Prestige Moving & Storage
Phone: (503)682-8832
Cell: (503) 866-7518
Fax: (503)682-8872



    



WOMEN'S CHOICE AWARD
WOMEN'S MOST RECOMMENDED
MOVING COMPANY

ATTACHMENT 32

| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>JOHNNY B. DELASHAW, JR., MD<br>License No. MD00023061<br><br>Respondent. | No. M2016-1084<br><br>**DECLARATION OF ZACHARY LITVACK, MD** |
| --- | --- |

I, Zachary Litvack, MD, declare as follows:

1.     I am competent to testify, and have personal knowledge of the matters set forth herein.

2.     I am a board certified Neurological Surgeon.  I hold active privileges at Swedish Medical Center, Swedish Issaquah and Providence Regional Medical Center Everett.  Prior to joining Swedish Neuroscience Institute in April 2016, I practiced in Washington DC where I was employed as active full time faculty at The George Washington Medical Faculty Associates.  I served as assistant Program Director for the ACGME accredited residency program in Neurosurgery at GWU, and currently serve as Director of Education for Swedish Neuroscience Institute.  In these roles, I have received additional training and have personal experience in identifying and remediating issues with physicians and physician trainees.

3.     I have known Dr. Delashaw since 2003.  From 2003-2010, I served as his resident and chief resident at OHSU and worked closely with him during this time.

4.     I am aware of the specific allegations against Dr. Delashaw of: 1) Engaging in a pattern of intimidation with staff; 2) Discouraging staff from reporting errors; 3) Discouraging staff from asking questions; and 4) Contributing to the loss of experienced personnel.  In my many years of working with Dr. Delashaw, I have never personally observed or have direct knowledge of any behavior or interaction of the type described in those allegations.  When I was his trainee,

Dr. Delashaw consistently treated me with professionalism and respect despite the power gradient between attending and trainee.

5.    I have been working full time at Swedish as his practice partner since April 2016. In this time, he has continued to impress me with his work ethic, and his commitment to improving quality of patient care within the institute. He held himself and those around him to high clinical and moral standards. He consistently exhibited technical skill and physical fitness during long and difficult operations which exceeded many of his faculty peers. I have yet to witness any action, incident or behavior that I would consider a direct threat to patient safety or quality outcomes or create an unreasonable risk that a patient may be harmed.

6.    It is my experience that he has always been reliable in his attending to patients in need. He has not exhibited any of the unreliability, erratic behavior, or internal inconsistencies which for me raise red flags for potential problems for disruptive conduct or unprofessional behavior. I have never personally witnessed nor have direct knowledge of interactions with staff that I would consider disruptive or unprofessional conduct.

7.    I recall being present at a meeting on October 30, 2016. The topic of the meeting was Dr. Delashaw's fitness as Chair of Swedish Neuroscience Institute. While my name appears in notes of this meeting, which are attached to a letter dated November 4, 2016 from Dr. Charles Cobbs to Anthony Armada, I was not aware that notes of this meeting were being generated, nor was I afforded the opportunity to review those notes, suggest changes, or approve them as formal minutes. The notes do not accurately reflect my view of what transpired during the meeting. No vote was taken on any action plan, motions, or proposals, or on any minutes of the meeting. The letter to Mr. Armada dated November 4, 2016 does not represent my views.

8.    I have no hesitation in recommending Dr. Delashaw for an unrestricted license to practice medicine and surgery. I have no question that when Dr. Delashaw is allowed to return to practice he will continue to make exceptional and positive contributions to patients in need.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on June __3__, 2017.

_____
ZACHARY LITVACK, MD

ATTACHMENT 33

To Whom It May Concern,

I am writing to you on behalf of Dr. Johnny Delashaw, who I have known for the last three years. I chose to apply for a neurosurgical fellowship at the Swedish Neuroscience Institute (SNI) in 2014 as I was finishing my residency training at Duke University to further my understanding of complex cranial surgeries. When I was informed that Dr. Delashaw would be the fellowship director, and I would be working closely with him over the course of 2014-2015, I was very excited as I heard quite a bit about him as a surgeon and as a person, overall.

I was able to spend time learning from and working with Dr. Delashaw for a year, in which I was thoroughly impressed not only by his surgical prowess, but also by his charisma, professionalism, optimistic and reassuring personality, and genuine respect and regard for his patients and colleagues. Whenever I needed his help, he was immediately available. Whether it was a small or larger matter, Dr. Delashaw was impressively quick to respond and provide guidance with a plan. His ingenuity, calmness in the operating room, and careful approach to patient care was inspiring for me.

