1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

JOHNNY B. DELASHAW, JR.,

                Plaintiff,

    v.

SEATTLE TIMES COMPANY, et
al.,

                Defendants.

CASE NO. C18-0537JLR

ORDER ON MOTIONS TO
DISMISS

16

17

18

19

20

21

22

## I.   INTRODUCTION

Before the court are Defendants Seattle Times Company's ("the Times") and

Charles Cobbs' (collectively, "Defendants") motions to dismiss.  (Times MTD (Dkt.

# 27); Cobbs MTD (Dkt. # 30).)  Plaintiff Johnny B. Delashaw, Jr. opposes both motions.

(Times Resp. (Dkt. # 33); Cobbs Resp. (Dkt. # 34).)  The court has considered the

motions, the parties' submissions in support of and in opposition to the motions, the

//

relevant portions of the record, and the applicable law.  Being fully advised,[1] the court

GRANTS in part and DENIES in part the Times' motion and DENIES Dr. Cobbs'

motion for the reasons stated below.

## II.    BACKGROUND

**A.    Factual Background**

In early 2017, the Times published a series of articles entitled *Quantity of Care*

about Dr. Delashaw, a neurosurgeon, and the Swedish Neuroscience Institute ("SNI").[2]

(Am. Compl. ¶¶ 1, 172.)  Those articles detailed a number of concerns with Dr.

Delashaw's tenure as SNI's Chairman.  (*See, e.g.*, *id.* ¶ 101.)  The court first recounts the

relevant background leading up to that series of articles, and then discusses the series and

the subsequent fallout.  *See infra* § III.A.1-5.

1. Dr. Delashaw

Dr. Delashaw earned a medical degree from the University of Washington School

of Medicine and completed his residency at the University of Virginia.  (Am. Compl.

¶ 15.)  He began his career as the chief of Neurosurgery at the Gainesville Veteran's

Administration Hospital and later served as an assistant professor of Neurological

Surgery at the University of Florida.  (*Id.* ¶ 18.)  Dr. Delashaw then spent 20 years at

Oregon Health & Science University ("OHSU"), where he served as chief of

---

[1] No party requests oral argument (*see* Times MTD at 1; Cobbs MTD at 1; Times Resp. at 1; Cobbs Resp. at 1), and the court determines that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[2] SNI is a practice group at Swedish Health Services d/b/a Swedish Medical Group ("Swedish").  (*Id.* ¶ 1.)

Neuro-Oncology and Skull Base Surgery and a professor of Neurological Surgery, Otolaryngology, and Neurology during part of that time. (*Id.* ¶ 17.) After his time at OHSU, Dr. Delashaw was the chief of neurological surgery at University of California, Irvine Health ("UC Irvine"). (*Id.* ¶ 16.)

In the spring of 2013, while Dr. Delashaw was still at UC Irvine, SNI began recruiting him. (*Id.* ¶ 19.) SNI was established in 2004 with the goal of becoming "a cutting edge neurosurgical institution in the Pacific Northwest." (*Id.* ¶ 21.) In 2012, SNI became part of Providence St. Joseph Hospital ("Providence"), a nonprofit health care provider of about 50 hospitals and hundreds of medical clinics in Washington, Alaska, California, Oregon, Montana, New Mexico, and Texas. (*Id.*) SNI was interested in hiring Dr. Delashaw "because of his exceptional surgical skills, his recognition in the profession for those skills, . . . his record of developing new highly effective surgical techniques[, and his] wide referral base." (*Id.*) Dr. Delashaw contends that SNI recruited him with the goal of establishing SNI "as the primary center for advanced neurological treatment for the dozens of hospitals brought together through the 2012 merger of" Swedish and Providence. (*Id.* ¶ 24.) Dr. Delashaw ultimately accepted SNI's offer in October 2013. (*Id.* ¶ 26.)

2. Dr. Delashaw's Tenure at SNI

At the time Dr. Delashaw joined SNI, it was experiencing significant change and continued to do so during his tenure. (*See id.* ¶¶ 27, 30-31.) For example, between 2010 and 2015, SNI's patient volume increased 66 percent. (*Id.* ¶ 31.) According to Dr. Delashaw, "a sharp increase in the number of other hospitals referring difficult cases to

SNI," "SNI's affiliation with Providence," and "the Affordable Care Act's extension of insurance coverage to a large new segment of patients" caused the significant increase in patient volume.  (*Id.* ¶ 33.)  An increase in the number of SNI's surgeons accompanied that patient growth.  (*See id.* ¶ 31.)

In 2014, Providence and Swedish "decided to end the pooling system for compensation and to adopt a compensation system based on a surgeon's own [Relative Value Units] RVUs without any compensation pooling."  (*Id.* ¶¶ 36-37.)  Dr. Delashaw contends that he did not adopt and implement that new compensation system, although "he agreed with the decision to align financial reward with high quality surgical work."  (*Id.* ¶ 37.)

Dr. Delashaw became the Chairman of SNI in April 2015.  (*Id.* ¶ 42.)  When he assumed that role, Dr. Delashaw alleges that he "took several actions to improve quality of care, transparency, and accountability," which were related to "quality review processes," presenting at "specialty conferences," and establishing "a formal Patient Outcome and Quality Review Committee."  (*Id.* ¶ 44.)  Dr. Delashaw also "implemented a method of choosing the best aneurysm treatment for each patient," which was designed to avoid "any individual bias" for one method over another.  (*Id.* ¶ 45.)  And he "revamped the referral process so that general referrals . . . were allocated to the right surgeons equitably and openly."  (*Id.* ¶ 47.)

According to Dr. Delashaw, some "doctors, nurses, and staff"—most notably, Dr. Cobbs and Dr. Marc Mayberg—"resented the loss of the more relaxed atmosphere they had previously enjoyed" before SNI's growth and his tenure.  (*Id.* ¶ 27; *see also id.* ¶ 35.)

Dr. Delashaw alleges that the change in compensation "produced unfavorable financial results for" Dr. Mayberg—who had recruited him to join SNI (*id.* ¶ 38; *see also id.* ¶ 40 (alleging that Dr. Mayberg's salary dropped from $1.16 million to about $360,000.00))—and that the leadership change resulted in Swedish "remov[ing] Dr. Mayberg as the medical director of SNI" (*id.* ¶ 39; *see also id.* ¶ 36 (alleging that Dr. Mayberg sought to regain his leadership position)). According to Dr. Delashaw, Dr. Mayberg "associated both decisions" with Dr. Delashaw. (*Id.* ¶ 40.)

Dr. Cobbs' role also changed after Dr. Delashaw took the helm of SNI. (*See id.* ¶ 48.) Dr. Cobbs joined SNI in August 2013 as Director of SNI's Ivy Center for Advanced Brain Tumor Treatment. (*Id.*) According to Dr. Delashaw, Dr. Cobbs expected that he would receive all brain tumor surgery referrals by virtue of his position. (*Id.*) But after the changes outlined above, Dr. Cobbs allegedly "grew unhappy about his compensation and was concerned that spine surgery could be completely eliminated from his practice." (*Id.*; *see also id.* ¶ 69.) As with Dr. Mayberg, Dr. Cobbs allegedly associated Dr. Delashaw with those changes. (*See id.* ¶¶ 49, 55.)

