The Honorable James L. Robart

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

JOHNNY B. DELASHAW, JR.,

9

Plaintiff,

10

v.

11

SEATTLE TIMES COMPANY, and
CHARLES COBBS,

12

13

Defendants.

14

CASE NO. 2:18-cv-00537-JLR

THE SEATTLE TIMES' SECOND
MOTION FOR SUMMARY JUDGMENT

**NOTED ON MOTION CALENDAR:
July 31, 2020**

15

16

17

18

19

20

21

22

23

24

25

26

SEATTLE TIMES SECOND MOTION FOR SUMMARY
JUDGMENT [2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ...................................................................................................... 1

II.   ARGUMENT ............................................................................................................. 1

    A.    Summary Judgment Standard ........................................................................ 1

    B.    The Financial Incentive Statements Did Not Cause Delashaw Any
    Damage Distinct From the Rest of the Nondefamatory Articles. ........................... 2

    C.    The Statement that the Swedish Employment Contracts Incentivized High
    Patient Volume Is Substantially True. ................................................................. 3

    D.    The Times Did Not Act with Fault. ................................................................ 8

        1.    Delashaw Cannot Point to Evidence of Actual Malice. ..................... 8

           a.    Delashaw is a Limited Purpose Public Figure ...................... 8

              (i)    He Voluntarily Assumed a Role of Prominence in the
              Public Controversy .............................................. 9

              (ii)    Delashaw Had Access to Channels of Effective
              Communication .................................................. 22

              (iii)    Delashaw Sought to Influence the Outcome of the
              Controversy ........................................................ 22

              (iv)    The Controversy Over Delashaw's Failed Leadership at
              SNI Existed Prior to Publication of the Articles .......... 22

              (v)    At the Time the Articles Were Published, Delashaw
              Retained His Public Figure Status ............................. 22

           b.    There is No Evidence that the Times Acted with Actual Malice ....... 23

        2.    Delashaw Also Cannot Point to Evidence of Negligence. ................ 23

III.   CONCLUSION ........................................................................................................ 24

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - i
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF AUTHORITIES

Page(s)

Cases

*Clardy v. Cowles Pub. Co.*,
   81 Wn. App. 53, 912 P.2d 1078 (1996) ................................................................. Passim

*Doe v. Gonzaga Univ.*,
   24 P.3d 390 (Wash. 2001) ....................................................................................... 23, 24

*Duc Tan v. Le*,
   177 Wn.2d 649, 300 P.3d 356 (2013) ............................................................................ 9

*Dunlap v. Wayne*,
   105 Wn.2d 529, 716 P.2d 842 (1986) ........................................................................... 25

*Gsouri v. Gentry*,
   2019 WL 4889790 (W.D. Wash. Aug. 8, 2019) .............................................................. 4

*Herron v. KING Broad. Co.*,
   112 Wn.2d 762, 776 P.2d 98 (1989) ............................................................................... 2

*Herron v. KING Broad. Co.*,
   746 P.2d 295 (Wash. 1987) ......................................................................................... 24

*Jinni Tech, Ltd. v. Red.com, Inc.*,
   2020 WL 1932696 (W.D. Wash. Apr. 20, 2020) ............................................................. 1

*LaMon v. Butler*,
   112 Wn.2d 193, 770 P.2d 1027 (1989) ......................................................................... 25

*Makaeff v. Trump Univ.*,
   715 F.3d 254 (9th Cir. 2012) ........................................................................................ 24

*Mohr v. Grant*,
   153 Wn.2d 812, 108 P.3d 768 (2005) ......................................................................... 1, 4

*Paterson v. Little, Brown & Co.*,
   502 F. Supp. 2d 1124 (W.D. Wash. 2007) .................................................................. 9, 23

*Schmalenberg v. Tacoma News, Inc.*,
   87 Wn. App. 579, 943 P.2d 350 (1997) ....................................................................... 2, 3

*Taskett v. KING Broad. Co.*,
   86 Wn.2d 439, 546 P.2d 81 (1976) ........................................................................... 24, 25

*Thompson*,
   130 Wn.2d 368, 922 P.2d 1343 (1996) ........................................................................... 2

*Zweigh v. Hearst Corp.*,
   521 F.2d 1129 (9th Cir. 1975) .............................................................................. 4, 5, 6, 7

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

## I.   INTRODUCTION

The Seattle Times moves for summary judgment on the remaining claim asserted by Dr. Johnny Delashaw regarding the newspaper's reporting in a February 2017 article about the financial incentive of doctors at Swedish Neuroscience Institute ("SNI") to pursue a high patient volume.[1]  He must, but cannot, make a prima facie case that the description of the incentive contracts caused him damage, that the remaining statements are not substantially true, **and** that the Times acted with fault.  For each of these reasons, the remaining claims against the Times should be dismissed.

## II.   ARGUMENT

### A.   Summary Judgment Standard

"[S]ummary judgment plays a particularly important role" in defamation cases because "[s]erious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms."[2]

"[T]o avoid summary judgment on a defamation claim, a plaintiff must make a prima facie showing of facts that would raise a genuine issue of material fact as to each of the following elements:" (1) "that the communication proximately caused damages," (2) that the statements were false, and (3) that the Seattle Times acted with fault.[3]  Because Delashaw cannot make out a prima facie case as to **all** of these independent elements, the lawsuit against the Times should be dismissed.

---

[1] Order on Defs.' Mots. for Summ. J., Dkt #160 ("SJ Order"), at 77:12-15.  The Court provisionally filed the SJ Order under seal.  Swedish has since filed in the open court file the portions of the Order that it agrees are not subject to sealing.  Dkt #180-1.  The Times in this motion abides by the pending redactions requested by Swedish.

[2] *Mohr v. Grant,* 153 Wn.2d 812, 821, 108 P.3d 768 (2005) (quotation marks and citations omitted).

[3] *Jinni Tech, Ltd. v. Red.com, Inc.*, No. C17-0217JLR, 2020 WL 1932696, *9 (W.D. Wash. Apr. 20, 2020).

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 1
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

**B.     The Financial Incentive Statements Did Not Cause Delashaw Any Damage Distinct From the Rest of the Nondefamatory Articles.**

The goal of damages in a defamation case "is to compensate the plaintiff for harm caused by the defendant's wrongful conduct."[4]  Hence, "a defamation plaintiff can recover damages only if he or she proves harm factually caused by the defendant's wrongful conduct."[5]  A plaintiff may not recover damages suffered as a result of the publication of nondefamatory statements.

> The question is whether the false statement has resulted in damage which is distinct from that caused by true negative statements also contained in the same report.  If it has not, then whatever damage the plaintiff has suffered does not amount to defamation because it is not solely attributable to the falsehood.  In that case, the plaintiff has not made a prima facie case.[6]

In other words, "when a defamation defendant's statement is partly true in substance and partly false in substance, the defamation plaintiff may not recover for damage that would have occurred even without the false part."[7]

Even assuming that the statements about the Swedish contracts are false – an assumption made only for purposes of the causation analysis – Delashaw cannot point to any evidence that these assumed false statements **_caused_** him damage distinct from the damage caused him by the rest of the nondefamatory articles.[8]  To the contrary, he has been unabashed throughout his career that his tremendous surgical volume warrants top dollars.  For example, he told the University of California at Irvine ("UCI") neurosurgery faculty "many times" that he "want[ed] them to be rich.  But in order to be rich, you have to work and you have to do clinical volume …."[9]  Upon arriving at UCI, he "eclipsed" the senior neurosurgeon's productivity "almost instantaneously."[10]  At UCI,

---

[4] *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 602, 943 P.2d 350 (1997).

