

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHNNY DELASHAW, JR., | CASE NO. C18-0537JLR |
| Plaintiff, | ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| SEATTLE TIMES COMPANY, et al., | **(PROVISIONALLY FILED UNDER SEAL)** |
| Defendants. | |

## I.   INTRODUCTION

Before the court are (1) Defendant Seattle Times Company's ("Seattle Times" or "the Times") motion for partial summary judgment (Times MSJ (Dkt. ## 109 (sealed); 156 (redacted))); and (2) Defendant Charles Cobbs' motion for partial summary judgment (Cobbs MSJ (Dkt. # 116)). Plaintiff Johnny Delashaw, Jr. opposes the motions. (*See* Times MSJ Resp. (Dkt. # 123); Cobbs MSJ Resp. (Dkt. # 140).) The court has considered the motions, the parties' submissions in support of and in opposition to the

ORDER - 1

1  motions, and the applicable law.  Being fully advised, the court GRANTS in part and

2  DENIES in part both motions.[1]

## II.    BACKGROUND

**A.    Dr. Delashaw**

Dr. Delashaw received his medical degree from the University of Washington. (Delashaw Decl. (Dkt. # 126) ¶ 2.)  Dr. Delashaw spent 20 years as a practicing neurosurgeon at Oregon Health & Science University ("OHSU") before leaving to become a professor and the Chairman of Neurological Surgery at University of California, Irvine ("UC Irvine").  (*Id.*)  Dr. Delashaw left UCI for a position at Swedish Medical Center ("Swedish") in 2013 and remained employed at Swedish's Cherry Hill campus in Seattle, Washington (hereinafter, "Cherry Hill" or "Swedish Cherry Hill") until 2017.  (*Id.*)  Most recently, he was the Chairman of Neurosurgery and Spine at the Swedish Neuroscience Institute ("SNI").  (*Id.*)

**B.    Internal Strife at SNI**

Dr. Delashaw's arrival at Swedish Cherry Hill, promotion to Chairman of Neurosurgery and Spine at SNI, and management tactics at SNI caused a considerable amount of turmoil at SNI.  In January 2014, Dr. Frances Broyles, the Medical Director of Neuroendocrinology at Swedish, wrote a letter to Swedish's CEO, Anthony Armada. (*See* 1st Baer Decl. (Dkt. # 117) ¶ 3, Ex. 4 at SWE_005725.)  Dr. Broyles voiced his

---

[1] No party requests oral argument (*see* Times Not. (Dkt. # 148) (withdrawing the Times' request for oral argument); Cobbs MSJ at 1; Times MSJ Resp. at 1; Cobbs MSJ Resp. at 1), and the court finds oral argument unnecessary to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

"extreme concern over the nuclear disruption of SNI by Dr. Delashaw" and alleged that Dr. Delashaw "has offended virtually every doctor at SNI, has bad mouthed SNI physicians, and attempted to steal patients." (*See id.*)  In July 2014, Dr. Marc Mayberg, one of the co-founders of SNI, accused Dr. Delashaw of falsely informing other physicians that Dr. Mayberg was "terminally ill with cancer and stopping practice" when Dr. Delashaw knew that Dr. Mayberg was practicing without limitation. (*See id.* ¶ 3, Ex. 5 at 000047.)  Dr. Mayberg also claimed that Dr. Delashaw had made "[n]on-collegial and derogatory comments" about Dr. Mayberg's medical recommendations to patients that Dr. Mayberg had referred to Dr. Delashaw. (*See id.*)  In December 2014, Mary Fearon, the Director of Perioperative Services at Swedish, informed a Swedish administrator that Dr. Delashaw "has not helped the [operating room] nursing staff in any capacity this year" and that she did not believe he should be promoted because:

- He lies.
- He does not practice within the culture of safety—[h]e is degrading to the nurses in the room.  When a nurse asks for him to spell the name of a specimen he sighs heavily and uses a condescending voice to spell out the name of the specimen.  The nurses fear him and he uses power to make sure they do not challenge him.
- He has a dictatorial leadership style[.]
- I would not put myself at risk as the Director of surgery with his decision making and risk taking behavior.

(*See id.* ¶ 3, Ex. 6 at SWE_005780.)

By January 2015, roughly 16 months after SNI hired Dr. Delashaw, SNI had received 32 Quality Variance Reports ("QVR") and 17 behavior reports about Dr. Delashaw—a number that Swedish's 30(b)(6) deponent testified seemed "high." (*See* 1st

ORDER - 3

1   Baer Decl. ¶ 3, Ex. 1 ("Swedish 30(b)(6) Dep.") at 124:25-125:8.)  At that time, the chair

2   of the Surgery Quality Review Committee and vice-chair of the Department of Surgery at

3   Swedish, Dr. Eric Vallieres, resigned from those positions when Swedish announced Dr.

4   Delashaw's promotion to Chairman of Neurosurgery and Spine.  (*See id.* ¶ 3, Ex. 2 at

5   ST_0014197-99.[2])  Dr. Vallieres pointed to the high volume of complaints against Dr.

6   Delashaw and stated that he "cannot continue as the [c]hair of a [c]ommittee that is to

7   oversee the 360 degree quality of care delivery in the Swedish surgical world when my

8   administration promotes an individual that has shown very little respect for the Culture of

9   Safety and related processes."  (*Id.* at ST_0014197.)

10          The complaints and concerns continued to roll in.  In July 2015, Dr. Peggy

11  Hutchison, Swedish's Chief of Staff, wrote that she had spoken with at least five

12  physicians who were unhappy with Dr. Delashaw but were "scared of retaliation" and did

13  not know where to turn for help.  (*See* 1st Baer Decl. ¶ 3, Ex. 7.)  In August 2015, Dr.

14  David Newell, another co-founder of SNI, informed Dr. Hutchison that a number of his

15  colleagues had expressed to him that Dr. Delashaw's leadership had created "an

16  atmosphere of fear and intimidation, lack of collegiality, as well as interference with

17  individual practices resulting in interference with referral patterns, and also quality of

18  care issues."  (*See id.* ¶ 3, Ex. 8 at NEWELL_SDT_004053.)  Dr. Newell also detailed

19  //

20

21        [2] Dr. Vallieres' letter states that SNI promoted Dr. Delashaw to "Chief of Neurosurgery"
    as opposed to "Chairman of Neurosurgery and Spine," which is the terminology that Dr.
22  Delashaw uses in his declaration to describe his promotion.  (*See id.*; Delashaw Decl. ¶ 2.)

ORDER - 4

1 | several specific examples of Dr. Delashaw's conduct in support of his accusations. (*See*

2 | *id.* at NEWELL_SDT_004053-55.)

3 |        In addition to the internal complaints about Dr. Delashaw circulated at Swedish, at

4 | least two individuals filed anonymous complaints with the Washington Department of

5 | Health ("DOH") in early 2016. In January 2016, an anonymous whistleblower filed a

6 | complaint with DOH noting that there had been numerous internal complaints filed

7 | within Swedish about "quality issues related to the neurosurgical service" at Swedish's

8 | Cherry Hill campus, where Dr. Delashaw worked. (*See id.* ¶ 3, Ex. 12 at

9 | JDEL_026824-26.) The whistleblower claimed that the "[a]llegations include

10 | inappropriate surgeries, increase in complications and infection rates, unsupervised

11 | surgery and critical care by neurosurgical fellows, and abuse of surgical staffing and

12 | scheduling protocols to facilitate surgeons['] convenience." (*Id.* at JDEL_026826.) The

13 | complaint also listed 15 providers who had either left or were fired from Swedish as a

14 | result of Swedish's response to these internal complaints. (*Id.* at JDEL_026826-27.)

15 |        In March 2016, another anonymous whistleblower filed a complaint against Dr.

16 | Delashaw with the Washington Medical Quality Assurance Commission ("MQAC").

17 | (*See id.* ¶ 3, Ex. 13 at JDEL_000431.) This complaint alleged that Dr. Delashaw threw a

18 | phone at one nurse in the operating room and screamed at another nurse and threatened

19 | her job. (*See id.*) The complaint noted that there "have been other instances of such

20 | unprofessional and disruptive behavior involving staff in the [operating room]" and that

21 | the behavior was cause for concern for the welfare of the staff and Swedish's patients.

22 | (*See id.*)

1      In addition to the whistleblower complaints, several more individuals filed internal

2  complaints against Dr. Delashaw in 2016.  In November 2016, Dr. Doug Backous, then

3  the Director of the Swedish Center for Hearing and Skull Base Surgery, wrote to Swedish

4  Human Resources that Dr. Delashaw had created a "toxic work environment at Swedish"

5  and that he felt "pushed in a corner . . . by the current environment of intimidation, fear

6  and retaliation promoted by Dr. Delashaw." (*See id.* ¶ 3, Ex. 10 at SWE_005767.)  He

7  complained of Dr. Delashaw "working to redirect referrals, interfering with my referral

8  network and intimidating my staff," and he ultimately refused to participate in surgeries

9  with Dr. Delashaw.  (*See id.*)

10      On November 4, 2016, Dr. Cobbs sent a letter to Mr. Armada regarding Dr.

11  Delashaw that constitutes one of the focal points of Dr. Delashaw's lawsuit against Dr.

12  Cobbs (the "November 2016 Letter").  (*See id.* ¶ 3, Ex. 26; Am. Compl. (Dkt. # 25)

13  ¶¶ 73-78.)  The November 2016 Letter outlined concerns that Dr. Cobbs claimed were

14  raised by physicians, nurses, and staff about Dr. Delashaw that fell into the following

15  categories:  (i) a pattern of intimidation, harassment, and retaliation; (ii) discouraging the

16  reporting of errors; (iii) discouraging staff from asking questions; (iv) contributing to the

17  loss of experienced personnel; (v) jeopardizing patient safety with disruptive behavior;

18  and (vi) interfering with other physicians' referrals and practices.  (*See* 1st Baer Decl. ¶ 3,

19  Ex. 26.)  Although Dr. Cobbs was the only signatory to the November 2016 Letter, he

20  received input from multiple Swedish surgeons on its content.  (*See id.* ¶ 3, Exs. 27-33.)

21  Dr. Cobbs testified that he omitted the names of the other surgeons from his letter

22  //

ORDER - 6

1  because he believed that those surgeons were afraid of retaliation from Dr. Delashaw.

2  (*See id.* ¶ 3, Ex. 25 ("Cobbs Dep.") at 192:19-193:5.[3])

3        On December 20, 2016, Mr. Armada informed Dr. Delashaw that Swedish had

4  "documented repeated and numerous complaints about your leadership," and despite

5  Swedish's efforts to counsel and support Dr. Delashaw, Swedish "continue[s] to hear the

6  concerns and the concerns are growing." (*See* 1st Goldman Decl. (Dkt. # 108) ¶ 5, Ex. 3

7  at JDEL_027310.)  Mr. Armada notified Dr. Delashaw that Swedish could no longer keep

8  him in the role of Chair of Neurosurgery at SNI and would instead move him into an

9  administrative role as "Chair Emeritus of Neurosurgery at SNI." (*See id.*)  In this new

10 position, Dr. Delashaw would continue to focus on his clinical practice, lead SNI's

11 philanthropic efforts, and help recruit neurosurgeons to Swedish. (*See id.*)  However,

12 effective immediately, Swedish planned to transition the management of the

13 neurosurgery practice at SNI to an interim Chair of Neurosurgery. (*See id.*)

14 **C.**    **MQAC Proceedings**

15       Beginning in May 2016, a DOH investigator, Stephen Correa, interviewed Dr.

16 Hutchison and six nurses about Dr. Delashaw's behavior as part of a MQAC

17 investigation into Dr. Delashaw. (*See* 1st Baer Decl. ¶ 3, Exs. 14-21.)  These individuals

18 consistently reported concerns about:  (i) the toxic environment created by Dr.

19 Delashaw's behavior and intimidation; (ii) hypothetical and actual patient safety issues

20

21      [3] Portions of Dr. Cobbs' deposition are also found in the record in Exhibit 38 to the

22 Declaration of Caitlin Pratt. (*See* Pratt Decl. (Dkt. # 141) ¶ 32, Ex. 38.)  The court cites to Dr. Cobbs' deposition as "Cobbs Dep." wherever it is found in the record.

1   caused by SNI staff discomfort when communicating with Dr. Delashaw; (iii) fear of

2   retaliation; and (iv) nurse and staff departures because of Dr. Delashaw's misconduct.

3   (*See generally id.*)  Some of the individuals that Mr. Correa interviewed acknowledged

4   that they had left Swedish Cherry Hill because of Dr. Delashaw.  (*See, e.g., id.* ¶ 3, Exs.

5   14 at JDEL_022763, 17 at JDEL_022767.)

6          On May 5, 2017, MQAC summarily suspended Dr. Delashaw's credential to

7   practice medicine via *ex parte* order.  (*See id.* ¶ 3, Ex. 35 at JDEL_013094-95.)  At Dr.

8   Delashaw's request, MQAC held a show cause hearing on June 13, 2017, and on June 19,

9   2017, MQAC issued an order upholding the summary suspension pending a full

10  adjudication of the allegations.  (*Id.*)  The matter then proceeded to a nine-day evidentiary

11  hearing before MQAC that was held on April 23-26 and April 30-May 4, 2018.  (*Id.* at

12  JDEL_013095.)  Twenty doctors, nurses, and medical staff testified on behalf of DOH;

13  Dr. Delashaw testified on his own behalf and presented testimony from 17 doctors and

14  medical staff members.  (*Id.*)  The parties admitted 137 exhibits.  (*See id.* at

15  JDEL_013096-104.)

16         On July 5, 2018, MQAC issued its findings of fact, conclusions of law, and final

17  order on Dr. Delashaw's case (the "MQAC Order").  (*See id.* at JDEL_013121.)  The

18  MQAC's findings of fact included the following:

19         [Dr. Delashaw] engaged in a pattern of intimidation with staff, discouraged
           staff from reporting errors, discouraged staff from asking questions, and
20         contributed to the loss of experienced personnel.  These actions jeopardized
           Swedish-Cherry Hill Hospital's culture of safety and normalized
21         unacceptable and unsafe practices, creating an atmosphere of normalized
           deviance.  As a result, patients were put at an increased risk of harm.  (*Id.*
22         ¶ 1.6.)

ORDER - 8

1      [Dr. Delashaw] engaged in multiple acts of intimidation of hospital staff,
       forming a disturbing pattern of behavior.  As a result of this pattern of
2      intimidation, the Respondent created an environment in which the ability of
       staff to provide safe patient care was put [in] jeopardy.  (*Id.* ¶ 1.7.)
3
       [Dr. Delashaw] contributed to an environment where reporting [disruptive
4      behavior and issues that may put patients at risk] . . . was discouraged.  (*Id.*
       ¶ 1.23.)
5
       [Dr. Delashaw's] behavior also discouraged staff from asking questions and,
6      consequently, put patients at risk of medical error.  (*Id.* ¶ 1.25.)
7      As a result of this behavior, . . . hospital staff were discouraged from asking
       questions.  This increased the chances that a mistake could occur; it also
8      diminished staff members' ability to advocate for patients.  As a result, there
       was a significantly increased risk to patients.  (*Id.* ¶ 1.27.)
9
       As a result of [Dr. Delashaw's] disruptive behavior, multiple nurses left their
10     positions at Swedish . . . .  As a result, patients and the public were put at
       increased risk.  (*Id.* ¶¶ 1.28-1.30.)
11
       [Dr. Delashaw's] behavior while working for [SNI] constituted disruptive
12     physician behavior . . . . [Dr. Delashaw's] behavior negatively affected the
       culture of safety, ultimately replacing it with a culture of fear.  This led to a
13     compromise of team effectiveness and, as a result, an unreasonable risk of
       patient harm.  (*Id.* ¶ 1.37.)
14
       Any internal disputes that [Dr. Delashaw] may have had with other
15     physicians at SNI regarding salaries or administrative control of SNI, or any
       workload disputes that the nurses at Swedish-Cherry Hill had with physicians
16     and management staff, are not relevant to the fact that [Dr. Delashaw]
       committed disruptive physician behavior.'  (*Id.* ¶ 1.38.)
17
       Based on these findings of fact, MQAC concluded that DOH had proven by clear
18
and convincing evidence that Dr. Delashaw had committed unprofessional conduct as
19
defined in RCW 18.130.180(4):
20
       Incompetence, negligence, or malpractice which results in injury to a patient
21     or which creates an unreasonable risk that a patient may be harmed.  The use
       of a nontraditional treatment by itself shall not constitute unprofessional
22

ORDER - 9

1    conduct, provided that it does not result in injury to a patient or create an
     unreasonable risk that a patient may be harmed.
2
     (*Id.* ¶ 2.4.) In determining the appropriate sanction for Dr. Delashaw's conduct, MQAC
3
     considered the following "aggravating factors":
4
          the incidents of [Dr. Delashaw's] disruptive conduct were not isolated; [Dr.
5         Delashaw's] disruptive conduct formed a pattern of behavior; [Dr.
          Delashaw's] behavior contributed to the normalization of deviance at his
6         workplace; and [Dr. Delashaw] did not show remorse for his behavior.