When I finished my fellowship year at SNI, I remember sharing with Dr. Delashaw that I wished he had been one of my attendings at Duke where many of the attendings lacked some of the interpersonal skills and positive attitude that he displayed. I can share with confidence that Dr. Delashaw has been a fine example of a surgeon, mentor, and as a human being.

Sincerely,

Amitoz S. Manhas

ATTACHMENT 34

June 1 2017

To whom it may concern:

Re: Johnny Delashaw, M.D.

I am writing in support of Dr. Delashaw being fully re-instated as a Washington State medical provider. I have known and worked with Dr. Delashaw for over 20 years and thousands of cases in the practice of skull base surgery. He is the finest neurosurgeon that I have worked with. During our time together we took care of some of the most complex skull base patients in the United States. I was and am proud of the work we did together. We always had as our top priority great patient care. I have never seen Dr. Delashaw be abusive either verbally or non-verbally in the operating room or anywhere else. The accusations levelled against him simply don't ring true and seem more motivated by agendas that have no relation to the truth. The suspension of his license also seems draconian and not motivated by an honest investigation seeking the truth. I am curious as to how a currently unemployed neurosurgeon is an immediate threat to the public based on complaints that are years old. The facts do not support the allegations. I urge you to immediately re-instate Dr. Delashaw.

Sincerely

Sean O. McMenomey, M.D.

Professor NYU Medical Center

| | |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of:<br><br>JOHNNY B. DELASHAW, JR., MD<br>License No. MD00023061<br><br>Respondent. | No. M2016-1084<br><br>DECLARATION OF MARC MOISI, MD |

I, Marc Moisi, MD, declare as follows:

1.      I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I have known and worked with Dr Delashaw since October 2013 when he began at the Swedish Neuroscience Institute (SNI) where at that time I was a Complex and Minimally Invasive Spine Fellow and the Chief Administrative Fellow from 2013-2016. In 2016, I relocated to Wayne State University School of Medicine in Detroit, Michigan. My current status here is as a sixth year resident, but I will transition to join the faculty as an attending neurosurgeon within the next few months.

3.      Dr Delashaw received his medical degree from University of Washington and then went on to the University of Virginia to train under Dr John Jane, Sr. Since then he has been in practice for over 20 years with the majority of his time spent in Portland, Oregon at OHSU. He has always been a leader since his early career. He would find innovative ways to treat neurological conditions and he would teach others. He has a passion for medicine rarely encountered these days. He spends hours upon hours teaching his invaluable experience to residents and fellows and has done this over the entire length of his career. But most important to him is THE PATIENT. He tells you this from the moment you meet him. He tells you it is a privilege to take care of people in their most vulnerable states and with this comes great responsibility. He holds everyone to this level and expects each member of his team to function at that level daily.

4.     Dr Delashaw is a talented neurosurgeon, both as a technical surgeon and with his knowledge base. Dr Delashaw had a busy neurosurgical practice in the majority of the sub-specialties, including vascular, skull base, tumors and spine. He was busy, not because he was an aggressive surgeon, but because he has established himself as a leader in the field with successes in the most complex cases. I was on the Morbidity and Mortality committee both at the SNI and other institutions and I can affirm that Dr Delashaw had a lower complication rate than the national average, especially after taking into consideration the complexity of his referrals. If other surgeons operated on the complex cases he takes on, the patients would have several times higher levels of both morbidities and mortalities. In fact, he was so interested in his outcomes, when he became the chairman of SNI he completely restructured the way Morbidity and Mortalities (M and M) were looked at. He created a non-biased committee with different levels and members of the care team. He also facilitated the hiring of a Quality Nurse. Prior to his restructuring, the M and M meetings gathered information based on an honor system. With his new system in place each and every patient that was on the neurosurgical service, whether it was a surgical case, an admission or a consult, was identified and evaluated by the quality nurse. Once a patient complication was identified, it was then discussed and evaluated by the committee. If there was a M and M regarding one of his patients he never had a problem having the case presented or discussed because he was always honest and wanted to improve outcomes for future patients. This system is one of the most thorough systems I have ever seen and should be implemented in all hospital systems so that a true measure of success can truly be established.

5.     Although Dr Delashaw has a busy practice, he is quite conservative. I have sent him several patients (friends/acquaintances of mine), who in other centers were offered aggressive surgical plans and he opted for conservative management. He takes each patient's symptoms seriously and treats each one as he would a member of his own family. His patients all appreciate his honesty, knowledge and expertise. His sole goal as a physician is to cure to the best of his ability and he reminds us daily. He has also taught us to know our limitations as a

physician and know when to ask for help. Although he is quite a veteran surgeon as I have mentioned above, I have seen him on occasion to ask a partner for help in an exceptionally difficult case. This is a level of maturity developed through experience, placing the patient's outcome first and foremost above one's own ego. In addition, while a fellow there I have witnessed on several occasions that Dr Delashaw would refer patients to his other partners if a patient's specific diagnosis is not one where he thinks he can give the best care to the patient. This includes vascular patients that he would send to his endovascular colleagues, if he thought the patients' outcomes would be better with a different approach.