3. Alleged Conspiracy

Dr. Delashaw alleges that in 2016, Dr. Mayberg and Dr. Cobbs agreed to destroy Dr. Delashaw's reputation and remove him as SNI's Chairman. (*Id.* ¶ 50.) He contends that Dr. Mayberg "abuse[d] the SNI anonymous complaint system" by filing his own complaints and "encouraging SNI nurses to file anonymous complaints against Dr. Delashaw" (*id.* ¶ 41), and made a "fictional complaint" to the Washington Department of

//

Health ("DOH") (*id.* ¶ 51).[3]  The anonymous complaints also led the Washington

Medical Quality Assurance Commission ("MQAC") to initiate a "Priority B"

investigation against Dr. Delashaw in March 2016.  (*Id.* ¶ 160.)  On October 7, 2016,

MQAC authorized a summary restriction of Dr. Delashaw's medical license.  (*Id.*)

In addition, Dr. Delashaw alleges that Dr. Mayberg used his personal email

account to communicate with Mike Baker, a reporter for the Times, about the DOH

investigation.  (*Id.*; *see also id.* ¶ 52.)  On October 24, 2016, Dr. Mayberg allegedly sent

Mr. Baker a list of surgeons who had left or were planning to leave SNI since Dr.

Delashaw arrived.  (*Id.* ¶ 58.)  Dr. Delashaw contends that the list and Dr. Mayberg's

claims about the list were false.  (*Id.*)

On October 29, 2016, Dr. Mayberg allegedly sent an email from his wife's email

address to Dr. Cobbs' wife's email address.  (*Id.* ¶ 60.)  In that email, Dr. Mayberg sent

the list of staff who had allegedly left SNI, which Dr. Delashaw contends Dr. Cobbs

"later adopted . . . as a central plank of his attack against" Dr. Delashaw and circulated

that list to "rally his colleagues" against Dr. Delashaw.  (*Id.* ¶¶ 60-61.)  At the same time,

Dr. Delashaw alleges that Dr. Cobbs sought "outside advice on what kinds of claims

would be most likely to undermine the confidence of Swedish management in Dr.

Delashaw."  (*Id.* ¶ 63.)

//

---

[3] Although he does not attribute the anonymous complaint to Dr. Mayberg, Dr. Delashaw also alleges that someone made an anonymous complaint to MQAC regarding Dr. Delashaw throwing a phone at a nurse in the operating room.  (*Id.* ¶ 54.)

On November 2, 2016, Dr. Cobbs allegedly began circulating a draft letter demanding Dr. Delashaw's removal, which Dr. Cobbs falsely stated was signed by 14 neurosurgeons. (*Id.* ¶ 72.) Dr. Delashaw alleges that Dr. Cobbs failed to get his colleagues to sign on to the letter, but the letter nonetheless included meeting minutes identifying concerns with Dr. Delashaw that Dr. Cobbs asserted were unanimously held by those other surgeons. (*See id.* ¶¶ 75, 78.) Dr. Cobbs sent that letter to others inside and outside of Swedish.[4] (*Id.* ¶¶ 85, 90.) Dr. Cobbs also allegedly drafted a "Confidential SNI Game Plan" to "'accomplish the resignation of'" Dr. Delashaw. (*See id.* ¶ 79.) Finally, Dr. Delashaw alleges that Dr. Cobbs communicated with Mr. Baker from the Times. (*See id.* ¶ 98.)

### 4. Alleged False Reporting

Against that backdrop, on February 10, 2017, the Times began publishing the *Quantity of Care* series, which reported that SNI and Dr. Delashaw "endanger[ed] neurosurgical patients." (*Id.* ¶ 101.) Dr. Delashaw alleges that the Times used the series to increase its profits, subscribers, and website traffic. (*Id.* ¶ 102.) The Times advertised the series in part through media interviews with the reporters who authored the articles. (*Id.*) Dr. Delashaw contends that the Times touted the series as the product of a year-long investigation rather than simply as "mere news." (*Id.* ¶ 103.)

Dr. Delashaw alleges that the series contained false statements, "false general accusations of practices," and accurate statements that—when combined with the

---

[4] Dr. Delashaw also suggests that Dr. Cobbs sent the same claims anonymously from a "jbartsolo@gmail.com" email address. (*Id.* ¶¶ 91-93.)

allegedly false statements—"were intended to, and did, create a false or misleading defamatory implication." (*Id.* ¶ 105.) He specifically alleges that the series contained "four main claims" that were false:

- SNI "incentivized" Dr. Delashaw and other "star surgeons" to maximize the volume of surgeries;

- Dr. Delashaw and other SNI surgeons engaged in "concurrent surgeries"[5] to increase the volume of surgeries and surgeon compensation;

- Dr. Delashaw left important surgical tasks to less experienced surgeons in order to increase the volume of surgeries; and

- Dr. Delashaw put patients in danger by engaging in those practices.

(*Id.* ¶¶ 106-07; *see also id.* ¶¶ 104, 108-10, 114-16, 129-31, 141.) He also claims that the first article in the series—about a patient who died 10 days after Dr. Delashaw performed her surgery—"prime[d]" readers to believe the later falsehoods specifically about Dr. Delashaw. (*See id.* ¶¶ 142-53.)

Dr. Delashaw contends that the Times knew its central claims were false but published them anyway. (*See, e.g.*, *id.* ¶ 111.) Dr. Delashaw alleges that before the Times published the series, Mr. Baker had interviewed Prashant Kelkar, a neurosurgeon and fellow at SNI, who had worked with Dr. Delashaw in the operating room hundreds of times. (*Id.* ¶ 155.) Dr. Kelkar informed Mr. Baker that he had never seen Dr. Delashaw abuse staff, that Dr. Delashaw was "actively engaged in the critical part of every surgery without fail," and that Dr. Delashaw was "a caring, compassionate physician." (*Id.*) Dr.

---

[5] "The term 'concurrent surgeries' refers to a single lead surgeon running the critical portion of two surgeries at the same time, leaving one operating room in mid-operation to go to another." (*Id.* ¶ 3.)

Delashaw further alleges that another neurosurgeon fellow, Christian Bowers, also told Mr. Baker that the following claims were false: (1) that Dr. Delashaw was not present for critical parts of surgery, (2) that Dr. Delashaw performed unnecessary procedures, and (3) that Dr. Delashaw was abusive to SNI staff. (*Id.* ¶ 157.) Based on those accounts, Dr. Delashaw alleges that the Times "knew, or should have known, that [its reporters] had been provided 'misinformation and bad data' by their sources." (*Id.* ¶ 158.) He contends the Times acted with malice in publishing the allegedly false statements. (*Id.* ¶ 163.)

Dr. Delashaw points to the DOH investigation into these issues as further demonstrating the falsity of the Times' reporting. (*See id.* ¶¶ 112, 120, 132.) Specifically, the DOH investigated the Times' claims, and in 2017, found (1) no concurrent surgeries were conducted and (2) no evidence that staff worked more than their scheduled hours or that staffing levels were below guidelines. (*Id.* ¶ 112; *see also id.* ¶¶ 112 n.8, 120, 132.)