[5] *Id.*

[6] *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 771-72, 776 P.2d 98 (1989), *modified on non-relevant grounds in Richard v. Thompson*, 130 Wn.2d 368, 922 P.2d 1343 (1996).

[7] *Schmalenberg*, 87 Wn. App. at 598 (affirming summary judgment).

[8] SJ Order at 32-55 (rejecting all Delashaw's other claims against the Times).

[9] 7/8/20 Goldman SJ Decl., Ex. 1 at 13:13-16.

[10] *Id.* at 31:10-13.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 2
[2:18-cv-00537-JLR]

1  he was paid $1.2 million annually and was "required to do 10,000 work rvus per year …."[11]  Then,

2  when he emailed Providence executives with his compensation demands before being hired, he

3  explained: "I can bring serious volume to SNI it has not seen."[12]  He promised he would make the

4  nonprofit hospital "more profitable for everyone than anywhere else on the planet."[13]

5      Moreover, his employment placement expert in *Delashaw v. Roberts*, his other defamation

6  lawsuit before this Court ("*Roberts*"),[14] opined that when Delashaw resigned from Swedish –

7  shortly after publication of the articles – he could have gotten a job at numerous hospitals

8  throughout the country.  It is her opinion that it was only after the Department of Health ("DOH")

9  **later** suspended Delashaw's license for fear of risk to patients that he became unemployable.[15]

10      Because there is no evidence of causation, summary judgment should issue and the Court

11  need proceed no further.[16]

12  **C.  The Statement that the Swedish Employment Contracts Incentivized High Patient
      Volume Is Substantially True.**

13      While we assumed above that the remaining challenged statements are not true for

14  purposes of the causation element, the remaining claim also fails because these statements **are**

15  substantially true.[17]  The "gist of the story, the portion that carries the sting, is true."[18]

16

---

17  [11] *Id.*, Ex. 2 at JDEL_008709.  A "wRVU" or "RVU" is a relative value unit, a numeric factor assigned to a medical service based on the skill and time required to undertake such a procedure.  *See* https://medical-

18  dictionary.thefreedictionary.com/relative+value+unit (last visited 7/6/20).
   [12] *Id.*, Ex. 2 at JDEL_008709.
   [13] *Id.* at JDEL_008708.

19  [14] Delashaw is suing officials from MQAC (the DOH Medical Quality Assurance Commission) in *Delashaw v. Roberts*, Case No. 2:18-cv-01850.

20  [15] 7/8/20 Wion Decl., Ex. 5 at 3; *id.*, Ex. 6 at 55:3-11.

21  [16] "Delashaw's tortious interference claim rises and falls with his defamation claims" as he "bases" that "claim entirely on the Times' allegedly defamatory publications."  SJ Order at 55:3-5.  So, what remains of his tortious

22  interference claim also should be dismissed for each of the reasons set forth in this motion.
   [17] In ruling on the Times' first summary judgment motion, the Court noted deficiencies and questions regarding the presentation of the financial incentive claim.  *Id.* at 35:20-36:16 & n.8.  In light of the Court's ruling and based on the

23  Court's subsequent authorization of the Times' depositions of more SNI physicians, Minute Entry, Dkt # 152, the Times conducted additional discovery regarding the financial incentive claim.  Given the First Amendment

24  implications of allowing baseless defamation claims to proceed to trial, *Mohr,* 153 Wn.2d at 821, the Times addresses here the issues raised by the Court as to the financial incentive claim and the undisputed evidence produced in

25  additional discovery.  *See also Gsouri v. Gentry,* No. 3:18-cv-5472 BHS-JRC, 2019 WL 4889790, *2 (W.D. Wash. Aug. 8, 2019) ("The purpose of summary judgment is to avoid unnecessary trials") (citing *Zweig v. Hearst Corp.*,

26  521 F.2d 1129, 1136 (9th Cir. 1975)).
   [18] SJ Order at 33:3-10 (quotation marks & citation omitted).

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 3
[2:18-cv-00537-JLR]

The Times reported five statements regarding the SNI surgeons' incentive contracts, only one of which mentioned Delashaw.

> The doctors in the neuroscience unit are incentivized to pursue a high-volume approach with contracts that compensate them for large patient numbers and complicated surgical techniques….

> Despite the concerns aired about Dr. Delashaw, the hospital's administrators moved ahead with a plan to revamp surgical contracts in a way that would incentivize the high-volume approach in which Delashaw excelled….

> The revised contracts at Cherry Hill's SNI program ended the pooling system, according to records and interviews.  Surgeons would be paid almost entirely on their production, as measured by Relative Value Units, or RVUs….

> Surgeons with production-based contracts can increase their revenue by adding more stages to a surgery.  That's particularly true when it comes to spine cases….

> All those RVUs equate to more reimbursements for the hospital and, under the Swedish contracts, more money for the doctors.[19]

As the Court has noted, the Times article "never explicitly states that Dr. Delashaw had a contract that incentivized him to pursue a high-volume patient load."[20]  Rather, the article reported on the change in which contracts that were already incentivizing production were changed to do so at an even greater degree for "[t]he doctors in the neuroscience unit."[21]  The statements are true as to the SNI surgeons, all of whom had contracts that increased productivity incentives, including Delashaw.

When SNI first opened, it eschewed a straight productivity model.  Co-founder Dr. Marc Mayberg testified that he:

> [S]urveyed a number of similar institutes around the country with multiple surgeons, and all … agreed that a 100 percent RVU compensation formula was destructive to collegiality.  It really pitted the surgeons against each other as competitors.  In addition, there are substantial differences in compensation for different kinds of procedures.  So people who do a procedure like pediatric neurosurgery or deep brain stimulation don't get very many RVUs for doing that even though they're working hard, they're

---

[19] 7/8/20 Wion Decl., Ex. 14 at ST_0041496, 0041501, 0041507, 0041508.
[20] SJ Order at 36 n.8.
[21] 7/8/20 Wion Decl., Ex. 14 at ST_0041496.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

doing as many cases, they're working as many hours as somebody who does, for example, spine surgery.  So this was an attempt to really narrow the – the range of salaries so they were closer together, but the number that most of the other groups had come up with was 20 percent.  So … everybody … each quarter took their reimbursement and put 20 percent of it into the pool.  That pool then was distributed equally among … six or seven surgeons – so that in essence the people contributing 20 percent got back some of it in that distribution.  And it varied how much they put in and how much they got out.[22]

In 2014, after Delashaw arrived, SNI abandoned its prior compensation model and adopted greater productivity incentives for its surgeons.[23]  "[T]he more RVUs you did, the more money you [made]."[24]  One of SNI's and Delashaw's goals was high surgical volume.[25]  Delashaw, by his own description, "was a principal player in negotiating the wRVU rate higher giving potentially each of us a raise.  Pooling is over …."[26]  Another goal was to enrich the hospital and the SNI surgeons.  As Delashaw explained, "I am a huge profit margin for the hospital …."[27]

Rachelle Daugherty, who was responsible for managing the employment contracts of the SNI physicians, attested that as of 2014, they were compensated for clinical care "█████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████[29]  The third-party fair market value analysis obtained by Swedish to support this change in PEAs, applied to the 11 SNI surgeons – including

---

[22] 7/8/20 Goldman Decl., Ex. 3 at 29:17-30:15.

[23] *Id.*, Ex. 4 at JDEL_007572 ███████████████████████████"); *id.*, Ex. 3 at 29:8-12 (the SNI pool sharing formulated was stopped "in April or May of 2014 and then the compensation went to 100 percent dollar per RVU").

[24] *Id.*, Ex. 3 at 103:13-17.