7    (*Id.* ¶ 2.6.) MQAC also noted, however, that the "mitigating factors" included the fact

8    that Dr. Delashaw had not engaged in prior misconduct and had a "long history of

9    providing needed services to his community." (*Id.*) Based on these factors, MQAC

10   concluded that Dr. Delashaw's conduct fell into "Tier B" of the standard of care schedule

11   found at WAC 246-16-810 (*see id.*), which defines a Tier B violation as one that

12   "[c]aused moderate patient harm or risk of moderate to severe patient harm," WAC

13   246-16-810. MQAC reinstated Dr. Delashaw's license to practice in Washington, but

14   placed him on oversight for three years, ordered him to submit to an evaluation of his

15   disruptive behavior, barred him from holding a "medical leadership position," ordered

16   him to periodically appear before MQAC to discuss his behavior and progress, and fined

17   him $10,000.00. (*See* 1st Baer Decl. ¶ 3, Ex. 35 at ¶¶ 3.1-3.5.)

18        Dr. Delashaw appealed the MQAC Order. (*See id.* ¶ 3, Ex. 36.) The Thurston

19   County Superior Court affirmed the MQAC Order on September 29, 2019. (*See id.* at 3.)

20   **D.    The Times' Investigation and Articles**

21        Although Dr. Delashaw's claims against Dr. Cobbs relate primarily to the

22   November 2016 Letter and Dr. Cobbs' participation in Dr. Delashaw's eventual ouster

1   from Swedish (*see* Am. Compl. ¶¶ 50-98), Dr. Delashaw's claims against the Times

2   center on a series of articles entitled *Quantity of Care* that the Times published on

3   February 12, 2017, about SNI's practices.  (*See* Farmer Decl. (Dkt. # 130) ¶ 2, Ex. 1 at

4   ST_0041671-75 ("1st Times Art."); *id.* at ST_0041676-79 ("2d Times Art."); *see also*

5   Am. Compl. ¶¶ 99-163.)  Notably, these articles were published after MQAC had

6   launched its investigation into Dr. Delashaw, but before MQAC suspended Dr.

7   Delashaw's license and held an evidentiary hearing.

8          1.      The First Times Article

9          The first article in the *Quantity of Care* series, titled *A Lost Voice* (the "First Times

10   Article"), describes the surgery, recovery process, and untimely death of one of Dr.

11   Delashaw's patients, "T.G."  (*See generally* 1st Times Art.)  The First Times Article

12   weaves her story with reporting on Swedish and SNI's surgery volume, compensation

13   practices, and data on SNI's surgical outcomes.  (*See id.*)

14          According to the article, T.G. was diagnosed with Ehlers-Danlos Syndrome

15   ("EDS"), a rare disorder "that causes unusual looseness in ligaments and other connective

16   tissues, leading to unstable joints and persistent pain."  (*Id.* at ST_041672.)  T.G. and her

17   family met with Dr. Delashaw and discussed the possibility of undergoing a cervical

18   spinal fusion, a procedure in which Dr. Delashaw "would use metal rods and screws to

19   better stabilize the vertebrae in [T.G.'s] neck."  (*Id.* at ST_041673.)  The First Times

20   Article states that "fusions were a routine part of [Dr. Delashaw's] care—records show he

21   did at least 140 of them in 2014."  (*Id.*)

22   //

ORDER - 11

1    The First Times Article goes on to state that Dr. Delashaw "had a reputation as a

2 workhorse whose ability to churn through surgeries could single-handedly alter an

3 institution's financial picture." (*Id.*)  The Times reported further that Dr. Delashaw "was

4 delivering on that promise," and "managed his workload by booking multiple operations

5 at the same time and by allowing his surgical fellows—essentially doctors getting

6 specialized training—to handle portions of the surgeries." (*Id.*)  The First Times Article

7 states:

8       Delashaw's methods bothered some of his colleagues, according to medical
        records.  And in the months after Delashaw arrived at Cherry Hill, his new
9       co-workers filed a range of internal complaints questioning his practices and
        commitment to patient care.
10
(*Id.*)
11
     The First Times Article reports that medical records do not include "when
12
Delashaw arrived in the operating room [for T.G.'s surgery], and it's unclear who
13
handled certain parts of the surgery." (*Id.*)  However, the Times reported, "Delashaw
14
wrote that he was 'present' during critical portions of the surgery." (*Id.*)
15
     After reporting on T.G.'s life, upbringing, and hobbies, the First Times Article
16
reports that after her surgery, T.G. had difficulty breathing.  (*Id.* at ST_041674.)
17
According to the First Times Article, T.G.'s father, who has a medical background, "felt
18
the medical staff was too dismissive about his daughter's breathing," and was alarmed
19
that "nobody was considering what would happen if [T.G.'s] airway suddenly closed."
20
(*Id.*)  He pointed out to medical staffers that T.G.'s surgically-fused neck would make it
21
difficult to intubate her if she stopped breathing, and that the only way to get her air
22

ORDER - 12

1   would be to use tools in a "crike kit" to perform a cricothyrotomy—a procedure that

2   involves cutting a hole in the throat to establish an emergency airway. (*Id.*)  Doctors

3   eventually moved T.G. to the intensive care unit ("ICU").  The First Times Article

4   reports that T.G. told her parents "that she explained to Delashaw about her trouble

5   breathing and that her jaw wouldn't open.  She said Delashaw responded that there was

6   nothing he did that would have put her jaw out of place and that he suggested she see a

7   specialist after leaving the hospital." (*Id.*)  Dr. Delashaw signed a note stating that T.G.

8   had "subjective mild difficulty breathing," something the surgical team "suspected was

9   related to the tracheal tube used during surgery." (*Id.*)

10          The First Times Article reports that at 1:26 p.m. on February 11, 2014—the day

11   after her surgery—according to T.G.'s parents, she "strained to bellow out a message

12   through her hoarse throat:  'I can't breathe!  Help me!  I can't breathe!" (*Id.*)  The First

13   Times Article reports that instead of grabbing a crike kit, ICU staffers tried to force an

14   airway device into T.G.'s throat. (*Id.*)  T.G. went into cardiac arrest about 20 minutes

15   after she gasped for help. (*Id.*)  She spent the next nine days in a comatose state and

16   passed away at 10:41 p.m. on February 20, 2014. (*Id.*)  The First Times Article ends as

17   follows:

18          It's not publicly known whether [T.G.]'s unexpected death led to changes at
            Swedish-Cherry Hill, or whether anyone faced internal discipline.
19

20          Dr. Delashaw has since been promoted.  He's now the chairman of
            neurosurgery.

21   (*Id.*)

22   //

ORDER - 13

1      2.  The Second Times Article

2          The Times published a second article in its *Quantity of Care* series on February

3  12, 2017, entitled "High volume, big dollars, rising tension" (the "Second Times

4  Article"). (*See generally* 2d Times Art.) A subheader for the Second Times Article

5  reads: "At Swedish's premier neurosurgery hub, internal records and interviews with

6  staff reveal an array of warnings about patient safety amid concerns about retribution

7  from a star surgeon in charge." (*Id.* at ST_041676.) The Second Times Article begins by

8  reporting that Providence Health & Services ("Providence") acquired Swedish in 2011,

9  and that a few years later, "Providence and Swedish had overhauled the way Cherry

10  Hill's neuroscience program approaches the business of medicine, enriching the nonprofit

11  institution and its star surgeons." (*Id.*) The Second Times Article then juxtaposes

12  Swedish's financial success with a suggestion about patient care:

> A steady churn of high-risk patients undergoing invasive brain and spine procedures allowed Cherry Hill to generate half a billion dollars in net operating revenue in 2015—a 39 percent increase from just three years prior. It also had the highest Medicare reimbursements per inpatient visit of any U.S. hospital with at least 150 beds.

> By those metrics, Providence's acquisition of Cherry Hill has been a rousing success story.

> But the aggressive pursuit of more patients, more surgeries and more dollars has undermined Providence's values—rooted in the nonprofit's founding as a humble home where nuns served the poor—and placed patient care in jeopardy, a Seattle Times investigation has found.

20  (*Id.*) The Second Times Article then reports that the Times spent "a year" examining

21  records, and made the following findings:

22  //

ORDER - 14

- The doctors in the neuroscience unit are incentivized to pursue a high-volume approach with contracts that compensate them for large patient numbers and complicated surgical techniques. Of the six top-producing brain and spine surgeons in Washington state in 2015, five were part of Cherry Hill's neuroscience team, averaging $67 million in billed charges.

- The hospital touts its star surgeons to draw patients from hundreds of miles away, but six current and former staffers said those doctors will sometimes do little in the operating room once the patient is under anesthesia. Instead, the surgeons will leave less-experienced doctors receiving specialized training to handle parts of a surgery. That allows the primary surgeons to be in another operating room—a practice known as "concurrent surgery"—to maintain high volumes. It is not prohibited but can test the limits of Medicare rules.

- Hospital leaders recruited one doctor from another institution as he dealt with an internal investigation and allegations that he had high rates of complications and may have performed unnecessary surgeries. At Cherry Hill, more allegations of patient care problems emerged about the doctor, but administrators promoted him to a top leadership position.

- Cherry Hill patients have undergone surgeries that are more invasive than available alternatives. That's particularly the case in the treatment of aneurysm patients, where data show a pronounced spike in a technique that requires opening a patient's skull and working on the brain instead of utilizing a less-invasive procedure that does not require a craniotomy.

- The increased volume of patients has left medical staffers from the operating room to the intensive-care unit with massive caseloads, dividing the attention of ICU nurses who would otherwise provide one-on-one patient care. A loophole in a Washington state law designed to enhance patient safety has forced some nurses at Cherry Hill to be on duty for 20 hours in a day.

- There are indications that the high-volume model is taking a toll on patient care. In benchmarks tracked by the federal government, Cherry Hill was flagged for having high rates of blood clots, collapsed lungs and serious surgical complications. State data show a rise in other problem indicators over the last several years, including aneurysm patients with high numbers of strokes.

ORDER - 15

1   (*Id.*)  The Second Times Article then reports that "the most troubling findings" from the

2   Times' investigation "came from the doctors and other medical staff members who have

3   witnessed the changes" inside SNI, findings that were "largely suppressed by a leadership

4   team that has been accused of disregarding clear problems." (*Id.*)  The Second Times

5   Article states that "one neurosurgeon, Dr. Charles Cobbs, in a memo to Swedish CO

6   Tony Armada last year" wrote:  "This toxic, repressive environment has already

7   negatively impacted the ability of the SNI community to provide the quality care (to) our

8   patients that they deserve." (*Id.*)

9          The Second Times Article reports that as SNI "was shifting toward a high-volume

10  practice, Providence recruited Dr. Johnny Delashaw, a star surgeon known around the

11  West Coast as a top producer." (*Id.*) at ST_041677.)  The Second Times Article goes on:

12          In just the first 16 months after his arrival in Seattle, state data show
           Delashaw handled 661 inpatient cases totaling more than $86 million in
13          billed charges for the hospital — more than any other brain or spine surgeon
           in the state.
14
           But over that same time, Delashaw faced 49 internal complaints from
15          alarmed staff members concerned about the quality of his patient care and
           alleging unprofessional behavior, internal records show.
16
                                           ***
17
           'Some have become disgruntled and some of these health care providers
18         have left,' Delashaw wrote. 'When there is a change in culture it is
           commonplace for individuals to complain through the anonymous
19         complaint system' at the hospital.

20  (*Id.*)

21          After describing Dr. Delashaw's appointment to lead SNI, the Times reports on a

22  number of internal complaints about Dr. Delashaw. (*Id.*)  The Times reports on Dr.

ORDER - 16

1  Vallieres' memorandum to Swedish administrators and his decision to "step[]down from

2  his position in protest" of Swedish's decision to promote "an individual that has shown

3  very little respect for the Culture of Safety and related processes." (*Id.*)  The Second

4  Times Article also quotes Dr. Vallieres' belief that the "number of negative reports

5  submitted by so many different individuals is, in my judgment, a serious indicator of

6  deficiencies that will not make [Dr. Delashaw] a good leader for Neurosurgery." (*Id.*)

7        The Times then reports:  "Despite the concerns aired about Dr. Delashaw, the

8  hospital's administrators moved ahead with a plan to revamp surgical contracts in a way

9  that would incentivize the high-volume approach in which [Dr.] Delashaw excelled."

10  (*Id.*)  The Times reports that the revised compensation system ended the practice of

11  "pooling," in which surgeons "pooled a portion of their pay and redistributed it among

12  each other, which encouraged doctors to pass along patients to their peers when they

13  thought a co-worker might be a better specialist to handle the patient's procedure." (*Id.*)

14  The Times goes on:  Under the new contracts, "[s]urgeons would be paid almost entirely

15  on their production, as measured by Relative Value Units, or RVUs," which "are part of a

16  Medicare reimbursement formula that assigns a value to each procedure." (*Id.*)  The

17  Second Times Article then reports that volumes among SNI "had been rising" in 2013

18  and 2014, and "continued rising under Delashaw's stewardship and the new contracts."

19  (*Id.*)

20        The Second Times Article then traces Dr. Delashaw's professional career.  It

21  reports that during a grievance process when Dr. Delashaw was at the UC Irvine, Dr.

22  Delashaw testified: "I wanted all my faculty—as I said to them many times—I want

ORDER - 17

1    them to be rich . . . . But in order to be rich, you have to work and you have to do clinical

2    volume or you have to have other kinds of financial support." (*Id.* at ST_041678.)  The

3    Second Times Article then reported that in April 2013, "the board of directors of the

4    American Association of Neurological Surgeons voted to censure Delashaw for

5    questionable testimony he gave in a malpractice case where he was serving as an expert

6    witness, according to the association.  The organization declined to provide details about

7    the case, including what Delashaw had said." (*Id.*)

8         The Second Times Article then reports on Dr. Delashaw's treatment of brain

9    aneurysms in particular. (*Id.*)  The Second Times Article distinguishes between a

10   "coiling" procedure, a less invasive option, and a "clipping" procedure, which requires

11   cutting into the scalp and removing a portion of the skull. (*Id.*)  The Second Times

12   Article states that coiling has grown in popularity because research shows it can be better

13   for patients. (*Id.*).  "[Dr.] Delashaw, however," the Second Times Article goes on,

14   "specializes in the clipping procedure." (*Id.*)  The Second Times Article reports that Dr.

15   Scott Goodwin, chair of the Department of Radiological Sciences at UC Irvine,

16   "expressed concern that Delashaw had steered the facility into performing the more

17   invasive clipping procedure at an unusually high rate." (*Id.*)  The Second Times Article

18   states:

19        A Seattle Times analysis of patient data shows dramatic shifts in aneurysm
          treatment as [Dr.] Delashaw moved between jobs.  Before his 2012 arrival at
20        UC Irvine, the university's medical center performed clipping surgery in only
          about 13 percent of cases.  After [Dr.] Delashaw's arrival, 62 percent of
21        aneurysm patients undergoing treatment at Irvine received a clip—the
          highest rate among California hospitals who had at least 20 aneurysm cases,
22        according to state data analyzed by The Times.

ORDER - 18

1

> When [Dr.] Delashaw moved to the Cherry Hill hospital in Seattle, that
> campus jumped from 36 percent of cases getting a clip in 2012 to 57 percent
> in 2014. The statewide average remained under 40 percent during that same
> time.

> [Dr.] Delashaw wrote in his statement that he has "a national referral practice
> and wherever I go, complex vascular patients follow. It was natural and
> expected to see a rise in vascular surgeries with my arrival in Seattle."

(*Id.*) The Second Times Article reports that one of Dr. Delashaw's patients, T.M.,

underwent the clipping procedure and "doesn't recall [Dr.] Delashaw ever mentioning

that there was a less-invasive treatment . . . . Medical records show her aneurysm was

small and located in the ophthalmic segment of the internal carotid artery, where research

shows coiling is an option." (*Id.*)

The Second Times Article, under the header "Growing the numbers," reports on

volume-based surgeon contracts, under which surgeons can increase their revenue by

adding more stages to a surgery. (*Id.*) "All those RVUs equate to more reimbursements

for the hospital and, under the Swedish contracts, more money for the doctors." (*Id.*)

"And, with the help of spine cases, Cherry Hill has drawn more Medicare spending for

every inpatient visit than any other hospital in the country that has at least 150 beds." (*Id.*

at ST_041678-79.) The Second Times Article then discusses the high volume of certain

surgeries at Swedish. (*Id.* at ST_041679.) It states that Dr. Delashaw "boasted" in his

testimony in the UC Irvine case "that his RVU prowess dwarfed the output of his

colleagues in the year before he joined the institution." (*Id.*) After listing Dr. Delashaw's

2014 compensation, the Second Times Article ends the subsection by reporting that John

Romley, an economist at the University of Southern California, said that "[t]here is

1  evidence that physicians respond to volume incentives by adding more procedures—

2  perhaps unnecessary ones—to a patient's visit." (*Id.*)

3      The Second Times Article then has a section entitled "Simultaneous surgeries"

4  that reports on Cherry Hill's practice of running multiple operating rooms at a time:

> At Swedish, surgeries are often scheduled to run at the same time, the six current and former staffers said. Four workers expressed concern that [Dr.] Delashaw would only be in the room for less than 15 minutes during a surgery.
>
> One of [Dr.] Delashaw's former fellows, Dr. Peter Bouz, said [Dr.] Delashaw was clear about which parts of the cases were critical portions that the fellow could not handle alone. For an aneurysm clipping, the fellow could open the scalp and remove part of the skull, but [Dr.] Delashaw would need to be there for putting the clip on the aneurysm, Bouz said.
>
> For other cases, such as the removal of portions of a patient's vertebrae in a laminectomy, Bouz said the procedure was simple enough that there was no critical portion. He said [Dr.] Delashaw would come to check to make sure it had been done correctly. Bouz noted that the fellows had completed their residency and were now qualified to work on their own but had come to Swedish for specialized training.
>
> Four current and former staffers who asked to remain anonymous expressed concern that the OR would have to pause to wait for [Dr.] Delashaw in the middle of the surgery, with the patient's body opened up and under anesthesia. Bouz said there were times when there was a pause but that it would typically last no more than 15 minutes. Another former fellow, Dr. Prashant Kelkar, said [Dr.] Delashaw always came in a timely fashion.
>
> Three of the workers who asked to remain anonymous expressed concern that [Dr.] Delashaw would be off in a clinic while simultaneously having multiple cases in the OR. Bouz said that would occur only when one case was beginning and another was ending.