6.     As a physician scientist and an innovator, Dr Delashaw is well known in the academic community both nationally and internationally. He has published over 60 peer reviewed articles, book chapters and taught courses nationally and internationally. He brings innovative ideas and technologies to the field of neurosurgery, always pushing the field forward. He does this to better the lives of his patients and to provide the best outcome each and every time.

7.     Dr Delashaw has been in leadership roles much of his career. However, the one I can speak the best about is his position as an attending and then as the chairman of SNI. I started at SNI 3 months prior to Dr Delashaw. In the days coming up to his arrival, there was immense excitement amongst the attendings, the fellows and the staff. He had an excellent reputation as a technical surgeon with an extensive referral pattern especially for vascular and skull base diseases. His goal was to create a neurological institute of excellence. And that is exactly what he started to create. He was recruiting leaders in the field of neurosurgery to begin to practice in the institute as well as top fellows to train. He began laying the groundwork for a residency program. His vision was to create an environment that would produce translational research for the advancement of all neurosurgical disease while providing the best care for all patients. He was never interested in volume but instead in patient outcomes. He would round on all his patients with his team almost daily always ensuring the best care for each and every one of his patients. As a leader, Dr Delashaw would lead by example. In 1942 Tom Peters stated "Leaders

do not create followers, they create more leaders." This is true of Dr Delashaw's teaching and leading style.

8.      As opposed to how the Seattle Times attempted to portray him, I have never seen him raise his voice or ever "throw" anything in the OR. In fact, I've witnessed consistently that when he gets upset or frustrated he gets exceptionally quiet. He states that's because it is more important to always keep your control at all times, in every situation and this is not done by raising your voice. On one occasion, one of my co-fellows was a little rude to another OR staff member. I remember that Dr. Delashaw immediately grabbed us and took us into a room to instruct us that it is unacceptable to ever be rude to anyone at any time. He continued on to say that for a team to work there must be mutual respect for everyone, otherwise it couldn't be successful. Therefore, it came as a complete surprise to me that there were accusations that Dr Delashaw that he would raise his voice or be disrespectful of the staff. Those accusations are simply not accurate. I have never witnessed him raise his voice or be rude ever during my tenure at SNI.

9.      As a fellow and the Chief Administrative Fellow at SNI for 3 years, I interacted frequently with all of the SNI nurses and came to know them quite well. I was also very familiar with Swedish's QVR process, because any time a QVR was filed that involved an SNI fellow, I was usually made aware of it and at times participated in addressing the QVR. I recall one occasion at SNI when I overheard SNI nurse Elizabeth Hendershott speaking about a plan by certain SNI nurses to mount a "campaign" against Dr. Delashaw by filing numerous QVRs to disparage him. I have also observed on social media that certain SNI nurses or former nurses, including Niki Ellington, have been disparaging Dr. Delashaw and posted their negative attitudes about him without using his name directly, but the intentions were known. These posts have since been removed by said individuals. Rather than supporting Dr. Delashaw, and celebrating his professional successes, they appear to have been celebrating the media coverage of negative allegations against him. In addition, I have been made aware by a scrub tech and a nurse who are both still working in the Cherry Hill OR that their feeling, which they believe is also the

feeling of others, is that any issues regarding the work environment or "culture" were completely unrelated to Dr. Delashaw's presence there.

10.     The neurosurgeons that Dr. Delashaw has trained are practicing all over the US as leaders or future leaders in the field. He has one of the most sought-after skull base fellowships in the country, typically filling 2-3 years in advance. This is due not only to his expertise, technical skills and teaching methods, but also due to the complexity of the cases that have been referred to him.

11.     Finally, as a human being, Dr Delashaw has an innate ability to build a great rapport with everyone he encounters, from members of the staff, to fellows and of course with his patients. He is generous with his time and knowledge, he is honest with everyone he encounters, he is loyal, and he is admired by colleagues.

12.     The field of Medicine and Neurosurgery need more individuals like Dr Delashaw, who are not afraid to push the bar forward challenging the knowledge base and creating more cures and innovations for future patients. Every single day he is not practicing as a physician, is a day that a handful of patients that could have been helped or cured are not getting the best medical care possible. This is true not only for the patients he is caring for, but also the future generations of surgeons he is training. This number can then be extrapolated to thousands of patients that will not get the best care possible because his knowledge, technical skill, innovation and expertise will not be shared.