5. The Fallout

Dr. Delashaw alleges that the articles "caused serious damage to [his] reputation and career." (*Id.* ¶ 2.) In February 2017, he resigned from SNI because he "was unable to focus on patient care." (*Id.* ¶ 159.) And Dr. Delashaw asserts that after the articles, MQAC—with pressure from a state senator—"did an about face on its low-priority, careful approach" to investigating the claims against him. (*Id.* ¶ 160.) Ultimately, in May 2017, MQAC suspended Dr. Delashaw's medical license after finding that he posed an "immediate risk to the public health and safety." (*Id.*; *see also id.* ¶ 53.) And finally, //

most of the $6 million raised at a gala to fund SNI "vanished" after the reports. (*Id.* ¶ 62.)

In addition to the damage to him personally and professionally, Dr. Delashaw alleges that the public has been deprived of his services because he "has a unique skill set in certain kinds of neurosurgical procedures and patients with conditions few can treat who need continuing care." (*Id.* ¶ 162.)

**B.      Procedural Background**

On April 11, 2018, Dr. Delashaw filed suit against the Times and Dr. Cobbs.[6] (*See* Compl. (Dkt. # 1).)  Against the Times, Dr. Delashaw brings claims of defamation, defamation by implication, tortious interference with a business expectancy, and violation of Washington's Consumer Protection Act ("CPA"), RCW ch. 19.86 *et seq.*  (Am. Compl. ¶¶ 164-189.)  Against Dr. Cobbs, Dr. Delashaw brings claims of defamation, tortious interference with a business expectancy, and civil conspiracy.  (*Id.* ¶¶ 190-208.) He seeks an injunction preventing the Times and Dr. Cobbs from making false statements about him and requiring the Times to remove the allegedly false statements from its website and to publish a retraction.  (*See id.* § VI (prayer for relief).)  Dr. Delashaw also seeks monetary damages, attorneys' fees and costs, and prejudgment interest.  (*See id.*)

On July 7, 2018, Defendants again moved to dismiss based on Federal Rule of Civil Procedure 12(b)(6).  (*See* Times MTD; Cobbs MTD.)  The court now addresses those motions.

---

[6] After Defendants each moved to dismiss, Dr. Delashaw amended his initial complaint. (*See generally* Am. Compl.)

# III.   ANALYSIS

## A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Although a plaintiff does not have to make "detailed factual allegations," a complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, a complaint must include sufficient factual allegations to "state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Under Rule 12(b)(6), the court can dismiss a complaint based on "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When considering a Rule 12(b)(6) motion, the court construes the complaint in the light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor, *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

//

//

**B.     Surreply**

Before the court addresses the motions to dismiss, it first takes up Dr. Delashaw's surreply.  (*See* Surreply.)  Dr. Delashaw moves to strike portions of Defendants' reply briefs because they "raise for the first time evidence from [MQAC's] July 2018 order, which reinstated Dr. Delashaw's medical license."  (*Id.* at 1; *see also* Times Reply (Dkt. # 35); Cobbs Reply (Dkt. # 36)); Local Rules W.D. Wash. LCR 7(g).  He contends that the MQAC order was not raised in either his complaint or Defendants' motions, and therefore is an improper subject for Defendants' replies.  (Surreply at 1.)  He further argues that the MQAC order is irrelevant because at the motion to dismiss stage, the court takes as true his factual allegations.  (*Id.* at 2.)  Because the court does not rely on the MQAC order, *see infra* § III.C, the court denies the motion to strike as moot.

**C.     The Motions**

The Times moves to dismiss (1) Dr. Delashaw's defamation claims based on "unspecified false statements in unspecified subsequent articles" or the entire series (Times MTD at 5), (2) his tortious interference claim (*id.* at 5-6), and (3) his CPA claim (*id.* at 6).[7]  Dr. Cobbs also moves to dismiss all claims against him—defamation, tortious interference, and civil conspiracy.  (*See* Cobbs MTD.)

---

[7] The parties' filings implicate a number of documents incorporated into the amended complaint by reference or purportedly subject to judicial notice.  (*See* Times Reply at 12 n.51; Cobbs MTD at 1 n.1; Cobbs Reply at 2.)  The court notes the Ninth Circuit's recent caution against allowing "exploit[ative]" use of judicial notice and the incorporation-by-reference doctrine to "improperly . . . defeat what would otherwise constitute adequately stated claims at the pleading stage."  *See Khoja v. Orexigen Therapeutics, Inc.*, --- F.3d ----, 2018 WL 3826298, at *5-6 (9th Cir. Aug. 13, 2018).  In addition, the court notes Dr. Cobbs' references to Dr. Delashaw's original complaint, which is superseded by the amended complaint.  (*See, e.g.*, Cobbs MTD at 8); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. 2011) ("[I]t is

1    1. Defamation

2    "A defamation action consists of four elements:  (1) a false statement, (2)

3    publication, (3) fault, and (4) damages."  *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013).

4    A plaintiff can allege the false statement prong by alleging facts showing that the

5    statement is provably false or "leaves a false impression due to omitted facts."  *See*

6    *Yeakey v. Hearst Commc'ns, Inc.*, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr*

7    *v. Grant*, 108 P.3d 768, 773 (Wash. 2005)).  "Defamation by implication occurs when

8    'the defendant juxtaposes a series of facts so as to imply a defamatory connection

9    between them.'"  *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010)

10   (quoting *Mohr*, 108 P.3d at 774).  To proceed on a theory of defamation by implication, a

11   plaintiff must allege facts supporting all of the elements of a defamation claim but may

12   support the first element by alleging that the statement is false or leaves a false

13   impression.  *See id.*; *see also U.S. Mission Corp. v. Kiro TV, Inc.*, 292 P.3d 137, 141

14   (Wash. Ct. App. 2013).

15       a.  *The Times' Motion*

16   The Times moves to dismiss Dr. Delashaw's defamation claims insofar as he

17   relies on false statements in "unspecified" articles and the *Quantity of Care* series as a

18   whole.[8]  (Times MTD at 5 (citing Am. Compl. ¶ 172).)  Dr. Delashaw responds that his

19

---

20   well-established that an amended complaint supersedes the original, the latter being treated
21   thereafter as non-existent.").

22       [8] The Times asserts that Dr. Delashaw is a public figure (*see* Times MTD at 2), but
     because its arguments do not rest on that distinction, the court does not address that issue.

defamation claims are not "based on unidentified or unpled articles or statements" and "are expressly limited to the articles the Times published as part of its *Quantity of Care* series." (Times Resp. at 7 (footnote omitted).) In its reply, the Times contends that because Dr. Delashaw's amended complaint identifies "subsequent articles" without specifically pleading the allegedly false statements in those articles, he fails to state a claim as to whatever those subsequent articles are. (Times Reply at 7-8.) In addition, the Times contends that Dr. Delashaw fails to state a claim as to the series as a whole because he addresses statements only from the February 10, 2017, articles—not from the other articles in the series. (*Id.*)

The Times contends that a heightened pleading standard applies to defamation actions and that Dr. Delashaw's amended complaint falls short of that standard.[9] (*See* Times MTD at 3 n.12.) In *Flowers v. Carville*, the Ninth Circuit stated that it had "held that 'where a plaintiff seeks damages . . . for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required." 210 F.3d 1118, 1130-31 (9th Cir. 2002) (ellipsis in original) (quoting *Franchise Realty Interstate Corp. v. S.F. Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082-83 (9th Cir. 1976)). The Ninth Circuit noted, though, that "[d]espite the apparent breadth of its holding, we have yet to apply *Franchise Realty* outside the *Noerr-Pennington* context" and held that because the plaintiff's complaint

---

[9] Dr. Cobbs makes the same argument, which the court addresses below. *See infra* § III.C.1.b.i.

satisfied either pleading standard, it assumed—without deciding—that *Franchise Realty* applies to all defamation claims. *Id.* at 1131 n.8.