[25] *Id.*, Ex. 5 at 48:4-17; *id.*, Ex. 6 at 46:13-25 (Delashaw stated he wanted SNI to be "a large internationally respected high volume [quaternary] referral center for neurosurgery").

[26] *Id.*, Ex. 7 at JDEL_120712.

[27] *Id.*, Ex. 8 at SWE-E_015842.

[28] 7/8/20 Daugherty Decl. ¶¶ 1, 3.

[29] *Id.* ¶ 3; *see also id.*, Ex. A at SWE_005825.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 5
[2:18-cv-00537-JLR]

Delashaw – and confirmed that they "████████████████████████████████████ ████████████████████████████████."[30]

Hence, on March 1, 2014, Delashaw entered into a new PEA with Swedish in which his compensation was directly "████████████████████n"[31] at a rate of ████████████.[32]  He testified that this compensation plan "was about how much work you did.  The more you did the more you got paid."[33]  As the Court has ruled, "Delashaw was, in fact, under contracts that incentivized him to pursue a high-volume patient load from October 2013 to April 2015, which is consistent with the claims in the Second Times Article."[34]

As with the Delashaw PEA, on March 1, 2014, Dr. Douglas Backous's PEA was amended.  The "██████████████████" provision was "████████████████████████████" the following provision: "██████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████[35]  Backous testified: "████████████████ ██████████"[36]  That meant that "the only way to make compensation goals [was] to see more patients or deliver more care."[37]  Hence, there was a financial incentive to increase surgical volume under this pure RVU model.[38]  He explained: "The RVU model was moving people in a straight production mode of thinking which would drive significant volume which was a positive, but would generate internal competition and breakdown of the morale of the group."[39]

The other SNI PEAs were the same.  For example, in November 2014, Dr. Jens Chapman signed a two-year contract that paid him ████████████[40]  Dr. Stephen Monteith also signed an

---

[30] *Id.*, Ex. D at SWE_0005842 and 005845.
[31] SJ Order at 23:4-7 (redaction requested by Swedish, Dkt #180-1).
[32] 3/6/20 Goldman Decl., Dkt #110 (sealed), Ex. 11 at JDEL_036246.
[33] SJ Order at 23:11-14 (quotation marks & citation omitted).
[34] *Id.* at 34:20-35:2.
[35] 7/8/20 Goldman Decl., Ex. 9 at SWE-E_026079-80.
[36] *Id.*, Ex. 5 at 112:20-113:13.
[37] *Id.* at 17:7-25.
[38] *Id.* at 18:1-5.
[39] *Id.* at 29:13-21.
[40] *Id.*, Ex. 10 at SWE-E_004875.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 6
[2:18-cv-00537-JLR]

RVU-based contract and the more he worked, the more he could potentially earn.[41]  By seeing "more patients in the hospital or in the office or by performing more procedures," he could increase his compensation.[42]  Mayberg also signed an RVU-based contract which continued through 2016.[43]  Dr. Zachary Litvack started at SNI in April 2016 and his PEA provided him a ███████████████████████████████████████████.[44]

In sum, the Times accurately reported that SNI "ended the pooling system" and "moved ahead with a plan to revamp surgical contracts in a way that would incentivize the high-volume approach in which Delashaw excelled."[45]

Daugherty, the SNI contracts manager, attests that ████████████████████████ ████████████████████████████████████████████████████ ████████████  The article's description of the change in contracts for "[t]he doctors in the neuroscience unit"[47] is substantially true irrespective of the *further* changes to Delashaw's 2015 and 2016 PEAs.

Although Delashaw's 2015-2016 PEAs were based on an annual salary, they too incentivized high productivity.  Each included a provision that "explicitly state[d] that Dr. Delashaw's compensation will be adjusted if he does not meet certain production thresholds."[48]  Daugherty confirms that Swedish read its 2015-2016 Delashaw PEAs in the same manner: "████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████[49] "████████████ Delashaw's compensation in these two

[41] *Id.*, Ex. 11 at 54:9-55:3.
[42] *Id.* at 56:16-19.
[43] *Id.*, Ex. 3 at 103:18-21.
[44] *Id.*, Ex. 6 at 105:20-108:1.  Delashaw's neurosurgery expert in the *Roberts* case confirmed that the SNI compensation system incentivized surgeons to do more work because they earned more money doing so.  7/8/20 Wion Decl., Ex. 17 at 47:7-14.
[45] 7/8/20 Wion Decl., Ex. 14 at ST_0041501.
[46] 7/8/20 Daugherty Decl. ¶ 3.
[47] 7/8/20 Wion Decl., Ex. 14 at ST_0041496.
[48] SJ Order at 35:8-10 (citation omitted).
[49] 7/8/20 Daugherty Decl. ¶ 7.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

contracts "███████ ██ ████████████" and he worked at least as much as the ███ ███████ of RVU productivity, ████████████████████████ ████████[50]  His damages expert, Neal Beaton, confirmed that there was a minimum volume of surgeries Delashaw needed to perform in order to earn the compensation provided in the 2016 PEA.[51]  Notably, Delashaw does not – and cannot – argue that if he failed to produce at or above the ██ percentile in 2015 or 2016,[52] he would have been paid his above-██ percentile "salary."

The remaining claim should be dismissed because Delashaw cannot point to evidence that the Times' reporting about SNI's change to ██████████████████"[53] PEAs was *not* substantially true and the Court need proceed no further.

## D.   The Times Did Not Act with Fault.

Finally, if Delashaw's remaining claim has not been dismissed for either of the reasons above, it fails because he cannot make a prima facie case of fault, whether the standard is actual malice, as is required for a limited purpose public figure like him, or negligence.

### 1.   Delashaw Cannot Point to Evidence of Actual Malice.

As a limited-purpose public figure, Delashaw must – but cannot – make a prima facie case with evidence of convincing clarity that the Times acted with actual malice.[54]

#### a.   Delashaw is a Limited Purpose Public Figure.

"A person may be a public figure for all purposes or for a limited purpose."[55]  "Limited purpose public figures are those who voluntarily inject themselves or are drawn into a public controversy and thereby become public figures for a limited range of issues."[56]  Whether a plaintiff is either type of public figure is an issue of law for the court.[57]

---

[50] *Id.* ¶ 6 (emphasis added).
[51] 7/8/20 Wion Decl., Ex. 9 at 44:20-45:8.
[52] The fair market value analysis prepared for Swedish described Delashaw's RVU productivity as "████████████ 7/8/20 Daugherty Decl., Ex. D at SWE_005851.
[53] 7/8/20 Daugherty Decl. ¶ 3
[54] *Duc Tan v. Le*, 177 Wn.2d 649, 668 n.5, 300 P.3d 356 (2013).
[55] *Clardy v. Cowles Pub. Co.*, 81 Wn. App. 53, 56, 912 P.2d 1078 (1996).
[56] *Id.* at 58.
[57] *Id.* at 57.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

"A public controversy is one that touches upon serious issues relating to community values, historical events, governmental or political activity, arts, education, or public safety."[58] Undisputedly, the controversy that had been simmering at SNI since Delashaw's arrival and burst into the open in the fall of 2016 was public and touched upon the concerns of many inside and outside Swedish that Delashaw increased the risks for the hospital's patients and staff.

"An individual need not be known outside of his or her particular industry to be a limited purpose public figure."[59]   Five nonexclusive considerations[60] confirm Delashaw is a limited purpose public figure in regard to the public controversy at Swedish caused by his leadership.