20  (*Id.*)

21      The final section of the Second Times Article is titled "Strain on Staff." (*Id.*) In

22  relevant part, it reports:

ORDER - 20

1

2

> Cobbs, the neurosurgeon, included in his memo that staff members believed [Dr.] Delashaw had decimated the ICU infrastructure and failed 'to adequately staff the unit with trained providers.'

3

4

> Other internal memos obtained by the Times say [Dr.] Delashaw exacerbated the situation with a caustic demeanor that created a toxic and hostile environment.

5

6

> 'Fundamental issues including respect for others, patient safety, appropriate surgery, and quality of care have been rebuffed by the leadership, in particularly Dr. Delashaw,' Cobbs wrote.  He declined to comment.

7 (*Id.*)

8

9

10

The Second Times article then reports on a memo from Dr. Ralph Pascualy, then the chief executive of physicians at Swedish, to Dr. Rod Hochman, the CEO of Providence, "about [Dr.] Delashaw's issues" in November 2016:

11

12

13

> Pascualy wrote that the Cherry Hill neurosurgeons felt intimidated to bring up what they considered to be [Dr.] Delashaw's unsafe practices and errors during the usual morbidity and mortality conference, a common gathering at hospitals around the country designed to be an open discussion for peers to give feedback on cases to improve future quality.

14

15

> He told Hochman that he heard stories of [Dr.] Delashaw making decisions that led to significant patient harm and death.

16

17

18

> 'You are perceived as giving him special privilege and honor when he is held in extremely low regard by every other physician on the medical staff,' Pascualy wrote.  'It has created a perception that what really matters at Swedish is vast RVU production without concern for the means by which it is achieved.'  Pascualy declined to comment.

19

(*Id.*)  The Article ends as follows:

20

21

> Ten surgeons and staff members joined together for a meeting with hospital leadership in October, with some making desperate pleas, according to minutes from the meeting obtained by The Times.  The surgeons reiterated concerns to Armada, the Swedish CEO, and two other administrators.

22 //

ORDER - 21

1   The minutes show the group warned that a Seattle Times reporter had been
    calling staff members.  They feared that a news article could damage the
2   institution's reputation.

3   They were clear in their message:  All the problems that had been ignored
    were poised to burst into the open.  Swedish's proud culture of safety was at
4   risk.  Delashaw needed to go.

5   To this day, [Dr.] Delashaw remains in charge.

6   (*Id.*)

7       3.   Fallout From the Articles

8       After publication of the First and Second Times Articles (together, the "Articles"),

9   Dr. Delashaw resigned from SNI in exchange for ███████████████and an

10  agreement that he would never again be employed by Swedish.  (*See* 1st Goldman Decl.

11  ¶ 7, Ex. 5 (sealed).)

12  **E.    Dr. Delashaw's Compensation**

13      The potential impact that Swedish's compensation model had on Dr. Delashaw's

14  practice is one of the focal points of the Articles and this lawsuit.  Dr. Delashaw's

15  compensation at Swedish was governed by successive contracts.  (Delashaw Decl. ¶ 13.)

16  Dr. Delashaw's first contract with Swedish was for a two-year term beginning October 1,

17  2013 (the "First Contract").  (*See* 1st Goldman Decl. ¶ 11, Ex. 9 (sealed) ("1st Contract")

18  at JDEL_036186.)  Under the First Contract, Dr. Delashaw's compensation was tied to

19  his work Relative Value Units ("wRVU"), a dollar amount assigned to each encounter,

20  procedure, or surgery:

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

ORDER - 22



(*See id.* at JDEL_036207.)  The First Contract was amended effective March 1, 2014 (the "Second Contract"), such that

(1st Goldman Decl. ¶ 13, Ex. 11 (sealed) ("2d Contract") at JDEL_036240, JDEL_036246-47.)  The Providence President for Operations, SNI surgeon Dr. Mayberg, and Dr. Delashaw testified at their depositions that the wRVU-based compensation system used to compensate Dr. Delashaw is a volume-based model.  (*See* 1st Goldman Decl. ¶ 8, Ex. 6 ("Butler Dep.") at 7:5, 19:12; *id.* ¶ 9, Ex. 7 ("Mayberg Dep.") at 54:23-55:2; *id.* ¶ 14, Ex. 12 ("Delashaw Dep.") at 415:15-19 (describing Dr. Delashaw's compensation plan as one "that was about how much work you did.  The more you did the more you got paid.").[4]

Dr. Delashaw signed a third physician employment agreement effective on April 4, 2015, that included a three-year term (the "Third Contract").  (*See* 1st Goldman Decl. (Dkt. # 108) ¶ 15, Ex. 13 (sealed) ("3d Contract") at JDEL_007321, JDEL_007332.)

---

[4] Portions of Dr. Delashaw's deposition are also found in the record in Exhibit 36 to the First Declaration of Jennifer Goldman, Exhibits 3 and 23 to the First Declaration of Jehiel I. Baer, and Exhibits 49 and 50 to the Second Declaration of Jehiel I. Baer.  (*See* 1st Goldman Decl. ¶ 38, Ex. 36; 1st Baer Decl. ¶ 3, Exs. 3, 23; 2d Baer Decl. (Dkt. # 144) ¶ 2, Exs. 49-50.) The court cites to Dr. Delashaw's deposition as "Delashaw Dep." wherever it appears in the record.

ORDER - 23

1 ███████████████████████████████████ (*Id.* at JDEL_007341.)  The Third

2 Contract provides that ████████████████████████████████

3 ███████████████████████ (*Id.*)  Dr. Delashaw signed a fourth

4 physician employment agreement effective May 1, 2016 (the "Fourth Contract").  (1st

5 Goldman Decl. ¶ 24, Ex. 22 (sealed) ("4th Contract") at JDEL_007348, JDEL_007359.)

6 The Fourth Contract provided Dr. Delashaw with █████████████████████

7 ██████████████████████████████████████████████

8 ██████████████████████████████████████████ (*Id.* at

9 JDEL_007368.)

10        Although the Third Contract and Fourth Contract moved to a salary-based

11 compensation model, Dr. Delashaw's production volume continued to impact the way in

12 which Swedish set his salary.  To justify Dr. Delashaw's high level of compensation for

13 the Third Contract, Swedish commissioned a fair market valuation ████████████

14 ██████████████████████████████████████████████████

15 ████████████████████████████" (1st Goldman Decl. ¶ 16, Ex. 14 at

16 SWE_005593-94.)  His proposed compensation was analyzed ███████████████

17 (*Id.*)  According to Swedish, "his historic productivity was used to estimate the projected

18 work RVUs that he would generate, and that in turn supported the compensation package

19 that was being proposed."  (*See* Swedish 30(b)(6) Dep. at 21:20-22:1.)

20        According to the fair market valuation analysis, the ████████████████

21 ████████████████████████████████████████████████

22 ███████████████████████████████████ (*See* 1st

ORDER - 24



1    Goldman Decl. ¶ 16, Ex. 14 at SWE_005593.)

2

3

4                                                                                   (*See id.* at

5    SWE_005593-94.)  Swedish testified, however, that if Dr. Delashaw did not attain the

6    projected level of production, such that "production no longer supported the

7    compensation package," the contract would not meet Swedish's standards "and,

8    therefore, would need to be adjusted" upon renewal.  (*Id.* at 22:2-14.)  In fact, the Third

9    Contract

10

11

12          Dr. Delashaw's productivity had the same impact on the Fourth Contract as it did

13   on the Third Contract.  Swedish commissioned another fair market valuation

14                                        (*See* 1st Goldman Decl. ¶ 23, Ex. 21 at

15   SWE_005563-71.)

16

17

18

19          (*Id.* at SWE_005566.)  In other words,

20

21                                        (*See id.*)  Based in large part

22

ORDER - 25

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See id.* at

2 SWE_005564-71.)  However, like the Third Contract, ▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮

5      Although Dr. Delashaw's Third and Fourth Contracts moved away from a strictly

6 productivity-based compensation model toward a fixed salary that was set based on

7 historical productivity, other SNI physicians continued to receive compensation on a

8 per-wRVU basis.  For example, Dr. Cobbs signed a contract amendment in October 2015

9 that set his compensation at ▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮ Swedish

11 offered a contract to another physician in April 2016 that stated that ▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮ (*See id.* ¶ 28, Ex. 26 at SWE-E_005896.)  Swedish

14 also created a ▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮ (*See id.* ¶ 26, Ex.

17 24 at JDEL_015355-61.)

18 **F.**    **Concurrent Surgeries**

19      Another focal point of both the Times' Articles and Dr. Delashaw's lawsuit

20 against the Times is the practice of concurrent surgeries at SNI.  Dr. Delashaw and the

21 Times appear to disagree on the definition of "concurrent surgeries."  Dr. Delashaw's

22 complaint alleges that "[c]oncurrent surgeries are surgeries in which the critical portions

1   of each operation occur simultaneously despite being led by the same doctor." (*See* Am.

2   Compl. ¶ 104.)  The Times argues, however, that the Articles did not define "concurrent

3   surgeries" as narrowly as Dr. Delashaw does.  (*See* Times MSJ at 11-12.)  Instead, the

4   Times cites Swedish's internal policy on concurrent surgeries and notes that concurrent

5   surgeries are surgeries where an attending surgeon is allowed to "'simultaneously work[]

6   in more than one operating room' and 'oversee the care provided by teams in two

7   operating rooms simultaneously [which is] defined as concurrent staffing,' so long as that

8   surgeon was present for the critical portion of the case." (*See id.* at 11 (quoting 1st

9   Goldman Decl. ¶ 30, Ex. 28 at SWE_000735-37).)

10          Although the parties disagree on the message conveyed by the Articles about

11   concurrent surgeries, the parties do not dispute that Dr. Delashaw participated in

12   concurrent surgeries at SNI—as that term is defined by Swedish's policy.  Swedish

13   commissioned ██████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████

17   (*See* 1st Goldman Decl. ¶ 36, Ex. 34 at JDEL_042124.)  Dr. Delashaw acknowledged at

18   his deposition that attending surgeons were not always present for the entirety of every

19   surgery.  (*See* Delashaw Dep. at 213:17-215:11; 217:1-8.)  He testified, for example, that

20   while a junior surgeon was making the incision or stitching up the patient, he "might be

21   in another operating room, or [] might be seeing a clinic patient, or [] might be sitting in

22   the operating room watching." (*See id.* at 298:3-9.)  Moreover, when the Times offered

ORDER - 27

Dr. Delashaw an opportunity to comment on the Times' claim that "[t]o maintain volumes, concurrent surgeries at SNI have become commonplace, and staffers have expressed concern about how they are being handled and how much time surgeons are spending in the operating room" before the Articles were first published, Dr. Delashaw responded that:

> Surgeries at many institutions such as ours occur in concurrent rooms by a team of surgeons.  These surgeries are staggered so that the attending of record is present for at least the key portions of each procedure.  Other attending surgeons are available if needed.

(*See* 1st Goldman Decl. ¶ 40, Ex. 38 at ST_0030713.)

**G.    Procedural History**

On April 11, 2018, Dr. Delashaw filed suit against the Times and Dr. Cobbs.  (*See* Compl. (Dkt. # 1).)  Against the Times, Dr. Delashaw brings claims of defamation, defamation by implication, and tortious interference with a business expectancy.[5]  (Am. Compl. ¶¶ 164-185.)  Against Dr. Cobbs, Dr. Delashaw brings claims of defamation, tortious interference with a business expectancy, and civil conspiracy.  (*Id.* ¶¶ 190-208.)  Dr. Delashaw seeks an injunction preventing the Times and Dr. Cobbs from making false statements about him, requiring the Times to remove the allegedly false statements from its website, and requiring the Times to publish a retraction.  (*See id.* § VI (prayer for relief).)  Dr. Delashaw also seeks monetary damages, attorneys' fees and costs, and prejudgment interest.  (*See id.*)

---

[5] Dr. Delashaw also pleaded a claim against the Times for violation of Washington's Consumer Protection Act ("CPA"), RCW ch. 19.86 *et seq.* (*see* Am. Compl. ¶¶ 186-89), but the court has already dismissed that claim.  (*See* 8/23/18 Order (Dkt. # 39) at 32-34.)

1    The Times moved for summary judgment on February 6, 2020 (*see* Times MSJ at

2  20), and Dr. Cobbs moved for summary judgment on February 27, 2020 (*see* Cobbs MSJ

3  at 25)).  The court now addresses Defendants' motions.

## III.    ANALYSIS

### A.    Legal Standard

6    Summary judgment is appropriate if the evidence viewed in the light most

7  favorable to the non-moving party shows "that there is no genuine dispute as to any

8  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

9  56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

10  816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

11  of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

12  is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

13  non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

14  (citing *Anderson*, 477 U.S. at 248-49).

15    The moving party bears the initial burden of showing there is no genuine dispute

16  of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

17  323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

18  show the absence of such a dispute in two ways:  (1) by producing evidence negating an

19  essential element of the nonmoving party's case, or (2) by showing that the nonmoving

20  party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

21  *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

22  meets its burden of production, the burden then shifts to the nonmoving party to identify

1    specific facts from which a factfinder could reasonably find in the nonmoving party's

2    favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

3    **B.    Dr. Delashaw's Motion to Strike**

4           In response to Dr. Cobbs' motion for partial summary judgment, Dr. Delashaw

5    moves to strike (1) certain of Dr. Cobbs' exhibits that include complaints about Dr.

6    Delashaw as inadmissible hearsay; and (2) what Dr. Delashaw characterizes as an

7    inadmissible offer of compromise under Federal Rule of Evidence 804. (*See* Cobbs MSJ

8    Resp. at 6-10.)

9           The court DENIES Dr. Delashaw's motion to strike. First, the complaints to

10   Swedish and DOH that Dr. Delashaw seeks to exclude are not hearsay because they are

11   not offered for their truth. The Federal Rules of Evidence define hearsay as "a statement

12   that . . . a party offers in evidence to prove the truth of the matter asserted in the

13   statement." Fed. R. Evid. 801(c). The "truth of the matter asserted" in the various

14   complaints against Dr. Delashaw that Dr. Delashaw aims to suppress is that Dr. Delashaw

15   did, in fact, engage in the misconduct alleged in those complaints. (*See, e.g.*, 1st Baer

16   Decl. ¶ 3, Exs. 2, 4-10, 14-22, 27-31, 42.) Dr. Cobbs does not offer the complaints to

17   prove that Dr. Delashaw engaged in misconduct. Instead, he offers the complaints to (1)

18   show that various individuals filed complaints about Dr. Delashaw's behavior both with

19   Swedish and DOH (*see, e.g.*, *id.* ¶ 3, Exs. 2, 4-10, 14, 22, 42); or (2) to show that his

20   November 2016 letter to Swedish was based on complaints from other Swedish

21   physicians (*see, e.g.*, *id.* ¶ 3, Exs. 27-31). Additionally, to the extent that Dr. Delashaw

22   expects to argue that Dr. Cobbs' November 2016 letter and his statements to MQAC

1   caused Dr. Delashaw's damages (*see* Cobbs MSJ Resp. at 18 ("[T]he jury will be asked

2   to determine whether Dr. Cobbs' actions were a factual cause of Dr. Delashaw's

3   damages.")), Dr. Cobbs is entitled to rebut that argument with evidence that other parties

4   were filing complaints against Dr. Delashaw that could have caused his damages.