13.     I hope that my comments help elucidate the type of individual Dr Delashaw is and the need for him to continue with his career. I thank you for your considering my comments. If you have any questions please feel free to contact me at any time.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Detroit, Michigan, on June 2 _ , 2017.

MARC MOISI, MD

ATTACHMENT 36

STATE OF WASHINGTON
MEDICAL QUALITY ASSURANCE COMMISSION

In the Matter of the License to Practice as a
Physician and Surgeon of:

JOHNNY B. DELASHAW, JR., MD
License No. MD00023061

          Respondent.

No. M2016-1084

**DECLARATION OF ADRIENNE
ODEN**

I, Adrienne Oden, declare as follows:

1.      I am the former Director of Interventional and Perioperative Services at Swedish. I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I have a Bachelor of Science degree in nursing, and a master's degree in nursing. I have over thirty-five years of experience in both clinical nursing and nursing administration. During my clinical practice, I had a focus in neuroscience clinical nursing. However, I transitioned to nursing leadership in the mid-2000s.

3.      From 2005-2011, I worked as the Director of Perioperative Services at Saint Anthony Hospital. From 2011-14, I worked a nurse consultant to large hospital systems through a healthcare interim leadership consulting firm, BE Smith.

4.      In May 2014, I started at Swedish Medical Center, as the Director of Interventional and Perioperative Services at Swedish Issaquah. Through my initiation to the Swedish system at Swedish Issaquah, I became familiar with their Quality Variance Report (QVR) system. I have used the QVR software before at several other hospitals. The program is designed to report clinical variances; that is, a way to document internally if there are any process or safety issues.

5.      At Swedish Issaquah, the QVR system was utilized by the staff in the same way as it was at the other hospitals where I have worked, to report and document quality variances in medical and surgical procedures. Some general examples of this would be if a surgical instrument broke and caused a delay in surgery, or if there was a lost needle during the needle count and the

staff was required to take an x-ray. As the Director at Swedish Issaquah, I would filter through and resolve the QVRs.

6. When I was working at Swedish Issaquah, I encountered Dr. Delashaw half a dozen times when he was operating on that campus. I had no issues with Dr. Delashaw in my experience with him at Swedish Issaquah, and received no reports from any of the staff that they had issues with him in or out of the operating rooms.

7. In January 2016, I moved to Swedish Cherry Hill-Swedish Neuroscience Institute (SNI), as the Director of Perioperative Services. The QVR system at Swedish Cherry Hill was the same as the system at Issaquah, but I observed that it was used very differently at Swedish Cherry Hill. Some of the SNI nurses were using the system punitively toward the physicians, mainly to report interpersonal conflicts that they were having with the surgeons and nursing leadership. Some of the QVRs that I reviewed were not directed toward patient care issues, but rather, toward interpersonal conflicts between the staff and the neurosurgeons.

8. When I moved over to Swedish Cherry Hill in January 2016, I attended a meeting organized by the Chief Executive of the Swedish system, June Altaras. Other participants included an organizational development psychologist, and the physician and nursing leadership from SNI. My understanding of the purpose of the meeting was to improve the communications and culture among SNI staff and physicians. My understanding was that Swedish Human Resources had completed an assessment and recommended setting up these meetings to occur weekly. The January 2016 meeting that I attended was the first of these meetings.

9. The key physicians from SNI attended the first meeting, including Dr. Johnny Delashaw. Dr. Delashaw also attended every single one of the subsequent meetings. Dr. Delashaw was very hands on and very positively invested in the process.

10. Part of my experience in interim leadership at the hospitals where I consult is getting to know the physician administration and staff, and facilitating progress and movement through inevitable change at an organizational level. SNI was going through exactly this type of change. They were transitioning from a more community-based hospital to a more specialized

hospital, and a portion of the staff was unhappy with the transition and did not want to embrace either the transition or their increased workloads.

11. I understood the feelings of this group of nurses; occasionally, you work for an organization and over time the organization changes its strategies and objectives. When this group of nurses at SNI began their nursing career at Cherry Hill it was a more community based hospital. Over the past few years Swedish Cherry Hill has become a high acuity, high performance Neuroscience Institute providing care for patients from a across a wide geographical region. As such, this group of nurses simply would not embrace the change that SNI was going through.

12. I came to understand that the weekly interdisciplinary meetings were an ongoing and serious attempt to address and facilitate resolution of the issues of this group of nurses. I attended the majority of the meetings. I never witnessed any behavior from Dr. Delashaw at those meetings that concerned me. I never saw him behave in a way that was inappropriate, or that was consistent with the Commission's allegations. I never saw or heard that Dr. Delashaw yelled, swore, threw things, or lashed out at the staff.