Courts in the Ninth Circuit addressing whether *Flowers* requires a plaintiff to plead "'the precise statements alleged to be false and defamatory, who made them, and when'" have reached differing conclusions. *Compare, e.g.*, *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1027 (D. Nev. 2013) (quoting *Flowers*, 310 F.3d at 1131), *with Castello v. City of Seattle*, No. C10-1457MJP, 2010 WL 4857022, at *12 (W.D. Wash. Nov. 22, 2010). In *Okeke v. Biomat USA, Inc.*, the District Court for the District of Nevada stated that "there are no heightened pleading requirements for defamation claims, and there is reason to be skeptical of a contrary interpretation of *Flowers*." *Id.* Because of the Ninth Circuit's "noted 'tension' with later Supreme Court precedent, [Federal] Rule [of Civil Procedure] 9's silence [on defamation claims], and the subsequent reluctance of district courts to recognize a heightened pleading standard for defamation," the court concluded that *Flowers* did not establish such a standard. *Id.* However, other District Courts have stated that "[b]ecause of the potential chilling effect on the exercise of First Amendment rights of free speech, allegations of defamation require a heightened level of specificity." *Castello*, 2010 WL 4857022, at *12 (quoting *Flowers*, 310 F.3d at 1130); *see also Heller v. NBCUniversal, Inc.*, No. CV-15-09631-MWF-KS, 2016 WL 6573985, at *3-4 (C.D. Cal. Mar. 30, 2016) (stating without discussion that the Ninth Circuit applies heightened pleading requirements in cases implicating the First Amendment). Regardless of that distinction, however, the court concludes that Dr. Delashaw sufficiently pleads defamation under either standard.

Dr. Delashaw pleads the "precise statements alleged to be false and defamatory." *See Flowers*, 310 F.3d at 1131. Although Dr. Delashaw refers to "subsequent articles" and the *Quantity of Care* series "as a whole," (Am. Compl. ¶¶ 165, 172), he otherwise identifies the statements that he alleges are false and indeed quotes a number of such statements. For example, Dr. Delashaw repeatedly alleges that the Times' reports of concurrent surgeries, the compensation structure at SNI, the volume of surgeries, patient endangerment, and Dr. Delashaw's absence from critical parts of surgical procedures are directly or impliedly false. (*See, e.g.*, Am. Compl. ¶¶ 104-07, 110-11, 114-16, 122, 125-27, 129, 131, 133-36, 141, 143-54.) Thus, Dr. Delashaw has put the Times on notice of the alleged falsehoods in the *Quantity of Care* series. *See Adams v. Rector*, No. 18-cv-02689-YGR (PR), 2018 WL 3854021, at *1 (N.D. Cal. Aug. 10, 2018) ("A complaint must contain sufficient allegations to put defendants fairly on notice of the claims against them."). To the extent that he does not include every allegedly false statement verbatim in his complaint, his allegations make clear the subject matter he contends is false.

In that regard, Dr. Delashaw's allegations are unlike those in *Marks v. City of Seattle*, No. C03-1701MJP, 2003 WL 23024522, at *3 (W.D. Wash. Oct. 16, 2003), upon which the Times relies. (*See* Times Reply at 4.) The Honorable Marsha J. Pechman dismissed the plaintiffs' defamation claim because it rested solely on the allegation that the "[d]efendants defame[d], frame[d], and set[]up and otherwise harmed" the plaintiffs. *Marks*, 2003 WL 23024522, at *3. That conclusory allegation failed to state a claim. *See id.* In contrast, Dr. Delashaw specifically alleges how the Times' articles were false.

(*See, e.g.*, Am. Compl. ¶¶ 104-07, 110-11, 114-16, 122, 125-27, 129, 131, 133-36, 141, 143-54.)

For those reasons, the court denies the Times' motion. However, the court clarifies that Dr. Delashaw's defamation claims are limited to the *Quantity of Care* series and to statements on the same subject matter addressed above. To the extent Dr. Delashaw intends to allege defamation arising from any articles outside of that series or from some other category of supposedly false statements, he fails to state a claim.

### b. *Dr. Cobbs' Motion*

Dr. Cobbs also argues that a heightened pleading standard applies and moves to dismiss the defamation claims against him as "vague" and "conclusory." (*See* Cobbs MTD at 4; *see also id.* at 10 (citing *Flowers*, 310 F.3d at 1130.) He further argues that Dr. Delashaw fails to state a claim because the statements were not published (*id.* at 12-13), were privileged (*id.* at 13-14), were merely expressing opinions (*id.* at 15-16), were "contextual discrepancies" (*id.* at 16-17), and were otherwise not false or disparaging (*id.* at 17-18). He also argues that he cannot be liable for Dr. Mayberg's statements (*id.* at 18-19) and that Dr. Delashaw has not complied with Washington's Uniform Correction or Clarification of Defamation Act ("UCCDA"), RCW 7.96, *et seq.* (MTD at 19-21).[10] The court addresses each argument in turn, and finding them lacking, denies Dr. Cobbs' motion to dismiss the defamation claim.

---

[10] Dr. Cobbs also contends that Dr. Delashaw's tortious interference and civil conspiracy claims fail because those claims are based on the allegedly defamatory statements. (MTD at 8; *see also id.* at 21-22.) The court addresses those arguments below. *See infra* §§ III.C.2, 4.

### i. Sufficiency of the Allegations

Dr. Cobbs alleges that Dr. Delashaw's defamation claim against him is based on only "general and conclusory allegations of disparagement and defamation." (Cobbs MTD at 11.) Dr. Cobbs cites eight excerpts from the amended complaint, which he contends are insufficient:

- "Dr. Mayberg . . . sent Dr. Cobbs . . . a list of individuals who, Dr. Mayberg inaccurately contended, had left SNI as a result [of] Dr. Delashaw's leadership";

- "[T]he list contained other inaccuracies";

- "Dr. Mayberg supplied another plank: Dr. Mayberg's list of phony alleged safety concerns";

- "Dr. Cobbs then circulated the false Mayberg materials";

- "Dr. Cobbs took action calculated to publicize his false criticisms of Dr. Delashaw";

- "Dr. Cobbs broadcast the false allegations to a broad range of Swedish employees, ranging from internal medicine and OB/GYN doctors to nurse practitioners";

- "Dr. Cobbs' email blast also included copies of Dr. Mayberg's lists of concerns, including those that the DOH had investigated and determined four months earlier in July 2016 could not be substantiated because there was no evidence to support them"; and

- "Dr. Cobbs' false report of a consensus on the false claims about Dr. Delashaw was sent to dozens of Swedish employees through an anonymous email sent from a Gmail account using the pseudonym jbartsolo@gmail.com."

(*See id.* (quoting Am. Compl. ¶¶ 60-61, 90-91).)