### (i)   He Voluntarily Assumed a Role of Prominence in the Public Controversy.

Delashaw describes himself as having "developed a national reputation for clinical excellence,"[61] with a "vast referral base, which extended to the entire United States and to other countries."[62]   His "referral base consisted of scores if not hundreds of physicians, clinics and hospitals who knew of and respected [his] exceptional capabilities."[63]   He has "an extensive CV of publications" and has "been interviewed on 60 minutes, 20/20, and the Discovery Channel as a result of [his] experience in the treatment of stroke and aneurysms."[64]   As he "became more and more experienced" he became "more and more well-known …."[65]

But, his vast referral base and his celebrity came with a price.  "Neurosurgery is a relatively small circle" and he was problematic.[66]   In his years at Oregon Health & Science University ("OHSU"), he "was seen as controversial" by faculty members; both residents and

---

[58] *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1140 (W.D. Wash. 2007) (quotation marks & citation omitted).
[59] *Id.* at 1140.
[60] *Clardy*, 81 Wn. App. at 62.
[61] 7/8/20 Goldman Decl., Ex. 13.
[62] First Amended Complaint, Dkt #25-1 ¶ 181.
[63] *Id.*
[64] 7/8/20 Goldman Decl., Ex. 15 at JDEL_031329.
[65] *Id.*, Ex. 14 at 11:12-14; *id.*, Ex. 15 at 13:9-14:6 ("he's very well known").
[66] *Id.*, Ex. 6 at 28:2, 28:17-22.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 9
[2:18-cv-00537-JLR]

faculty voiced concern about him.[67]  Then, at UCI, immediately prior to arriving at Swedish, he

"cause[d] disruption" that resulted in whistleblower complaints and four internal investigations,[68]

which he blamed on other surgeons being "envious" of him.[69]

Neurosurgeons outside of UCI were aware of Delashaw's conflicts with the other UCI

faculty.[70]  As Swedish considered hiring him, Dr. Ralph Pascualy, the Swedish Senior Vice

President of Care Transformation, heard from multiple neurosurgeons with concerns about

Delashaw.[71]  Mayberg, the SNI Co-Director, heard from a doctor who had worked at the

Cleveland Clinic that Delashaw had behavioral issues beginning in the late 1990s.[72]  Dr. Dan

Kelly, a neurosurgeon in California, reached out to the Providence leadership to warn them against

hiring Delashaw because he "was a pathological liar, and [] he practices outside the bounds of

standard of care, and [] he really didn't have leadership skills … that would allow him to work …

in a collegial way with other people."[73]

Providence, Swedish's parent company, nonetheless hired Delashaw and installed him at

Swedish in Seattle.  According to the Swedish Chief of Staff, this had never happened before.[74]

"Delashaw's arrival at Swedish Cherry Hill, promotion to Chairman of Neurosurgery and Spine at

SNI, and management tactics at SNI caused a considerable amount of turmoil at SNI."[75]  By late

2013, Swedish leaders requested a "behavior modification program for" him.[76]  In January 2014,

an anonymous SNI surgeon emailed the Providence and Swedish Boards:

> The proximate cause of the current chaos is Mr. Butler's decision to insert
> a neurosurgeon, Dr. Delashaw, into Swedish after it was clear that after
> due diligence on his references by Swedish and SNI physicians found him
> unacceptable.  The Swedish vetting process was thorough and included

---

[67] *Id.* at 25:13-17, 25:21-26:6.
[68] *Id.*, Ex. 1 at 43:3-21.
[69] *Id.*, Ex. 13 at JDEL_031330.
[70] *Id.*, Ex. 6 at 27:16-22.
[71] *Id.*, Ex. 16 at 303:7-304:15.
[72] *Id.*, Ex. 3 at 184:25-185:7.
[73] *Id.*, Ex. 17 at 25:14-26:21, 42:24-43:12 & Ex. 504 at KEL_000085.
[74] *Id.*, Ex. 19 at 64:21-25.
[75] SJ Order at 2:15-17.
[76] 7/8/20 Goldman Decl., Ex. 15 at 19:25-20:10.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 10
[2:18-cv-00537-JLR]

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

informal checks with other top national neurosurgical leaders, conversations with Providence Oregon physicians, all revealing that Delashaw had questionable ethics, a DUI, two investigations undoubtedly triggered by his volume of cases, a censure by the Society of Neurosurgery for essentially lying as an expert witness, and predatory behavior to gain referrals from other surgeons. Of course he also delivered off the charts surgical volumes and accompanying millions to the medical centers where he had worked.[77]

In March 2014, neurosurgeon Dr. Sara Fouke complained to Delashaw that SNI faculty "are very vocally disappointed" with "various aspects of organizational behavior; I for one place a much higher priority on seeing whether we can, as a group, bridge this turmoil and become something better than the sum of the parts, or whether the division will destroy us."[78]

For Delashaw, SNI was "toxic with jealous surgeons and nurses reporting falsely or reported events that damage[d] my reputation with false claims."[79] Dr. Frances Broyles, the Medical Director of Neuroendocrinology at Swedish warned the hospital's CEO of her "'extreme concern over the nuclear disruption of SNI by Dr. Delashaw" and alleged that he "has offended virtually every doctor at SNI, has bad mouthed SNI physicians, and attempted to steal patients.'"[80] In July 2014, there followed serious complaints against Delashaw by Mayberg.[81] The following month, an anonymous nurse wrote a detailed letter to Swedish executives:

Over the last several months I have heard rumors and have heard conversations and comments about the trouble that Providence executives caused by hiring Dr. Delashaw and forcing him on Swedish to bring surgery volumes. I have personally heard Dr. Delashaw talking about "[Providence CEO] Dr. Hochman this and Dr. Hochman that" – that is intimidating…. If Dr. Delashaw is backed by Dr. Hochman no wonder everyone is afraid! …. Nursing staff have seen enough of Dr. Delashaw's ingratiating behavior and his real self and understand why Swedish didn't want him. Providence is trying to build a mega neurosurgery money-machine …. Forcing a Providence employed doctor into Swedish who everyone says has a known checkered history, is a drinker with a DUI, and was censored for his behavior as an expert witness is a shameful influence from Providence. My sister-in-law works at UW neuroscience and she told me she heard their surgeons laughing expecting Dr. Delashaw would "wreck the place!"… It seems everyone on the West Coast knows about

---

[77] *Id.*, Ex. 20 at SWE_005726-27.
[78] *Id.*, Ex. 7 at JDEL_120711.
[79] *Id.*, Ex. 8.
[80] SJ Order at 2:17-3:13 (citation omitted).
[81] *Id.* at 3:3-9.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

this doctor and even though he is doing the same things here nothing is being done about it….   This situation will eventually blow up and stain Swedish….[82]

By the end of 2014, the Director of Perioperative Services at Swedish raised serious concerns about Delashaw to the hospital's administration.[83]

By January 2015,

SNI had received 32 Quality Variance Reports [] and 17 behavior reports about Dr. Delashaw – a number that Swedish's 30(b)(6) deponent testified seemed "high."  At that time, the chair of the Surgery Quality Review Committee and vice-chair of the Department of Surgery at Swedish, Dr. Eric Vallieres, resigned from those positions when Swedish announced Dr. Delashaw's promotion to Chairman of Neurosurgery and Spine.  Dr. Valliere pointed to the high volume of complaints against Dr. Delashaw and stated that he "cannot continue as the [c]hair of a [c]ommittee that is to oversee the 360 degree quality of care delivery in the Swedish surgical world when my administration promotes an individual that has shown very little respect for the Culture of Safety and related processes."[84]

Dr. Vallieres' resignation e-mail was widely shared among the doctors at Swedish.[85]  His resignation in protest from the committee responsible for overseeing quality of care and patient safety resulted in "a great emotional outcry among the physicians."[86]