5          Ultimately, Dr. Delashaw alleges that Dr. Cobbs engaged in a nefarious

6   conspiracy to oust Dr. Delashaw from Swedish and maliciously defame his character

7   based on Dr. Cobbs' greed and jealousy.  (*See, e.g.*, Am. Compl. ¶¶ 50-98.)  Even if the

8   complaints against Dr. Delashaw were not true, the fact that other individuals at Swedish

9   were lodging complaints against Dr. Delashaw in droves is directly relevant to the

10  legitimacy of Dr. Cobbs' motivations and actions in this case and to Dr. Delashaw's

11  causal arguments.[6]

12         The court also rejects Dr. Delashaw's attempt to strike portions of his deposition

13  testimony on the grounds that the testimony is an inadmissible offer of compromise.  It is

14  not.  Federal Rule of Evidence 408 states that a party may not offer evidence of another

15  party "furnishing, promising, or offering—or accepting, promising to accept, or offering

16  to accept—a valuable consideration in compromising or attempting to compromise the

17  claim" for purposes of proving or disproving the "validity or amount of a disputed

18  claim."  Fed. R. Evid. 408(a)(1).  In the testimony at issue, Dr. Cobbs asked Dr.

19  Delashaw whether there was "anything else [he] remember[ed] . . . [a]bout a request for a

20  retraction" from Dr. Cobbs, and Dr. Delashaw responded with "Retraction—I wanted an

21  _____

22  [6] Although the court denies the motion to strike at this time, the court will entertain a renewed
    objection to these exhibits at trial if Dr. Cobbs attempts to offer these complaints for their truth.

ORDER - 31

1    apology." (*See* Delashaw Dep. at 800:20-24.)  That testimony is not an offer of

2    compromise under Rule 408.[7]

3    **C.    The Times' Summary Judgment Motion**

4            The Times moves for summary judgment on Dr. Delashaw's defamation and

5    tortious interference claims.  The Times' primary arguments against Dr. Delashaw's

6    defamation claims are that (1) Dr. Delashaw cannot carry his burden to establish falsity

7    and (2) certain statements that Dr. Delashaw claims are defamatory are non-actionable

8    opinion statements.  (*See* Times MSJ at 1-3.)  The Times also argues that if Dr.

9    Delashaw's defamation claims fail, then his tortious interference claims must also fail.

10   (*See id.* at 5.)  The court first addresses the standard for defamation claims before

11   addressing the merits of the Times' arguments.

12           1.    Defamation Standard

13           "A defamation action consists of four elements: (1) a false statement, (2)

14   publication, (3) fault, and (4) damages." *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013).

15   A plaintiff can allege the false statement prong by alleging facts showing that the

16   statement is provably false or "leaves a false impression due to omitted facts."  *See*

17   *Yeakey v. Hearst Commc'ns, Inc.*, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr*

18   *v. Grant*, 108 P.3d 768, 773 (Wash. 2005)).  "Defamation by implication occurs when

19   'the defendant juxtaposes a series of facts so as to imply a defamatory connection

20

21           [7] Even if Dr. Delashaw's testimony could be construed as offer of compromise under
     Rule 408(a)(1), the court would admit the testimony for purposes of its bearing, if any, on
22   whether Dr. Delashaw ever requested a retraction from Dr. Cobbs.  *See* Fed. R. Evid. 408(b)
     (noting that the court may admit evidence of offers of compromise for other purposes).

1   between them.'" *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010)

2   (quoting *Mohr*, 108 P.3d at 774).

3           To establish the first element of defamation, falsity, "the plaintiff must show the

4   statement is provably false, either in a false statement or because it leaves a false

5   impression." *Mohr*, 108 P.3d at 775. Washington courts do "not require a defamation

6   defendant to prove the literal truth of every claimed defamatory statement." *Id.* at 775.

7   Rather, "[a] defendant need only show that the statement is substantially true or that the

8   gist of the story, the portion that carries the 'sting,' is true." *Id.* (quoting *Mark v. Seattle*

9   *Times*, 635 P.2d 1081, 1092 (Wash. 1981)). The court, not the jury, determines the

10  "sting" of a report. *See id.*

11          2.      Statements at Issue

12                  a.      Financial Incentives

13          The first grouping of statements that Dr. Delashaw alleges defamed him relate to

14  alleged financial incentives at SNI to increase patient volume. (*See* Times MSJ at 6-10;

15  Times MSJ Resp. at 6-9.) A number of statements in the Second Times Article relate to

16  SNI physicians' financial incentives to pursue high volumes:

17          The doctors in the neuroscience unit are incentivized to pursue a high-volume
            approach with contracts that compensate them for large patient numbers and
18          complicated surgical techniques. (2d Times Art. at ST_041676.)

19          The revised contracts at Cherry Hill's SNI program ended the pooling
            system, according to records and interviews. Surgeons would be paid almost
20          entirely on their production, as measured by Relative Value Units, or RVUs."
            (*Id.* at ST_041677.)

21      //

22

ORDER - 33

1
> Surgeons with production-based contracts can increase their revenue by
> adding more stages to a surgery. That's particularly true when it comes to
2
> spine cases. (*Id.* at ST_041678.)

3
> All those RVUs equate to more reimbursements for the hospital and, under
> the Swedish contracts, more money for the doctors. (*Id.*)
4

5
The Times argues that Dr. Delashaw cannot establish that these claims are false because

6
SNI surgeons, including Dr. Delashaw, were incentivized to produce a high-volume

7
approach. (*See* Times MSJ at 6-10.) Thus, Dr. Delashaw carries the burden to show that

8
the facts viewed in the light most favorable to his case identify a genuine dispute of

9
material fact on the question of whether that the Times' claims about financial incentives

10
are "provably false, either in a false statement or because [they] leave[] a false

11
impression." *Mohr*, 108 P.3d at 775; *see also* Fed. R. Civ. P. 56(a).

12
    The court concludes that there is a genuine dispute of material fact on the falsity of

13
the Times' allegations on financial incentives that precludes summary judgment on those

14
particular statements. On one hand, the parties appear to agree that the First Contract and

15
Second Contract compensated Dr. Delashaw on a volume basis. (*See* 1st Contract at

16
JDEL_036207-08; 2d Contract at JDEL036246-49; Delashaw Dep. at 415:15-19 ("So as

17
of March 1st, 2014, I began to be compensated similar to the other surgeons and was not

18
on a salary. I was on a compensation plan that was about how much work you did. The

19
more work you did the more you got paid."); Times MSJ at 7.) The First Contract began

20
on October 1, 2013 and the Third Contract did not begin until April 4, 2015. (*See* 1st

21
Contract at JDEL_036180; 3d Contract at JDEL_007321.) This evidence shows that Dr.

22
Delashaw was, in fact, under contracts that incentivized him to pursue a high-volume

1    patient load from October 2013 to April 2015, which is consistent with the claims in the

2    Second Times Article.

3            Although Dr. Delashaw was compensated based on productivity for a period of

4    time, Dr. Delashaw moved to a salary-based compensation model in the Third Contract

5    and Fourth Contract. (*See* 3d Contract at JDEL_007341-42; 4th Contract at

6    JDEL_007368-69.)  The compensation terms in Dr. Delashaw's Third Contract and

7    Fourth Contract arguably suggest that he was not financially incentivized to pursue a

8    high-volume patient load after April 2015.  The court recognizes that (1) both the Third

9    Contract and the Fourth Contract explicitly state that Dr. Delashaw's compensation will

10   be adjusted if he does not meet certain production thresholds (*See* 3d Contract at

11   JDEL_007342; 4th Contract at JDEL_007369); and (2) the Times submitted evidence

12   showing that Swedish relied heavily on Dr. Delashaw's historical productivity in setting

13   Dr. Delashaw's salary (*see, e.g.*, 1st Goldman Decl. ¶¶ 16, 23, Exs. 14, 21).  Although

14   this evidence supports the Times' argument that Dr. Delashaw continued to have a

15   financial incentive to pursue a high-volume patient load under the Third and Fourth

16   Contracts, the court cannot weigh the parties' conflicting evidence on summary

17   judgment.  Instead, the court concludes that a reasonable factfinder could credit the

18   language in the Third and Fourth Contracts and conclude that Dr. Delashaw was not

19   financially incentivized to pursue a high-volume patient load after April 2015.

20           The Times briefly argues that the court need not consider any factual disputes

21   related to Dr. Delashaw's compensation under the Third and Fourth Contracts because

22   the fact that Dr. Delashaw was paid on a volume basis under the First and Second

ORDER - 35

1    Contracts is sufficient to "establish[] the truth of the reporting." (*See* Times Reply at 4).

2    The court rejects this argument because the Times fails to adequately support it. The

3    Times briefly argues—without support from caselaw—that the financial incentive

4    statements are true because the period in which Swedish paid Dr. Delashaw on a volume

5    basis was "during the period about which the Articles reported." (*See id.*) However, the

6    statements in the Second Times Article regarding physician financial incentives are not

7    qualified by any particular period of time (*see* 2d Times Art. at ST_041676-78), and

8    when Times published the Articles in February 2017, Dr. Delashaw was operating under

9    the salary-based compensation model in the Fourth Contract (*see* 4th Contract at

10   JDEL_007368-69). The Times fails to address the potential impact of these

11   chronological distinctions with any amount of analysis or support from caselaw.

12   Accordingly, the court concludes that the factual dispute over whether Dr. Delashaw was

13   incentivized to pursue a high-volume patient load after April 2015 is sufficient to

14   preclude summary judgment on Dr. Delashaw's defamation claims insofar as those

15   claims are based on statements regarding physician financial incentives in the Second

16   Times Article.[8]

17   _____

18   [8] Although the court denies the Times' motion based on this factual dispute, the court
     notes that the Times' failure to address the chronological distinctions in Dr. Delashaw's
     compensation is not the only loose end left by the parties' briefing. The parties also fail to
19   address the fact that the Second Times Article never explicitly states that Dr. Delashaw had a
     contract that incentivized him to pursue a high-volume patient load. (*See generally* Second
20   Times Article.) Instead, the explicit language in the Second Times Article states vaguely that
     "[t]he doctors in the neuroscience unit" are incentivized to pursue a high-volume patient load.
21   (*See id.* at ST_041676.) Although the Times dances around this distinction in its motion and
     reply (*see* Times MSJ at 10 ("As for the other surgeons at SNI, the more they performed, the
22   more they too got paid."); Times Reply (Dkt. ## 137 (sealed); 157 (redacted)) at 5 ("As the paper
     accurately reported, **the SNI surgeons** were 'incentivized to pursue a high-volume approach

ORDER - 36

1              b.      Unnecessary Surgeries

2          The second group of statements from the *Quantity of Care* series that Dr.

3    Delashaw alleges defamed him relate to SNI's alleged practice of engaging in what Dr.

4    Delashaw refers to as "unnecessary surgeries."[9]  (*See* Times MSJ Resp. at 9-12; Times

5    Reply at 5-6.)  Dr. Delashaw argues that the Times "falsely[] conveyed that he performed

6    unnecessary surgeries at SNI."  (*See* Times MSJ Resp. at 9.)  In support of that claim, he

7    quotes snippets of the following passages from the Second Times Article:

8          The records show that Dr. Scott Goodwin, the chair of the Department of
           Radiological Sciences at UC Irvine, testified that doctors in his department
9          had flagged more than 40 [Dr.] Delashaw cases that concerned them.  The
           flagged cases included surgeries that were potentially unnecessary and others
10         that involved significant complications for the patient.

11         . . . .

12         A Seattle Times analysis of patient data shows dramatic shifts in aneurysm
           treatment as [Dr.] Delashaw moved between jobs.  Before his 2012 arrival at
13         UC Irvine, the university's medical center performed clipping surgery in only
           about 13 percent of cases.  After [Dr.] Delashaw's arrival, 62 percent of
14

15   with contracts that compensate them for large patient numbers and complicated surgical
     techniques.'"")), the Times fails to explicitly argue that the financial incentive claims in the
16   Second Times Article are true because SNI surgeons other than Dr. Delashaw operated under
     volume-based contracts.  Thus, the court cannot determine what impact, if any, this potential
17   distinction between Dr. Delashaw's contract and the contracts of the other SNI surgeons might
     have on Dr. Delashaw's defamation claim.

18         [9] The court rejects the Times' argument that Dr. Delashaw is precluded from arguing that
     the claims in the Second Times Article about "unnecessary surgeries" defamed him because that
19   topic is "not among the subjects" that the court limited Dr. Delashaw to in the court's order on
     the Times' motion to dismiss.  (*See* Times Reply at 5.)  The Times reads the court's order too
20   broadly.  The court ordered that Dr. Delashaw's defamation claims are limited to statements in
     the *Quantity of Care* series and listed examples of the defamatory statements Dr. Delashaw
21   identified in his complaint.  (*See* 8/23/18 Order at 16-17.)  However, the court made clear that its
     list of subjects were examples, and specifically cited the Times' claims about unnecessary
22   surgeries as an example of potentially actionable statements in Dr. Delashaw's complaint.  (*See
     id.*)

aneurysm patients undergoing treatment at Irvine received a clip—the highest rate among California hospitals who had at least 20 aneurysm cases, according to state data analyzed by The Times.

When [Dr.] Delashaw moved to the Cherry Hill hospital in Seattle, that campus jumped from 36 percent of cases getting a clip in 2012 to 57 percent in 2014. The statewide average remained under 40 percent during that same time.

. . . .

Dr. Joe Eskridge, an interventional neuroradiologist who specialized in coiling procedures during his 11 years at the Cherry Hill campus, said before [Dr.] Delashaw arrived he worked with Dr. David Newell, who had handled many of the aneurysm clippings.

Eskridge said he and Newell often discussed aneurysms to assess whether the patient would have better results with a clip or coil procedure. Newell would come over to Eskridge's office or lab, bringing images to discuss with him. At times, Newell and Eskridge would both discuss the options with the patient.

'[Dr.] Delashaw never did that,' said Eskridge, who said he was forced out of Swedish after complaining about a different surgeon's level of care.

. . . .

A growing body of research suggests that, though lucrative, spinal-fusion surgery is not the best option for lumbar stenosis, a common condition of degenerative spinal changes, when the patient doesn't also have a displaced vertebra said Dr. Richard Deyo, who researches spine surgeries at OHSU.

Swedish saw an increase in the number of lumbar-fusion surgeries in 2014 when the patient had a primary diagnosis of lumbar stenosis and did not also have a displaced vertebra. [Dr.] Delashaw and [Dr.] Oskouian ranked tops in the state that year among brain and spine specialists, with 24 cases each.

. . . .

There is evidence that physicians respond to volume incentives by adding more procedures—perhaps unnecessary ones—to a patient's visit, [University of Southern California economist John] Romley said.

//

ORDER - 38

1    (*See id.* at 9-12 (quoting 2d Times Art. at ST_041678-79).)  Dr. Delashaw argues that

2    these passages left a clear implication that was false:  "Dr. Delashaw chose to perform

3    procedures (including tumor removal, clipping, and fusions) because of greed."  (*See id.*

4    at 10.)

5        The fatal flaw with Dr. Delashaw's argument is that he fails to argue that any of

6    the statements that the Times wrote are false or that the various declarants did not make

7    the statements that the Times claimed they made.  (*See id.* at 9-12.)  Instead, Dr.

8    Delashaw takes issue with the negative impression created by the portions of the story

9    that the Times "chose to print" and argues that other facts about his surgical methods

10   would have painted him in a more accurate light.  (*See id.*)  The general rule under

11   Washington law is that "[a] defamation claim may not be based on the negative

12   implication of true statements.  This is because defamatory meaning may not be imputed

13   to true statements."  *U.S. Mission Corp. v. KIRO TV, Inc.*, 292 P.3d 137, 141 (Wash. Ct.

14   App. 2013) (citations omitted).  Although Washington law recognizes a limited

15   "defamation by omission" exception to that rule, that exception requires a showing that

16   "the communication left a false impression that would be contradicted by the inclusion of

17   omitted facts."  *See Mohr*, 108 P.3d at 776.  But even the defamation by omission

18   doctrine recognizes that "[m]erely omitting facts favorable to the plaintiff or facts that the

19   plaintiff thinks should have been included does not make a publication false and subject

20   to defamation liability."  *Id.*

21       Here, Dr. Delashaw identifies a number of counterpoints about the science behind

22   clipping and coiling procedures and about his tenure at SNI, UC Irvine, and OHSU that

1    he believes the Times should have included in the Second Times Article.  (*See* Times

2    MSJ Resp. at 9-12.)  But Dr. Delashaw fails to show how any of the alleged omitted facts

3    identified in his response brief would contradict the claims in the Second Times Article

4    and prove that those claims are untrue.[10]  (*See id.*)  Even when viewed in the light most

5    favorable to Dr. Delashaw, the counterpoints he offers could have "led to a more

6    balanced report" or "portrayed [Dr. Delashaw] in a more favorable light" if the Times

7    had chosen to include them in the Second Times Article, but Dr. Delashaw failed to show

8    that the Times' omission of those counterpoints made "what was published untrue."  *See*

9    *Mohr*, 108 P.3d at 776 (citing *Green v. CBS Inc.*, 286 F.3d 281 (5th Cir. 2002), *Peter*

10   *Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 563 (5th Cir. 1997), & *Janklow v.*

11   *Newsweek, Inc.*, 759 F.2d 644, 648 (8th Cir. 1985)).