13. In transitions similar to what SNI was going through, I try to bring an outsider's perspective to the situation. I certainly could sense that there was animosity from this group of nurses toward the physicians, which included Dr. Delashaw. My impression from my work with Dr. Delashaw was that he wanted to grow something big and wonderful at SNI, and the unhappy nurses just thought he was egotistical.

14. Accordingly, I worked very hard to try and get these nurses excited about the transition at SNI. However, they continued to use the QVR system in a punitive fashion, instead of attempting to bridge the gap between themselves and the physicians. At no point did I, or anyone in nursing leadership, discourage these nurses from utilizing the QVR system in this fashion. Instead, I asked that in addition to the QVRs that they were sending, that they also send me an email or come to me in person so that we could resolve whatever the issue was at the time it occurred. I continuously tried to encourage the nurses to use QVRs but also email or meet with nursing leadership about their concerns.

15.     From my long career in consulting at hospital systems, my impression from all of my meetings, interactions, and personal experience with the SNI operating rooms was that the quality of patient care at SNI was some of the best I have ever seen. I did not see any situations that I believed created a lack of patient safety. I did not believe that the nurses were working too many hours or were bullied by the physicians.

16.     Occasionally in my interactions with this group of nurses, they would report that they felt intimated by the neurosurgeons. This issue was not specific to Dr. Delashaw. When I then asked for more specifics about when the behavior occurred, they would report that it happened many months prior, and be relatively generic. They would not be able to articulate any specific or recent examples; everything was predicated on old behavior that I did not witness.

17.     My impression of this entire situation is that a small group of six or seven nurses were unhappy with the transition at SNI, and engaged in incredibly destructive behavior at the institutional level as a result, which is directed at Dr. Delashaw in part.   The main reason I am writing and signing this declaration is to address what I perceive to be substantial injustice in this proceeding. I have been in nursing my entire career, and I am a huge advocate for the profession of nursing. Here, this entire situation was manufactured by six or seven nurses who were unhappy with organizational change, and who reacted in a punitive and cruel fashion.

18.     The allegations of professional misconduct in this matter are coming from a group of charge nurses and circulating nurses at SNI. The role of these nurses does not involve scrubbing in and assisting in the actual surgical procedure. The primary tasks of the circulating RN include assessing the patient prior to the procedure, assisting with OR set up, ensuring regulatory and safety processes are followed, such as the time out at the beginning of the surgery, retrieving items requested by the surgeons and documenting the procedure for the patient's record.   At no time did I witness behavior from any team member including Dr. Delashaw that compromised the safety or quality of care the patient received.

19.     When three of this group of nurses left SNI to join the Swedish Orthopedic Institute, the organization was very interested to hear why they were leaving SNI.  The nurses ultimately

reported they were burned out and wanted a new start. They did not report they were leaving because of Dr. Delashaw.

20. My interactions with Dr. Delashaw were very positive. I simply did not witness firsthand, or hear about second hand, any of the negative behavior that has been alleged by the handful of nurses in this matter: that Dr. Delashaw yelled, swore, made intimidating movements toward staff or threw instruments.

21. In October 2016 I transitioned from the Swedish system back to a Leadership Consultant position with BE Smith.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at _Baltimore, MD_____ on May _31_, 2017.

_Adrienne Oden_, RN, MS, CNOR

ATTACHMENT 37

SWEDISH NEUROSCIENCE INSTITUTE
ROD J. OSKOUIAN, JR., MD, FAANS
Chief of Spine, Neurological Surgery
President, Seattle Science Foundation
T 206.320.4555  F 206.860.6706
rod.oskouian@swedish.org



**SWEDISH**
NEUROSCIENCE
INSTITUTE

March 3, 2017

RE:   Johnny Delashaw, MD

To Whom It May Concern:

It is my utmost pleasure to write this letter of recommendation for Dr. Johnny Delashaw. I have known him since 2001 and have seen firsthand his ascending international reputation as a teacher and surgeon.

Dr. Delashaw is simply an outstanding surgeon, capable of excelling in all aspects of neurosurgery. He is extremely personable with an exceptional bedside manner, and all members of my staff enjoyed working with him. He accepts responsibility unconditionally and without hesitation, choosing to build strong partnerships and relationships with other physicians, departments, and referral sources.

Dr. Delashaw is a rare find with both the skill set and the personality to help any institution excel. He would be an outstanding addition to any institution searching visionary leadership and exceptional patient care, and has my unbridled support.

Please do not hesitate to contact me with any additional questions.