Despite that laundry list of supposed deficiencies, Dr. Delashaw's complaint contains specific allegations of defamation. For example, he alleges that Dr. Mayberg

sent Mr. Baker—the Times reporter—a false list of surgeons who left SNI after Dr. Delashaw's arrival and falsely attributed those departures to concerns about quality and an abusive work environment related to Dr. Delashaw.[11] (*See* Am. Compl. ¶ 58.) He also alleges that Dr. Cobbs defamed Dr. Delashaw by falsely stating that Dr. Delashaw forced all referrals to go to him, terminated 13 physicians, and had been the subject of a no-confidence vote. (*Id.* ¶ 67.) In addition, he alleges that Dr. Cobbs sent the CEOs of Swedish and Providence a letter in which he falsely claimed that SNI's surgeons had unanimously identified concerns with Dr. Delashaw's leadership. (*See id.* ¶ 75.) Those allegations—even under a heightened pleading standard—give rise to the plausible inference that Dr. Cobbs made defamatory statements about Dr. Delashaw.

The court must read the excerpts Dr. Cobbs provides in context—not in isolation. Those excerpts merely characterize or summarize more specific allegations. For example, Dr. Delashaw alleges that Dr. Mayberg supplied Dr. Cobbs with a "list of phony alleged safety concerns." (Am. Compl. ¶ 60.) On its own, that statement might be vague. But when read in light of Dr. Delashaw's other allegations—such as Dr. Mayberg's allegedly false statements through the anonymous complaint system—Dr. Delashaw adequately pleads sufficient factual material. As another example, Dr. Cobbs takes issue with Dr. Delashaw's allegation that Dr. Cobbs "took action calculated to publicize his false criticisms." (Cobbs MTD at 11 (citing Am. Compl. ¶ 90).) However, the complaint also alleges that Dr. Cobbs claimed the other surgeons voted no-confidence

---

[11] Because Dr. Delashaw alleges a conspiracy, Dr. Mayberg's allegedly false statements are attributed to Dr. Cobbs. *See infra* § III.C.1.b.iv; (Am. Compl. ¶¶ 57-58.)

in Dr. Delashaw, which Dr. Cobbs disseminated to "a broad range of Swedish employees." (Am. Compl. ¶ 90; *see also id.* ¶¶ 91-93 (alleging Dr. Cobbs sent other false statements to his colleagues).) In short, specific allegations bolster the conclusory or broad statements in Dr. Delashaw's complaint. *Cf. Castello*, 2010 WL 4857022, at *12 (stating that the plaintiff's complaint did not include "a single specific statement . . . cite[d] as false").

Dr. Cobbs also argues that Dr. Delashaw fails to state a defamation claim because of the UCCDA. (*See* Cobbs MTD at 19 (citing RCW 7.96, *et seq.*).) He contends that the UCCDA requires a person to make "a timely and adequate request for correction or clarification from the defendant" to maintain a defamation action. (*Id.* (quoting RCW 7.96.030(1)(a)).) Here, he again asserts that Dr. Delashaw's allegations are insufficiently specific to constitute that request. (*Id.* at 21.) Indeed, he contends that the UCCDA imposes a heightened pleading standard for defamation claims. (*See* Cobbs Reply at 5.)

The UCCDA provides that:

(1) A person may maintain an action for defamation . . . only if:

    (a) The person has made a timely and adequate request for correction or clarification from the defendant; or

    (b) The defendant has made a correction or clarification.

(2) A request for correction or clarification is timely if made within the period of limitation for commencement of an action for defamation.

(3) A request for correction or clarification is adequate if it:

    (a) Is made in writing and reasonably identifies the person making the request;

> (b) Specifies with particularity the statement alleged to be false and defamatory or otherwise actionable and, to the extent known, the time and place of publication;
>
> (c) Alleges the defamatory meaning of the statement;
>
> (d) Specifies the circumstances giving rise to any defamatory meaning of the statement which arises from other than the express language of the publication; and
>
> (e) States that the alleged defamatory meaning of the statement is false.

RCW 7.96.040(1)-(3)(e). "[S]ervice of a summons and complaint stating a claim for defamation or another claim covered by [the statute] and containing the information required . . . constitutes an adequate request for correction or clarification." *Id.* 7.96.040(4).

Dr. Cobbs' argument involving the UCCDA is unavailing. A plaintiff falls short of the UCCDA's requirements when "[t]he defamation cause of action pleads only a formulaic recitation of the elements in a conclusory manner." *See Snook v. Whatcom Humane Soc'y*, No. C18-0313RSM, 2018 WL 3752221, at *3 (W.D. Wash. Aug. 8, 2018). For the reasons stated previously in this subsection, Dr. Delashaw pleads the alleged defamatory meaning of the statements and their falsity. Thus, to the extent the UCCDA imposes a specific pleading requirement, Dr. Delashaw meets it.

Thus, the court denies Dr. Cobbs' motion to dismiss on the basis that Dr. Delashaw fails to plead sufficient factual allegations giving rise to a reasonable inference of defamation.

//

//

ii.  Publication

Dr. Cobbs next argues that Dr. Delashaw's defamation claim fails because "the vast majority of the alleged defamatory statements were intra-corporate communications made . . . in the course of [Dr. Cobbs'] employment." (Cobbs MTD at 12.)  Thus, Dr. Cobbs argues that his statements were privileged and are not actionable. (*See id.* at 12-14.)  Dr. Delashaw argues that Dr. Cobbs forfeited the privilege because he published defamatory statements outside of SNI and Swedish and outside the course of his employment with actual malice. (*See* Cobbs Resp. at 12-13.)

"Liability for defamation requires that the defamation be communicated to someone other than the person defamed; in other words, there must be a 'publication' of the defamation." *Doe v. Gonzaga Univ.*, 24 P.3d 390, 397 (Wash. 2001), *rev'd on other grounds by Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002).  Intracorporate communications between co-employees are subject to a qualified privilege.  *See id.* at 398 (stating that intracorporate communications are not "absolutely privileged.").  A defendant may forfeit the privilege in five ways:  (1) by acting with actual malice; (2) by not acting for the purpose of protecting the interest; (3) by knowingly publishing the matter to a person to whom the publication is not otherwise privileged; (4) by not reasonably believing that the matter is necessary to accomplish the purpose; and (5) by publishing unprivileged and privileged matter. *See Moe v. Wise*, 989 P.2d 1148, 1157 (Wash. Ct. App. 1999), *rev. denied*, 10 P.3d 406 (Wash. 2000) (internal citations omitted).

"When a corporate employee, not acting in the ordinary course of his or her work, publishes a defamatory statement, either to another employee or to a nonemployee, there

can be liability . . . ." *Doe*, 24 P.3d at 398. The privilege can also be lost when the defendant makes a statement with actual malice. *See id.* "Actual malice exists when a statement is made 'with knowledge of its falsity or with reckless disregard of its truth or falsity." *Id.* (quoting *Herron v. KING Broad. Co.*, 746 P.2d 295, 301 (Wash. 1987)). A plaintiff can allege actual malice with facts supporting that the defendant "knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth." *Story v. Shelter Bay Co.*, 760 P.2d 368, 373 (Wash. Ct. App. 1988).