And then, "Swedish leadership" installed Delashaw as the "chair of SNI."[87]  Still, "[t]he complaints and concerns continued to roll in."[88]  In July 2015, the hospital's Chief of Staff Dr. Peggy Hutchison "wrote that she had spoken with at least five physicians who were unhappy with Dr. Delashaw but were 'scared of retaliation' and did not know where to turn for help."[89]  In August 2015, SNI co-founder Dr. David Newell reported to the hospital's administration "that a number of his colleagues had expressed to him that Dr. Delashaw's leadership had created 'an

---

[82] 7/8/20 Goldman Decl., Ex. 21.  The Swedish Chief of Staff, a former nursing administrator herself, "had never seen anything like" the concerns raised by the SNI nurses. *Id.*, Ex. 19 at 151:23-152:6.
[83] SJ Order at 3:9-18.
[84] *Id.* at 3:19-4:9 (citations omitted).
[85] 7/8/20 Goldman Decl., Ex. 19 at 57:17-22.
[86] *Id.* at 55:1-11; *Id.*, Ex. 16 at 296:13-297:24.
[87] *Id.*, Ex. 22 ¶ 7.
[88] SJ Order at 4:10.
[89] *Id.* at 4:10-13 (citation omitted).  The Chief of Staff also was threatened by Delashaw.  7/8/20 Goldman Decl., Ex. 19 at 148:3-149:25.

SEATTLE TIMES SECOND MOT. FOR SUMMARY JUDGMENT - 12
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

atmosphere of fear and intimidation, lack of collegiality … and also quality of care issues.'"[90]  Dr. Ralph Pascualy, a Swedish leader, met with Providence CEO Dr. Rod Hochman and told him "that it was a very strong sense for many, many physicians that this has to be addressed immediately."[91]  The Chief of Staff testified that "most of us knew there was going to be a large problem by what was happening….  [I]t was obvious that this was … going to boil up into something bigger than we had ever seen."[92]  Noting his "high profile leadership position," Swedish required Delashaw to work with coaches to address his toxic leadership style.[93]

In 2016, the internal complaints reached outside of Swedish.  Two anonymous whistleblowers filed public complaints with the DOH.  The first complaint, by neurosurgeon Mayberg, alleged "that there had been numerous internal complaints filed within Swedish about 'quality issues related to the neurosurgical service' at Swedish's Cherry Hill campus, where Dr. Delashaw worked."[94]  In addition, the complaint "listed 15 providers who had either left or were fired from Swedish as a result of Swedish's response to these internal complaints."[95]  The second complaint alleged that "Delashaw threw a phone at one nurse in the operating room and screamed at another nurse and threatened her job."[96]  The whistleblower warned that Delashaw's "behavior was cause for concern for the welfare of the staff and Swedish's patients."[97]  "On April 6, 2016, the complaint was reviewed by a panel of four MQAC members, who determined there was sufficient reason to investigate the complaint …."[98]  Meanwhile, Delashaw responded by complaining to the Swedish CEO that he was angry the hospital's Chief Medical Officer had written a letter to MQAC describing Delashaw as "a disruptor."[99]

---

[90] SJ Order at 4:13-18 (citation omitted).
[91] 7/8/20 Goldman Decl., Ex. 16 at 299:10-300:6.
[92] *Id.*, Ex. 19 at 92:4-20.  Delashaw threatened to sue Hutchison on multiple occasions.  *Id.* at 114:1-8.
[93] *Id.*, Ex. 85 SWE-E_060158; *id.*, Ex. 23.
[94] SJ Order at 5:3-9 (citation omitted).
[95] SJ Order at 5:12-14 (citation omitted).
[96] *Id.* at 5:15-19 (citation omitted).
[97] *Id.* at 5:19-22 (citation omitted).
[98] *Delashaw v. Roberts*, No. 2:18-cv-01850, Dkt # 1 ¶ 12.
[99] 7/8/20 Goldman Decl., Ex. 24.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 13
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

In the fall of 2016, the situation worsened.  Adrienne Oden, the Swedish Director of Perioperative Services, warned that "[s]taff are requesting monetary bonus/compensation for staying, stepping up and working under very difficult conditions….  There is a real feeling of crisis and I need additional leadership presence to communicate the situation is being communicated and heard."[100]  By October, Oden herself left Swedish and the MQAC panel requested the filing of a Statement of Charges and summary action be taken against Delashaw.[101]  But his prominence increased as he headlined the Swedish Gala that raised $6 million from the public for the hospital and celebrated with the actor Kevin Costner and the former Seahawk Ricardo Lockette.[102]  Dave Sabey, the real estate developer, Swedish landlord, and major philanthropist noted that "Delashaw was important in many ways to the success of the evening."[103]

On October 28, 2016, SNI's Vice President Andy Cosentino emailed the Swedish CEO and all the SNI surgeons **except for** Delashaw requesting an "urgent meeting" "to address … the unrest within the practice….  We sense an urgency in addressing your concerns."[104]  Immediately, word began to spread outside of SNI regarding the meeting.[105]

Then, on October 30, 2016, a group of SNI surgeons engaged in a lengthy discussion about their "desire to have [Delashaw] removed"; Dr. Rod Oskouian noted that "the Dictator experiment is long over[,] time to move on."[106]  Oskouian charged that Delashaw "has abused his position and power to create a system of fear, intimidation and retaliation for anybody who goes against him….  We are the laughing stock of the city right now!!!!"[107]

The Swedish CEO reported to the CEO of Providence about "the challenge of [Delashaw's] leadership style – bullying – 'it's my way' – 'brought there to make changes' –

---

[100] *Id.*, Ex. 25.
[101] *See* https://www.linkedin.com/in/adrienne-oden-505b561a/ (last visited 7/7/20); *Delashaw v. Roberts*, No. 2:18-cv-01850, Dkt #39-9.
[102] 7/8/20 Goldman Decl., Ex. 26 at JDEL_030031; *id.*, Ex. 79.
[103] *Id.*, Ex. 27.
[104] *Id.*, Ex. 28.
[105] *See, e.g.*, *id.*, Ex. 29 at NEWELL_SDT_000110.
[106] *Id.*, Ex. 30 at COBBS00000292.
[107] *Id.*, Ex. 31 at SWE-E_061050.

people fearful that if they don't go along with him, they will be targeted privately and publicly by [Delashaw] ….  Lots of swirl going on … un-factual statements, hallway conversations, etc."[108] SNI surgeon Dr. Ryder Gwinn further reported to a top Swedish executive:

> It seems crazy to me that a group of neurosurgeons could be held hostage and intimidated by anybody, but unfortunately the environment has become so hostile and toxic here that our ability to speak up for the safety of our patients, our practice, and our institute has been nearly completely silenced.  We have finally come together as a group of Neurosurgeons to express our concerns in a meeting on Sunday the 30th of October, but we are unsure if administration can help us fix the problem, as we have not heard back from them.[109]

Finally, the long-simmering controversy surrounding Delashaw's leadership of SNI became apparent to some outside SNI.  SNI surgeon Dr. Charles Cobbs reached out to Dr. Edward Laws, a highly regarded senior neurosurgeon in Boston, seeking advice about how to deal with the situation created by Delashaw.