12         The problem with Dr. Delashaw's defamation by omission theory is underscored

13   by the exemplar case that Dr. Delashaw cites in his opposition to the Times' motion for

14   summary judgment, *Memphis Publishing Company v. Nichols*, 569 S.W.2d 412, 419

15   (Tenn. 1978), which the *Mohr* Court stated was a "prime example of defamation by

16   implication caused by certain material omissions."  *Mohr*, 108 P.3d at 776.  The *Mohr*

17   Court noted that, in *Memphis Publishing*, a newspaper reported that "a woman shot her

18   husband and another woman after finding them together in the second woman's living

19

---

20   [10] The court also notes that many of Dr. Delashaw's "omitted facts" are not "facts" at all.  For
     example, Dr. Delashaw disputes Dr. Goodwin's claims about UC Irvine's "concerns" about Dr.

21   Delashaw's "potentially unnecessary" surgeries on the grounds that Dr. Goodwin is a radiologist,
     not a neurosurgeon, and that Dr. Goodwin appears to have misunderstood the purpose of some of
     Dr. Delashaw's procedures.  (*See id.* at 9.)  Dr. Delashaw's opinions about Dr. Goodwin's

22   opinions are not "omitted facts" but rather Dr. Delashaw's counter-opinions.

ORDER - 40

1    room" without mentioning "the fact that the two were not alone and that several others

2    were in the same room during the wife's attack." *See id.* (citing *Memphis Pub'g Co.*, 569

3    S.W.2d at 419).  That report was defamatory because it left a "clear implication" that the

4    husband and the second woman were having an affair.  *See id.*

5         Unlike *Memphis Publishing*, however, where "omitted information would have

6    negated the defamatory implication in its entirety," *see id.*, Dr. Delashaw cannot identify

7    any omitted facts that would directly negate any of the statements or impressions about

8    potentially unnecessary surgeries in the Second Times Article.  (*See* Times MSJ Resp. at

9    9-12.)  Even if the court assumes Dr. Delashaw has a point that the Times could have

10   reported on the issue of unnecessary surgeries in a more neutral fashion, that does not

11   make any of the Times' statements false by implication.  *See Mohr*, 108 P.3d at 776-77.

12   Thus, the statements in the Second Times Article about unnecessary surgeries cannot

13   support Dr. Delashaw's defamation claim.

14         *c.   Concurrent Surgeries*

15        The third group of statements from the First and Second Times Articles that Dr.

16   Delashaw alleges defamed him relate to SNI's alleged practice of engaging in concurrent

17   surgeries.  Dr. Delashaw claims that the Times falsely reported that "Dr. Delashaw

18   abandoned his patients to maximize volume."  (*See* Times MSJ Resp. at 12-13.)  In

19   support of that claim, he quotes snippets of the following passages from the Second

20   Times Article:

21         The hospital touts its star surgeons to draw patients from hundreds of miles
          away, but six current and former staffers said those doctors will sometimes
22        do little in the operating room once the patient is under anesthesia.  Instead,

1

the surgeons will leave less-experienced doctors receiving specialized
training to handle parts of a surgery.  That allows the primary surgeons to be
in another operating room—a practice known as "concurrent surgery"—to
maintain high volumes.  It is not prohibited but can test the limits of Medicare
rules.

2

3

4

. . . .

5

To manage their caseloads, Cherry Hill's top doctors will run multiple
operating rooms at a time, according to six current and former staffers.

6

Concurrent surgeries aren't prohibited by law.   Medicare allows
simultaneous surgeries if the attending physician is present during "critical"
portions of each procedure.

7

8

It's a common practice to have residents and fellows perform basic tasks, like
stitching up a patient, when the surgery is largely complete.  Fellows may
also take on larger tasks while the attending doctor supervises.

9

10

(*See id.* (citing 2d Times Art. at ST_041676, 79).)  Dr. Delashaw argues that these

11

passages imply that he "abandoned his patients to maximize volume" and that he was

12

"not present during the 'critical' portion [of procedures] because he had raced to another

13

operation."  (*See* Times MSJ at 12-13.)

14

Dr. Delashaw also argues that portions of the following passage about T.G. in the

15

First Times Article included "weasel words" that conveyed the message that Dr.

16

Delashaw "neglected patients by leaving operating rooms the minute they were

17

unconscious, endangering them and creating risk of the kind of injury suffered by

18

[T.G.]":

19

The available medical records don't show how much time [Dr.] Delashaw
spent in the operating room while [T.G.] was under anesthesia.   [Dr.]
Delashaw and a spokeswoman for Swedish declined to comment for this
story, citing patient privacy.

20

21

22

//

ORDER - 42

1
2
3

> [Dr.] Delashaw's surgical fellow filed the initial surgery note after [T.G.]'s procedure, and then records indicate [Dr.] Delashaw filed a more detailed one a few days later.  The note does not include when [Dr.] Delashaw arrived in the operating room, and it's unclear who handled certain parts of the surgery.

4
5

> [Dr.] Delashaw wrote that he was "present" during critical portions of the surgery.

6

(*See id.* at 14 (citing 1st Times Art. at ST_041673).)

7
8
9
10
11
12
13
14
15
16
17

The problem with Dr. Delashaw's argument is that he accuses the Times of making statements it did not make.  The Second Times Article's bulleted summary states that "six current and former staffers" informed the Times that certain surgeons "will sometimes do little in the operating room once the patient is under anesthesia" and will "leave less-experienced doctors receiving specialized training to handle parts of a surgery." (2d Times Art. at ST_041676.)  The Second Times Article further claims that this practice "allows the primary surgeons to be in another operating room."  The Times specifically expounded on these claims in the body of the article, noting that Medicare requires that an attending physician be present for the "critical" portions of a procedure and stating that it is "common practice to have residents and fellows perform basic tasks . . . when a surgery is largely complete." (*See id.* at ST_041679.)

18
19
20
21
22

Dr. Delashaw does not argue that any of these statements are false. (*See generally* Times MSJ Resp.)  He does not, for example, provide any evidence showing that the Times fabricated the accounts of the "six current and former staffers" who allegedly told the Times that some surgeons "do little in the operating room once the patient is under anesthesia." (*See* Times MSJ Resp. at 12-14; 2d Times Art. at ST_041676.)  Dr.

1   Delashaw also does not argue that the statement that SNI surgeons left "less experienced

2   doctors receiving specialized training to handle parts of a surgery" was false, or that there

3   were not circumstances in which an SNI surgeon would be scheduled for simultaneous

4   procedures, such that the surgeon had to be "in another operating room" at some point

5   during the procedure.  (*See* Times MSJ Resp. at 12-14; 2d Times Art. at ST_041676.)

6       In fact, the only available evidence shows that Dr. Delashaw participated in the

7   kinds of simultaneous procedures about which the Second Times Article reported and

8   was not present for the entirety of every surgical procedure.  Swedish commissioned a

9   report ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████          (*See* 1st Goldman Decl. ¶ 36, Ex. 34 at

12  JDEL_042124.)  Dr. Delashaw further acknowledged at his deposition that attending

13  surgeons were not always present for the entirety of every surgery.  (*See* Delashaw Dep.

14  at 213:17-215:11; 217:1-8.)  He testified, for example, that while a junior surgeon was

15  making the incision or stitching up the patient, he "might be in another operating room,

16  or [] might be seeing a clinic patient, or [] might be sitting in the operating room

17  watching."  (*See id.* at 298:3-9.)  Moreover, before the Times published the Articles, Dr.

18  Delashaw conceded to the Times that "[s]urgeries at many institutions such as ours occur

19  in concurrent rooms by a team of surgeons.  These surgeries are staggered so that the

20  attending of record is present for at least the key portions of each procedure.  Other

21  attending surgeons are available if needed."  (*See* 1st Goldman Decl. ¶ 40, Ex. 38 at

22  ST_0030713.)  One of Dr. Delashaw's former physician's assistants also declared that

ORDER - 44

1  "[p]atients always were informed that Dr. Delashaw would not be present for the entire

2  surgical procedure[] but would be there for the critical portions." (*See* Dancan Decl.

3  (Dkt. # 125) ¶ 11.)

4         Instead of attempting to refute the claims that the Times made in the Second

5  Times Article, Dr. Delashaw erects straw men in hopes of surviving summary judgment.

6  He argues that the Times alleged that he "abandoned his patients to maximize volume"

7  and that he was "not present during the 'critical' portion [of procedures] because he had

8  raced to another operation." (*See* Times MSJ at 12-13.)  Not so.  The Second Times

9  Article never accuses Dr. Delashaw—or any SNI surgeon, for that matter—of being

10 absent during "critical" portions of a procedure. (*See generally* 2d Times Art.)  To the

11 contrary, the Times noted that Medicare required an attending physician's presence

12 during the critical portion of procedures, and also quoted one of Dr. Delashaw's former

13 fellows who stated that Dr. Delashaw was always clear about what portions of the

14 surgery were "critical" and that even on surgeries that did not have "critical" portions, Dr.

15 Delashaw would continue to supervise and check on the fellow's work. (*See id.* at

16 ST_041679.)  Dr. Delashaw cannot succeed on defamation claims against the Times

17 based on allegedly defamatory statements that the Times never made.

18        Dr. Delashaw's arguments about the First Times Article fare no better.  In the First

19 Times Article, the Times stated that "[t]he available medical records" and a note from a

20 surgical fellow about T.G.'s treatment did not "show how much time Delashaw spent in

21 the operating room while [T.G.] was under anesthesia," "when Delashaw arrived in the

22 operating room," or "who handled certain parts of the surgery." (*See* 1st Times Art. at

1  ST_041673.)  Dr. Delashaw does not dispute the veracity of any of these statements.

2  (*See* Times MSJ Resp. at 14-15.)  Instead, he accuses the Times of using "weasel words"

3  to convey that Dr. Delashaw was "driven by greed" and neglected his patients.  (*See id.* at

4  14.)  As noted above, however, "[a] defamation claim may not be based on the negative

5  implication of true statements.  This is because defamatory meaning may not be imputed

6  to true statements."  *U.S. Mission Corp.*, 292 P.3d at 141.

7         In sum, the court concludes that the Times is entitled to summary judgment with

8  respect to Dr. Delashaw's defamation claims to the extent they are based on statements in

9  the First and Second Times Articles about concurrent surgeries.

10                    d.     *Misleading Data*

11        The fourth category of statements from the *Quantity of Care* series that Dr.

12  Delashaw alleges defamed him relates to the Times' use of medical data from Swedish

13  Cherry Hill.  Dr. Delashaw argues that the Second Times Article misleads readers by

14  "referring interchangeably to SNI and Cherry Hill, conflating the two so that, as the

15  article progressed, SNI went from a unit of Cherry Hill to the equivalent of Cherry Hill."

16  (*See* Times MSJ Resp. at 15.)  According to Dr. Delashaw, this sleight of hand allowed

17  the Times to use data relating to Cherry Hill as a whole to imply that SNI had high

18  complication rates that were below "the neurosurgical norm," when in reality SNI's

19  outcomes were "better than comparable institutions."  (*See id.* at 15-16.)  Dr. Delashaw

20  also avers that the Times used data from Cherry Hill to "falsely impl[y] a causal

21  connection between Dr. Delashaw and purported increased stroke rates at SNI."  (*See id.*

22  at 16-17.)

1    The court rejects Dr. Delashaw's arguments.  The Second Times Article quite

2   clearly refers to "Cherry Hill" in reference to the Swedish campus as a whole and reports

3   on what the data about "Cherry Hill" showed at the time.  (*See, e.g.*, 2d Times Art. at

4   ST_041676 ("In benchmarks tracked by the federal government, Cherry Hill was flagged

5   for having high rates of blood clots, collapsed lungs and serious surgical

6   complications."), ST_041679 ("Among 10 patient safety indicators published by the

7   federal government, Cherry Hill ranked below national levels in three areas in the data

8   through the middle of 2015:  blood clots after surgery, collapsed lungs and serious

9   complications.").)  Dr. Delashaw does not dispute the veracity of any of this data.  (*See*

10  Times MSJ Resp. at 15-17.)  Instead, he argues that the Times should have done more to

11  clarify that this data included the "ICU, the cardiac institute, and a vascular service" at

12  Cherry Hill in addition to data from SNI.  (*See id.* at 16.)  He also complains that the

13  Times failed to include SNI-specific data that "showed that SNI's outcomes were better

14  than comparable institutions." (*See id.*)  But even if the Times could have included other

15  data or framed the data it did include in a way that Dr. Delashaw would have preferred,

16  that does not mean that the statements the Times made about data at Cherry Hill are false

17  or false by implication.  *See Mohr*, 108 P.3d at 776.  Absent a genuine dispute of material

18  fact that the data the Times reported was false or false by implication, Dr. Delashaw's

19  defamation claims cannot stand on the Times' reporting of that data.

20     Dr. Delashaw's claim that the times "falsely implied a causal connection" between

21  him and "purported increased stroke rates at SNI" fails for similar reasons.  (*See* Times

22  MSJ Resp. at 17.)  First, the Times never reported on "increased stroke rates at SNI."

1    Instead, the Times noted that the stroke rate at Cherry Hill was high compared to other

2    hospitals during Dr. Delashaw's tenure:  "From the time Delashaw arrived at Cherry Hill

3    in October 2013 through the end of 2015, 9 percent of the aneurysm patients treated at

4    Cherry Hill developed an ischemic stroke during their stay, compared with 4 percent at

5    all other hospitals in the state.  When looking at just clipping procedures, Cherry Hill's

6    stroke rate was twice that of other hospitals—14 percent to 7 percent."  (*See* 2d Times

7    Art. at ST_041679.)  But Dr. Delashaw fails to dispute that stroke rates were, in fact, high

8    at Cherry Hill compared to other hospitals during Dr. Delashaw's tenure.  (*See* Times

9    MSJ Resp. at 16-17.)  Instead, he argues that the Times should have analyzed and

10   reported on the data in ways that would have painted SNI in a more favorable light.  (*See*

11   *id.*)  Again, however, the critical failure of Dr. Delashaw's argument is that "[m]erely

12   omitting facts favorable to the plaintiff or facts that the plaintiff thinks should have been

13   included does not make a publication false and subject to defamation liability."  *Mohr*,

14   108 P.3d at 776.  Thus, the court concludes that the Times is entitled to summary

15   judgment with respect to Dr. Delashaw's defamations claims to the extent they are based

16   on statements about misleading data in the Second Times Article.

17        *e.  Patient Harm*

18        The final group of statements from the *Quantity of Care* series that Dr. Delashaw

19   alleges defamed him are about patient harm at SNI.  The parties do not agree on the

20   statements at issue in this category.  The Times argues that Dr. Delashaw bases his claim

21   on the following statement from the Second Times Article:  "[T]he aggressive pursuit of

22   more patients, more surgeries and more dollars has undermined Providence's values—

1    rooted in the nonprofit's founding as a humble home where nuns served the poor—and

2    placed patient care in jeopardy, a Seattle Times investigation has found."  (2d Times Art.

3    at ST_041676; Times MSJ at 15.)  Dr. Delashaw does not point out any specific

4    statement from either the First or Second Times Article that he claims is demonstrably

5    false.  (*See* Times MSJ Resp. at 17-21.)  Instead, he contends that the First and Second

6    Times Articles, taken as a whole, falsely imply that Dr. Delashaw and SNI caused

7    patients harm.  (*See id.* at 17 ("The Times falsely implied that Dr. Delashaw and SNI in

8    fact harmed patients.").)

9           The court agrees with Dr. Delashaw that the First and Second Times Articles

10    imply that Dr. Delashaw and SNI placed patients at risk.  In fact, the sentence that the

11    Times quotes specifically states that Swedish Cherry Hill's practices have "placed patient

12    care in jeopardy."  (2d Times Art. at ST_041676.)  Similarly, the point of the First Times

13    Article was to report on the actual harm caused to T.G. while she was in Swedish's care

14    (*see generally* 1st Times Art.), and the Times does not dispute Dr. Delashaw's claim that

15    the First Times Article implied that Dr. Delashaw and Swedish bore some measure of

16    responsibility for that harm (*see, e.g.*, Times Reply 10-12).  Indeed, the Times argues that

17    the "gist" of the Articles is "that SNI faced substantial challenges under the disruptive

18    and abusive leadership of Dr. Delashaw which caused many surgeons, nurses and

19    administrators to quit, incentivized astronomically high production among surgeons, and,

20    according to Swedish surgeons, nurses, administrators, and patients, put patients at risk."

21    (*Id.* at 2.)  Thus, there is no dispute that the Times directly stated and indirectly implied

22    that Swedish Cherry Hill, SNI, and Dr. Delashaw "put patients at risk."

ORDER - 49

1       The question, however, is whether Dr. Delashaw can show that any of the

2   statements the Times made about patient harm are "provably false, either in a false

3   statement or because [they] leave[] a false impression." *Mohr*, 108 P.3d at 775.  Dr.

4   Delashaw's opposition makes plain that his defamation argument rests on a defamation

5   by implication or defamation by omission theory.  (*See, e.g.*, Times MSJ Resp. at 17-22.)

6   Thus, as discussed above, Dr. Delashaw bears the burden to show that the First and

7   Second Times Articles left readers with "a false impression that would be contradicted by

8   the inclusion of omitted facts."  *Mohr*, 108 P.3d at 776.