Sincerely,

Rod. J. Oskouian, Jr, MD
Chief of Spine
Department of Neurosurgery
Swedish Neuroscience Institute

ATTACHMENT 38

In the Matter of the License to Practice as a
Physician and Surgeon of:

JOHNNY B. DELASHAW, JR., MD
License No. MD00023061

                Respondent.

No. M2016-1084

DECLARATION OF AKSHAL
PATEL, MD

I, Akshal Patel, MD, declare as follows:

1.     I am a physician licensed to practice in the State of Washington. I am competent to testify herein, and have personal knowledge of the matters set forth herein.

2.     I am a board-eligible neurosurgeon practicing as an attending physician at Swedish Neuroscience Institute (SNI). I was a fellow at SNI from 2014-2015. Prior to my fellowship, I had completed my residency in neurological surgery at Penn State University College of Medicine. I chose to participate in a fellowship in order to have the great opportunity to work with the neurosurgeons here.

3.     During my fellowship, I primarily worked with Dr. David Newell and Dr. Stephen Monteith. During my fellowship, I was in the OR with Dr. Delashaw on average about 1-2 times per week, which would have totaled about 100 cases that I worked on as a fellow with Dr. Delashaw.

4.     In my work as an attending after my fellowship, I continued to have many opportunities to work in the OR with Dr. Delashaw on complex cases. This continued until the time of Dr. Delashaw's resignation.

5.     Both in the OR and outside of it, I have had many opportunities in my years at SNI to observe Dr. Delashaw's interactions with the SNI nurses and other support staff.

6.     As an attending, I have also participated in various administrative activities and meetings at SNI along with the other SNI attendings including Dr. Delashaw.

7.     I am aware of the allegations that the Commission is pursuing against Dr. Delashaw, I don't know where the accusations are coming from. I never saw any conduct by Dr. Delashaw that was anything less than professional. Dr. Delashaw had a strong and effective working relationship with other attendings, fellows, physician assistants, nurses, and support staff.

8.     After I completed my fellowship, I had a number of options available for continuing my practice as an attending. I chose to stay at SNI. I would not have stayed if I had reason to believe that it was a problematic place to work, or that the chair, Dr. Delashaw, was a problem.

9.     I recall being present at a meeting on October 30, 2016. I was invited by Dr. Charles Cobbs to come to the meeting. I have seen a copy of Dr. Cobbs' letter to Tony Armada, dated November 4, 2016, which also attached what appears to be a summary of the meeting. Dr. Cobbs' letter to Mr. Armada does not represent my views. I do not believe that Dr. Cobbs' narrative about what transpired at that meeting was accurate or complete.

10.    Since I came to SNI in 2014, the surgical staff has grown significantly. The additional neurosurgical attendings have included me, Dr. Cameron McDougall, Dr. Jens Chapman, Dr. Zachary Litvack, Dr. Sean Mcmenomey, and others. Dr. Stephen Monteith also joined SNI shortly before I started as a fellow. In addition, beginning in the fall of 2016, three neurosurgeons from Kaiser Permanente also have privileges to perform neurosurgery at Swedish Cherry Hill.

11.    I strongly support Dr. Delashaw's continuing practice of medicine, and the restoration of his medical license.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington on June 2, 2017.

_____
AKSHAL PATEL, MD

ATTACHMENT 39

In the Matter of:

Johnny B. Delashaw, M.D.

Respondent.

MQAC File No. 2016-3527 MD

DECLARATION OF KEVIN
REINARD, M.D.

I, Kevin Reinard, M.D., declare as follows:

1.      I am a neurosurgeon practicing at ProMedica Physicians Neurosurgery in Toledo, Ohio.  I am over the age of 18 years, am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I obtained my medical degree from the University of Wisconsin in 2008.  I then completed a neurosurgery residency between the years of 2008-2015.  I came to Swedish Neuroscience Institute (SNI) in June 2015 to complete a post-graduate skull-based neurosurgery fellowship with Dr. Delashaw.  I completed that fellowship in June 2016.

3.      During my fellowship, I worked with Dr. Delashaw on an almost daily basis.  We came into the hospital together on most days at 5:30 a.m.  In my experience with Dr. Delashaw over the course of a year, he was very friendly and pleasant to work with.  In fact, I never saw him raise his voice with any of the operating room staff, or engage in any type of workplace violence.

3.      I was at the hospital on December 21, 2015.  I was in operating room (OR) 6 at SNI on that date, and saw Dr. Delashaw at multiple points during that day.  At no time during that day did I witness Dr. Delashaw throw anything in the OR or raise his voice to anyone on the staff.  I also did not hear any reports regarding this type of behavior, either on December 21, 2015, or at any point during my fellowship.