At the pleading stage, Dr. Delashaw's complaint plausibly states that Dr. Cobbs' allegedly defamatory statements are not covered by the privilege. Dr. Delashaw alleges that Dr. Cobbs made statements to his colleagues that he knew were false—that is, that Dr. Cobbs acted with actual malice. (*See, e.g.*, Am. Compl. ¶¶ 77, 85, 90, 193-94.) In addition to alleging that Dr. Cobbs knew specific statements were false (*see id.* ¶¶ 77, 85, 90), in setting forth the cause of action for defamation against Dr. Cobbs, Dr. Delashaw alleges more generally that Dr. Cobbs "knew that his statements about Dr. Delashaw were false[] or acted with reckless disregard for their falsity" (*id.* ¶ 194). Moreover, at least one of Dr. Cobbs' allegedly false statements was to someone outside of SNI. (*See id.* ¶ 67.) Those allegations are sufficient to give rise to the plausible inference that Dr.

//

//

//

//

Cobbs forfeited the intracorporate communications privilege.[12]  *See Moe*, 989 P.2d at 1157.

### iii. Falsity

A number of Dr. Cobbs' arguments go to the falsity element of the defamation claim.  (*See* Cobbs MTD at 15-18.)  He first argues that the statements in the meeting minutes are not provably false because they are merely his opinions.  (*See id.* at 15-16.)  Dr. Delashaw counters that those statements are provably false because they "purport to be an accurate recitation of what happened at an October 30, 2016[,] meeting."  (Cobbs Resp. at 13.)

The falsity element of a defamation claim requires the plaintiff to allege facts giving rise to a reasonable inference that "the offensive statement was 'provably false.'"  *Valdez-Zontek v. Eastmont Sch. Dist.*, 225 P.3d 339, (Wash. Ct. App. 2010) (quoting *Schmalenberg v. Tacoma News, Inc.*, 943 P.2d 350, 357 (Wash. Ct. App. 1997)).  A statement can be provably false because the statement "falsely represents the state of mind of the person making it" or "falsely describes the act, condition[,] or event that comprises its subject matter."  *Schmalenberg*, 943 P.2d at 357.  A statement of opinion is generally not provably false and therefore cannot be the subject of a defamation claim.  *See Corbally v. Kennewick Sch. Dist.*, 973 P.2d 1074, 1077 (Wash. Ct. App. 1999); *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002).  "[A] statement structured as an

---

[12] Because Dr. Delashaw alleges Dr. Cobbs acted with actual malice, the court declines to consider whether Dr. Cobbs acted in the course of his employment when he made the statements. (*See* Cobbs Resp. at 12.)

opinion may still be actionable," however, "if it implies the allegation of undisclosed

defamatory facts as the basis for the opinion, because it may then contain a provably false

factual connotation." *Duc Tan*, 300 P.3d at 363. The court considers "(1) the medium

and context in which the statement was published, (2) the audience to whom it was

published, and (3) whether the statement implies undisclosed facts." *Robel*, 59 P.3d at

622 (internal quotation marks omitted) (quoting *Dunlap v. Wayne*, 716 P.2d 842, 848

(Wash. 1986)). Whether a statement is capable of defamatory meaning is a question of

law. *See Crossman v. The Brick Tavern, Inc.*, 655 P.2d 1206, 1207 (Wash. 1982).

Here, the statements in the meeting minutes are provably false. In those minutes,

Dr. Cobbs stated that "Dr. Delashaw has overseen the direct interference of patient

referrals and has used direct intimidation and retaliation to interfere with long-standing

referral patterns." (Am. Compl. ¶ 75.) He also stated that there was a "unanimous lack

of confidence and trust in" Dr. Delashaw's leadership and that the group wanted Dr.

Delashaw to resign immediately. (*Id.*) Those statements are capable of being proved

false. To the extent any of them can be characterized as an opinion, they rest on implied

facts—such as a vote of no confidence—that itself can be proved false. *See Duc Tan*,

300 P.3d at 363. Moreover, considering the context of the statements, they were not

"made in circumstances and places that invited exaggeration and personal opinion" or for

an audience "prepared for mischaracterization and exaggeration." *See Robel*, 59 P.3d at

622 (internal quotation marks omitted) (quoting *Dunlap*, 716 P.2d at 848).

Dr. Cobbs relies on Swedish CEO Tony Armada's response to Dr. Cobbs' letter,

in which Mr. Armada stated that he did not believe the minutes accurately reflected the

meeting and said, "[i]f you are providing them to me as your notes or thoughts from the meeting, that is fine." (*See* Cobbs MTD at 16 (citing Am. Compl. ¶ 84).) The fact that Mr. Armada would accept the minutes only as Dr. Cobbs' notes or thoughts—because Mr. Armada disagreed that the minutes accurately reflected the underlying meeting— does not demonstrate that the statements are opinions as a matter of law. The statements are provably false regardless of Mr. Armada's reaction to them. Moreover, the fact that Mr. Armada declined to accept them as true demonstrates that they are capable of being false. In addition, Dr. Cobbs allegedly later forwarded the minutes to additional Swedish employees (*see* Am. Compl. ¶ 90), from which the court can plausibly infer that he intended to portray them as fact, *see Robel*, 59 P.3d at 622.

Dr. Cobbs next argues that Dr. Delashaw fails to state a claim because even if the statements are inaccurate, they are mere "contextual inaccuracies." (Cobbs MTD at 16-17.) He argues that the gist of his allegedly defamatory statements was his view that Dr. Delashaw endangered patient safety and took patient referrals, which did not depend on whether other SNI surgeons shared his view. (*Id.* at 17.) Dr. Delashaw argues that Dr. Cobbs' "intentional misstatement of events is not a minor inaccuracy" because it goes to the heart of Dr. Cobbs' false accusations against Dr. Delashaw. (Cobbs Resp. at 15.)

"Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge can be justified." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991); *see also Herron*, 776 P.2d at 102 ("The 'sting' of a report is defined as the gist or substance of a report when considered as a whole."). In other words, in challenging falsity, "[a] defendant need only show that the statement is substantially true

or that the gist of the story, the portion the carries the 'sting,' is true." *Mark v. Seattle Times*, 635 P.2d 1081, 1092 (Wash. 1981).

Dr. Cobbs' argument misses the point. Even if the statement that all of SNI's surgeons had no confidence in Dr. Delashaw were a minor inaccuracy, Dr. Delashaw alleges that Dr. Cobbs' other statements—the gist—are also false. For example, Dr. Delashaw alleges that Dr. Cobbs' statement that Dr. Delashaw used "direct intimidation and retaliation to interfere with long-standing referral patterns" is false. (*See* Am. Compl. ¶ 75.) Thus, even if the claim of unanimity on that point is a minor inaccuracy, Dr. Delashaw nonetheless alleges that the gist of the statements is also false. In any event, however, the claim of unanimity creates "significantly greater opprobrium," affecting the sting of the other statements. *Cf. Mark*, 635 P.2d at 1093.

Finally, Dr. Cobbs argues that some of the allegedly defamatory statements are actually true or are not disparaging. (*See* Cobbs MTD at 17.) First, he argues that his statement that Dr. Delashaw required all referrals to go only to Dr. Delashaw is true and cannot form the basis of a defamation claim. (*Id.*) Second, he argues that his statement that "13 of our physicians have been booted if they tried to get in his way or investigate quality issues" is not disparaging of Dr. Delashaw. (*Id.*) And finally, he argues that Dr. Delashaw only implies that Dr. Cobbs defamed him by leaking information to the Times but that his allegations do not support a reasonable inference that Dr. Cobbs in fact gave defamatory information to the Times. (*Id.* at 18.)