> As you will recall, we spoke when [Delashaw] was coming here 3 years ago … and the prediction was that there would be destruction.  He has methodically eviscerated as many of his colleagues' practices here as he could while going on a hiring spree.  He has managed to force all our referring MD's to send only to him, and 13 of our physicians have been booted if they tried to get in his way or investigate quality issues.  I have waited patiently until the time was right, and then last week I assembled our group together with the CEO of Swedish.  We had a vote of no confidence and [Delashaw] is meeting with the CEO now.  I'm hoping they'll make the right decision and let him go.  He has created a toxic and repressive culture….  Sadly he looks at humans as walking wRVUs.[110]

Laws testified that

> this was immediately recognizable as a disruptive situation.  And often the disruptive situation has fallout that damages the safety of what we do, which is neurosurgery which, as you can imagine, is a very stressful and – vocationally dangerous specialty.  It requires cohesion, support, integrity, honesty, lack of blaming people, lack of humiliating people, being open to receiving criticism and thereafter correcting it.  And it seemed that that sort of disruptive situation was in process at the time that [] Cobbs felt motivated to do something to change it.[111]

---

[108] *Id.*, Ex. 32.
[109] *Id.*, Ex. 33.
[110] *Id.*, Ex. 34; *see* https://physiciandirectory.brighamandwomens.org/details/325/edward-laws-neurosurgery-boston (last visited 7/7/20).
[111] 7/8/20 Goldman Decl., Ex. 35 at 14:3-15:25.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 15
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

From Boston, it looked to Laws as if the situation with Delashaw "had developed to one that was not correct, not safe, and dangerous both to patients and to other members of the neurosurgical team."[112]  Two other SNI neurosurgeons Oskouian and Dr. Zach Litvack also reached out to Laws regarding the problem with Delashaw.[113]

Others were informed.  Cobbs reached out to Dr. Phil Gutin, a neurosurgeon in New York, noting: "There is a major brouhaha about to go down here at Swedish pertaining to Johnny Delashaw, and I would love to get your perspective on how to negotiate through this."[114]  And to Dr. Luba Foltz at the Seattle Obstetrics & Gynecology Group:

> [Delashaw] is trying to take down the Ivy Center [at SNI] (as well as everyone else's practices) and turn SNI into JDNI (JD Narcissistic Institute).  I am helping to organize an overthrow of him with the other surgeons but the administrators (Armada and Altaras) are complicit with [Delashaw].  So sad.  Even Hochman doesn't seem to have the guts to fire him.[115]

And to major Swedish donor ▌▌▌▌▌ in ▌▌▌▌▌.[116]  Oskouian reported in to Dr. Shane Tubbs at the Seattle Science Foundation.[117]  Mayberg reported about the situation with Delashaw to Dr. Christopher Shaffrey at the University of Virginia School of Medicine.[118]

On November 4, 2016, Cobbs wrote to the CEOs of Providence and Swedish about the "universal concerns" about Delashaw.

> In the last two years, we have lost 62 team members from this campus. Our current functionality as a surgical institute is severely limited by decreased ability to staff and support our operating rooms, provide effective and safe care in our ICU/floor, and demonstrate excellence to our patients in the clinical setting.  This in turn, has led to a financial downturn for the institute and system.  The common thread linking these events is the leadership and management style of [] Delashaw….

---

[112] *Id.* at 16:1-16.
[113] *Id.* at 32:13-21.
[114] *Id.*, Ex. 36; *see* https://health.usnews.com/doctors/philip-gutin-16614 (last visited 7/7/20).
[115] 7/8/20 Goldman Decl., Ex. 37; *see* https://seaobgyn.com/physicians/luba-foltz-md/ (last visited 7/4/20).
[116] 7/8/20 Goldman Decl., Ex. 38.
[117] *Id.*, Ex. 32.
[118] 7/8/20 Wion Decl., Ex. 17 at 16:17-18:25; *see* https://ortho.duke.edu/latest-news/christopher-i-shaffrey-md-facs-named-chief-duke-spine-division (last visited 7/7/20).

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 16
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1
2
3

       I know for a fact that many individuals who work at SNI also fear for their careers because of Dr. Delashaw's relentless vindictiveness, as they have witnessed the forced departure of dozens of their physician, administrator, nursing and OR staff colleagues who challenged him. They feel that as a condition of their continued employment, they must endure this intimidating and hostile environment.[119]

4

      Several days later, Cobbs wrote to Dr. Pascualy, the CEO of the Swedish Medical

5

Group: "The current environment is bringing us all down to a horrible level, where we can

6

barely perform surgeries due to lack of staff, and due to fear of retaliation by Dr. Delashaw

7

if we speak up about inappropriate safety issues. We are at a breaking point and we need to

8

fix the situation immediately."[120]

9

      Pascualy responded by writing directly to the CEOs of Providence and Swedish

10

and forwarding Cobbs' e-mail.

11
12
13
14
15

       I recognize that Dr. Delashaw does not report to me and that his situation has been handled by the top executives in the company.  Tonight I learned many details from Dr. Cobb[s] which completed a picture that was previously fragmentary.  I am sending this to you …. to carry out what I feel are my executive responsibilities in a situation that is threatening to Swedish's reputation and the neurosurgical program….  Tonight Dr. Cobbs also let me know … that … it is directly affecting patient care, employee emotional health, the integrity of the neurosurgery group, and the ability to retain trained staff so it's a safety issue as well.[121]

16

The Swedish administration responded with "a deaf ear."[122]

17

      And then, the controversy exploded publicly.  On November 22, 2016, an anonymous

18

email from a "JBartSolo" went viral.  Notwithstanding an FBI investigation initiated by a

19

complaint from Swedish,[123] JBartSolo's identity remains unknown.  The email was entitled:

20

"Cherry Hill is not safe for patient care with Dr. Delashaw in a leadership role."  It went out

21

initially "to almost 200 health care providers," with others blind copied.[124]

22
23

       Please read the material and this email and then verify the information for yourselves ….  The letter from Dr. Charles Cobbs … to Tony Armada

24
25
26

---

[119] 7/8/20 Goldman Decl., Ex. 39 at SWE-E_060572-73.
[120] *Id.*, Ex. 40.
[121] *Id.*, Ex. 41.
[122] *Id.*, Ex. 19 at 168:6-20.
[123] *Id.*, Ex. 42.
[124] *Id.*, Ex. 43 at SWE-E_017976, Ex. 44 at SWE-E_059633, & Ex. 45.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

detailing the ongoing unethical behavior of Dr. Delashaw has gone viral because Dr. Delashaw's behavior has been going on for over two years and now threatens the reputation of Swedish as a whole.  Many of you do not know that Dr. Eric Vallieres … resigned in protest two years ago because Mr. Armada would not pursue Dr. Delashaw's behaviors despite having the support from the medical staff leaders such as [Chief of Staff] Dr. Peggy Hutchison.  If you speak privately to top medical leaders at Swedish who are not surgeons and are informed you will learn that they too see a crisis in leadership….  We are bcc: another hundred individuals on the medical staff as we hope they will join the conversation….  You will find [attached] three documents that you should read carefully to understand what follows.

1. The offer from Mike Butler and [Providence CEO] Dr. Rod Hochman to Dr. Rod Oskouian guaranteeing him 13M for 0.7 FTE….  When Dr. Oskouian finally began to oppose Dr. Delashaw's leadership he was offered protection from the very tactics that Dr. Delashaw has used on Dr. Cobbs and multiple other physicians….

2.  A very readable summary of the medical literature on high-functioning psychopaths.  It outlines what occurs when high-functioning psychopaths gain power in corporations, political office, or medical systems.  Neurologists are trained in psychiatry and we have known and said that Dr. Delashaw has all the hallmarks of this personality disorder….  In the case of Dr. Delashaw it's his single-minded intent to drive out physicians who oppose the administration into turning SNI into a high profit machine without concern for the staff and the quality….  When high volume is the goal it becomes necessary to suppress peer criticism about surgical judgment and patient harm.  This is precisely what Dr. Cobb[s] and others have called out as Dr. Delashaw's tactic and should be an extreme signal to any caring physician….  The fact that multiple physicians have called this out and the administration refuses to remove Dr. Delashaw from a position of leadership is a <u>crisis</u>.