9       Dr. Delashaw cannot meet this burden because he fails to identify any omitted

10  facts that would contradict the impression left by the First and Second Times Articles.

11  Regarding the Second Times Article, Dr. Delashaw claims that the Times should have:

12  (1) included SNI-specific data showing that "complications were lower [at SNI] than at

13  comparable facilities and stable"; (2) reported on the "independent studies [that] find that

14  surgeons performing high volumes of surgeries have better outcomes"; (3) stated that

15  there is "no evidence that overlapping surgeries . . . lead to worse outcomes"; and (4)

16  reported that "there is no evidence that Dr. Delashaw's choice of surgical procedures

17  caused harm."  (*See* Times MSJ Resp. at 17-18.)  Even if the court assumed that Dr.

18  Delashaw could prove at trial that each of these proposed additions were "omitted facts,"

19  none of these additions "contradict" the impression that Dr. Delashaw takes issue with—

20  that Swedish Cherry Hill, SNI, and Dr. Delashaw engaged in practices that placed

21  patients at risk or caused patients harm.

22  //

ORDER - 50

1       At most, the addition of these points may have created a more balanced report on

2   the goings-on at Swedish Cherry Hill and SNI that would have painted Dr. Delashaw in a

3   more favorable light.  But, as discussed in detail above, *see supra* § III.C.2.b, absent

4   evidence of "omitted facts" that would "negate the asserted defamatory implication in its

5   entirety," Dr. Delashaw's argument that the Second Times Article could have approached

6   the issue of potential patient harm in a more neutral fashion is not sufficient to support his

7   defamation claim.  *See Mohr*, 108 P.3d at 776 (citing cases in which courts found that the

8   omission of facts that could have "led to a more balanced report" or "portrayed the

9   subject in a more favorable light" were inadequate absent a showing of falsity); *Sisley v.*

10  *Seattle Pub. Sch.*, 321 P.3d 276, 279-80 (Wash. Ct. App. 2014) ("The mere omission of

11  facts favorable to the plaintiff or facts the plaintiff thinks should have been included in a

12  publication does not make that publication false.").  Unlike *Memphis Publishing*, where

13  "omitted information would have negated the defamatory implication in its entirety," *see*

14  *Mohr*, 108 P.3d at 776, Dr. Delashaw does not identify any omitted facts that would

15  directly negate the Times' implication that Swedish, SNI, and Dr. Delashaw placed

16  patients at risk.  Instead, he relies on a series of counterarguments that he believes the

17  Times should have included to report on the issues in a more balanced manner.  (*See*

18  Times MSJ Resp. at 17-18.)  But even if Dr. Delashaw has a reasonable argument that the

19  Times could have approached the question of patient harm at Swedish Cherry Hill with a

20  more balanced mindset, that does not make any of the Times' statements false by

21  implication.  *See Mohr*, 108 P.3d at 776-77.

22  //

1    Dr. Delashaw's argument about the First Times Article suffers from the same

2    deficiencies.  Dr. Delashaw does not argue that the Times falsely reported any of his

3    actions in treating T.G.  (*See* Times MSJ Resp. at 17-21.)  Instead, he argues that the

4    "inescapable implication" of the First Times Article "is that Dr. Delashaw's practices

5    caused [T.G.'s] death."  (*See id.* at 19.)  The court disagrees with Dr. Delashaw that the

6    Times reported that Dr. Delashaw directly "caused" T.G.'s death.  The First Times

7    Article specifically stated that "Swedish's doctors performed an autopsy but reported that

8    they were unable to pinpoint the cause of [T.G.]'s sudden inability to breathe.  Her

9    parents still don't know exactly what happened."  (1st Times Art. at ST_041675.)

10   However, the court concludes that a reasonable fact-finder could conclude that the First

11   Times Article implies that Swedish and Dr. Delashaw contributed to her death.  That

12   conclusion does not resolve the issue, however.  Dr. Delashaw still bears the burden to

13   establish that the Times' implication that he caused T.G.'s death is provably false.  *See*

14   *Mohr*, 108 P.3d at 776-77.  Dr. Delashaw fails to carry that burden because he does not

15   identify omitted facts that would contradict the Times' reporting that Dr. Delashaw's

16   treatment played a part in T.G.'s death and render it a false implication under Washington

17   law.  Dr. Delashaw argues that the Times (1) failed to include sufficient detail about

18   T.G.'s post-surgical care by non-surgical medical staff, (2) insinuated that Dr. Delashaw

19   caused T.G.'s death even though the Times had "drawn no conclusion about what caused

20   her death"; (3) failed to mention that T.G.'s wrongful death complaint did not name Dr.

21   Delashaw; and (4) had "no information suggesting that Dr. Delashaw was responsible for

22   her death or for any patient death."  (*See* Times MSJ Resp. at 19.)  Again, the issue with

1  each of these proposed additions is that none of them "negate the asserted defamatory

2  implication in its entirety."[11]  *See Mohr*, 108 P.3d at 776-77.  Thus, Dr. Delashaw has not

3  carried his burden to show that the implications in the First Times Article are false.

4    At bottom, the gravamen of Dr. Delashaw's complaints about this category of

5  statements from the *Quantity of Care* series is that the Times' reporting about patient

6  harm was unfair and unbalanced.  Even if he could establish at trial that the Times'

7  reporting about patient harm unfairly cast him in a bad light, however, that does not

8  establish that the Times made false or impliedly false statements.[12]

9    *f.  Summary*

10    In sum, the court GRANTS in part and DENIES in part the Times' motion for

11  summary judgment on Dr. Delashaw's defamation claims against the Times.  Dr.

12  Delashaw provides evidence sufficient to establish a genuine dispute of material fact on

13

14   [11] There are a myriad of other problems with these alleged omissions in addition to the fact that they do not contradict the allegedly false implication in the First Times Article.  For

15  example, Dr. Delashaw's argument that the Times did not have adequate information to imply that Dr. Delashaw caused T.G.'s death incorrectly assumes that the Times bears the burden to prove that its implication was true.  *See Sisley v. Seattle Sch. Dist. No. 1*, 286 P.3d 974, 978

16  (Wash. Ct. App. 2012).  Dr. Delashaw bears the burden to show that the Times made false implications, *see id.*, and he cannot carry that burden by suggesting that the Times had

17  inadequate information to make implications about T.G.'s cause of death.  Dr. Delashaw also ignores important language in the First Times Article that does not suit his arguments.  As an

18  example, although Dr. Delashaw argues that the Times should have stated that Dr. Delashaw was not sued by T.G.'s parents, he fails to mention that the First Times Article specifically states that

19  T.G.'s parents "filed a lawsuit against the hospital," without ever mentioning Dr. Delashaw or any specific providers who were or were not included in the lawsuit.  (*See* 1st Times Art. at

20  ST_041675.)

21   [12] Because the court finds that Dr. Delashaw cannot establish a genuine dispute of material fact on the falsity element of the Times' statements about patient harm, the court

22  declines to address the Times' argument that its statement about placing patient care in "jeopardy" is a non-actionable statement of opinion.  (*See* Times MSJ at 15-19.)

1  the falsity of the Times' claims about Dr. Delashaw's financial incentives to pursue a

2  high patient volume.  Thus, the court DENIES the Times' motion for summary judgment

3  insofar as Dr. Delashaw's defamation claims rely on those statements.  For the remainder

4  of the statements that Dr. Delashaw relies on, however, Dr. Delashaw has failed to

5  establish a genuine dispute of material fact on the falsity element of his defamation claim.

6  Thus, the court GRANTS the Times' motion for summary judgment on the remainder of

7  Dr. Delashaw's defamation claims against the Times.

8      3.  Tortious Interference

9      The Times offers a short argument in support of its motion for summary judgment

10  on Dr. Delashaw's tortious interference claim:  "Dr. Delashaw . . . may not avoid the free

11  speech protections of defamation law by pleading [tortious interference] based on the

12  [same] allegedly defamatory statements."  (*See* Times MSJ at 19.)  The Times also cites a

13  handful of Washington and Ninth Circuit cases that hold that tortious interference claims

14  based on protected speech are "subject to the same First Amendment requirements that

15  govern actions for defamation."  *Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009);

16  *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 821 (9th Cir.

17  2002); *Elec. Recycling Ass'n of Alta. v. Basel Action Network*, No. C18-1601MJP, 2019

18  WL 1453575, at *4 (W.D. Wash. Apr. 2, 2019) ("A tortious interference claim brought as

19  a result of constitutionally protected speech is subject to the same requirements that

20  govern actions for defamation.");  *Stidham v. State, Dep't of Licensing*, 637 P.2d 970, 973

21  (Wash. Ct. App. 1981).  Dr. Delashaw did not respond to the Times' argument.  (*See*

22  *generally* Times MSJ Resp.)

ORDER - 54

1      Although the court expresses its frustration with the limited effort that the Times'

2   expended raising this argument, the court agrees with the Times that Dr. Delashaw's

3   tortious interference claim rises and falls with his defamation claims.  Dr. Delashaw

4   bases his tortious interference claim entirely on the Times' allegedly defamatory

5   publications.  (*See* Am. Compl. ¶ 183 ("The Times intentionally induced or caused the

6   termination of these business relationships and expectancies through its repeated

7   publication of false and defamatory statements about Dr. Delashaw.").)  Thus, his tortious

8   interference claim is "subject to the same requirements that govern actions for

9   defamation."  *Elec. Recycling Ass'n of Alberta*, 2019 WL 1453575, at *4.  Accordingly,

10   the court GRANTS in part and DENIES in part the Times' motion for summary judgment

11   on Dr. Delashaw's tortious interference claim to the same extent as Dr. Delashaw's

12   defamation claims.  *See supra* § III.C.2.f.

13   **D.    Dr. Cobbs' Summary Judgment Motion**

14      Dr. Cobbs moves for summary judgment on Dr. Delashaw's defamation, civil

15   conspiracy, and tortious interference claims.  (*See generally* Cobbs MSJ.)  He raises four

16   arguments in support of his motion:  (1) Dr. Delashaw's claims are barred by collateral

17   estoppel (*see id.* at 13-17); (2) Dr. Delashaw's claims fail to the extent that they are based

18   on Dr. Cobbs' intracorporate statements because those statements are privileged (*see id.*

19   at 17-20); (3) Dr. Delashaw's claims fail to the extent that they are based on Dr. Cobbs'

20   statements to MQAC because those statements are privileged under Washington's Anti-

21   Strategic Litigation Against Public Participation ("Anti-SLAPP") statute, RCW 4.24.510

22   (*see id.* at 20-23); and (4) Dr. Delashaw is barred from seeking damages for reputational

1  harm under the Uniform Correction or Clarification of Defamation Act ("UCCDA"),

2  RCW 7.96.050 (*see id.* at 23-24).  The court addresses each argument in turn.

3      1.   Issue Preclusion

4      Dr. Cobbs argues that the MQAC Order includes a number of determinative

5  factual findings that Dr. Delashaw is barred from relitigating in this case under the

6  doctrine of collateral estoppel, or issue preclusion.[13]  (*See* Cobbs MSJ at 10-13.)  Federal

7  courts must give the same preclusive effect to state court judgments as would the courts

8  of that state.  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  This

9  rule can apply to state agency fact finding.  *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799

10  (1986) ("[W]hen a state agency 'acting in a judicial capacity . . . resolves disputed issues

11  of fact properly before it which the parties have had an adequate opportunity to litigate,'

12  federal courts must give the agency's factfinding the same preclusive effect to which it

13  would be entitled in the State's courts.") (quoting *United States v. Utah Constr. & Mining*

14  *Co.*, 384 U.S. 394, 422 (1966)).  Thus, the key question is whether the MQAC Order is

15  entitled to preclusive effect under Washington law.

16      In Washington, seven factors must be met in order to give preclusive effect to

17  agency fact finding—four generally applicable issue preclusion factors and three that are

18  ─────────────────────

19  [13] Washington courts often use the terms "issue preclusion" and "collateral estoppel"
   interchangeably.  *See, e.g.*, *Christensen v. Grant Cty. Hosp. Dist. No. 1*, 96 P.3d 957, 960 (Wash.
20  2004).  For purposes of this order, however, the court follows the United States Supreme Court's
   guidance and uses the term "issue preclusion."  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)
21  ("Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and
   resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in
   the context of a different claim.") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49
22  (2001)).

specific to agency fact finding.  First, for issue preclusion to apply to any Washington

findings—from an agency or otherwise—the party seeking to apply preclusion must

establish that:

> (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

*Christensen*, 96 P.3d at 961 (citations omitted).  Three additional factors must be

considered before granting preclusive effect to agency findings:  "(1) whether the agency

acted within its competence, (2) the differences between procedures in the administrative

proceeding and court procedures, and (3) public policy considerations."  *Id.* at 961-62

(citations omitted).

Dr. Cobbs' preclusion argument fails on the first element—identity of issues.  For

issue preclusion to apply here, Dr. Cobbs bears the burden to show that the issues decided

in the MQAC Order are identical "in all respects" to the issues in this case that he seeks

to preclude Dr. Delashaw from relitigating, such that "the controlling facts and applicable

legal rules remain unchanged" in both proceedings.  *See Lemond v. State, Dep't of

Licensing*, 180 P.3d 829, 833 (Wash. Ct. App. 2008) (quoting *Standlee v. Smith*, 518 P.2d

721, 722-23 (Wash 1974)).  He fails to carry that burden.  The MQAC Order states that

the issues before MQAC in Dr. Delashaw's disciplinary hearing were:  (1) "Did [Dr.

Delashaw] commit unprofessional conduct as defined by RCW 18.130.180(4)?"; and (2)

"If [DOH] proves unprofessional conduct, what are the appropriate sanctions under RCW

1  18.130.160?" (*See* 1st Baer Decl. ¶ 3, Ex. 35 at JDEL_013094.)  RCW 18.130.180(4)

2  defines "unprofessional conduct" as:

3      Incompetence, negligence, or malpractice which results in injury to a patient
       or which creates an unreasonable risk that a patient may be harmed.  The use
4      of a nontraditional treatment by itself shall not constitute unprofessional
       conduct, provided that it does not result in injury to a patient or create an
5      unreasonable risk that a patient may be harmed[.]

6  RCW 18.130.180(4).

7      In this case, in contrast, the issues before the court turn on whether Dr. Cobbs

8  defamed and conspired against Dr. Delashaw by making false statements to Swedish and

9  MQAC about Dr. Delashaw. (*See, e.g.*, Am. Compl. ¶¶ 50-98.)  The MQAC Order did

10 not make specific factual findings on the veracity of Dr. Cobbs' statements or determine

11 that Dr. Cobbs did not conspire against Dr. Delashaw because those issues were not in

12 front of MQAC. (*See generally* 1st Baer Decl. ¶ 3, Ex. 35.)  Instead, MQAC was tasked

13 with determining whether Dr. Delashaw engaged in unprofessional conduct under a

14 specific Washington statute. (*See id.* at JDEL_013094.)  Although the court recognizes

15 that MQAC's inquiry into Dr. Delashaw's alleged unprofessional conduct bears some

16 relation to the question of whether Dr. Cobbs' accounts of Dr. Delashaw's unprofessional

17 conduct were false, issue preclusion requires issues that are identical "in all respects."

18 *See Lemond*, 180 P.3d at 833 (quoting *Standlee*, 518 P.2d at 722-23).  Because Dr. Cobbs

19 fails to make that showing of identity, issue preclusion is inapplicable.[14]  Thus, the court

20 DENIES Dr. Cobbs' motion for summary judgment on issue preclusion.

21  _____

22      [14] Because the court rejects Dr. Cobbs' preclusion argument on the identity of issues
    requirement, the court will not address the other requirements of issue preclusion.

1       2.  Intracorporate Privilege

2          Dr. Cobbs next argues that Dr. Delashaw cannot base his claims for defamation on

3   Dr. Cobbs' internal statements at Swedish because those statements are subject to an

4   intracorporate communications privilege.[15]  (*See* Cobbs MSJ at 17-20.)  "Liability for

5   defamation requires that the defamation be communicated to someone other than the

6   person defamed; in other words, there must be a 'publication' of the defamation."  *Doe v.*

7   *Gonzaga Univ.*, 24 P.3d 390, 397 (Wash. 2001), *rev'd on other grounds*, 536 U.S. 273

8   (2002).  Intracorporate communications between co-employees are subject to a qualified

9   privilege.  *See id.* at 398 (stating that intracorporate communications are not "absolutely

10  privileged").  A defendant may forfeit the privilege in five ways:  (1) by acting with

11  actual malice; (2) by not acting for the purpose of protecting the interest; (3) by

12  knowingly publishing the matter to a person to whom the publication is not otherwise

13  privileged; (4) by not reasonably believing that the matter is necessary to accomplish the

14  purpose for which the privilege is given; and (5) by publishing unprivileged and

15  privileged matter.  *See Moe v. Wise*, 989 P.2d 1148, 1157 (Wash. Ct. App. 1999) (internal

16  citations omitted).