4.      In fact, during my time at Swedish, I never heard any of the staff or physicians mention anything that relates to the allegation presented in this initial complaint, that Dr.

Delashaw threw a cell phone at a member of the nursing staff, or that he yelled at one of the nurses. Based on my experience with Dr. Delashaw, I do not believe that the allegations in this initial investigation are credible.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Toledo, Ohio on July ___, 2016.

_____
Kevin Reinard, M.D.

ATTACHMENT 40

**From:** Julie Rissberger ████████████████
**Date:** June 4, 2017 at 5:41:58 PM PDT
**To:** <Amagnano@bbllaw.com>
**Subject: Support for Dr. Delashaw**

I recently experienced a scary heath crisis. Sudden bilateral hearing loss. I was referred to Dr. Delashaw.
Dr. Delashaw was very professional, easy to approach with questions and thorough in his explanation of procedures. He scheduled a scan an MRI and had the result by the end of day. Dr. Delashaw's care was exceptional. I am very very thankful to him for helping when I needed medical attention.

Fondly,

Julie Rissberger

Sent from my iPhone

1

ATTACHMENT 41

To whom it may concern,

I am writing this letter in support of Dr. Johnny Delashaw. I am a medical rep that has worked in the operating room with Dr. Delashaw on average of 2-3 times a week since his arrival to Swedish Cherry Hill in 2013. I have witnessed nothing but professionalism from him towards the staff, fellows, reps and most importantly the patients. By no means did I see him as "an immediate threat to public health and safety." I always had a great experience and looked forward to working with him in the operating room.

If I had a family member with a cranial condition, I would not hesitate to send them to Dr. Delashaw for an operation.

I hope this letter sheds light on the character that Dr. Johnny Delashaw has and the professionalism in which he conducted himself.

Regards,

Craig Roosendaal

ATTACHMENT 42

STATE OF WASHINGTON
MEDICAL QUALITY ASSURANCE COMMISSION

|  |  |
|---|---|
| In the Matter of the License to Practice as a Physician and Surgeon of: | No. M2016-1084 |
|  | **DECLARATION OF JAYSON SACK, M.D.** |
| JOHNNY B. DELASHAW, JR., MD License No. MD00023061 |  |
| Respondent. |  |

I, Jayson Sack, M.D., declare as follows:

1.      I am competent to testify, and have personal knowledge of the matters set forth herein.

2.      I have known and worked with Dr Delashaw since September 2013, when we were both at University of California, Irvine. I then worked with Dr. Delashaw from January 2014-June 2014 at Swedish Neuroscience Institute, as a fellow. I worked in a couple hundred surgeries with Dr. Delashaw during my fellowship.

3.      Although the time I spent with him was brief in the grand scheme of neurosurgical training, Dr. Delashaw had a tremendous impact on my development as a neurosurgeon. Dr. Delashaw is an excellent surgeon, a leader, an innovator, but most importantly—a great teacher and role model for residents and fellows. He went to great lengths inside and outside the operating room to provide mentorship and to ensure continued growth as a surgeon

4.      Aside from the technical aspects of surgery, Dr. Delashaw modeled ideal doctor-patient relationships, spending a great deal of time connecting with patients, answering questions, and providing reassurance. Accordingly, I was very surprised in finding out some of the accusations of the staff and reading the statement recently released by the medical commission— "disruptive and abusive behavior compromised team effectiveness and created an unreasonable risk of patient harm that was below the accepted standard of care." That was simply not my experience with Dr. Delashaw.

5.    While it is true that Dr. Delashaw would try to motivate and encourage those around him to become better and excel, he did so in a very collegial way, without disregard for professionalism. The current reality of the situation deeply saddens me, and it is incredibly unfortunate for Dr. Delashaw, his patients, and future residents/fellows whom would greatly benefit from his mentorship.

6.    I never witnessed any of the behavior that he is accused of in this proceeding: yelling, abusive behavior or threatening staff. I also never witnessed Dr. Delashaw discouraging staff members from communicating with him. Likewise, I never saw him discouraging people from reporting issues that they witnessed during surgery.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at ___TAMPA, FLORIDA___, on May _31_, 2017.

JAYSON SACK, M.D.