//

//

Those arguments fail. First, Dr. Delashaw's other factual allegations support the reasonable inference that Dr. Cobbs' statement implies that all referrals—not just the general referrals that Dr. Delashaw parceled out to the appropriate surgeons—went to Dr. Delashaw. (*See* Am. Compl. ¶¶ 67-68, 75.) Therefore, when viewed in the light most favorable to Dr. Delashaw, the statement creates a false impression. *See Corey*, 225 P.3d at 373 (describing defamation by implication).

Second, the statement about 13 physicians is directed at Dr. Delashaw, not at SNI leadership generally as Dr. Cobbs contends. (Cobbs MTD at 18 (arguing that "the statement is about the general administration of SNI as a whole").) Dr. Cobbs stated that 13 physicians were "booted" when they got in "his way" (Am. Compl. ¶ 67); the statement makes clear that "his" refers specifically to Dr. Delashaw (*see id.*). For that reason, the statement—particularly when viewed in the light most favorable to Dr. Delashaw—disparages Dr. Delashaw. *See Sisley v. Seattle Pub. Sch.*, 321 P.3d 276, 279 (Wash. Ct. App. 2014) (stating that "[t]he defamatory character of the language must be apparent from the words themselves").

Finally, Dr. Delashaw pleads sufficient facts giving rise to the plausible inference that Dr. Cobbs provided defamatory information to the Times. (*See* Am. Compl. ¶ 98.) He alleges that Dr. Cobbs and Mr. Baker exchanged emails and that the Times reported Dr. Cobbs' allegations and posted his letter and the "'unanimous' surgeon complaints." (*Id.*) There is no merit to Dr. Cobbs' contention that "Dr. Delashaw implies, but does not allege," that Dr. Cobbs gave the information to the Times. (*See* Cobbs MTD at 18.)

//

The court therefore concludes that Dr. Delashaw has pleaded that Dr. Cobbs' allegedly defamatory statements were false, and denies Dr. Cobbs' motion on that basis.

### iv. Dr. Mayberg's Statements

Dr. Cobbs next argues that Dr. Mayberg's allegedly defamatory statements cannot be imputed to him. (*See* Cobbs MTD at 18-19.) Dr. Delashaw argues that because he alleges a civil conspiracy, Dr. Cobbs is liable for any defamatory statements Dr. Mayberg made within the scope of the conspiracy. (*See* Cobbs Resp. at 17.)

A civil conspiracy exists when two or more people agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *See Woody v. Stapp*, 189 P.3d 807, 810 (Wash. Ct. App. 2008). Defamation can be the unlawful aim of a conspiracy, *cf. Wilson v. State*, 929 P.2d 448, 459 (Wash. Ct. App. 1996) (considering whether the alleged defamation was part of a civil conspiracy), and conspirators are jointly and severally liable for damages arising from conduct within the scope of the conspiracy, *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 35 (Wash. Ct. App. 2002); *see also Sterling Business Forms, Inc. v. Thorpe*, 918 P.2d 531, 535 (Wash. Ct. App. 1996) ("The liability of conspirators is joint and several."). Based on that rule, Dr. Cobbs could be liable for damages arising from Dr. Mayberg's defamatory statements. Thus, the court denies the motion to dismiss on this basis.

Dr. Cobbs also argues in passing that any allegedly defamatory statements by Dr. Mayberg are "at best ambiguous." (*See* Cobbs MTD at 19.) The court declines to address that cursory argument, however, because Dr. Cobbs does not provide enough detail to allow the court to fully evaluate it. *See Maldonado v. Morales*, 556 F.3d 1037,

1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

Thus, the court concludes that Dr. Delashaw sufficiently states a claim for defamation against Dr. Cobbs, and accordingly, denies Dr. Cobbs' motion to dismiss that claim.

### 2. Tortious Interference

Defendants next challenge Dr. Delashaw's tortious interference claim. (*See* Times MTD at 5-6; Cobbs MTD at 21-24.) They argue that because Dr. Delashaw voluntarily resigned from SNI, he fails to adequately plead the causation element of the tortious interference claim.[13] (*See* Times MTD at 5-6; Cobbs MTD at 22-24.) Dr. Delashaw argues that even though he resigned, Defendants' defamatory statements caused him to do so. (*See* Times Resp. at 9; Cobbs Resp. at 19-20.)

The five elements of a tortious interference with a business expectancy claim are: "(1) the existence of a valid . . . business expectancy; (2) that defendants had knowledge of that [expectancy]; (3) an intentional interference inducing or causing a breach or termination of the . . . expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med.*

---

[13] Dr. Cobbs also argues that the tortious interference claim fails because the acts underlying the claim—alleged defamation—are not actionable. (*See* Cobbs MTD at 21-22.) Because the court denied Dr. Cobbs' motion to dismiss the defamation claims, the court rejects this argument. *See supra* § III.C.1.b. In addition, Dr. Cobbs argues for the first time on reply that the statute of limitations bars Dr. Delashaw's tortious interference claim. (*See* Cobbs Reply at 10.) Accordingly, the court does not consider that argument. *See Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990) (stating that a party "cannot raise a new issue for the first time in [his] reply brief").

*Bureau,* 930 P.2d 288, 300 (Wash. 1997) (ellipses in original).  Whether a defendant is responsible for the interference with a business expectancy depends on "traditional principles of proximate causation."  *City of Seattle v. Blume*, 947 P.2d 223, 227 (Wash. 1997).  Although "a person's own conduct may . . . be the sole cause of his . . . injuries," the Washington Supreme Court recognizes that "the tortious acts of another [may] necessitate a person's decision."  *Id.* at 230.  Therefore, a person's voluntary action alone does not bar a tortious interference claim.  *See id.* at 231.  Rather, at the motion to dismiss stage, the court must determine whether the plaintiff pleads that the defendants nonetheless caused the plaintiff to act.  *See id.* at 230-31.

Defendants' assertion that Dr. Delashaw's resignation bars his tortious interference claim as a matter of law contravenes *Blume*.[14]  Dr. Delashaw alleges that Defendants' tortious acts necessitated his "decision to remove" himself as SNI's director.  *See id.* at 230; (*see also* Am. Compl. ¶ 159.)  After the Times' allegedly false reports, he "was unable to focus on patient care" and resigned.  (Am. Compl. ¶ 159.)  And he alleges

---

[14] The court is not persuaded otherwise by Defendants' reference to *Haglund v. Sawant*, No. C17-1614MJP, 2018 WL 2216154, at *2 (W.D. Wash. May 14, 2018).  (*See* Times MTD at 6 n.32; Cobbs MTD at 23.)  In *Haglund*, the court concluded that the plaintiff's claim failed due to his own "voluntary business decisions" and relied on *Pleas v. City of Seattle*, 774 P.2d 1158, 1169 (Wash. 1989) (stating that the Washington Supreme Court had "emphasized liability should not be imposed on the basis of the voluntary business decisions of the plaintiff").  2018 WL 2216154, at *2.  However, the plaintiff did not identify any action by the defendants that amounted to interference, and the court did not address proximate causation in the manner discussed in *Blume*.  *See id.*  Moreover, *Pleas* is not necessarily at odds with the court's conclusion here; although a court should not impose liability solely based on a plaintiff's voluntary decision, liability may be appropriate for a defendant's tortious acts that in turn cause the plaintiff's decision.  *See* 774 P.2d at 1169; *see also Blume*, 947 P.2d at 230-31.  For those additional reasons, the court concludes that Dr. Delashaw's resignation does not bar a tortious interference claim as a matter of law.