3.  Dr. Cobbs['] letter to Tony Armada.

The email continued for four pages describing how Providence installed and protected Delashaw to achieve "unbridled RVU and volume production at the cost of staff health and patient safety."[125]

The JBartSolo email spread like wildfire throughout Seattle and the neurosurgery community nationally, to individuals at the Polyclinic (Seattle), Ortho Arizona (Scottsdale and Phoenix, AZ), Seattle Science Foundation, Sabey Corporation (Seattle), Hart Wagner law firm (Portland, OR), Seattle Neuroscience Institute, Houston Methodist Neurological Institute (Houston, TX), OHSU (Portland, OR), Mount Sinai School of Medicine (Manhattan, NY), NeoSpine (Seattle), Virginia Mason (Seattle), Western Neurosurgical Society (San Jose, CA), and

---

[125] *Id.*, Ex. 46.

SEATTLE TIMES SECOND MOT. FOR SUMMARY JUDGMENT - 18
[2:18-cv-00537-JLR]

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

beyond.[126]  "Copies of the email were also printed out and placed in both Starbucks locations at the Cherry Hill campus."[127]  Dr. Kelly at the Pacific Neuroscience Institute in Santa Monica, CA read the JBartSolo email and noted that there is "lots of buzz about JD-Swedish."[128]  Within a day, Dr. Santosh Kesari at the John Wayne Cancer Institute in California noted "[t]he email word spread down here."[129]  SNI surgeon Dr. Cameron McDougall testified that the JBartSolo email was "universally distributed."[130]

The crisis expanded.[131]  Just a few days after the JBartSolo email, SNI surgeon Backous wrote to the head of Swedish Human Resources "to express concerns about a hostile work environment created by the management of SNI by Johnny Delashaw.  The issues which compel me to write have an adverse impact on staff in addition to myself, and have an ultimate effect of compromising patient safety."[132]

Then, On November 28, 2016, another anonymous letter was sent to the Boards of Directors of Swedish and Providence.

> There is a broad sentiment among the Medical Staff that under Providence's leadership Swedish is in a crisis.  We expect that this letter will be broadly read in the Swedish Community….  To fully understand this material please first read Dr. Cobbs['] letter which has gone viral and other related materials below.  The many calls, conversations, and emails triggered by Dr. Cobb's [sic] letter have revealed additional problems ….  The leadership crisis revealed by [Providence CEO] Dr. Hochman's ongoing handling of Dr. Delashaw for over two years is part of a greater crisis at Swedish.  The issues with Dr. Delashaw have been devastating to our hopes of what a physician CEO could and should do….  [T]he atmosphere created by Dr. Hochman and [Swedish CEO] Mr. Armada at Swedish is one of intimidation and suppression of views dissenting with Providence….  This has begun to spill over to Swedish philanthropists with cancelled pledges ….
>
> We hate resorting to anonymous communication but do so because critical dissenting views are now career ending at Swedish.  Please begin to communicate openly and share critical information that can be verified

---

[126] *See, e.g.*, *id.*, Exs. 46-645; *id.*, Ex. 80.
[127] *Id.*, Ex. 26 at JDEL_030031.
[128] *Id.*, Ex. 64.
[129] *Id.*, Ex. 64.
[130] *Id.*, Ex. 65 at 75:1-24.
[131] *Id.*, Ex. 15 at 50:2-11.
[132] *Id.*, Ex. 66.

SEATTLE TIMES SECOND MOT. FOR SUMMARY JUDGMENT - 19 [2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

externally. We desperately want honest, transparent and complete information….

Respectfully,
Concerned Swedish Physicians[133]

The following day, Swedish restricted Delashaw's privileges:



[134]

This type of restriction "█████████████████████████████████████"[135] When Delashaw complained to his professional coach about the restriction, the coach advised: "a suspension is standard procedure in situations like this – it's designed to reassure the public (and recipients of the anonymous letter) that the concerns raised are being treated with due consideration by administration …."[136]  Indeed, the Swedish CEO told Delashaw that the hospital's "donors [were] getting timid with all this strife."[137]

News of the controversy continued to spread.  Delashaw reported to Swedish leadership that the Senior Society of Neurosurgery had "received [an] email that Swedish [is] in turmoil" and that Swedish had suspended his privileges.[138]  Neurosurgical leader Dr. Kim Burchiel of OHSU had been "informed" and had "talked to his ohsu faculty" about the Delashaw situation.[139]  Delashaw noted that "if OHSU faculty know then other surgeons know …."[140]  As he put it, the "cat is out of [the] bag" and the "reputation [of] sni and myself [is] severely tarnished."[141]

---

[133] *Id.*, Ex. 68 ST_0010923; *id.*, Ex. 67.
[134] *Id.*, Ex. 69.
[135] *Id.*, Ex. 70 at 116:12-117:16.
[136] *Id.*, Ex. 71.
[137] *Id.*, Ex. 72 at LIT_000234.
[138] *Id.*, Ex. 73.
[139] *Id.*
[140] *Id.*
[141] *Id.*, Ex. 74 at MCD_000108-09.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

In December 2016, Swedish leadership had no choice but to confront the controversy created by Delashaw.  Dr. Guy Hudson informed Delashaw "blunt[ly] … about his perception to others, leadership capabilities or flaws and his contribution to [the] current situation."[142]  Then, Swedish demoted Delashaw.  The Swedish CEO Tony Armada wrote Delashaw:

> Unfortunately, we have documented repeated and numerous complaints about your leadership.  We worked with you through the initial transition and addressed many of the individual physicians whom you identified as barriers to your success.  We also spent considerable time trying to deescalate the conflict within SNI and to support you as the leader for that group.  You and I had numerous conversations, which included counseling about your approach to others on several occasions….  Despite this counsel and support provided, we continue to hear the concerns and the concerns are growing….  Swedish will not keep you in the role as the Chair of Neurosurgery at SNI.  To that end, we are offering you an administrative role as the Chair Emeritus of Neurosurgery at SNI….  I hope that you will continue to work with Swedish and SNI. If you do not, we will need to move to end our relationship with you and begin discussions on your transition from Swedish and SNI.[143]

Delashaw responded by telling developer Dave Sabey that "Tony may be a problem."[144]

A month and a half later – after Swedish had engaged a crisis management firm and "reached out to community partners such as [Group Health] and philanthropic donors, competitors such as the UW, and the more than 1500 physicians who refer patients to SNI"[145] – the Times published the articles at issue in this lawsuit.  The Swedish Chief of Staff "wasn't surprised" by what she read in the articles.[146]

Delashaw did not simply "voluntarily inject" himself or become "drawn into a public controversy,"[147] he was the public controversy and a limited purpose public figure for the defamation lawsuit he filed against The Seattle Times.

---

[142] *Id.*, Ex. 75.
[143] *Id.*, Ex. 76.
[144] *Id.* Ex. 77.
[145] *Id.*, Ex. 42.
[146] *Id.*, Ex. 19 at 202:7-17.
[147] *Clardy*, 81 Wn. App. at 58.

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 21
[2:18-cv-00537-JLR]

### (ii)     Delashaw Had Access to Channels of Effective Communication.

Despite his repeated refusal to be interviewed for the articles, the Times took the very unusual step of publishing in full Delashaw's written statement.[148]  Likewise, when he wanted favorable coverage following the Times' publication of the articles, he turned to his hometown newspaper and they obliged.[149]  For this reason too, he is a limited purpose public figure.