17          *a.    Actual Malice*

18          The first issue with regard to privilege is whether Dr. Cobbs forfeited the

19  intracorporate communications privilege by making statements to Swedish with actual

20

21          [15] Dr. Cobbs also claims that if Dr. Delashaw's defamation claims fail, his civil
22  conspiracy and tortious interference claims based on those statements also fail.  (*See* Cobbs MSJ
    at 19-20.)

ORDER - 59

1    malice. (*See* Cobbs MSJ Resp. at 8, 10-11.)  Actual malice exists when a false statement

2    is made "with knowledge of its falsity or with reckless disregard of its truth or falsity."

3    *Gonzaga Univ.*, 24 P.3d at 398 (quoting *Herron v. KING Broad. Co.*, 746 P.2d 295, 301

4    (Wash. 1987)).  "To prove actual malice a party must establish that the speaker knew the

5    statement was false, or acted with a high degree of awareness of its probable falsity, or in

6    fact entertained serious doubts as to the statement's truth." *Id.* (citations omitted). "The

7    standard for determining 'actual malice' is subjective, focusing on the defendant's belief

8    in or attitude toward the truth of the statement, not the defendant's personal hostility

9    toward the plaintiff." *Herron*, 746 P.2d at 302 (citations omitted).  Dr. Delashaw bears

10   the burden of proving actual malice by clear and convincing evidence. *See Gonzaga*

11   *Univ.*, 24 P.3d at 398 (approving the portion of a defamation jury instruction that stated

12   that "[t]he plaintiff has the burden of proving 'actual malice' . . . by clear and convincing

13   evidence").

14          Dr. Delashaw alleges that Dr. Cobbs made statements on the following topics with

15   actual malice:  (1) "that there had been a mass exodus of surgeons from SNI"; (2) that

16   departures from SNI were due to "concerns about quality and an abusive work

17   environment related to Dr. Delashaw"; (3) "that Dr. Delashaw had forced all referrals to

18   go to him"; (4) "that there had been a vote of no confidence in Dr. Delashaw"; (5) "that

19   Dr. Cobbs'[] purported concerns were shared by 14 neurosurgeons"; and (6) "that a

20   document constituted 'minutes' of a meeting"; and (7) "falsely claiming that SNI

21   surgeons were unanimous in opposing Dr. Delashaw." (*See* Cobbs MSJ Resp. at 8,

22   10-11.)  The court concludes that Dr. Delashaw establishes a genuine dispute of material

ORDER - 60

1   fact on two of these seven categories of statements—Dr. Cobbs' claims that (1) SNI

2   surgeons unanimously opposed Dr. Delashaw and (2) Dr. Delashaw caused the mass

3   personnel departures from SNI.

4         In Dr. Cobbs' November 2016 letter to Mr. Armada, Dr. Cobbs attaches what he

5   refers to as "meeting minutes" from an October 31, 2016 meeting held between Swedish

6   administration and a number of Swedish physicians.  (*See* 1st Baer Decl. ¶ 3, Ex. 26 at

7   COBBS00002371-73.)  In those minutes, Dr. Cobbs states that the "surgeons group

8   unanimously identified serious concerns in three domains" and also that "[t]he group

9   stated that at the current time, there is unanimous lack of confidence and trust in the

10   leadership of Dr. Delashaw, and that we essentially feel zero confidence in his ability to

11   self-correct and return to a position of trust amongst the group."  (*See id.* at

12   COBBS00002371-72.)  During his deposition, Dr. Cobbs stated that even though he

13   referred to the "unanimous" opinion of the "surgeons group" in his meeting minutes, he

14   did not intend to imply that the surgeons who attended the meeting in question but had

15   been at SNI for less than six months shared Dr. Cobbs' opinion on Dr. Delashaw.  (*See*

16   Cobbs Dep. at 91:15-94:3.)  According to Dr. Cobbs, he "maybe should have specified"

17   that the "brand new" surgeons at the meeting were not included in his "surgeons group"

18   because those new surgeons "didn't understand sort of where it had been and where it

19   was going."  (*See id.* at 92:2-93:5.)  Viewed in the light most favorable to Dr. Delashaw,

20   this testimony suggests that Dr. Cobbs was aware that he overstated the "unanimous"

21   nature of the agreement amongst the so called "surgeons group" in his letter.

22   //

ORDER - 61

1    Dr. Delashaw has also provided evidence showing that Dr. Cobbs may have

2    overstated the causal impact that Dr. Delashaw had on personnel departures at Swedish

3    Cherry Hill. Dr. Cobbs' letter to Mr. Armada and the meeting minutes repeatedly

4    reference the significant number of personnel departures from Swedish Cherry Hill as

5    grounds for concern. (*See* 1st Baer Decl. ¶ 3, Ex. 26 at COBBS00002369-73.) As one

6    example, Dr. Cobbs wrote:

7         In the last two years, we have lost 62 team members from this campus. Our
          current functionality as a surgical institute is severely limited by decreased
8         ability to staff and support our operating rooms, provide effective and safe
          care in our ICU/floor, and demonstrate excellence to our patients in the
9         clinical setting. This in turn, has led to a financial downturn for the institute
          and system. The common thread linking these events is the leadership and
10        management style of Dr. Johnny Delashaw.

11   (*See id.* at COBBS00002369.) The meeting minutes also include an enclosure that lists

12   16 physicians, five members of "O.R. Nursing Leadership," and seven Swedish "Program

13   Managers" that had been dismissed by Swedish, had resigned, or had been reassigned or

14   had a position eliminated by Swedish. (*See id.* at COBBS00002375-56.)

15       During his deposition, Dr. Cobbs testified that he did not mean to convey that each

16   of these individuals left solely because of Dr. Delashaw. (*See* Cobbs Dep. at 98:15-99:8.)

17   Rather, his intent was to state that Dr. Delashaw and the "whole change" that was

18   occurring at Swedish Cherry Hill caused personnel to leave. (*See id.*) He also testified

19   that he does not believe that the letter states anywhere that "everybody here was booted

20   because of [Dr.] Delashaw." (*See id.* at 102:4-16.) However, viewed in the light most

21   favorable to Dr. Delashaw, the language of the letter contradicts Dr. Cobbs' claims about

22   what he intended to say. The letter specifically states that "the leadership and

ORDER - 62

1  management style of Dr. Johnny Delashaw" is the "common thread" linking together

2  Swedish's recent problems—including the loss of 62 personnel from Swedish Cherry

3  Hill. (*See* 1st Baer Decl. ¶ 3, Ex. 26 at COBBS00002369-73.)  Moreover, there is also

4  evidence suggesting that Dr. Cobbs knew or had reason to know that the statement that

5  Dr. Delashaw was the "common thread" may have been an exaggeration for certain

6  physicians.  Despite identifying Dr. Delashaw as the "common thread" for Swedish's

7  problems, Dr. Cobbs testified that he could not offer any opinion on the reasons that at

8  least two individuals on the enclosed list of departed physicians left Swedish Cherry Hill.

9  (*See* Cobbs Dep. at 101:8-16, 102:1-3.)

10        Additionally, although the standard for actual malice focuses on "the defendant's

11  belief in or attitude toward the truth of the statement, not the defendant's personal

12  hostility toward the plaintiff . . . . actual malice can be inferred from circumstantial

13  evidence, including [the] defendant's hostility or spite." *Herron*, 746 P.2d at 302

14  (citations omitted).  Thus, while "hostility alone will not constitute actual malice,"

15  evidence of the defendants' hostility toward the plaintiff coupled with other sources of

16  evidence of actual malice "may be taken into account cumulatively as probative evidence

17  of actual malice." *See id.* (citations omitted).  Here, Dr. Delashaw persuasively argues

18  that Dr. Cobbs harbored hostility toward him that could be viewed as circumstantial

19  evidence of actual malice against Dr. Delashaw. (*See* Cobbs MSJ Resp. at 12-15

20  (compiling statements made by Dr. Cobbs evincing Dr. Cobbs' animosity toward Dr.

21  Delashaw).)  Viewed in the light most favorable to Dr. Delashaw, that circumstantial

22  evidence combined with Dr. Cobbs' deposition testimony creates a genuine dispute of

1   material fact on the questions of whether Dr. Cobbs acted with actual malice in making

2   statements about surgeon unanimity and the cause of Swedish Cherry Hill's personnel

3   departure.  Thus, the court DENIES Dr. Cobbs' motion for summary judgment as it

4   applies to those categories of statements.

5        The court also concludes, however, that Dr. Delashaw has failed to identify a

6   genuine dispute of material fact on whether Dr. Cobbs acted with actual malice in making

7   any of the other categories of statements identified in Dr. Cobbs' letter to Swedish.  (*See*

8   Cobbs MSJ Resp. at 8, 10-11.)  First, Dr. Delashaw takes issue with two statements that

9   Dr. Cobbs did not actually make in his letter to Swedish: (1) "that there had been a vote

10  of no confidence in Dr. Delashaw"; and (2) "that Dr. Cobbs' purported concerns were

11  shared by 14 neurosurgeons."  (*See id.*)  Dr. Cobbs' letter says nothing about a supposed

12  "no confidence" vote.  (*See generally* 1st Baer Decl. ¶ 3, Ex. 26.)  Additionally, although

13  the court concludes that there is a dispute of fact regarding whether Dr. Cobbs' unanimity

14  claims were made with actual malice, the letter does not state that Dr. Cobbs' concerns

15  were "shared by 14 neurosurgeons."  (*See generally id.*)  Indeed, Dr. Cobbs is the only

16  signatory to the letter.  (*See id.* at COBBS00002370.)  Dr. Delashaw cannot accuse Dr.

17  Cobbs of making statements with actual malice without evidence that he made the

18  statements at issue in the first place.

19       Second, Dr. Delashaw offers no argument in support of his contention that Dr.

20  Cobbs' statements "that Dr. Delashaw had forced all referrals to go to him" were made

21  with actual malice.  (*See* Cobbs MSJ Resp. at 10-15.)  Moreover, Dr. Cobbs' testimony

22  on the topic of referrals states that he believed that one of the "general issue[s]" and

1    "major concern[s]" amongst physicians he spoke to about Dr. Delashaw was that Dr.

2    Delashaw was interfering with the referral process at SNI. (*See* Cobbs Dep. at

3    90:1-91:14.)  Given that Dr. Delashaw fails to identify any contrary evidence, the court

4    concludes that Dr. Delashaw has failed to carry his burden to identify a genuine dispute

5    of material fact on this category of statements.

6            Third, Dr. Delashaw failed to identify sufficient evidence to create a genuine

7    dispute of material fact on the final two categories of statements he identifies:  (1) "that

8    there had been a mass exodus of surgeons from SNI"; and (2) "that a document

9    constituted 'minutes' of a meeting." (*See* Cobbs MSJ Resp. at 8, 10-11.)  The only

10   evidence Dr. Delashaw points to in support of his claim that Dr. Cobbs acted with actual

11   malice in stating that there had been significant personnel departures from Swedish is Dr.

12   Cobbs' deposition testimony. (*See id.* at 11.)  However, Dr. Cobbs testified that another

13   physician wrote the sentence in his November 2016 letter about Swedish losing "62 team

14   members" and that he was told that the number was accurate. (*See* Cobbs Dep. at

15   80:18-81:10.)  Similarly, he testified that Dr. Mayberg had provided the list of specific

16   individuals that had left Swedish. (*See id.* at 98:15-23.)  Dr. Delashaw fails to explain

17   why Dr. Cobbs' apparent decision to trust his colleagues on this issue constitutes clear

18   and convincing evidence of actual malice. (*See* Cobbs MSJ Resp. at 10-11.)

19           Dr. Delashaw also mischaracterizes Dr. Cobbs' testimony about "meeting

20   minutes."  Dr. Delashaw argues that Dr. Cobbs acted with actual malice by labeling the

21   attachment to his email as "meeting minutes" because he "admits that he knew the

22   'minutes' were not minutes at all." (*See id.* at 11.)  However, Dr. Cobbs' testimony

1    shows that any error he made in labeling the attachments to his letter was inadvertent.  He

2    testified that he did not "know what a minute is supposed to be" and that his intention

3    was to "put together what the meeting was about."  (*See* Cobbs Dep. at 64:5-65:1.)  Dr.

4    Delashaw does not point to any evidence to contradict Dr. Cobbs' assertion that his error

5    in labeling the document as "meeting minutes," if any, was unintentional and, as such,

6    not made with actual malice.  (*See* Cobbs MSJ Resp. at 10-11.)

7                      *b.      Acting for the Purpose of Protecting the Interest*

8          In addition to his argument that Dr. Cobbs forfeited the intracorporate

9    communications privilege by acting with actual malice, Dr. Delashaw also argues that Dr.

10   Cobbs forfeited the privilege because he did not "act for the purpose of protecting the

11   interest that is the reason for the existence of the privilege."  (*See* Cobbs MSJ Resp. at

12   11-12); *see also Moe*, 989 P.2d at 1157.  The intracorporate privilege exists because a

13   corporation acts only through its employees and cannot defame itself.  *Doe*, 24 P.3d at

14   397.  Thus, the privilege is held only insofar as the employee is "acting in the ordinary

15   course" of his work.  *Id.*  Consequently, "[w]hen a corporate employee, not acting in the

16   ordinary course of his or her work, publishes a defamatory statement, either to another

17   employee or to a nonemployee, there can be liability in tort for resulting damages."  *Id.* at

18   398.  Further, if an otherwise privileged statement is "made solely from spite or ill will,"

19   the statement is "an abuse and not a use of the privilege."  Restatement (Second) of Torts

20   § 603, cmt. a. (1977).[16]  "However, if the publication is made for the purpose of

21   _____

22   [16] Washington courts have cited Section 603 of the Restatement (Second) of Torts with
     approval in defamation cases.  *See, e.g., Moe*, 989 P.2d at 1157.

ORDER - 66

1    protecting the interest in question, the fact that the publication is inspired in part by

2    resentment or indignation at the supposed misconduct of the person defamed does not

3    constitute an abuse of the privilege." *Id.*

4         Dr. Delashaw argues that Dr. Cobbs did not send his letter to Mr. Armada in the

5    ordinary course of his work and that he instead wrote the letter out of "spite or ill will"

6    toward Dr. Delashaw and in the interest of furthering his personal career at the cost of Dr.

7    Delashaw. (*See* Cobbs MSJ Resp. at 11-12.) Dr. Cobbs does not respond substantively

8    to this argument. (*See* Cobbs Reply (Dkt. # 143) at 12.) Instead, Dr. Cobbs argues that

9    Dr. Delashaw only pleaded actual malice in his complaint and, as such, must be limited to

10   actual malice because it would be "unfair for Dr. Delashaw to assert four new bases for

11   abuse of privilege nearly two years after suing." (*See id.*) The court disagrees. Dr.

12   Delashaw specifically pleaded that Dr. Cobbs' statements were not privileged (*see* Am.

13   Compl. ¶ 192) and argued throughout the complaint that Dr. Cobbs authored the letter

14   only to advance his own personal agenda and not for Swedish's benefit (*see id.* at ¶¶ 61,

15   67, 73, 75, 90-93). Moreover, the court finds Dr. Cobbs' apparent surprise at Dr.

16   Delashaw's attempt to raise this argument to be disingenuous given that Dr. Delashaw

17   raised this same argument in his opposition to Dr. Cobbs' motion to dismiss on the

18   intracorporate privilege. (*See* Cobbs MTD Resp. (Dkt. # 34) at 10.) The court's order on

19   the motion to dismiss also recognized that Dr. Delashaw argued that Dr. Cobbs did not

20   //

21   //

22   //

ORDER - 67

1  make the statements within the course of his employment.[17]  (*See* 8/23/18 Order at 24

2  n.12.)  Thus, the court concludes that Dr. Delashaw sufficiently pleaded this theory and

3  that Dr. Cobbs had adequate notice that this theory was at issue in this case.

4       Because Dr. Cobbs fails to respond substantively to Dr. Delashaw's argument, the

5  court concludes that Dr. Delashaw adequately identifies a genuine dispute of material fact

6  as to whether Dr. Cobbs forfeited the intracorporate communications privilege by failing

7  to "act for the purpose of protecting the interest that is the reason for the existence of the

8  privilege."  *See Moe*, 989 P.2d at 1157.

9            c.       *Remaining Forfeiture Arguments*

10       Dr. Delashaw also argues that Dr. Cobbs forfeited the intracorporate privilege by

11  (1) sending copies of the false statements in his letter to persons outside of Swedish (*see*

12  Cobbs MSJ Resp. at 15); and (2) making statements that he did "not reasonably believe"

13  were "necessary to accomplish the purpose for which the privilege is given."  (*See* Cobbs

14  MSJ Resp. at 12-15); *see also Moe*, 989 P.2d at 1157.  Because Dr. Cobbs fails to

15  respond substantively to these arguments (*see* Cobbs Reply at 12), the court concludes

16  that they survive summary judgment.

17            d.       *Summary*

18       In sum, the court GRANTS in part and DENIES in part Dr. Cobbs' motion for

19  summary judgment on application of the intracorporate communications privilege.  The

20

21  ───────────────

22  [17] The court concluded that it did not need to address that argument at the time because it had already denied Dr. Cobbs' motion to dismiss based on Dr. Delashaw's allegations of actual malice.  (*See* 8/23/18 Order at 24 n.12.)