ATTACHMENT 43

From: Courtney Spackman [█████████████████████████]
Sent: Friday, June 2, 2017 10:51 AM
To: Amy M. Magnano <AMagnano@bbllaw.com>
Subject: Dr. Delashaw Statement

Hello,

   My name is Courtney Spackman and I am a Certified Surgical Technologist. I met Dr. Delashaw in November of 2015 when I started working at Swedish and began doing cases with at least twice a week over the span of a year. Dr. Delashaw was very kind the first time I was introduced to him and his kindness never faltered for as long as I have known him. He was incredibly helpful and taught me things throughout the cases because I was always eager to learn. I was able to observe him with both patients and staff (nurses, techs, and fellows) at least twice a week for the year. I never witnessed any ill behavior during my time there. As the year went on, Dr. Delashaw always went out of his way to be kind to me, always going above and beyond. Staffing grew short at Swedish over time and there were days the surgical techs and nurses would not receive breaks or lunches. On a regular basis Dr. Delashaw would buy lunch for the entire staff and on many other occasions bought me lunch personally and made sure I had time to eat. He even went so far as to talk to management on the staffs behalf because we were overworked and tired. Turning a hiring freeze into 30 new open positions. A position at Swedish was created where a tech was assigned to a doctor and helped facilitate their needs on a daily basis. I chose to work with Dr. Delashaw and this position allowed me to work very closely with him. One of my responsibilities was to mediate between him and the staff if there was ever a problem. In my six months in this position, not a single staff member ever came to me with any concerns about him. Even when I asked other staff members if there was a problem, never once did anyone step up and say anything other than good words. Dr. Delashaw was one of the kindness surgeons I ever had the privilege of working with and I would work with him everyday if given the opportunity to do so.

I would love to do anything I can to help him. He was never anything but kind to me when he did not have to be. Please reach out if there is anything else I can do to help.

Thank you,

Courtney Spackman, CST
███████████████



**ATTACHMENT 44**

Wayne Summers


To Whom It May Concern:

I am writing this letter to provide some insight and share my experiences working with Dr. Delashaw in the operating room over the course of the last 2.5 years. I am responsible for selling devices for a company called Synaptive Medical. This technology is owned and utilized by both spine and neuro surgeons at Swedish (Cherry Hill Campus).

I have assisted supporting several medical devices in Dr. Delashaw's operating room since January 2015 and I was astonished to read the accusations against his demeanor in the operating room in the Seattle Times article. The article suggests that the Medical Quality Assurance Commission "said Delashaw had intimidated subordinates by yelling, swearing and making threatening movements towards staff members. Not once have I ever seen him raise his voice and/or loose his cool in the operating room with other staff members and resident's in training. In fact, one instance comes to mind where the stress levels were extremely high in the operating room during an aneurysm clipping case with one of his past fellows. He operated in such a confident and relaxed manner and did not raise his voice whatsoever during this vital part of the surgery. He managed his operating rooms in a very calm and extremely competent manner. Questions were asked freely and answers given without attitude or hesitation. Ultimately, Dr. Delashaw created a calm atmosphere for staff members, trainees, and medical device representatives.

I find the Commission's allegations deeply falsified and completely inaccurate.

Please feel free to reach out to me with any questions regarding my experiences with Dr. Delashaw in the operating room.

Sincerely,

Wayne Summers
Regional Sales Manager Synaptive

ATTACHMENT 46

June 2, 2017

To Whom It May Concern:

I am writing this letter as a follow up to the accusations made about Johnny Delashaw MD in The Seattle Times in early March. I have known Dr. Delashaw as a business colleague and friend for more than 20 years. During this time I've had firsthand experience and witnessed over 200 surgeries with Dr. Delashaw spanning the neurosurgical spectrum, many of which have involved some of the most difficult, delicate procedures performed in medicine. These procedures required the best assistants, equipment, preparation and surgical skill to achieve the outcomes that Dr. Delashaw routinely achieves. Throughout, Dr. Delashaw and his team have always delivered this high outcome results.

In my time knowing Dr. Delashaw, I have always admired his respect for hospital staff, patients and procedures. Never have I seen him raise his voice, be disrespectful, or lose his focus, regardless of the pressure associated with performing some of the world's most advanced neurosurgery. I have also witnessed Johnny Delashaw outside of the medical world and he has the same composed, caring and natural bedside manner as he does in the hospital. I will also add that his humility, grace and willingness to listen always make everybody around him feel heard and understood.

Over the past 3 months I have read the opinions of Mike Baker from the Seattle Times and I am deeply dismayed at how Mr. Baker could portray Dr. Delashaw to the public so inaccurately, without any firsthand knowledge of his character or surgical experience. Such a defamatory caricature could only be based on hearsay and in my opinion is libel. I have spent half of my professional life working side by side with Dr. Delashaw, witnessing him in and out of the operating room and I know he is a man of great virtue. I support wholeheartedly any and all efforts to bring Dr. Delashaw back to what he does best--taking care of patients and providing leadership in the world of neurosurgery.

Respectfully,


Todd Welch
President NW Surgical LLC
NW Surgical LLC