1   that Dr. Cobbs conspired to force Dr. Delashaw's resignation and provided defamatory

2   material to the Times, thereby alleging links between Dr. Cobbs' tortious actions and Dr.

3   Delashaw's decision to resign. (*See id.* ¶¶ 50, 98, 108, 159.) The court therefore

4   concludes that Dr. Delashaw sufficiently alleges a claim for tortious interference. His

5   resignation does not bar that claim as a matter of law, *see Blume*, 947 P.2d at 231, and the

6   court denies the motions to dismiss.

7       3. <u>The CPA</u>

8       Next, the Times argues that a CPA claim based on a newspaper article is not

9   actionable as a matter of law. (*See* Times MTD at 6.) The Times relies on *Fidelity*

10   *Mortgage Corporate v. Seattle Times Co.*, 128 P.3d 621, 624 (Wash. Ct. App. 2005). (*Id.*

11   at 6 n.34.) Dr. Delashaw contends that *Fidelity Mortgage* contravenes the Washington

12   Supreme Court's decision in *Short v. Demopolis*, 691 P.2d 163, 168 (Wash. 1984), which

13   stated that the CPA reaches "*every* person who conducts unfair or deceptive acts or

14   practices in *any* trade or commerce." (*See* Times Resp. at 13 (quoting *Short*, 691 P.2d at

15   168).)

16       The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts

17   or practices in the conduct of any trade or commerce." RCW 19.86.020. A private cause

18   of action arises under the CPA if the conduct (1) is unfair or deceptive, (2) occurs in trade

19   or commerce, (3) affects the public interest, and (4) causes (5) injury to a plaintiff's

20   business or property. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,

21   719 P.2d 531, 535 (Wash. 1986). The CPA defines "trade" and "commerce" as "the sale

22   //

of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington."  RCW 19.86.010(2).

In *Fidelity Mortgage*, the Washington Court of Appeals stated that "a news article . . . is not published 'in the conduct of any trade or commerce'" and "does not fall within" the CPA.  128 P.3d at 624.  The court also stated, however, that the published rate chart could be considered trade or commerce if the newspaper accepted an advertising fee in exchange for including a lender in the chart.  *See id.* at 625.

Based on *Fidelity Mortgage*, the court concludes that Dr. Delashaw's CPA claim fails.  Dr. Delashaw alleges that the *Quantity of Care* series deceived the Times' readers and that the deception occurred in trade or commerce.  (Am. Compl. ¶ 188.)  Specifically, Dr. Delashaw alleges that disparaging him "was a key component of [the Times'] multi-media marketing strategy to increase [its] revenue and notoriety."  (*Id.*)  Although Dr. Delashaw characterizes his claim as stemming from the Times' advertising to drum up interest in the series, at bottom, his claim is based on the news articles.  Thus, the claim is not actionable.  *See Fidelity Mortg.*, 128 P.3d at 624.

*Short* does not reach as far as Dr. Delashaw asserts.  In that case, the Washington Supreme Court held that only the "entrepreneurial aspects of the practice of law" are considered trade or commerce under the CPA.  691 P.2d at 170.  Thus, to fall within the ambit of the CPA, for claims involving "the 'learned professions,'" "the question is whether the claim involves entrepreneurial aspects of the practice," rather than "mere claims of professional negligence."  *See Jaramillo v. Morris*, 750 P.2d 1031, 1304

//

(Wash. Ct. App. 1988) (citing *Short*, 691 P.2d at 168).  Thus, the CPA does not cover "claims which relate to the competence and performance of the profession."  *Id.*

Analogizing to the present context, Dr. Delashaw's CPA claim is not based on the entrepreneurial aspects of journalism, despite Dr. Delashaw's assertion that the *Quantity of Care* articles "earn[ed] the Times revenue."  (Times Resp. at 15.)  Washington law does not support the logical extension of that broad assertion—that all reporting is inherently commercial.  The court concludes that Dr. Delashaw may not bring a CPA claim based on the content of a news article and grants the Times' motion to dismiss.

4.  <u>Civil Conspiracy</u>

Finally, Dr. Cobbs seeks dismissal of Dr. Delashaw's civil conspiracy claim.  (*See* Cobbs MTD at 21-22.)  He makes two arguments:  (1) that because Dr. Delashaw fails to sufficiently allege the underlying defamatory conduct, he fails to state a claim for civil conspiracy; and (2) the applicable statute of limitations bars the claim.  (*Id.* at 21-22; *see also id.* at 22 n.9.)  The court rejects both arguments.

First, as the court detailed extensively, Dr. Delashaw adequately alleges defamation against Dr. Cobbs.  *See supra* § III.B.1.a-b.i; *cf. LaRoche v. Kimball*, No. C15-1003TSZ, 2015 WL 12930125, at *2 (W.D. Wash. Nov. 6, 2015) (stating that a civil conspiracy claim fails if the underlying act is not actionable).  Thus, even if the civil conspiracy claim depends solely on those allegations, the court denies the motion to dismiss on that basis.

Second, it is not apparent from the face of Dr. Delashaw's complaint that the statute of limitations bars his civil conspiracy claim.  *See Huynh v. Chase Manhattan*

*Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding that dismissal under Rule 12(b)(6) because the statute of limitations has expired is appropriate only when the expiration "is apparent on the face of the complaint"). Dr. Cobbs tucks his statute of limitations argument into a brief footnote. (*See* Cobbs MTD at 22 n.9.) By doing so, he fails to provide the court with sufficient detail to fully analyze that basis for dismissal. *See First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal. 2008) ("A footnote is the wrong place of substantive arguments . . . , particularly where such arguments provide independent bases for dismissing a claim . . . ."). Moreover, a three-year statute of limitations—contrary to Dr. Cobbs' assertion of two years—applies to civil conspiracy claims. *See* RCW 4.16.080(2) (stating that the three-year limitations period applies to "any other injury to the person or rights of another not [otherwise] enumerated"); *see also Allenmore Med. Investors, LLC v. City of Tacoma*, No. C14-5717RBL, 2014 WL 7045700, at *3 (W.D. Wash. Dec. 11, 2014) (stating that civil conspiracy claims under Washington law are subject to a three-year limitations period and citing RCW 4.16.080(2)). The court therefore denies Dr. Cobbs' motion to dismiss the civil conspiracy claim.

//

//

//

//

//

//

# IV.    CONCLUSION

For the reasons set forth above, the court GRANTS in part and DENIES in part the Times' motion to dismiss (Dkt. # 27) and DENIES Dr. Cobbs' motion to dismiss (Dkt. # 30).

Dated this 22nd day of August, 2018.

JAMES L. ROBART
United States District Judge