### (iii)    Delashaw Sought to Influence the Outcome of the Controversy.

As described above, Delashaw was the controversy.  At every turn, he fomented it and threatened anyone who crossed him.  This is the hallmark of a limited purpose public figure.

### (iv)    The Controversy Over Delashaw's Failed Leadership at SNI Existed Prior to Publication of the Articles.

The Times' publication of the two articles at issue in this lawsuit occurred after all of the events described above.  This too establishes Delashaw as a limited purpose public figure.

### (v)     At the Time the Articles Were Published, Delashaw Retained His Public Figure Status.

The Delashaw controversy continued in full force in February 2017 when the Articles were published.[150]  At the time he quit, the Swedish Medical Executive Committee had an open investigation against him that involved interviewing ███████████████████[151]  Just then, the hospital was in the process of determining the scope of a ██████████████████████ ████████████████████.[152]  But he quit, instead.

In sum, Delashaw is a limited purpose public figure in regard to the public controversy he created at Swedish and about which the Times reported.

---

[148] 7/7/20 Baker Decl. ¶¶ 12-13 & Exs. H-I; 7/8/20 Matassa Flores Decl. ¶ 2; *see* https://www.seattletimes.com/seattle-news/times-watchdog/full-text-swedish-hospital-dr-johnny-delashaw-comment-on-seattle-times-investigation/ (last visited 7/7/20).

[149] *See, e.g.,* https://tdn.com/news/local/doctor-patients-waiting-on-johnny-delashaw-licensing-decision/article_acdddaa8-e6a9-5767-9256-e8ca928a3fd1.html (last visited 7/7/20); https://tdn.com/news/local/months-after-getting-medical-license-back-neurosurgeon-johnny-delashaw-cant-find-a-job/article_374c2ee0-8d6c-599a-98cd-67ce41c62926.html (last visited 7/7/20).

[150] *Clardy*, 81 Wn. App. at 60; *id.* at 65 ("These articles were published during the height of the controversy surrounding this project").

[151] 7/8/20 Goldman Decl., Ex. 19 at 174:1-9, 176:5-14.

[152] *Id.* at 177:13-179:10.

### b.   There is No Evidence that the Times Acted with Actual Malice.

"As a limited purpose public figure, [Delashaw]'s defamation claims require clear and convincing proof of actual malice."[153]  A statement is made with "actual malice" only when the publisher does so "'with knowledge of its falsity or with reckless disregard of its truth or falsity.'"[154]  "'To prove actual malice a party must establish that the speaker knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth.'"[155]  "'The standard for determining "actual malice" is subjective, focusing on the defendant's belief in or attitude toward the truth of the statement, not the defendant's personal hostility toward the plaintiff.'"[156]  "Delashaw bears the burden of proving actual malice by clear and convincing evidence."[157]

This is a burden Delashaw cannot meet.  Mike Baker, the author of the statements about the Swedish RVU-based employment contracts, believed them to be true.[158]

Summary judgment should issue on the remaining claim because Delashaw cannot point to any evidence – let alone evidence of convincing clarity – that the Times acted with actual malice.

### 2.   Delashaw Also Cannot Point to Evidence of Negligence.

Even if Delashaw were a mere "helpless private citizen"[159] for purposes of his defamation claim, he cannot place into issue material facts necessary to prove the Times acted with negligence.  "[S]ince erroneous statements of fact are inevitable, this … standard does not require the media to guarantee the absolute accuracy of their publications, as would be required under a strict liability scheme."[160]  Delashaw can point to no evidence that the Times "knew, or, in the

---

[153] *Paterson*, 502 F. Supp. 2d at 1147; *accord Clardy*, 81 Wn. App. at 65.
[154] SJ Order at 60 (quoting *Doe v. Gonzaga Univ.*, 24 P.3d 390, 398 (Wash. 2001), *rev'd on other grounds*, 536 U.S, 273 (2002)).
[155] *Id.* (quoting *Gonzaga Univ.*, 24 P.3d at 398).  Mere republication of a third party's allegation without investigating the veracity of the allegation "does not establish reckless disregard for the truth."  *Makaeff v. Trump Univ.*, 715 F.3d 254, 270 (9th Cir. 2012).
[156] SJ Order at 60 (quoting *Herron v. KING Broad. Co.*, 746 P.2d 295, 302 (Wash. 1987)).
[157] *Id.* (citing *Gonzaga*, 24 P.3d at 398).
[158] 7/8/20 Baker Decl. ¶ 14.
[159] *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 546 P.2d 81, 86 (1976).
[160] *Id.*

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 23
[2:18-cv-00537-JLR]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

exercise of reasonable care, should have known that the statement" about SNI's switch to RVU productivity-based contracts was false.[161]

To the contrary, the Times engaged in thorough and careful reporting.[162]  Just a few days before the articles were published, a member of the Swedish communications office wrote that

> [b]y all accounts [Times reporter] Mike Baker is a thorough and courteous reporter.  He's interviewed a ton of folks while reviewing data to inform him about our industry and especially certain of our neurosurgery procedures.  He has provided straight forward questions to Swedish ….  He's also made sure that the most senior system management has had an opportunity to respond to questions….  In the course of your article if Swedish finds things where improvements can be made, they will be addressed.[163]

Indeed, Swedish made dramatic changes as a result of the Times' reporting.[164]

Summary judgment should issue irrespective of the standard of fault.[165]

### III.   CONCLUSION

Delashaw cannot make out a prima facie case that the description of the incentive contracts caused him damage, that the remaining statements are not substantially true, **and** that the Times acted with fault.  For each of these independent reasons, The Seattle Times requests that his lawsuit be dismissed.

---

[161] *Id.* at 85.

[162] 7/8/20 Baker Decl. ¶¶ 2-14 & Exs. A-I.

[163] 7/8/20 Goldman Decl., Ex. 78.

[164] Swedish fired its CEO.  *Id.*, Ex. 19 at 197:10-21.  *See also* https://www.seattletimes.com/seattle-news/health/at-swedishs-neuroscience-unit-some-staff-see-a-better-culture-ceo-vows-more-improvements/ (last visited 7/7/20); http://www.seattletimes.com/seattle-news/health/swedish-health-largely-bans-overlapping-surgeries/ (last visited 7/7/20); https://www.seattletimes.com/seattle-news/health/swedish-ceo-its-my-job-to-restore-trust/ (last visited 7/7/20); http://www.seattletimes.com/seattle-news/times-watchdog/swedish-ceo-resigns-in-wake-of-seattle-times-investigation/ (last visited 7/7/20).

[165] *See Dunlap v. Wayne*, 105 Wn.2d 529, 716 P.2d 842, 850 (1986) (affirming summary judgment for lack of negligence); *LaMon v. Butler*, 112 Wn.2d 193, 770 P.2d 1027, 1030-31 (1989) (same).

SEATTLE TIMES SECOND MOT. FOR SUMMARY
JUDGMENT - 24
[2:18-cv-00537-JLR]

DATED this 8ᵗʰ day of July, 2020.

Respectfully submitted,

SUMMIT LAW GROUP PLLC
Attorneys for Defendant Seattle Times Company

By *s/ Jessica L. Goldman*
   *s/ Christopher T. Wion*
   *s/ Tanya Nesbitt*
Jessica L. Goldman, WSBA #21856
Christopher T. Wion, WSBA #33207
Tanya Nesbitt, WSBA #56122
315 Fifth Avenue South, Suite 1000
Seattle, WA  98104
Tel: (206) 676-7000
*jessicag@summitlaw.com*
*chrisw@summitlaw.com*
*tanyan@summitlaw.com*