1    court concludes that Dr. Delashaw has failed to establish that Dr. Cobbs acted with actual

2    malice when he made statements related to the following topics: (1) "that there had been

3    a mass exodus of surgeons from SNI"; (2) "that Dr. Delashaw had forced all referrals to

4    go to him"; (3) "that there had been a vote of no confidence in Dr. Delashaw"; (4) "that

5    Dr. Cobbs'[] purported concerns were shared by 14 neurosurgeons"; and (5) "that a

6    document constituted 'minutes' of a meeting." (*See* Cobbs MSJ Resp. at 8, 10-11.)

7    However, Dr. Delashaw has established a genuine dispute of material fact on actual

8    malice in regards to the following categories of statements: (1) "that SNI surgeons were

9    unanimous in opposing Dr. Delashaw" and (2) that departures from SNI were due to

10   "concerns about quality and an abusive work environment related to Dr. Delashaw." (*See*

11   *id.*) Further, the court concludes that Dr. Delashaw may also establish that Dr. Cobbs

12   forfeited the intracorporate communications privilege in whole or in part if he is able to

13   establish that (1) Dr. Cobbs failed to "act for the purpose of protecting the interest that is

14   the reason for the existence of the privilege;" (2) "knowingly publishe[d] the matter to a

15   person to whom the publication is not otherwise privileged"; or (3) made statements

16   without "reasonably believing" that the statements were "necessary to accomplish the

17   purpose for which the privilege is given."[18]  *See Moe*, 989 P.2d at 1157.

18   //

19

20   ───────────────
     [18] Because summary judgment is granted in part and denied in part on the application of
21   the intracorporate communications privilege, the court also grants in part and denies in part Dr.
     Cobbs motion on Dr. Delashaw's tortious interference and civil conspiracy claims to the same
22   extent as Dr. Delashaw's defamation claims.  *See supra* § III.C.3; (*see also* Cobbs MSJ at
     19-20.)

ORDER - 69

3.    Anti-SLAPP Immunity

Dr. Cobbs also takes aim at Dr. Delashaw's attempts to hold Dr. Cobbs liable for

statements Dr. Cobbs made to MQAC or actions Dr. Cobbs took to "conspire" with

others to make false statements to MQAC.  Dr. Delashaw fails to clearly define the

relationship between his claims in this case and Dr. Cobbs' participation in MQAC

proceedings against Dr. Delashaw.  As best the court can tell, it appears that Dr.

Delashaw expects to prove that Dr. Cobbs conspired with the anonymous whistleblowers

to make false statements against Dr. Delashaw with MQAC.  (*See* Cobbs MSJ Resp. at 8

("Dr. Delashaw has alleged and will prove that Dr. Cobbs conspired against and defamed

him by (1) falsely reporting to MQAC the Flett incident, [and] (2) falsely reporting to

MQAC the allegations in the Mayberg complaint."), 15 ("Washington's Anti-SLAPP

Statute Does Not Immunize the Two False Statements Dr. Cobbs'[] Co-Conspirators

Made to MQAC in Early 2016").)

Dr. Cobbs argues that he is immune from civil liability for any communications

made to MQAC based on the following provision of Washington's Anti-SLAPP Statute:

> A person who communicates a complaint or information to any branch or
> agency of federal, state, or local government . . . is immune from civil
> liability for claims based upon the communication to the agency . . .
> regarding any matter reasonably of concern to that agency . . . .

RCW 4.24.510.[19]  The communicator need not have acted in good faith in order to be

entitled to immunity under this statute. *Bailey v. State*, 191 P.3d 1285, 1291 (Wash. Ct.

---

[19] The Washington Supreme Court declared unconstitutional a separate section of
Washington's Anti-SLAPP statute. *Davis v. Cox*, 351 P.3d 862, 874 (Wash. 2015) (invalidating
"RCW 4.24.525 as a whole").  That decision acknowledged and left intact the narrower,

1     App. 2008). Rather, Dr. Cobbs is immune so long as the information that Dr. Cobbs or

2     his alleged co-conspirators provided "regard[s] any matter reasonably of concern to"

3     MQAC. RCW 4.24.510.

4           Dr. Cobbs is immune from civil liability for statements made to MQAC or any

5     actions taken with regard to the MQAC proceedings against Dr. Delashaw. MQAC is

6     unquestionably a state agency. *See* RCW 18.71.015 (enabling statute for MQAC).

7     MQAC's express mission is to promote patient safety through the discipline of

8     physicians. (*See* 1st Baer Decl. ¶ 3, Ex. 41); *see also* RCW 18.71.002 ("It is the purpose

9     of the commission to regulate the competency and quality of professional health care

10    providers under its jurisdiction by establishing, monitoring, and enforcing qualifications

11    for licensing, consistent standards of practice, continuing competency mechanisms, and

12    discipline."). Thus, the court concludes that complaints about physician conduct are

13    "matter[s] reasonably of concern to" MQAC under RCW 4.24.510. Therefore, Dr. Cobbs

14    is immune from liability "based on" any of his or his co-conspirators' communications to

15    MQAC about Dr. Delashaw. *See* RCW 4.24.510. Moreover, because the statements and

16    conduct at issue relate to a matter of concern to MQAC, immunity applies even if Dr.

17    Cobbs or his co-conspirators made statements to MQAC or otherwise participated in

18    MQAC proceedings in bad faith, as Dr. Delashaw claims. *See Bailey*, 191 P.3d at 1291.

19    //

20

21    longstanding provisions of RCW 4.24.510, under which Dr. Cobbs proceeds here. *Id.* at 865; *see*
22    *also Phoenix Trading, Inc. v. Loops LLC*, 732 F.3d 936, 942 (9th Cir. 2013) (differentiating
     between RCW 4.24.510 and RCW 4.24.525).

1        Dr. Delashaw argues that Anti-SLAPP immunity is inapplicable to false

2   statements. (*See* Cobbs MSJ Resp. at 16-17.)  The court rejects that argument.  Although

3   Dr. Delashaw attempts to contorts caselaw to support his position, he does not cite a

4   single case that holds that Anti-SLAPP immunity only applies to true statements.  (*See*

5   *id.*)  He also ignores cases that quite plainly hold that communications to government

6   agencies are immune "regardless of content or motive."  *See, e.g.*, *Bailey*, 191 P.3d at

7   1291; *Peltier v. Sacks*, C17-5209RBL, 2017 WL 3188414, at *3 (W.D. Wash. July 25,

8   2017) ("Even if his speech was defamatory, he is immune if his communication regarded

9   'any matter reasonably of concern' to the governmental agency to which he reported.")

10  Moreover, the court agrees with Dr. Cobbs that a statute that provided immunity only for

11  true statements would be superfluous given that true statements are inherently immunized

12  from liability.  *See Lundin v. Discovery Commc'ns, Inc.*, 18-17300, 2020 WL 1131231, at

13  *1 (9th Cir. Mar. 9, 2020) ("[B]ecause of First Amendment protections, truth is an

14  absolute defense to defamation even if statements were made with actual malice.") (citing

15  *Garrison v. Louisiana*, 379 U.S. 64, 77-78 (1964)).

16        The court further agrees with Dr. Cobbs that Anti-SLAPP immunity extends to

17  any damages that Dr. Delashaw alleges were caused by Dr. Cobbs or his co-conspirators'

18  complaints to MQAC.  (*See* Cobbs MSJ at 22-23.)  Anti-SLAPP immunity extends to

19  "[a]ll of the actions" in Dr. Delashaw's complaint, as well as "all of the damages," that

20  stem from Dr. Cobbs or his co-conspirators' communications with MQAC.  *See Dang v.*

21  *Ehredt*, 977 P.2d 29, 37-38 (Wash. Ct. App. 1999).  Thus, Dr. Delashaw cannot recover

22  //

1   damages that were caused by Dr. Cobbs or his co-conspirators' statements to MQAC or

2   his participation in MQAC proceedings.[20]

3        In conclusion, the court GRANTS Dr. Cobbs' motion for summary judgment on

4   the application of Anti-SLAPP immunity.  Dr. Cobbs is immune from Dr. Delashaw's

5   defamation, civil conspiracy, and tortious interference claims to the extent that those

6   claims are based on Dr. Cobbs or his alleged co-conspirators' statements to MQAC or

7   participation in MQAC proceedings.

8        4.   Reputational and Presumed Damages

9        Finally, Dr. Cobbs argues that Dr. Delashaw is barred from recovering

10  reputational or presumed damages under UCCDA because Dr. Delashaw failed to

11  respond to a request for additional information about the alleged falsity of the statements

12  he made in the November 2016 letter.  (See Cobbs MSJ at 23-24; Cobbs Reply at

13  12-13.[21])  The UCCDA states that "[a] person may maintain an action for defamation

14  . . . only if . . . the person has made a timely and adequate request for correction or

15

16      [20] The court acknowledges that Dr. Delashaw believes he can prove that actions Dr. Cobbs took outside of his statements to MQAC caused Dr. Delashaw's damages. (See Cobbs MSJ Resp. at 18.)  Because those causal arguments are not currently at issue, the court declines to comment or rule on them.

17

18      [21] The court notes that Dr. Cobbs' reply brief exceeds the 12-page limit for reply briefs provided by Local Civil Rule 7(e)(3). See Local Rules W.D. Wash. LCR 7(e)(3). As the court has previously warned Dr. Delashaw, the court expects all parties to strictly adhere to the Federal Rules of Civil Procedure and the Local Civil Rules. (See 5/28/2020 Order (Dkt. # 155) at 11-12 ("The court warns Dr. Delashaw and his counsel that it expects all parties to diligently adhere to this district's local rules and that additional attempts to flout the local rules may result in sanctions.").)  Thus, the court refuses to consider the portion of Dr. Cobbs' UCCDA argument that extends beyond the twelfth page of Dr. Cobbs' reply brief, as it is entitled to do under the Local Civil Rules. Local Rules W.D. Wash. LCR 7(e)(6) ("The court may refuse to consider any text, including footnotes, which is not included within the page limits.").

ORDER - 73

clarification from the defendant." RCW 7.96.040(1)(a). The UCCDA defines an

"adequate" request for correction or clarification as one that:

> (a) Is made in writing and reasonably identifies the person making the request;
> (b) Specifies with particularity the statement alleged to be false and defamatory or otherwise actionable and, to the extent known, the time and place of publication;
> (c) Alleges the defamatory meaning of the statement;
> (d) Specifies the circumstances giving rise to any defamatory meaning of the statement which arises from other than the express language of the publication; and
> (e) States that the alleged defamatory meaning of the statement is false.

RCW 7.96.040(3)(a)-(e). Service of a complaint may constitute an adequate request for correction or clarification if the complaint satisfies the requirements of RCW 7.96.040(3). RCW 7.96.040(4). After a request to make a correction or clarification under UCCDA, the recipient may "ask the requester to disclose reasonably available information material to the falsity of the allegedly defamatory or otherwise actionable statement." RCW 7.96.050(1). If a person receives such a request and "unreasonably fails to disclose the information," the person "may not recover damages for injury to reputation or presumed damages." RCW 7.96.050(2).

Dr. Cobbs argues that an email he sent Dr. Delashaw in February 2017—over a year before Dr. Delashaw filed this lawsuit—serves as a request to disclose available information as to falsity that cuts Dr. Delashaw off from recovering reputational or presumed damages. (*See* 1st Baer Decl. ¶ 3, Ex. 38.) In that email, Dr. Cobbs informed Dr. Delashaw that he received a call from a third party who claimed to be sending a message from Dr. Delashaw to Dr. Cobbs. (*See id.* at COBBS00001722.) According to

ORDER - 74

1   Dr. Cobbs, the individual informed Dr. Cobbs that Dr. Delashaw was considering suing

2   Dr. Cobbs, and if Dr. Cobbs wanted to avoid a lawsuit, he needed to write a new letter to

3   Mr. Armada that stated that (1) Dr. Cobbs was angry when he wrote the November 2016

4   letter, (2) the November 2016 letter contained inaccuracies, and (3) Dr. Delashaw was a

5   very high quality neurosurgeon. (*See id.*)  Dr. Cobbs asked Dr. Delashaw to confirm that

6   the third party spoke on Dr. Delashaw's behalf, and also asked Dr. Delashaw to go over

7   the November 2016 letter and identify or make comments on the portions that he believed

8   were inaccurate. (*See id.*)  According to Dr. Cobbs, Dr. Delashaw never responded to

9   this email. (*See* Cobbs MSJ at 24.)

10          The issue with Dr. Cobbs' argument is one of timing.  RCW 7.96.050(1) states

11   that "[a] person who has been requested to make a correction or clarification" may ask

12   the requesting person for reasonable disclosure of material information about falsity.  By

13   February 2017, when Dr. Cobbs sent the email to Dr. Delashaw asking for additional

14   information, Dr. Delashaw had not requested that Dr. Cobbs make a correction or

15   clarification under UCCDA.  The third-party call Dr. Cobbs received was not in writing

16   and, as such, does not meet the requirements of an "adequate" request for correction or

17   clarification. *See* RCW 7.96.040(3)(a).  Thus, at the time Dr. Cobbs emailed Dr.

18   Delashaw, Dr. Cobbs was not "a person who has been requested to make a correction or

19   clarification" under RCW 7.96.050(1), meaning that he was not yet entitled to make a

20   request for disclosure of material information that would have triggered Dr. Delashaw's

21   obligation to reasonably disclose information or risk being barred from recovering

22   reputational and presumed damages.

ORDER - 75

1        In its order on Dr. Cobbs' motion to dismiss, the court concluded that Dr.

2   Delashaw's operative complaint constituted an adequate request for correction or

3   clarification under RCW 7.96.040(4).  (*See* 8/23/18 Order at 20-21.)  However, Dr.

4   Cobbs does not point to any evidence showing that he requested that Dr. Delashaw

5   provide additional evidence of falsity after Dr. Delashaw served the complaint or that Dr.

6   Delashaw failed to respond to such a request.  (*See* Cobbs MSJ at 23-24.)  Instead, Dr.

7   Cobbs argues that Dr. Delashaw "admits he is not seeking a retraction from Dr. Cobbs at

8   all."  (*See id.* at 24.)  Dr. Cobbs reads too much into Dr. Delashaw's testimony.  In the

9   portion of Dr. Delashaw's testimony that Dr. Cobbs cites, Dr. Delashaw states that he

10  wants a retraction from the Times and he "just want[s] an apology [from] Dr. Cobbs so

11  we could move forward."  (*See* Delashaw Dep. at 801:1-4.)  The fact that Dr. Delashaw

12  stated that he "just wants an apology" from Dr. Cobbs does not take away from the fact

13  that Dr. Delashaw filed a complaint that constitutes an adequate request for clarification

14  or correction under UCCDA, which is all that UCCDA requires.  *See* RCW

15  7.96.040(1)(a).  Thus, the court DENIES Dr. Cobbs' motion for summary judgment on

16  the issues pertaining to his UCCDA arguments.

17  **E.    Sealing**

18        Because this order relies on materials filed under seal, the court DIRECTS the

19  Clerk to provisionally file this order under seal.  The court ORDERS counsel for all

20  parties—including counsel for interested party Swedish Health Services—to meet and

21  confer regarding which, if any, portions of this order they seek to redact.  Counsel must

22  then submit one joint statement or, if they cannot agree on a joint statement, competing

ORDER - 76

1  statements indicating the portions of the order they seek to have redacted and on what

2  basis.[22] *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th Cir.

3  2006).  The statement or statements must attach a proposed redacted order that

4  incorporates the redactions requested in the corresponding statement.  The parties must

5  file any such statement within 14 days of the date of the filing date of this order.  The

6  court will consider the parties' redaction requests, if any, and then file the order on the

7  docket with any necessary redactions.

8                          IV.   CONCLUSION

9        For the reasons set forth above, the court GRANTS in part and DENIES in part the

10  Times' motion for summary judgment (Dkt. ## 109 (sealed); 156 (redacted)), and

11  GRANTS in part and DENIES in part Dr. Cobbs' motion for summary judgment (Dkt.

12  # 116).  Regarding the Times' motion, the court DENIES the motion insofar as Dr.

13  Delashaw's defamation and tortious interference claims rely on statements about Dr.

14  Delashaw's financial incentives to pursue a high patient volume, but otherwise GRANTS

15  the Times' motion.  Regarding Dr. Cobbs' motion, the court DENIES Dr. Cobbs' issue

16  preclusion argument, GRANTS in part and DENIES in part Dr. Cobbs' intracorporate

17  //

18  //

19  //

20  //

21  _____

22      [22] In preparing their joint or competing statements, the court advises the parties to hew to the guidance provided by the court's recent sealing order.  (*See* 5/28/20 Order.)

1    privilege argument, GRANTS Dr. Cobbs' Anti-SLAPP argument, and DENIES Dr.

2    Cobbs' UCCDA argument.  The court DIRECTS the Clerk to provisionally file this order

3    under seal.

4         Dated this 11th day of June, 2020.

5

6

7         JAMES L. ROBART
          United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 78